**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

-----------------------------------------------------------------------X

**ANDREWS INTERNATIONAL, INC.**

**Plaintiff,**

**-against-**

**NEW YORK CITY HOUSING AUTHORITY,**

**Defendant.**

-----------------------------------------------------------------------X

**ECF Case**

**Civil Action No. 08-cv-1580 (HB)**

**Andrews International, Inc.'s Motion for Summary Judgment**

## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Andrews International, Inc., pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment. In accordance with Local Rule 7.1, the reasons and authorities supporting this motion for summary judgment are set forth in the accompanying Memorandum of Law in Support of Motion for Summary Judgment. Pursuant to Local Rule 56.1, a separate Statement of Undisputed Material Facts also accompanies this motion.

WHEREFORE, the Court should grant summary judgment in favor of Andrews International, Inc., dismiss the counterclaim filed by the New York City Housing Authority ("NYCHA"), and enter judgment against NYCHA in the amount of $112,196.58.

Case 1:08-cv-01580-HB Document 11 Filed 08/08/2008 Page 2 of 2

Respectfully submitted,

/s/

Christopher E. Dunne (CD9472)
325 Chestnut Street, Suite 403
Philadelphia, Pennsylvania 19106
Telephone: (215) 625-2995
cdunne@cedunne.us

Bryan D. Bolton, Admitted *Pro Hac Vice*
Funk & Bolton, P.A.
36 South Charles Street, 12 Floor
Baltimore, Maryland 21201
Telephone: (410) 659-7754
bbolton@fblaw.com

*Attorneys for Plaintiff,*
*Andrews International, Inc.*

Dated: August 8, 2008

# EXHIBIT 1

# AGREEMENT

# BY AND BETWEEN

# NEW YORK CITY HOUSING AUTHORITY

# AND

# COPSTAT SECURITY INC.

This agreement (the "**Agreement**"), dated as of the 8th day of November, 2001, is by and between the New York City Housing Authority ("**NYCHA**" or the "**Authority**"), a public benefit corporation organized and existing under the laws of the State of New York, having its principal office at 250 Broadway, New York, New York 10007, and Copstat Security Inc. (the "**Contractor**"), a privately owned corporation organized and existing under the laws of the State of New York. The Contractor has its office at 1860 East Tremont Avenue, Bronx, New York 10460.

WHEREAS, NYCHA desires to retain the Contractor to provide security services as set forth in this Agreement; and

WHEREAS, the Contractor represents that it possesses the necessary knowledge, skill, resources, personnel and experience to perform the Services; and

WHEREAS, NYCHA desires to retain the Contractor on the terms and conditions set forth in this Agreement, and the Contractor agrees to accept such engagement in accordance with the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the Authority and the Contractor agree as follows:

## ARTICLE 1
## ENTIRE AGREEMENT

1.1 The Agreement constitutes the entire agreement between the parties, and any modification, amendment or supplement to the Agreement is not valid or enforceable against either party unless it is in writing and signed by duly authorized officers of both parties.

EXHIBIT
Ryan 1

ARTICLE 2
INCORPORATION

2.1 Except as otherwise set forth in this Agreement, it incorporates by reference the provisions of the Contractor's letter and information package dated October 5, 2001, submitted to the Authority in response to the Authority's solicitation of proposals for the services of contract security guards. In the event of any conflict in the language between this Agreement and any such document incorporated by reference, the terms contained in this Agreement will prevail.

ARTICLE 3
TERM OF AGREEMENT

3.1 Subject to the provisions of Articles 4, 8, 9, 10, 11, 12, 16 and 26 of this Agreement, the term of this Agreement will be for a period not to exceed 26 weeks, commencing on November 8, 2001, and ending on May 8, 2002.

ARTICLE 4
RENEWALS

4.1 The Authority will have the sole option of renewing this Agreement for three additional 26-week periods (the "**Renewal Terms**"). The Authority may exercise its option to renew the term by giving written notice to the Contractor of its exercise of such option no later than 10 days prior to the commencement of each Renewal Term. All of the terms and conditions of this Agreement will apply to such Renewal Terms.

ARTICLE 5
SCOPE OF SERVICES

5.1 The Contractor will provide, upon 24 hours' prior oral notice by the Authority, the number of full-time, unarmed, uniformed guards (the "**Guards**") as the Authority designates, up to a maximum of ten, to be stationed at the Authority's Central Office locations (the "**Services**") in Manhattan and Queens (the "**Central Office Locations**"). A list of the Central Office Locations at which the Authority will require the Contractor to station the Guards is provided in **Exhibit A** to this Agreement and made a part hereof.

5.2 The Contractor will cause its Guards to:

5.2.1 perform the types of patrols as fully set forth in Section 5.4 below, at the Central Office Location(s) as each Guard may be assigned;

5.2.2 report to the New York City Police Department, or to other officials as the Authority may require, immediately, or as reasonably soon as may be practical, after sighting the presence of anyone or any condition that may compromise the safety of anyone at a Central Office Location or that may constitute a danger to a Central Office Location; and

5.2.3 create, maintain and provide to the Authority, on demand, those records as the Authority may direct from time to time.

5.3 The specific number of Guards, the hours of the day, and the Central Office Locations at which the Guards will be located will be determined by the Authority, and the Contractor will adjust or cancel the numbers and shifts of its Guards upon 24 hours' prior oral notice from the Authority.

5.4 The Contractor must provide the following types of patrols, as the Authority instructs the Contractor:

5.4.1 Stationary patrol: Guards must remain in the lobby (lobbies) of the building(s) at the Central Office Locations, and must inspect the conditions of the lobby (lobbies) of the buildings.

5.4.2 Roving patrol: Guards must walk throughout the Central Office Locations and must inspect exterior areas of the building(s) at the Central Office Locations.

5.4.3 Vertical patrol: Guards must patrol stair halls and interior area(s) of the building(s) at the Central Office Locations.

Guards shall perform these and any additional functions in such manner as the Authority may direct.

5.5 The Contractor must provide an adequate number of supervisory personnel to monitor the performance of Guards assigned to each Central Office Location. The supervisors must make periodic unscheduled visits to all Central Office Locations where the Guards are patrolling and report the results of their inspections to the Authority, in such manner as the Authority may direct. Such supervisors shall report the results of their inspections on a copy of the sign-in register form included as **Exhibit B** to this Agreement and made a part hereof, or on any other form as the Authority may direct.

5.6 The Authority has the right to require the Contractor to replace any Guard for any reason or no reason.

5.7 The Authority will not provide Guards with any means of telephone or other communication with the Contractor's headquarters or control point. The Contractor must provide its own means of telephone or other communication between its headquarters or control point and Guards.

5.8 The Contractor may not assign any person to perform guard service who has been convicted of a felony or misdemeanor involving moral turpitude, or who has been refused fidelity bonding. The Contractor will be responsible for conducting such background investigation of individual Guards assigned to work as it deems appropriate.

ARTICLE 6
COMPENSATION AND PAYMENT

6.1 The Authority will compensate the Contractor a fee not to exceed $14.75 per hour for each hour for which the Contractor provides a Guard under this Agreement.

6.2 The Contractor represents and warrants that it will withhold all appropriate federal, New York State and New York City income taxes, as well as any and all appropriate Social Security and unemployment taxes, benefits, Workers' Compensation and other insurance premiums, and any and all other costs, from the hourly fee to be paid by the Authority, as stated in this Article 6.

6.3 The Contractor represents and warrants that it will pay its Guards no less than the prevailing wage rate for unarmed security guards, which is stated in **Exhibit C**, attached to this Agreement and made a part hereof, or such other prevailing wage rate for unarmed security guards as may be determined by the Comptroller of the City of New York during the course of this Agreement or during the Renewal Terms, if any.

6.4 The Authority will not pay the Contractor for any fees or expenses other than the hourly fee stated in Article 6.1 above.

6.5 The Contractor must submit two original counterparts of its invoice(s) to:

NEW YORK CITY HOUSING AUTHORITY
250 Broadway, 8th Floor
New York, New York 10007

Attention: Mr. Sean Ryan, Facility Safety Coordinator
General Services Department



at the beginning of each month for Services rendered in the preceding month. Each invoice must be accompanied by any and all timekeeping records as the Authority may require, including, without limitation, certified weekly payrolls. The Authority reserves the right to require the Contractor to verify time and attendance by use of time sheets submitted as the Authority may require. All time records shall be subject to audit and verification by the Authority.

6.6 The Facility Safety Coordinator will review and approve all invoices and forward the approved invoices to the appropriate Authority personnel for payment. The Authority shall endeavor to pay all invoices within 30 days of approval by the appropriate Authority personnel, but the Authority's failure to pay within 30 days will not be a breach of this Agreement, and will not entitle the Contractor to interest or penalties.

6.7 The Authority's maximum liability under this Agreement for all payments will not exceed $153,400 for the entire 26-week term of this Agreement.

ARTICLE 7
RELEASE BEFORE FINAL PAYMENT

7.1 Prior to the Authority's final payment to the Contractor (whether upon completion of the work under this Agreement or as a result of the Authority's right to terminate this Agreement as provided below), the Contractor must execute and deliver to the Authority, in a form acceptable to the Authority, a release by the Contractor of the Authority from all claims against the Authority arising under and by virtue of this Agreement, other than such claims, if any, as may be specifically excepted by the Contractor in stated amounts set forth therein. If the Contractor does have claims against the Authority, the Contractor may specifically exempt these claims setting forth the nature and amount of such claims in the release.

7.2 If a release is not forthcoming for any reason whatsoever, the Contractor's acceptance of a check with notice advising that the check is designated as "Final Payment", without formal written exception, will operate as a release of the Authority from any and all claims and all liability to the Contractor in connection with work under this Agreement and for every act, omission and neglect of the Authority and others relating to or arising out of this Agreement.

ARTICLE 8
CANCELLATION AND DISQUALIFICATION UNDER CERTAIN CIRCUMSTANCES

8.1 If a principal, officer, employee, or a fiduciary of the Contractor who derives a



monetary benefit from this Agreement:

8.1.1 is called before a grand jury, or any other body which is empowered to compel the attendance of witnesses and examine them under oath; and

8.1.2 that person refuses to testify concerning any transaction, contract, subcontract, lease, permit or license entered into with the State of New York, or any political division thereof, or any public authority or municipal housing authority or with any public authority, public department, agency or office of the City of New York, or a political subdivision thereof; and

8.1.3 that person continues to refuse to testify after being advised that neither his nor her statement nor any information derived from such statement shall be used against that person in that and any subsequent criminal proceeding;

Then, unless such person asserts the privilege against self-incrimination, the Authority may, after holding a hearing upon notice to all parties involved:

8.1.4 terminate any open Authority contracts about which such person has refused to testify, or take other appropriate action, without the Authority's incurring any penalty or damages because of such termination or action; and

8.1.5 disqualify such person, and any entity with which such person is affiliated, from submitting bids for Authority contracts, or from entering into any agreement which will be paid in whole or in part out of funds under the control of or collected by the Authority. Such a disqualification shall not exceed five years after such person's refusal to testify.

8.2 In the event of any such termination of an open Authority contract, the Authority shall pay the Contractor any money which the Authority owes the Contractor for work done prior to such termination.

## ARTICLE 9
## TERMINATION FOR CONVENIENCE

9.1 The Authority has sole discretion to terminate this Agreement at any time for its convenience upon prior written notice to the Contractor of the Authority's intention to terminate this Agreement. Such termination may be for any reason or for no reason. After receipt of such notice, the Contractor must cease all work under this Agreement, unless otherwise directed in the notice. The Contractor will be entitled to payment for Services performed under this Agreement up to the time of

termination, provided that the Authority first receives and approves a request for payment and an invoice.

ARTICLE 10
TERMINATION FOR CAUSE

10.1 If the Contractor breaches any of the terms of this Agreement, the Authority shall have the right to give the Contractor written notice specifying the nature of the Contractor's breach, violation or default. Thereafter, the Contractor will have 30 calendar days after the mailing date of such notice to remedy the breach, violation or default. If the Contractor does not do so within such thirty-day period, the Authority shall have the right, at its sole option, to terminate this Agreement. The termination will be effective either upon the expiration of the thirty-day period or upon any subsequent date set by the Authority.

ARTICLE 11
CHANGED CIRCUMSTANCES

11.1 If, at any time after the execution of this Agreement by the parties, the Authority is informed of "Changed Circumstances" (as hereinafter defined) with regard to the Contractor, and the Authority, in its sole discretion, determines that under such Changed Circumstances the continuation of this Agreement would be contrary to the Authority's best interest, then the Authority, in its sole discretion, may terminate this Agreement upon one day's prior written notice to the Contractor. As used herein, the term "**Changed Circumstances**" shall mean: (a) the initiation of any type of investigation by any federal, state or local governmental department, agency, authority or other instrumentality, or any federal, state or local prosecutor's office, into any activity or operation of the Contractor or any director, officer or principal shareholder of the Contractor; (b) the return of any federal or state grand jury indictment against the Contractor or any director, officer or principal shareholder of the Contractor; or (c) the filing of any information by any federal, state or local prosecutor charging the Contractor or any director, officer or principal of the Contractor with the commission of any felony. In the event of any termination under this Article, the Contractor will be entitled to payment as provided under the section of this Agreement entitled "Termination for Convenience," except that the Authority shall have the right to part or all of any profit that would otherwise be payable under such section in the event the investigation or indictment pertains, in whole or in part, to the solicitation, award or performance of this Agreement.

ARTICLE 12
INVESTIGATIONS

12.1 The New York City Department of Investigation and the Authority's Office of the Inspector General have the right to require any person dealing with the Authority to answer questions concerning such dealings, provided that such person is first advised that neither his/her statements nor any information or evidence derived therefrom will be used against him/her in a subsequent criminal prosecution, other than for perjury or contempt arising from such testimony. The Authority has the right to terminate this Agreement or to take other appropriate action upon the refusal of a person dealing with the Authority to answer questions in relation to any agreements with the Authority on the condition of immunity described in this paragraph.

ARTICLE 13
INSURANCE REQUIREMENTS

13.1 It is understood that all personnel assigned to perform work under this Agreement by the Contractor are deemed to be employees or subcontractors of the Contractor, and not of the Authority, for any and all purposes. The Contractor must maintain Workers' Compensation Insurance for its employees working on the Authority's premises.

13.2 The Contractor must maintain during the term of this Agreement and any Renewal Term of this Agreement, and until the date of final payment, insurance required by law or this Agreement, consisting of:

13.2.1 Workers' Compensation and Employers' Liability Insurance, in the minimum amount of $1,000,000;

13.2.2 General Legal Liability, Contractual Liability, and Personal Injury coverage in the minimum amount of $3,000,000 combined single limit for bodily injury and property damage; and

13.2.3 Comprehensive Automobile Liability Insurance, in the minimum amount of $1,000,000; provided, however, that the Contractor need not carry Comprehensive Automobile Liability Insurance if it does not utilize any motor vehicle(s) in its performance of the Services of this Agreement.

13.3 The Contractor must furnish to the Authority prior to the start of its Services, certificates of insurance or copies of the policies of the foregoing insurance. All policies of insurance must:

13.3.1 be written with companies authorized to do business in the State of New York;

13.3.2 except for Workers' Compensation, name the Authority as an additional insured;

13.3.3 be written on an occurrence basis; and

13.3.4 provide that the insurance policy shall not be canceled, or that its coverage reduced, without 30 days prior written notice to the Authority. The Contractor's naming of the Authority as an additional insured in its liability policies under this Agreement will afford coverage only for the negligent performance of activities by the Contractor for the Authority under this Agreement, be limited to the terms and conditions appearing in this Agreement, and in no event be construed for any purpose so as to make the Contractor or its insurer liable for the acts or omissions of the Authority, its agents, servants or employees.

13.4 Self-insurance programs may be permitted depending upon the financial condition of the Contractor. The Authority will be the sole judge of such financial condition.

ARTICLE 14
INDEMNIFICATION

14.1 The Contractor agrees to defend, indemnify and hold harmless NYCHA, its members, officers, employees, agents and representatives, and any other party or entity acting on behalf of NYCHA, from and against any and all liabilities, claims, losses, damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred by NYCHA in enforcing this indemnification), and all reasonable sums charged to associated litigation, relating to (a) any alleged or actual personal injury, bodily injury (including death), or property damage (or any consequential damages related to such personal injury, bodily injury or property damage), arising out of or resulting from any work or Services provided by the Contractor or its employees, agents, subconsultants or subcontractors in conjunction with the Agreement, or arising out of any other act, error or omission of the Contractor or its employees, agents, subconsultants or subcontractors, or (b) any claim for loss, damage to, or theft of any personal property of, or in the care of, the Contractor, its subconsultants or subcontractors while such personal property is at or upon

NYCHA premises or in NYCHA vehicles, unless resulting from the intentional act of NYCHA. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

14.2 The Contractor agrees to defend, indemnify and hold harmless NYCHA, its members, officers, employees, agents and representatives, and any other party or entity acting on behalf of NYCHA, from and against any and all liabilities, claims, losses, damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred by NYCHA in enforcing this indemnification), and all reasonable sums charged to associated litigation, which may be incurred in any action for unfair competition, for infringement of any United States Letters Patent, or any trademark or service mark, or of any copyright or for theft of any trade secret with respect to the Agreement. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

14.3 The Contractor agrees to indemnify and hold NYCHA harmless from and against any and all damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses incurred by NYCHA in enforcing this indemnification, and all reasonable sums charged to associated litigation, which may be incurred by NYCHA as a result of, or by way of mitigating NYCHA's damages resulting from, any failure by the Contractor to fulfill its obligations under the Agreement. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

## ARTICLE 15
## DEFENSE AND SETTLEMENT OF MATTERS TO WHICH INDEMNITY PROVISIONS APPLY

15.1 The Authority will notify the Contractor promptly of any action or claim with respect to which the indemnity provisions of the prior section may apply. The Contractor will have the exclusive right to control and conduct the defense and settlement of all such actions or claims; provided, however, (a) if there is a reasonable probability that any action or claim for which the Contractor is to provide indemnity to the Authority hereunder may adversely affect the Authority or any of its members, officers, employees or agents (other than as a result of money damages or other money payments), the Authority then will have the exclusive right to defend, compromise or settle such action or claim, and (b) the Contractor will not, without the Authority's prior written consent, settle or compromise or consent to the entry of any judgment in connection with any such action or claim, if such settlement, compromise or judgment does not include as an unconditional term thereof an unconditional release of the Authority by the claimant or the plaintiff, as the case may be, from all liability in respect of such action or claim.

ARTICLE 16
WARRANTY OF NO DISABILITY

16.1 The Contractor represents and warrants to the Authority that it is not now under any disability, by reason of contractual restriction on its employment, by reason of custom or practice, by reason of filing for protection under the United States Bankruptcy Code, or by reason of any other legal or financial obligation imposed on the Contractor, which would prevent the Contractor from the full, faithful and timely completion of the work contemplated by this Agreement. The Contractor further covenants to the Authority that, during the term of this Agreement, the Contractor will not incur any such disability nor permit such disability to exist. For breach of any such representation, warranty or covenant, the Authority may, at its sole option, terminate this Agreement on written notice to the Contractor.

ARTICLE 17
LIMITATION OF ACTIONS; WAIVER OF TRIAL BY JURY

17.1 No action or special proceeding will lie or be maintained by the Contractor, its assignees, designees, successors in interest, or anyone claiming under the Contractor, against the Authority (a) based upon any claim arising out of, under or related to this Agreement, or by reason of any act, omission or requirement of the Authority, unless such action or special proceeding shall be commenced within one year after the date of final payment under this Agreement; or (b) based upon any claim based upon monies to be retained for any period after the date of final payment under this Agreement, unless such action or special proceeding is commenced within one year after such monies become due and payable under the terms of this Agreement; or, (c) if this Agreement is terminated, rescinded, revoked, annulled, or abandoned under the terms hereof, unless such action or special proceeding is commenced within one year after the date of termination, rescission, revocation, annulment, or abandonment. Nothing herein shall be deemed to extend any applicable statute of limitations. The Contractor, its assignees, designees, successors in interest, or anyone claiming under it shall not be entitled to any additional time to begin anew any other action or special proceeding, if an action or special proceeding commenced within the times herein specified be dismissed or discontinued, notwithstanding any provisions in the Civil Practice Law and Rules of the State of New York to the contrary.

17.2 The Authority and the Contractor agree to, and they each hereby do, waive trial by jury in any action, counterclaim or third party action brought by either of the parties against the other based on any claim or other matter arising out of, under or related to this Agreement; provided, however, that there shall be excepted from the foregoing waiver of trial by jury any action based upon a claim for damages for personal injuries or death.

ARTICLE 18
DISPUTES

18.1 In the event the Contractor has a dispute with the Authority under this Agreement, the Contractor will, within 30 calendar days after such dispute shall have arisen, notify the Authority in writing of the Contractor's contention and submit its claim, specifying the nature of the claim and the sum claimed. If the dispute arises prior to the performance of the related duties, the written notice shall be submitted prior to the commencement of such duties. In any event, the Contractor will proceed with its duties hereunder in compliance with the written instructions of the Authority, and such compliance will not be deemed to be a waiver of the Contractor's right to pursue its claim, provided it has given notification in writing as provided above.

ARTICLE 19
LIMITATION OF AUTHORITY LIABILITY

19.1 In no event will the Authority be liable for any special, punitive, incidental or consequential damages, including without limitation, lost profits or lost business opportunity.

ARTICLE 20
PROMOTIONAL LITERATURE

20.1 The Contractor agrees that the terms "New York City Housing Authority," "NYCHA," "The City of New York Housing Authority" or any derivation thereof shall not be utilized in any promotional literature, advertisements, press releases, responses to requests for proposals or client lists without the express prior written consent of the Authority.

ARTICLE 21
CONFIDENTIALITY

21.1 The parties anticipate that the Contractor may acquire access to information and data about the operations, the staff and the residents of the Authority (the "**Confidential Information**"). To the extent that the Contractor or any subcontractor of the Contractor obtains any Confidential Information, the Contractor agrees (a) that it will protect and preserve the confidentiality of such Confidential Information with the same care and diligence with which it protects and preserves its own most secret business information; (b) that it will use such Confidential Information only in the performance of its obligations arising under this Agreement; and (c) that it will make no disclosure of such Confidential Information other than to an employee of the Authority or to an employee or subcontractor of the Contractor in the course of such Contractor employee's or subcontractor's

provision of Services under this Agreement. In addition, the Contractor agrees to obtain a written commitment from each employee and each subcontractor which it may use in its performance of this Agreement to be bound by the terms of this section, and the Contractor shall make available the original copy of any such commitment upon written request from the Authority from time to time. The Contractor agrees that this obligation of confidentiality shall survive the termination or expiration, as the case may be, of this Agreement.

## ARTICLE 22
## NON-DISCRIMINATION

22.1 In connection with the performance of Services under this Agreement, the Contractor will not discriminate against any employee or applicant for employment because of race, sex, color, age, religion, national origin, disability, marital status, military service, sexual orientation or for any other unlawful reason.

## ARTICLE 23
## RIGHT TO AUDIT

23.1 The Authority, and any agency providing funds to the Authority, will have the right to perform any audit of the Contractor's finances and records related to its performance under this Agreement, including, without limitation, the financial arrangement with anyone the Contractor may delegate to discharge any part of its obligations under this Agreement.

23.2 The Contractor must provide, and must cause each subcontractor of the Contractor to provide, access by the Authority, any agency providing funds to the Authority, or any of their duly authorized representatives to any books, documents, papers and records of the Contractor and such subcontractors which are directly pertinent to this Agreement for the purpose of making audit, examination, excerpts and transcriptions.

23.3 In order to permit the making of audit, examination, excerpts and transcriptions by the Authority, any agency providing funds to the Authority, or any of their duly authorized representatives, the Contractor must maintain all records and supporting materials for the work performed under this Agreement for a period of three years following either (a) the end of the term of this Agreement, or (b) such time as the Authority makes final payments and all other pending matters related to this Agreement are closed, whichever is longer.

ARTICLE 24
OFFICIALS NOT TO BENEFIT

24.1 No member of or delegate to the Congress of the United States or the New York State or City government shall be permitted by the Contractor to share in any part of this Agreement or any benefit that may arise herefrom.

ARTICLE 25
INTEREST BY MEMBERS OF LOCAL AUTHORITY AND LOCAL GOVERNING BODY

25.1 No member, officer or employee of the Authority, no member of the governing body of the jurisdiction in which the Authority is situated and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the Services covered by this Agreement shall, during his or her tenure and for one year thereafter, have any interest, direct or indirect, in this Agreement or the proceeds hereof.

ARTICLE 26
COVENANT AGAINST FEES FOR SOLICITATION

26.1 The Contractor warrants that it has not employed any third party to solicit or secure this Agreement based upon any agreement calling for any payment for such services, including, without limitation, the payment of a commission, percentage, credit or contingent fee (collectively referred to hereinafter as a "**Commission**"). Breach of this warranty will give the Authority the right to immediately terminate this Agreement or, at its discretion, to deduct from the Contractor's compensation the amount of such Commission.

ARTICLE 27
ASSIGNMENT, DELEGATION AND SUBCONTRACTING

27.1 This Agreement and the rights and duties thereunder may not be assigned, delegated or subcontracted by the Contractor without the prior written consent of the Authority, and any purported assignment, delegation or subcontracting of this Agreement without said consent of the Authority shall be void.

ARTICLE 28
NEW YORK LAW

28.1 This Agreement and performance of it shall be governed by and construed in accordance with the laws of the State of New York, excluding New York's rules regarding conflicts of laws. Any and all proceedings relating to the subject matter of this Agreement shall be maintained in the state courts sitting in the City of New York, which courts shall have exclusive jurisdiction for such purpose. The parties hereby consent to submit themselves to the jurisdiction of such courts with respect to any proceedings arising out of, under or related to this Agreement.

ARTICLE 29
COMPLIANCE WITH ENVIRONMENTAL LAWS AND ENERGY STANDARDS

29.1 The Contractor agrees to comply with: (a) all applicable standards, orders, or requirements issued under Section 306 of the Clean Air Act (42 U.S.C. 7401 et seq.), Section 508 of the Clean Water Act (33 U.S.C. 1251 et seq.), Executive Order 11738, and Environmental Protection Agency regulations (40 CFR Part 15); and (b) mandatory standards and policies relating to energy efficiency contained in the New York State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (Pub. L. 94-163).

ARTICLE 30
COMPLIANCE WITH LAWS

30.1 The Contractor must cooperate in any investigation or any inquiry by any governmental authority or agency. In addition, the Contractor must comply with all applicable laws, ordinances and codes of the federal, state and local governments as they affect the performance of this Agreement and with all rules and regulations of any governmental authority or agency having jurisdiction or interest in this Agreement.

ARTICLE 31
OWNERSHIP OF WORK

31.1 The Contractor waives any claim or right it has or may have against the Authority or any third party as it may relate to ownership of the product of the Services delivered pursuant to this Agreement. The Contractor waives all such claims or rights, including, but not limited to, all rights throughout the world of reproduction and distribution on any medium by any means, art or method and all rights in copyright, trademark and patent. The Contractor must assign and transfer to the Authority all rights of every such kind in connection with any discovery or invention or idea which arises or is

developed in the course of or under this Agreement. Specifically, and without in any way limiting the generality of the foregoing, the Contractor expressly grants all rights of every kind in any and all material that the Contractor or any of its employees or subcontractors may write, suggest, interpolate, devise, direct or include in connection with the delivery of Services to the Authority, whether or not the product of the delivery of such Services constitutes a "work made for hire" as defined in 17 U.S.C. Section 201(b). The Contractor must, without unreasonable delay, execute any document, including, without limitation, an assignment of copyright or of letters patent, which the Authority may reasonably require to show evidence of its ownership of any such copyrights, patents, trademarks, or other rights.

ARTICLE 32
NOTICES

32.1 Any notice or other communication, including a change of address or of the person to be notified, given under this Agreement to any party must be in writing and must be sent by Certified or Registered Mail, Return Receipt Requested, to the attention of the parties at the respective addresses set forth below:

To the Authority:

NEW YORK CITY HOUSING AUTHORITY
250 Broadway, 8th Floor
New York, New York 10007

Attention: Mr. Sean Ryan, Facility Safety Coordinator
General Services Department

with a copy to:

Deputy General Counsel for Corporate Matters
New York City Housing Authority
Law Department
250 Broadway, 8th Floor
New York, New York 10007

To the Contractor:

COPSTAT SECURITY INC.
1860 East Tremont Avenue
Bronx, New York 10460

Attention: Mr. Joseph H. Bosio, Director
Consulting & Development

ARTICLE 33
SEVERING CERTAIN AGREEMENT PROVISIONS

33.1 If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby and shall remain in full force and effect.

ARTICLE 34
NO WAIVER

34.1 The failure of either party to exercise in any respect any right provided for in this Agreement will not be deemed a waiver of any right under this Agreement.

ARTICLE 35
HEADINGS

35.1 The descriptive headings used in this Agreement are for purposes of convenience only and do not constitute a part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

NEW YORK CITY HOUSING AUTHORITY

By: ______________________
Frank T. W. New
Deputy General Manager, Administration

COPSTAT SECURITY INC.

By: ______________________
Name:
Title:

EXHIBIT A

LIST OF CENTRAL OFFICE LOCATIONS AT WHICH AUTHORITY WILL REQUIRE CONTRACTOR TO STATION GUARDS

90 Church Street
New York, New York 10007

250 Broadway
New York, New York 10007

The L.I.C. facility:
23-02 49th Avenue
Long Island City, New York 11101

EXHIBIT B

SIGN-IN REGISTER FORM ON WHICH SUPERVISORS SHALL REPORT RESULTS OF THEIR INSPECTIONS

| Date | Time | Location | Supervisor | Guard(s) on Duty | Inspection Results |
|---|---|---|---|---|---|

EXHIBIT C

SCHEDULE OF PREVAILING WAGE RATES FOR UNARMED SECURITY GUARDS (PER HOUR)

| Wages | Benefits | Total |
|---|---|---|
| $8.52 | $0.94 | $9.46 |

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

-----------------------------------------------------------------------X

**ANDREWS INTERNATIONAL, INC.**

**Plaintiff,**

**-against-**

**NEW YORK CITY HOUSING AUTHORITY,**

**Defendant.**

-----------------------------------------------------------------------X

**ECF Case**

**Civil Action No. 08-cv-1580 (HB)**

**Declaration of James Wood In Support of Andrews International, Inc.'s Motion For Summary Judgment**

**DECLARATION OF JAMES WOOD**

I, James Wood, affirm under penalty of perjury and based upon personal knowledge that the facts set forth herein are true and correct:

1. I am over eighteen years of age and am competent to testify about the facts and circumstances stated herein.

2. I am currently employed by Andrews International, Inc. ("Andrews") as Co-President and Chief Operating Officer. Andrews is in the business of providing security guard services. In my position, I supervise management staff, who in turn supervise company operations.

3. Prior to the merger of Copstat Security, Inc. ("Copstat") and Andrews, I was employed as President of Copstat. Copstat was in the business of providing security guard services. Copstat and Andrews merged in 2006.

4. Guardsmark, Inc. ("Guardsmark") provides security guard services in the New York and New Jersey area and was a competitor of Copstat. Guardsmark is now a competitor of Andrews.

5. Beginning in November 2001, Copstat contracted with the New York City Housing Authority ("NYCHA") to provide security services at certain NYCHA locations.

6. Copstat provided security services to NYCHA under the initial contract through November 7, 2004.

7. Effective March 1, 2005, Copstat, and later, Andrews, provided security services to NYCHA under Agreement 4020633 (the "NYCHA Contract").

8. From March 1, 2005, until the end of the NYCHA Contract on June 22, 2007, Andrews's supervisors regularly inspected security guards working at NYCHA senior development sites. Andrews provided an adequate number of supervisory personnel and conducted a reasonable number of inspections.

9. In late 2006, I learned that Veritas Vox was conducting an audit of Andrews on behalf of NYCHA.

10. Andrews did not receive a copy of the audit report prepared by Veritas Vox until after this lawsuit was filed.

11. Prior to the expiration of the initial term of the NYCHA Contract on February 28, 2007, Andrews did not receive any notice from NYCHA to stop providing security guard services. Without such notice, Andrews continued to provide security services at NYCHA senior development sites after February 28, 2007.

12. On April 26, 2007, I attended a meeting at NYCHA with Patrick O'Hagan. The meeting was the first time I met Mr. O'Hagan.

13. On May 4, 2007, Michael Topf and I met with Anthony Picciano of Veritas Vox to discuss the payroll analysis conducted by Veritas Vox. As of May 4, 2007, I had not received a written report from Veritas Vox detailing the results of their audit, and was not aware that the

Veritas Vox report included an analysis of supervisory inspections. Neither Michael Topf nor I discussed the supervisory inspections with Anthony Picciano.

14. On or about May 18, 2007, Andrews management representatives and I met with Mr. O'Hagan. Mr. O'Hagan again raised his concern about an alleged lack of supervision at NYCHA locations and sought a credit from Andrews. No documentation or details about the missed supervisory inspections or amount of credit requested was provided at this meeting.

15. By letter dated May 21, 2007, Mr. O'Hagan notified me that NYCHA did not elect to renew the NYCHA Contract and was terminating the contract for convenience.

16. In late May 2007, Mr. O'Hagan requested that Andrews execute an amendment to the NYCHA Contract to facilitate the payment of invoices. A true and correct copy of the May 24-30, 2007, email correspondence regarding the contract amendment (NYCHA 0080 – NYCHA 0081) is attached to Andrews's Motion for Summary Judgment as Exhibit 20.

17. A July 16, 2007, letter from Mr. O'Hagan to Michael Topf was the first written notice received by Andrews from NYCHA alleging that Andrews had allegedly failed to perform supervisory duties under the NYCHA Contract and that NYCHA had decided to impose liquidated damages.

18. Andrews timely notified NYCHA in writing that a dispute had arisen under the NYCHA Contract, resulting from NYCHA's attempt to impose liquidated damages. True and correct copies of the notices issued to NYCHA are attached to Andrews's Motion for Summary Judgment as Exhibits 27 (July 20, 2007, letter from Christopher Dunne to Mr. O'Hagan), 28 (July 30, 2007, letter from Mr. Dunne to Sean Ryan), 29 (August 2, 2007, letter from Mr. Dunne to Mr. Ryan), and 31 (August 16, 2007, letter from Mr. Dunne to Mr. O'Hagan).

I SOLEMNLY AFFIRM under the penalty of perjury and upon personal knowledge that the foregoing statements are true and correct.

Dated: August 6, 2008

James Wood

EXHIBIT  3



http://nyc.gov/nycha

**NEW YORK CITY HOUSING AUTHORITY**
**LAW DEPARTMENT**
250 Broadway
New York, N.Y. 10007

**Tino Hernandez**
Chairman
**Earl Andrews, Jr.**
Vice-Chairman
**JoAnna Aniello**
Member
**Frank Marin**
Secretary
**Douglas Apple**
General Manager

**Ricardo Elías Morales**
General Counsel

WRITER'S DIRECT LINE
(212) 776-5161

December 11, 2003

Copstat Security Inc.
1860 East Tremont Avenue
Bronx, New York, 10460
Attn: Thomas Murray
Senior Vice President

Re: Amendment to the Agreement by and between New York City Housing Authority and Copstat Security Inc. (the "**Agreement**")

Dear Mr. Murray:

Enclosed for your records is a fully executed counterpart of the above-referenced Amendment. If you have any questions, please do not hesitate to call me at (212) 776-5257.

Sincerely,

Glenda Fussa
Senior Counsel
Contracts Division

EXHIBIT
Ryan 4
7/25/08

cc: Ms. Bat-Sheva Horodniceanu

**AMENDMENT TO THE AGREEMENT**
**BY AND BETWEEN**
**THE NEW YORK CITY HOUSING AUTHORITY**
**AND**
**COPSTAT SECURITY INC.**

This amendment (the "**Amendment**"), dated as of the 7th day of November, 2003, to the agreement dated as of the 8th day of November, 2001, as previously extended by letters dated April 25, 2002, October 17, 2002, and April 15, 2003 (the "**Contract**"), is by and between the New York City Housing Authority ("**Authority**"), a public benefit corporation organized under the laws of the State of New York, having its principal office at 250 Broadway, New York, New York 10007, and Copstat Security Inc. (the "**Contractor**"), a corporation organized and existing under the laws of the State of New York, having its principal office at 1860 East Tremont Avenue, Bronx, New York, 10460.

Capitalized terms used herein shall have the meanings set forth in the Contract unless otherwise specified herein.

WHEREAS the original term of the Contract extended for a period of twenty-six weeks, commencing on November 8, 2001 and terminating on March 8, 2002, unless extended pursuant to its terms;

WHEREAS, by letter dated April 25, 2002, the original term of the Contract was extended pursuant to its terms for a second period of twenty-six weeks, commencing on March 9, 2002 and terminating on November 7, 2002, unless the term was further extended pursuant to its terms;

WHEREAS, by letter dated October 17, 2002, the term of the Contract was further extended pursuant to its terms for an additional period twenty-six weeks, commencing on November 8, 2002 and terminating on May 10, 2003, unless the term was further extended pursuant to its terms;

WHEREAS, by letter dated April 15, 2003, the term of the Contract was further extended pursuant to its terms for an additional period of twenty-six weeks, which extension is now due to expire on November 7, 2003; and

WHEREAS the Authority and the Contractor desire to extend the term of the Contract for an additional period of one year upon the same terms and conditions set forth therein;

NOW THEREFORE, in consideration of the mutual promises set forth below, the undersigned agree as follows:

1. The Contractor agrees to continue to provide the Services of the Contract for an additional period of one year, which period shall terminate on November 7, 2004.

2. The Authority shall make payments for Services performed pursuant to this Amendment at the hourly rate set forth in the Contract, and upon the terms set forth in the Contract. The total payments to be made by the Authority under the terms of this Amendment shall not exceed $306,800.

3. All other terms and conditions of the Contract remain unchanged, in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment to the Contract as of the date first above written.

COPSTAT SECURITY INC.

By: [signature]
Name: JAMES WOOD
Title: PRESIDENT

NEW YORK CITY HOUSING AUTHORITY

By: [signature]
Natalie Y. Rivers
Deputy General Manager of Administration

# EXHIBIT 4



Menu Compose Search Personal Account Options... Help Logout

Bernie's
**Main Mail**

- Print
- Header

Message 5 of 344

FROM: "TOM MURRAY" <TMURRAY@COPSTAT.COM> | Save Address
DATE: Wed, 3 Nov 2004 16:31:14 -0500
TO: <bernierosner@copstat.com>
SUBJECT: FW: Copstat Piggyback Agreement for review (based on HPD agreement).

Bernie ,Ispoke to Sean Ryan and he wanted to discuss this agreement.Please review and compare to our agreement with HPD

-----Original Message-----
**From:** Ryan, Sean [mailto:Sean.Ryan@nycha.nyc.gov]
**Sent:** Wednesday, November 03, 2004 12:21 PM
**To:** tmurray@copstat.com
**Subject:** FW: Copstat Piggyback Agreement for review (based on HPD agreement).
**Sensitivity:** Private

Prevailing Wage? HPD Contract

Tom
– As discussed. Please review and give me any feedback asap.

---

**From:** Redican, Laurence [mailto:Laurence.Redican@nycha.nyc.gov]
**Sent:** Monday, November 01, 2004 12:55 PM
**To:** Ryan, Sean
**Subject:** Copstat Piggyback Agreement for review (based on HPD agreement).
**Sensitivity:** Private

Sean, here is the draft Copstat agreement based on the HPD agreement.

As we discussed, here are the major changes.

OK

1- Insurance – the insurance provisions have been replaced to include NYCHA's standard insurance terms;

30 dys on receipt of Inv.

2- Payment-- the payment procedures have been modified to reflect monthly payments (from weekly) and, since NYCHA does not have a "prompt payment" requirement by law, I have changed the terms to mirror what is in our current agreement with Copstat;

OK

3- All references to the Procurement Policy Board ("PPB") rules have been deleted (this includes in-house dispute payment resolution procedures) since NYCHA does not follow the PPB rules and procedures;

Not Needed

4- I have added the performance and payment bond provisions at Article 7. The form payment and performance bond will now be attached as Exhibit 3.

The one thing I will need from you is Exhibit 2, the central office locations.

To expedite this matter, you can forward my e-mail to Copstat. If you have any questions, please do not hesitate to call,

EXHIBIT
Ryan 5
7/25/08

<<copstat piggyback word2.doc>>

Here are the form bonds.

<<Payment bond_.doc>>

<<PERFORMANCE BOND_.doc>>

Laurence M. Redican

Assistant General Counsel

New York City Housing Authority Law Department

212-776-5064

This email contains private, confidential information. Any unauthorized use or retransmission of this message (including any attachments thereto), by any means, is strictly prohibited. If you received this message in error, please delete it and contact the sender at the above telephone number.

copstat piggyback word2.doc (Binary attachment)
Payment bond_.doc (Binary attachment)
PERFORMANCE BOND_.doc (Binary attachment)

Summary | Prev | Next Reply | Reply All | Forward | Delete

Move to >> Draft

Powered by IMail.

# Exhibit 5

## Excerpts from Deposition of Sean Ryan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x

ANDREWS INTERNATIONAL, INC.,

Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,

Defendant.

Civil Action No.: 08-cv-1580 (HB)

--------------------------------------x

250 Broadway
New York, New York

July 25, 2008
4:00 p.m.

Deposition of Non-Party Witness SEAN RYAN, held at the above-mentioned time and place, before Linda A. Schilt, a Notary Public of the State of New York.

A P P E A R A N C E S:

FUNK & BOLTON
Attorneys for Plaintiff
36 South Charles Street
Baltimore, Maryland 21201-3111
BY: BRYAN D. BOLTON, ESQ.

NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
Attorneys for Defendant
250 Broadway, 9th Floor
New York, New York 10007
BY: STEPHEN W. GOODMAN, ESQ.

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except asto the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

S E A N R Y A N, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. BOLTON:

Q. Can you state your full name and your home address, please?

A. Sean K. Ryan, R-Y-A-N. 227 Walnut Street, Peekskill, New York 10566.

Q. You understand you have given an oath to tell the truth?

A. I understand.

Q. If you don't understand any of my questions, please let me know. I'm going to try to go fast because I know we have time limits.

A. Okay.

Q. Please make sure you answer audibly because we have a court reporter here and we want the transcript to reflect accurately.

Do you understand that?

A. I do.

document, but it appears to be recognizable to me.

Q. In what sense?

A. It appears to be a separate, second and separate agreement between NYCHA and Copstat for security guard services.

Q. And this agreement refers to another agreement between what's referred to as HPD, correct?

A. Yes.

Q. Do you know why this agreement adopted the various provisions of the HPD agreement?

A. Yes.

Q. Why was that?

A. The procurement guidelines -- well, as I understand it, or as I understood at the time anyway, NYCHA's procurement guidelines permitted us to piggyback, common term we use is piggyback, on an existing agreement between another city agency and a vendor for services of similar scope, and so in an effort to streamline the procurement process to avoid publishing an RFP or going

 through some sort of procurement acrobatics, this was typically done as an expedient way to get services for various types of services.

Q. Was there any intention to change any of the functions that Copstat was already performing in terms of guard staffing or supervision at the time of the piggybacking on to the HPD contract?

A. I can't recall a specific instance of that; however, in general I'm certain that there was because we would have had different man-hour requirements, for example, different location requirements and so on.

Q. What do you mean by different location requirements?

A. Well, the HPD will have had locations at, you know, would have had called for guard service at their own locations and NYCHA would have called for guard service at different locations. So there was intent to change some details of performance, but that's hardly significant. I can't recall other details like that.

Q. What was your understanding of the supervisory obligations of Andrews/Copstat at the time when they were working for you during your tenure at NYCHA under the contract marked as NYCHA Exhibit 2?

A. My understanding of Copstat's supervisory obligations at the time that they worked for us, I'm not certain. I'm not certain.

Q. Did you ever find any deficiencies during your tenure at NYCHA with the supervisory services performed by Copstat such that it led you to ever impose liquidated damages for any failure to supervise?

A. I cannot recall a specific instance of that; however, two things. One, we used the services of more security guard vendors other than Copstat as well. So I would have difficulty attributing to one of the several vendors an instance where we imposed liquidated damages. However, I would say that there certainly were instances that warranted that, there certainly were

instances where service was less than perfect. Can I say specifically that it was the supervisory aspect of the service, frankly, no. To be honest, my recollection is a little bit vague on that.

Q. Did you ever send any written notice or E-mail notice to anyone at Andrews notifying Andrews or Copstat that their supervisory performance was deficient in any way that you can recall?

A. Not that I can recall.

Q. If you thought, in fact, that Andrews' performance was or Copstat's performance was deficient in some way in terms of their supervisory function, would you have sent them some sort of notice either electronically through E-mail or letter or notified them by some means?

A. By some means, yes.

Q. Would that means have been in writing or through an E-mail?

A. Possibly.

Q. After the contract marked as NYCHA Exhibit 2 was signed, did you ever assign any

additional duties and responsibilities for additional sites to Copstat?

A. I cannot be certain of the chronology, but certainly sites were added and possibly removed. Possibly added or removed. Certainly the sites that Copstat was responsible for changed, let's put it that way.

MR. BOLTON: Let's mark as Ryan Exhibit 5, it's a two-page exhibit.

(Series of E-mails were marked as Ryan Exhibit 5 for identification; 7/25/08, L.S.)

Q. Placing before you what I had marked as your deposition Exhibit 5, and if you look down at the bottom of the page, it appears that it's a series of E-mails and the first E-mail appears to be addressed to you from a Laurence Redican, do you see that?

A. I do.

Q. Dated November 1, 2004, correct?

A. Correct.

Q. And then Mr. Redican, he was an attorney at NYCHA at that time?

A. Correct.

Q. Had you actually met and spoken with Mr. Redican about this piggybacking concept on the HPD agreement?

A. Yes.

Q. He says, "As we discussed, here are the major changes," do you see that?

A. I do.

Q. These major changes, were these things that you and Mr. Redican had discussed?

A. Give me a moment to read them, please.

Q. Sure.

A. Yes, this seems to reflect my recollection of my discussions with Mr. Redican, sure.

Q. Down at the bottom, do you see that same page, do you see where Mr. Redican indicates you can forward his E-mail on to Copstat?

A. Yes.

Q. In fact, up above it appears that is what you did, correct?

A. Yes.

Q. And that's your E-mail from you to Tom Murray at Copstat dated November 3, 2004?

A. Yes.

Q. It says, "Please review and give me any feedback ASAP," do you see that?

A. I do.

Q. Do you recall whether there were any changes made to the agreement by Copstat?

A. I don't.

Q. In sending the agreement on to Copstat as you did on November 3, 2004, did you feel there were any other major changes to the existing contracts that were being made other than the items noted by Mr. Redican?

A. I suppose not.

Q. If you assigned additional work to Copstat, would that be indicative of the fact that you were satisfied with Copstat's performance on the contract marked as NYCHA Exhibit 2?

A. Well, yes and no.

Q. What do you mean by that?

 A. Well, with a limited universe of security guard vendors in contract with us and a non-negligible need for timely security service, because of its nature --

Q. Go ahead.

A. -- there could be times conceivably when a contractor, Copstat or otherwise, was essentially the only game in town. So that's the answer to that specific question. Using their service does not automatically indicate satisfaction of their service. I'm not trying to be difficult about that, I just want to be clear about answering your specific question.

Q. Do you recall whether, in Copstat's particular instance, whether you were satisfied with their performance or dissatisfied with their performance?

A. I was satisfied with their performance.

Q. Looking back at Exhibit 2 to the NYCHA Exhibit 2, which the first page is list of NYCHA field office locations, and next page says lobby monitoring sites and it says

security guard services sites, was it your understanding that Andrews would have supervisory visits once per shift for all these sites under this contract?

A. I don't believe so.

Q. Why do you not believe that's true?

A. Well, a number of reasons. It's a large number of sites. Multiplied by three tours per day. That's an onerous number of field supervisory visits. And I'm quite certain if I had expected them to perform those supervisory visits and they didn't, then I would have acted on that.

Q. Are you familiar with the site referred to as Prospect Park, Prospect Plaza?

A. Yes, I am.

Q. Did there come a time when you asked Copstat for assistance with respect to that site?

A. Yes.

Q. What were the circumstances under which you asked for Copstat's assistance?

A. Prospect Plaza was a difficult

site and a different security guard vendor was performing poorly there and I recall asking Copstat to assume that post.

Q. Who was this other vendor?

A. Am I free to answer that? FJC Security.

Q. When you say it was a difficult site, what do you mean by that?

A. Prospect Plaza was, is an abandoned housing development, several buildings in an extremely difficult location in Brooklyn. Buildings were abandoned and subject to squatters and criminals and all sorts of security issues, and it was very difficult to keep those facilities secure in any way.

Q. You referred to that as senior development. Am I correct in understanding that the sites identified in NYCHA Exhibit 2 on Exhibit 2, listing where it says lobby monitoring sites, these are all senior developments on the top part of the page all the way down to security guard services sites?

A. Generally, yes. Yes, I believe so.

Q. Markham Gardens, are you familiar with that site?

A. Yes.

Q. Was that a senior site as well?

A. No. Markham Gardens was similar to Prospect Plaza. An abandoned -- correction. It was almost abandoned. It was scheduled for modernization, I believe, and so residents there had been transitioned out. There were a small number of holdout families and so that was a combination. I don't believe that Markham Gardens was originally a senior citizen site. I could be mistaken about that.

Q. Am I correct in understanding from your testimony that Markham Gardens was a residential facility?

A. Yes.

Q. Were all of the facilities under the lobby monitoring sites all residential facilities?

A. Yes.

Q. Other than Prospect Plaza, do you recall the names of any other locations that you assigned to Copstat any time after the contract dated February 28, 2005?

A. I don't. I don't.

Q. I'd like to show you what has been previously marked for identification as Defendant's Exhibit E. I want to direct your attention to an E-mail in the middle of the page from Mr. Kestecher dated May 30, 2007. This E-mail right here in the middle. 1:43 p.m.

A. I do.

Q. If you read that I will ask you a question about it.

A. "Hi, Pat, thank you."

Q. You don't have to read it out loud. Just read it to yourself.

A. Okay.

Q. Now, as you will see, Mr. Kestecher refers to a standard of an adequate number of supervisory personnel to monitor the performance of our guards and periodic unscheduled visits.

Was that consistent with your understanding of Copstat and Andrews' obligations under the contract marked as NYCHA Exhibit 2 during your tenure at NYCHA?

A. Well, it's consistent with my recollection of their performance. I can't speak to their obligations under this agreement, but it's consistent with my recollection of their operations at that time.

Q. Did you ever advise Andrews or Copstat that that performance was contractually deficient in some way based on your role as the supervising party?

A. Not to my recollection.

Q. Am I correct you would have been the person at NYCHA to advise Copstat or Andrews if, in fact, that was a perceived deficiency, correct?

A. Yes. Formally others, my subordinates, would have advised them first verbally, what have you, but I would have been the person to make a formal communication about that, sure.

# EXHIBIT 6

PART 1 of 3

**AGREEMENT # 4020633**
**BY AND BETWEEN**
**NEW YORK CITY HOUSING AUTHORITY**
**AND**
**COPSTAT SECURITY L.L.C.**

This agreement (the "**Agreement**"), dated as of the 28 day of February, 2005, is made by and between the New York City Housing Authority ("**NYCHA**" or the "**Authority**"), a public benefit corporation organized and existing under the laws of the State of New York, having its principal office at 250 Broadway, New York, New York 10007, and Copstat Security L.L.C.. (the "**Contractor**"), a privately owned corporation organized and existing under the laws of the State of New York. The Contractor has its office at 1860 East Tremont Avenue, Bronx, New York 10460.

WHEREAS, NYCHA desires to retain the Contractor to provide security services; and

WHEREAS, the Contractor has entered into an agreement with the New York City Department of Housing Preservation and Development ("**HPD**") to provide security services (the "**City Contract**"); and

WHEREAS, NYCHA is authorized by its contract procedures to use the City Contract as a basis for contracting with the Contractor for the work and services set forth herein; and

WHEREAS, the Contractor represents that it possesses the necessary knowledge, skill, resources, personnel and experience to perform the Services; and

WHEREAS, NYCHA desires to retain the Contractor on the terms and conditions set forth in this Agreement, and the Contractor agrees to accept such engagement in accordance with the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, NYCHA and the Contractor agree as follows:

ARTICLE 1
ENTIRE AGREEMENT

1.1 Each party acknowledges that this Agreement and the documents incorporated by reference into this Agreement constitute the entire agreement between the parties, which supersedes and merges all prior proposals, understandings, and all other agreements, oral or written, between the parties relating to this Agreement, and any modification, amendment, or supplement to this Agreement is not valid or enforceable against either party unless it is in writing and signed by an authorized representative of each party.



1.2     This Agreement incorporates the following Exhibits as though each is set forth in full herein:

      1.2.1     The HPD City Contract with Copstat for Unarmed Security Guard Services, Contract No. 2003-000618, attached hereto as **Exhibit 1**;

      1.2.2     The list of NYCHA field office locations attached as **Exhibit 2**; and

      1.2.3     The Billing Rates from HPD dated June 21, 2004, attached hereto as **Exhibit 3**.

1.3     In the event of any conflict in language between this Agreement and Exhibit 2, the terms contained in this Agreement shall prevail.

1.4     For the purposes of this Agreement, the following references in **Exhibit 1** are hereby deemed changed, wherever they appear, to read as provided herein:

      1.4.1     Throughout the City Contract, "NYCHA" or "the Authority" shall be substituted for "City," "HPD," and "Agency Chief Contracting Officer" unless the context otherwise requires.

      1.4.2     Throughout the City Contract, "Facility Security Unit" shall be substituted for "Disciplinary Unit," unless the context otherwise requires.

      1.4.3     Throughout the City Contract all references to the "Procurement Policy Board" or "PPB" are hereby deleted.

1.5     The following provisions in the City Contract attached as **Exhibit 1** are hereby modified as follows:

      1.5.1     Article 10, entitled "Insurance," shall be deleted in its entirety and replaced with Article 6 of this Agreement.

      1.5.2     Article 5, entitled "Payment," shall be modified and replaced with Article 5 of this Agreement.

      1.5.3     Article 7, entitled "Prompt Payment," shall be deleted in its entirety and replaced with Article 5 of this Agreement.

      1.5.4     Article 13, entitled "Payment Guarantee," shall be deleted in its entirety.

      1.5.5     Article 16, entitled "Disputes," and Article 22, entitled "Changes," shall be deleted in their entirety and replaced with Article 10 of this Agreement.

1.5.6 Articles 19.1 and 19.2 are deleted in their entirety.

1.5.7 Article 21 "Conditions Precedent" is deleted in its entirety.

1.5.8 Appendix B, entitled "Sites Requiring Two Way Radios" is deleted in its entirety.

1.5.9 Article 35, of the Information to Bidders, entitled "Locally Based Enterprise Requirements (LBE)" shall be deleted in its entirety and replaced with Article 16 of this Agreement.

1.5.10 Articles 37, 38 and 39 of the Information to Bidders are deleted in their entirety.

1.6. For the purposes of this Agreement, the following references in Exhibit A, entitled "Scope of Work," to the City Contract are hereby deemed changed, wherever they appear, to read as provided herein:

1.6.1 Article 3. b) 3. and Article 3. b) 4. are deleted in their entirety.

1.6.2 Article 3, subsection entitled "Work Hours" is modified to reflect the following holidays under the Agreement: "NYCHA-observed holidays are New Year's Day, Martin Luther King, Jr., Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Election Day, Veterans Day, Thanksgiving Day and Christmas Day."

1.6.3 Article 4(b) is deleted and replaced with the following: "All newly appointed guards will receive training at one of NYCHA's facilities, at NYCHA's discretion."

1.6.4 Article 5(d) is deleted and replaced with the following: "make a report by calling NYCHA's security unit at 212-306-8800 at any time, 24 hours per day, 7 days per week, as soon after the happening of such an event, but no later than the first hour of the first business day after the happening of such event or occurrence."

1.6.5 Article 12 is deleted in its entirety.

ARTICLE 2
TERM OF AGREEMENT

2.1 Article 3 of the City Contract is hereby deleted in its entirety and replaced with the following: "The term of this Agreement will be for a period of two years,

commencing on March 1, 2005, and ending on February 28, 2007 unless earlier terminated by NYCHA at its sole option."

ARTICLE 3
RENEWALS

3.1 NYCHA shall have the sole option of renewing this Agreement for two additional one-year periods (the "**Renewal Terms**"). NYCHA may exercise its option to renew the term by giving written notice to the Contractor of its exercise of such option no later than 10 days prior to the commencement of each Renewal Term. All of the terms and conditions of this Agreement shall apply to such Renewal Term.

ARTICLE 4
SCOPE OF SERVICES

4.1 The Scope of Services shall be performed in accordance with Exhibit A to the City Contract except as modified herein.

ARTICLE 5
COMPENSATION AND PAYMENT

5.1 Article 5, entitled "Payment" and Article 6, entitled "Payment Procedure" of the City Contract are modified as follows:

5.1.1 Article 5.1 is deleted and replaced with the following language: "NYCHA will compensate the Contractor by payment of a fee not to exceed $13.92 per hour for a Level I security guard and a fee not to exceed $15.18 per hour for a Level II security guard for each hour for which the Contractor provides a security guard under this Agreement (the "**Hourly Rate**"). If the prevailing wage is increased during the contractual period, the Contractor will pass only the increase in wage rate increases to NYCHA without additional margins.."

5.1.2 The first and sixth paragraphs of Article 6.1 are deleted and replaced with the following:

Billing shall be done on a monthly basis. Invoices shall be provided at the beginning of each month for Services rendered in the preceding month. Each invoice must be accompanied by any and all timekeeping records as NYCHA may require, including, without limitation, certified weekly payrolls. NYCHA reserves the right to require the Contractor to verify time and attendance by use of time sheets submitted as NYCHA may

require. All time records shall be subject to audit and verification by NYCHA. The Contractor must submit one original counterpart of its invoice(s) to each of the following NYCHA Departments:

NEW YORK CITY HOUSING AUTHORITY
90 Church Street - 9th Floor
New York, New York 10007

Attention: Mr. Sean Ryan, Assistant Director for Security
General Services Department

and to:

NEW YORK CITY HOUSING AUTHORITY
Accounts Payable Division
P.O. Box 3656- Church Street Station
New York, New York 10007

5.2 The Facility Safety Coordinator will review and approve all invoices and forward the approved invoices to the appropriate Authority personnel for payment. NYCHA shall endeavor to pay all invoices within 30 days after approval by the appropriate NYCHA personnel, but NYCHA's failure to pay within 30 days will not be a breach of this Agreement, and will not entitle the Contractor to interest or penalties.

5.3 NYCHA's maximum liability under this Agreement for all payments will not exceed $3,137,583.24 (the "**Not-To-Exceed Amount**") for the two- year term of this Agreement.

## ARTICLE 6
## INSURANCE REQUIREMENTS

6.1 It is understood that all personnel assigned to perform work under this Agreement by the Contractor are deemed to be employees or subcontractors of the Contractor, and not of NYCHA, for any and all purposes. The Contractor must maintain Workers' Compensation Insurance for its employees working on NYCHA's premises.

6.2 The Contractor must maintain during the term of this Agreement, and until the date of final payment, insurance required by law or this Agreement, consisting of:

6.2.1 Workers' Compensation Insurance and Employer's Liability Insurance, including occupational disease for all employees as per statutory limits, and Employer's Liability Insurance: unlimited in the State of New York or

$1,000,000 for other states and $1,000,000 for those specific categories not covered by the New York State Workers' Compensation Law;

6.2.2 General Liability Insurance, which shall include Contractual Liability Insurance and Personal Injury Insurance, as well as Bodily Injury Insurance and Property Damage Insurance, in amounts of at least $1,000,000 per occurrence, and $2,000,000 in the aggregate, for a combined single limit for bodily injury and for property damage;

6.2.3 Automobile Liability Insurance on owned, non-owned and hired motor vehicles used in connection with the Services for a combined single limit for bodily injury and property damage of not less than $1,000,000 per occurrence; and

6.3 The Contractor shall be responsible for obtaining and maintaining, at its sole cost and expense, and for causing its Subcontractors and subcontractors to obtain and maintain, at their sole cost and expense, insurance covering their respective personal property while upon NYCHA premises or in NYCHA vehicles during the term of the Agreement. Except for the intentional wrongful acts of NYCHA, NYCHA shall have no responsibility for loss of, damage to, or theft of the Contractor's or its Subcontractors' or subcontractors' personal property.

6.4 All policies of insurance must be written on an occurrence basis, except for Workers' Compensation Insurance, including Employer's Liability Insurance, and must be issued by companies licensed and/or admitted, or authorized to do business, in the State of New York, having a rating of at least "A-" (Excellent) and a financial rating of "X," as rated by the most recent Best's Insurance Rating Guide. The Contractor's General Liability Insurance policy must be endorsed:

(a) to name NYCHA as an additional insured;
(b) to allow severability of interests and rights of cross-claim; and
(c) to provide that the policy must not be canceled, or its coverage reduced, without at least 30 days' prior written notice to NYCHA.

6.5 Prior to its employees', Subcontractors' or subcontractors' starting to perform the Services, and from time to time thereafter on demand from NYCHA, the Contractor must provide NYCHA with satisfactory certificates of insurance, and/or certified copies of the insurance policies, evidencing that such insurance is in effect. Such certificates, and/or certified copies of the insurance policies, must be sent to:

New York City Housing Authority
90 Church Street, 6th Floor
New York, NY 10011
Attn: Risk Finance

6.6 Insurance coverage in the amounts provided for herein shall not limit the Contractor's liability and shall not relieve the Contractor from any liability that might exceed such amounts, nor shall NYCHA be precluded by such insurance coverage from taking other actions that may be available to NYCHA under any other provisions of the Agreement or otherwise.

ARTICLE 7
PAYMENT AND PERFORMANCE BOND

7.1 Article 12 of the City Contract is deleted.

ARTICLE 8
INDEMNIFICATION

8.1 In furtherance of and not in limitation to Article 14 of the City Agreement, the Contractor agrees to the following:

8.1.1 The Contractor agrees to defend, indemnify and hold harmless NYCHA, its members, officers, employees, agents and representatives, and any other party or entity acting on behalf of NYCHA, from and against any and all liabilities, claims, losses, damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred by NYCHA in enforcing this indemnification), and all reasonable sums charged to associated litigation, relating to (a) any alleged or actual personal injury, bodily injury (including death), or property damage (or any consequential damages related to such personal injury, bodily injury or property damage), arising out of or resulting from any work or Services provided by the Contractor or its employees, agents, Subcontractors or subcontractors in conjunction with the Agreement, or arising out of any other act, error or omission of the Contractor or its employees, agents, Subcontractors or subcontractors, or (b) any claim for loss, damage to, or theft of any personal property of, or in the care of, the Contractor, its Subcontractors or subcontractors while such personal property is at or upon NYCHA premises or in NYCHA vehicles, unless resulting from the intentional act of NYCHA. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

8.1.2 The Contractor agrees to defend, indemnify and hold harmless NYCHA, its members, officers, employees, agents and representatives, and any other party or entity acting on behalf of NYCHA, from and against any and all liabilities, claims, losses, damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred by NYCHA in enforcing this

indemnification), and all reasonable sums charged to associated litigation, which may be incurred in any action for unfair competition, for infringement of any United States Letters Patent, or any trademark or service mark, or of any copyright or for theft of any trade secret with respect to the Agreement. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

8.1.3 The Contractor agrees to indemnify and hold NYCHA harmless from and against any and all damages, costs, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses incurred by NYCHA in enforcing this indemnification, and all reasonable sums charged to associated litigation, which may be incurred by NYCHA as a result of, or by way of mitigating NYCHA's damages resulting from, any failure by the Contractor to fulfill its obligations under the Agreement. The Contractor agrees that its obligations under this indemnification provision shall survive the expiration or earlier termination of the Agreement.

## ARTICLE 9
## DEFENSE AND SETTLEMENT OF MATTERS TO WHICH INDEMNITY PROVISIONS APPLY

9.1 NYCHA will notify the Contractor promptly of any action or claim with respect to which the indemnity provisions of the prior section may apply. The Contractor will have the exclusive right to control and conduct the defense and settlement of all such actions or claims; provided, however, (a) if there is a reasonable probability that any action or claim for which the Contractor is to provide indemnity to NYCHA hereunder may adversely affect NYCHA or any of its members, officers, employees or agents (other than as a result of money damages or other money payments), NYCHA then will have the exclusive right to defend, compromise or settle such action or claim, and (b) the Contractor will not, without NYCHA's prior written consent, settle or compromise or consent to the entry of any judgment in connection with any such action or claim, if such settlement, compromise or judgment does not include as an unconditional term thereof an unconditional release of NYCHA by the claimant or the plaintiff, as the case may be, from all liability in respect of such action or claim.

ARTICLE 10
DISPUTES

10.1 In the event the Contractor has a dispute with NYCHA under this Agreement, the Contractor will, within 30 calendar days after such dispute shall have arisen, notify NYCHA in writing of the Contractor's contention and submit its claim, specifying the nature of the claim and the sum claimed. If the dispute arises prior to the performance of the related duties, the written notice shall be submitted prior to the commencement of such duties. In any event, the Contractor will proceed with its duties hereunder in compliance with the written instructions of NYCHA, and such compliance will not be deemed to be a waiver of the Contractor's right to pursue its claim, provided it has given notification in writing as provided above.

ARTICLE 11
CONFIDENTIALITY

11.1 The parties anticipate that the Contractor may acquire access to information and data about the operations, the staff and the residents of NYCHA (the "**Confidential Information**"). To the extent that the Contractor or any subcontractor of the Contractor obtains any Confidential Information, the Contractor agrees (a) that it will protect and preserve the confidentiality of such Confidential Information with the same care and diligence with which it protects and preserves its own most secret business information; (b) that it will use such Confidential Information only in the performance of its obligations arising under this Agreement; and (c) that it will make no disclosure of such Confidential Information other than to an employee of NYCHA or to an employee or subcontractor of the Contractor in the course of such Contractor employee's or subcontractor's provision of Services under this Agreement. In addition, the Contractor agrees to obtain a written commitment from each employee and each subcontractor which it may use in its performance of this Agreement to be bound by the terms of this section, and the Contractor shall make available the original copy of any such commitment upon written request from NYCHA from time to time. The Contractor agrees that this obligation of confidentiality shall survive the termination or expiration, as the case may be, of this Agreement.

ARTICLE 12
RIGHT TO AUDIT

12.1 In furtherance of and not in limitation to, the provisions contained in Article 19.4 of the City Contract, the Contractor agrees as follows:

12.1.1 NYCHA, and any agency providing funds to NYCHA, will have the right to perform any audit of the Contractor's finances and records related to its performance under this Agreement, including, without limitation, the financial arrangement with anyone the Contractor may delegate to discharge any part of its obligations under this Agreement.

12.1.2 The Contractor must provide, and must cause each subcontractor of the Contractor to provide, access by NYCHA, any agency providing funds to NYCHA, or any of their duly authorized representatives to any books, documents, papers and records of the Contractor and such subcontractors which are directly pertinent to this Agreement for the purpose of making audit, examination, excerpts and transcriptions.

12.1.3 In order to permit the making of audit, examination, excerpts and transcriptions by NYCHA, any agency providing funds to NYCHA, or any of their duly authorized representatives, the Contractor must maintain all records and supporting materials for the work performed under this Agreement for a period of three years following either (a) the end of the term of this Agreement, or (b) such time as NYCHA makes final payments and all other pending matters related to this Agreement are closed, whichever is longer.

## ARTICLE 13
## COMPLIANCE WITH ENVIRONMENTAL LAWS AND ENERGY STANDARDS

13.1 The Contractor agrees to comply with: (a) all applicable standards, orders, or requirements issued under Section 306 of the Clean Air Act (42 U.S.C. 7401 et seq.), Section 508 of the Clean Water Act (33 U.S.C. 1251 et seq.), Executive Order 11738, and Environmental Protection Agency regulations (40 CFR Part 15); and (b) mandatory standards and policies relating to energy efficiency contained in the New York State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (Pub. L. 94-163).

## ARTICLE 14
## NOTICES

14.1 Any notice or other communication, including a change of address or of the person to be notified, given under this Agreement to any party must be in writing and must be sent by Certified or Registered Mail, Return Receipt Requested, to the attention of the parties at the respective addresses set forth below:

To NYCHA: NEW YORK CITY HOUSING AUTHORITY
90 Church Street, 9th Floor
New York, New York 10007

Attention: Mr. Sean Ryan, Assistant Director for Security
General Services Department

with a copy to:

Deputy General Counsel for Corporate Matters
New York City Housing Authority
Law Department
250 Broadway, 8th Floor
New York, New York 10007

To the Contractor:

COPSTAT SECURITY INC.
1860 East Tremont Avenue
Bronx, New York 10460

Attention: Mr. Bernard Rosner, Director of Sales and Contracts

## ARTICLE 15
## SECTION 3 OF THE HOUSING AND URBAN DEVELOPMENT ACT OF 1968

15.1 The Services to be performed under the Agreement are subject to the requirements of Section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u (**"Section 3"**), if (a) the total sum payable by NYCHA under the Agreement is $100,000 or more, or (b) the nature of Services to be provided is such that hiring residents would be logical and feasible. The purpose of Section 3 is to ensure that employment and other economic opportunities generated by HUD assistance or HUD-assisted projects covered by Section 3 shall, to the greatest extent feasible, be directed to low-income and very low-income persons, particularly persons who are recipients of HUD assistance for housing.

15.2 The Contractor agrees to comply with the HUD regulations in 24 Code of Federal Regulations (**"CFR"**) part 135 that implement Section 3. The Contractor hereby certifies that it is under no contractual or other impediment that would prevent it from complying with the regulations in 24 CFR part 135.

15.3 The Contractor agrees to send to each labor organization or representative of workers with which the Contractor has a collective bargaining agreement, if any, a notice advising the labor organization or workers' representative of the Contractor's commitments under these Section 3 provisions, and the Contractor agrees to post copies of the notice in conspicuous places at the work site where both employees and applicants for training and employment positions can see the notice. The notice shall describe the Section 3 preference (as set forth in 24 CFR part 135) and shall set forth the minimum number and job titles subject to hire, the availability of apprenticeship and training positions, the qualifications for each, the

name and location of the person(s) taking applications for each of the positions, and the anticipated date the work shall begin.

15.4 The Contractor agrees to include these Section 3 provisions [i.e., provisions equivalent to those set forth in paragraphs (1) through (6) hereof] in every subcontract subject to compliance with the regulations in 24 CFR part 135, and the Contractor agrees to take appropriate action, as provided in an equivalent provision of the subcontract or in this Section, upon a finding that the Subcontractor or subcontractor is in violation of the regulations in 24 CFR part 135. The Contractor will not subcontract with any Subcontractor or subcontractor where the Contractor has knowledge that the Subcontractor or subcontractor has been found in violation of the regulations in 24 CFR part 135.

15.5 The Contractor hereby certifies that any vacant employment positions, including training positions, that were filled (a) after the Contractor was selected but before the Agreement is executed, and (b) with persons other than those to whom the regulations of 24 CFR part 135 require employment opportunities to be directed, were not filled to circumvent the Contractor's obligations under 24 CFR part 135.

15.6 Noncompliance with HUD's regulations in 24 CFR part 135 may result in sanctions, termination of the Agreement for default, and/or a finding of non-responsibility with respect to (or debarment or suspension from) future NYCHA contracts or other HUD-assisted contracts.

## ARTICLE 16
## SEVERING CERTAIN AGREEMENT PROVISIONS

16.1 If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby and shall remain in full force and effect.

## ARTICLE 17
## HEADINGS

17.1 The descriptive headings used in this Agreement are for purposes of convenience only and do not constitute a part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

NEW YORK CITY HOUSING AUTHORITY

By: [signature]
Robert Podmore
Deputy General Manager

COPSTAT SECURITY INC.

By: Bernard Rosner 2/28/05
Mr. Bernard Rosner, Director
of Sales and Contracts

28th of February 2005

Cassandra Nicks
CASSANDRA NICKS
Commissioner of Deeds
City of New York - No. -2-9077
Certificate Filed in Kings County
Commission Expires Oct. 1, 2006

**Exhibit 1**

HPD City Contract with Copstat for Unarmed Security Guard Services, Contract No. 2003-000618



**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
JERILYN PERINE, Commissioner

**Office of Administration**
DISCIPLINARY UNIT
100 GOLD STREET, 1W, NEW YORK, N.Y. 10038
Mario Ferrigno, Director

June 28, 2002

Copstat Security, Inc.
1860 East Tremont Avenue
Bronx, New York 10460
ATTN: Mr. Terry Hill

**Re: Unarmed Security Guard Services**
**Contract # 2003-0000618**

Dear Mr. Hill:

Please be advised that on June 25, 2002, the New York City Comptroller's Office registered the above referenced contract between Copstat Security, Inc. and the New York City Department of Housing Preservation and Development. The contract term is from July 1, 2002 through June 30, 2005.

If you have any questions or require additional information, please contact me directly at (212) 863-5616.

Very truly yours,

Mario Ferrigno
Director,
HPD Disciplinary Unit

cc: file

nyclink.org/hpd



DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT
JERILYN PERINE, Commissioner

**Office of Administration**
DIVISION OF RESOURCES MANAGEMENT AND LABOR RELATIONS
100 GOLD STREET, NEW YORK, N.Y. 10038

BERNARD SCHWARZ, Assistant Commissioner

**ADDENDUM #2**

To: Prospective Bidders

Subject: Addendum to Invitation For Bid for Unarmed Security Guard Services, PIN # 806011000110

Date: March 27, 2002

---

The following changes are made to the subject Invitation for Bid ("IFB"):

1. Exhibit A, Scope of Services, page 1, paragraph 1:
   The list of HPD sites shall be as follows:

   *100 Gold Street, NYC – 496 hrs per week
   Parking Lot (manned by Security Specialist) – 40 hours per week
   *516 Bergen Street, Brooklyn 45 hours per week
   *965 Longwood Avenue, Bronx – 233.5 hours per week
   *701 Euclid Avenue, Brooklyn – 90 hours per week
   *560 West 133 Street, NYC – 42.5 hours per week
   **320 Sterling Street, Brooklyn – 336 hours per week

   *HPD Office Site

   **320 Sterling Street, Brooklyn is a current security site which is not an HPD office site.

It should be noted that these are estimates based on the hours currently required. HPD makes no representations that these will be the actual hours required under the resultant contract and any renewals or extensions made thereto.

2. Exhibit A, Scope of Services, page 8, Paragraph 11, Sub-paragraph (b) is deleted. Sub-paragraph (a) is amended by adding the word "day" between "working shifts".



Addendum #2
PIN #806011000110
March 27, 2002
Page 2

All other terms and conditions remain unchanged.

Approved for Issuance:

Jay Bernstein
Deputy Agency Chief Contracting Officer

Issued By:

Bernard Schwarz
Assistant Commissioner

ADDENDUM #2 ACKNOWLEDGEMENT

PIN # 806011000110

PRINTED NAME: ______________________

SIGNATURE: ______________________

POSITION/TITLE: ______________________

COMPANY: ______________________

NOTARY PUBLIC: ______________________

**NOTE: SIGNED AND NOTARIZED COPIES (IN BLUE INK) OF THIS ADDENDUM MUST BE INCLUDED WITH THE BID SUBMISSION. FAILURE TO COMPLY MAY RENDER YOUR BID NON-RESPONSIVE.**

HPD
nyclink.org/hpd



DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT
JERILYN PERINE, Commissioner

Office of Administration
DIVISION OF RESOURCES MANAGEMENT AND LABOR RELATIONS
100 GOLD STREET, NEW YORK, N.Y. 10038

BERNARD SCHWARZ, Assistant Commissioner

To: Prospective Bidders

Subject: Questions and Answers pursuant to the March 21, 2002 Pre-Bid Conference For Bid for Unarmed Security Guard Services, PIN # 806011000110

Date: March 27, 2002

---

Pursuant the Pre-Bid Conference held on Thursday, March 21, 2002, the following constitutes the questions and answers presented on that day. Please note, the answers provided below do not constitute any change to the terms and conditions of the subject solicitation. Also, please find attached the attendance sheets representing those in attendance at the Pre-Bid Conference.

<u>Questions and Answers</u>

1- What does the Contractor's Hourly Fee include?
Answer- Profit & Overhead

2- Do Bidders provide Bid Security? How much is the Bid Security?
Answer – Yes. 5% of the total bid amount. Refer to Attachment 1, page 14 "Bid Information".

3- Should the Vendex forms be submitted with the Bid or after?
Answer – Vendex forms are to be submitted upon request by the Agency and generally at the time the low responsive bidder has been determined.

4- Should the Employment report be submitted with the Bid or after?
Answer – The Employment report is to be submitted upon request by the Agency and generally at the time the low responsive bidder has been determined.

5- Where are the Vendex forms available for pick-up?
Answer – 100 Gold Street, Room 1 W, New York, NY 10038 (Monday-Friday between 9:00 AM and 5:00 PM).

6- What are the construction sites?
Answer – Construction sites vary depending on the needs of the Agency.

7- What are the current weekly hours for the sites listed?
Answer – See Addendum # 2.

8- What if the payroll taxes are higher than suggested in the bid schedule?
Answer- Payroll costs are compensable (i.e. wages, taxes and benefits). Refer to Exhibit A, Scope of Services, paragraph 3 (b).

9- Are the current guards part of a union?
Answer – Yes



10- Are Security Guards paid for their ½ hour lunch break?
Answer – Unless requested to take an on-site lunch break, security guards are not paid for their lunch break. Refer to Exhibit A, Scope of Services, page 2, **Work Hours**, paragraph (a).

11- Is the $2,000.00 annual allowance for Sanitation facilities and Construction trailers the maximum amount allowable on this contract?
Answer – The $2,000.00 allowance is based on our needs over the past 3 years. Should HPD's need for such items exceed $2,000.00, the actual cost will be borne by HPD as a compensable cost.

12 - What benefits are covered by the Supplemental Benefits Rate established by the NYC Comptroller's Office?
Answer – According to the Comptroller's Office, the Supplemental Benefits Rate can be paid as cash or benefits including but not limited to health, welfare, pensions, sick or vacation.

13 - Page 6 of the Scope of Services refers to the Security Officer uniform jackets being blue in color, however, the Security Officer jackets were observed to be "red" in color. Is blue the required color for jackets?
Answer – The contract requires blue jackets. Any other colors must be pre-approved by HPD.

14 - What billing period is required?
Answer – The billing period should be a 7 day period as determined by the Contractor and agreed to by the Agency (HPD).

15- How is the cost for the required two-way radios to be reflected?
Answer – The costs should be included as part of the contractor's overhead. Refer to Exhibit A, Scope of Services, page 9, paragraph 12, **Equipment**.

16- What is the requirement for supervisory shift inspections?
Answer – The requirements for Shift/Supervisory Functions are listed on Page 8, Paragraph 11 of Exhibit A, Scope of Services. See Addendum # 2.

17- Are the supervisory shift inspections conducted by the Security Coordinator, Security Specialist or the Clerical Support Aide/Receptionists or does the contractor have to use additional staff?
Answer – No. The contractor will be required to utilize additional staff, at their sole expense, to perform the supervisory shift inspections.

18- Where are the Security Coordinator, Security Specialist and Clerical Support Aide/Receptionists assigned?
Answer – Currently, the Security Coordinator and Clerical Support Aide/Receptionist are assigned to 100 Gold Street, NYC. The Security Specialist is assigned to our parking facility located at East Houston Street off of Chrystie Street, NYC.

HPD

Questions & Answers
PIN 80600I1000110
March 2 2002
Page 3

19- Is there any objection to the rollover of current Security Officers?

Answer – There is no objection to the rollover of current Security Officers provided that they meet the hiring standards of the contractor. In fact, in an effort to maintain the continuity of security services, we encourage the rollover of qualified Security Officers.

Issued By:

Bernard Schwarz
Assistant Commissioner

HPD
nyclink.org/hpd

# SIGN – IN SHEET FOR PRE-BID CONFERENCE

**Unarmed Security Guards**
**Thursday, March 21, 2002**
**100 Gold Street, 8-P6**

| | Name of Company | Name | Date |
|---|---|---|---|
| 1 - | AL-QIYAMAT SECURITY | NIKIAL ABDUR RAHIM | 3/21/02 |
| 2 - | PARK AVE SECURITY | STEPHEN DIRIENZO | 3-21-02 |
| 3 - | INTER-CON OPS SERVICES CORP | LARRY Mulvey | 3-21-02 |
| 4 - | D.A.O.R SECURITY | JOEL Gil | 3-21-02. |
| 5 - | S&J Security | Sid Bloom | 3/21/02 |
| 6 - | FLASH SECURITY | J. ADEGHE | 2/21/02 |
| 7 . | Frinap Guard Service | ELEANOR CHANDLER | 2/21/02 |
| 8 - | WATCHDOG Patrols | John Johnson | 2/21/02 |
| 9 - | Fortune Security Corp. | Ray Simareo | 3/21/02. |
| 10 - | Topguard Security | Leon Chajkowski | 3/21/02 |
| 11 - | Bowles | Tom Bosio | 3/21/02 |
| 12 - | Copsint | Thomas J. Murray | 3/21/02 |
| | COPSTAT | TERENCE HILL | 3/21/02 |
| 13 - | NORTH-EAST SECURITIES | ADEGHE EKAN | 3/21/02. |
| 14 - | Explorer Investigation Agency | Joseph Shore | 3/21/02 |
| 15 - | Securitas | Jim O'Neill | 3/21/02 |
| 16 - | Defender Security | Rick PEREIRA | 3/21/02 |
| 17 - | Guardian Security | A. T. Pelaez | 3/21/02 |
| | Guardian Security | J. [illegible] | 3/21/02 |
| 18 - | Defender Security | Rick Pereira | 3/21/02 |
| 19 - | I.S.F. | Manny Gerald | 3/21/02 |
| | ISF | [illegible signature] | 3/21/02 |
| 20 - | Babs Int'l Security | Fadekemi Babalola | 3/21/02 |
| 21 - | STAT SECURITY | H Sealy | 3/21/02 |



**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
JERILYN PERINE, Commissioner

**Office of Administration**
DIVISION OF RESOURCES MANAGEMENT AND LABOR RELATIONS
100 GOLD STREET, NEW YORK, N.Y. 10038

BERNARD SCHWARZ, Assistant Commissioner

**ADDENDUM #1**

To: Prospective Bidders

Subject: Addendum to Invitation For Bid for Unarmed Security Guard Services, PIN # 806011000110

Date: March 11, 2002

---

The following changes are made to the subject Invitation for Bid ("IFB"):

1. The Table of Contents has been replaced with the attached. (Attachment 1)
2. Attachment 1, page 14 "Bid Information" has changed as follows:
   BID OPENING PLACE: 100 Gold Street, New York, New York,
   8th floor conference room, Room 8P6.
3. Attachment 2, page 15 "Copy of Advertisement for Bids" third paragraph, last sentence: "12 months" has been changed to "36 months with an option to renew for up to two additional one (1) year terms."
4. Article 3 of the Agreement, pages 32-33, has been replaced in its entirety with the following:

**ARTICLE 3**
**TIME OF PERFORMANCE**

3.1 The term of this Agreement shall commence thirty (30) days from receipt by the Contractor of written notice to proceed and shall expire on the expiration date.

3.2 Renewals. At the sole option of HPD, this Contract may be renewed for up to two additional one (1) year terms on the same terms and conditions as are contained herein, excepting such non-material scope and other changes as may be permitted pursuant to the rules of the City's Procurement Policy Board ("PPB Rules"). If HPD elects to renew this Contract, HPD shall give notice to Contractor not later than thirty (30) days prior to the expiration hereof.

3.3 Extension of Time. Upon written application by the Contractor, the Agency Chief Contracting Officer may grant an extension of time for performance of the contract. Said application must state, at a minimum, in detail, each cause for delay, the date the cause of the alleged delay occurred, and the total number of delay in days attributable to such cause.

The ruling of the Agency Chief Contracting Officer shall be final and binding as to the allowance of an extension and the number of days allowed.



**ATTACHMENT 1**

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| INFORMATION FOR BIDDERS | | 1 |
| SUPPLEMENTAL INFORMATION FOR BIDDER | | 16 |
| BID FORM | | 19 |
| FORM OF BID BOND WITH ACKNOWLEDGMENT | | 25 |
| BIDDER QUALIFICATION STATEMENT | | 28 |
| BIDDER'S CERTIFICATION | | 30 |
| AGREEMENT | | 31 |
| ARTICLE | | |
| 1 | Definitions | 31 |
| 2 | The Agreement | 32 |
| 3 | Time of Performance | 32 |
| 4 | Scope of Services | 33 |
| 5 | Payment | 33 |
| 6 | Payment Procedure | 34 |
| 7 | Prompt Payment | 35 |
| 8 | Records and Audit | 35 |
| 9 | Limitation on Payments | 36 |
| 10 | Insurance | 36 |
| 11 | Liquidated Damages | 38 |
| 12 | Payment and Performance Bond | 39 |
| 13 | Payment Guarantee | 39 |
| 14 | Contractor's Employees and Liability | 40 |
| 15 | Termination | 41 |
| 16 | Resolution of Disputes | 43 |
| 17 | Assignments | 47 |
| 18 | Notices | 47 |
| 19 | City Supplemental Terms and Conditions | 48 |
| 20 | Equal Employment Opportunity | 55 |
| 21 | Conditions Precedent | 55 |
| 22 | Changes | 56 |
| 23 | Miscellaneous Provisions | 57 |
| Acknowledgments | | 59 |
| Scope of Services | | Exhibit A |
| Executive Order 50 (EO) Provisions | | Exhibit B |
| Section 230 Wage Rates | | Exhibit C |



All other terms and conditions remain unchanged.

| Approved for Issuance: | Issued By: |
|---|---|
| Jay Bernstein<br>Deputy Agency Chief Contracting Officer | Bernard Schwarz<br>Assistant Commissioner |

**ADDENDUM # 1 ACKNOWLEDGEMENT** **PIN # 806011000110**

**PRINTED NAME:** ______________________ **SIGNATURE:**______________________

**POSITION/TITLE:** ______________________ **COMPANY:** ______________________

**NOTARY PUBLIC:** ______________________

**NOTE: SIGNED AND NOTARIZED COPIES (IN BLUE INK) OF THIS ADDENDUM MUST BE INCLUDED WITH THE BID SUBMISSION. FAILURE TO COMPLY MAY RENDER YOUR BID NON-RESPONSIVE.**

nyc.gov/hpd

**THE CITY OF NEW YORK**

**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

**INFORMATION FOR BIDDERS, BID, AGREEMENT AND CONDITIONS**

FOR FURNISHING SUCH SECURITY GUARDS AND SUCH MATERIALS, EQUIPMENT, SERVICES, ETC., AS MAY BE REQUIRED AND ORDERED BY THE DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT OR ITS SUCCESSORS IN CONNECTION WITH SECURITY GUARDS SERVICES AT CERTAIN CITY OPERATED BUSINESS OFFICES AND CONSTRUCTION SITES FOR THE PERIOD OF THREE YEARS COMMENCING THIRTY (30) DAYS FROM THE RECEIPT OF A NOTICE TO PROCEED AND IN ACCORDANCE WITH THE AGREEMENT AND SPECIFICATION THEREFORE, ADDENDA THERETO, APPENDIX AND VARIOUS EXHIBITS.

02/25/02



City of New York
DEPARTMENT OF
HOUSING PRESERVATION AND DEVELOPMENT
100 GOLD STREET, NEW YORK, N.Y. 10038

JERILYN PERINE
Commissioner

Date: January 29, 2002

**Certificate of No Effect**
**PIN # 806011000110**

The Department of Housing Preservation and Development (HPD) intends to award a contract (PIN # 806011000110) to provide Unarmed Security Guard Services. HPD has determined that the contract to be awarded through this solicitation will not directly result in the displacement of any City employee. Pursuant to Section 312 of The New York City Charter, this Certificate of No Effect will be included in the solicitation document.

Jerilyn Perine

nyc.gov/hpd
(212) 863-6100
FAX (212) 267-2565
TTY (212) 863-7934

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| INFORMATION FOR BIDDERS | | 1 |
| SUPPLEMENTAL INFORMATION FOR BIDDER | | 21 |
| BID FORM | | 24 |
| FORM OF BID BOND WITH ACKNOWLEDGMENT | | 29 |
| BIDDER QUALIFICATION STATEMENT | | 32 |
| BIDDER'S CERTIFICATION | | 34 |
| AGREEMENT | | 35 |
| ARTICLE | | |
| 1 | Definitions | 35 |
| 2 | The Agreement | 36 |
| 3 | Time of Performance | 36 |
| 4 | Scope of Services | 37 |
| 5 | Payment | 37 |
| 6 | Payment Procedure | 38 |
| 7 | Prompt Payment | 39 |
| 8 | Records and Audit | 39 |
| 9 | Limitation on Payments | 40 |
| 10 | Insurance | 40 |
| 11 | Liquidated Damages | 42 |
| 12 | Payment and Performance Bond | 43 |
| 13 | Payment Guarantee | 43 |
| 14 | Contractor's Employees and Liability | 44 |
| 15 | Termination | 45 |
| 16 | Resolution of Disputes | 46 |
| 17 | Assignments | 50 |
| 18 | Notices | 51 |
| 19 | City Supplemental Terms and Conditions | 51 |
| 20 | Equal Employment Opportunity | 58 |
| 21 | Conditions Precedent | 59 |
| 22 | Changes | 59 |
| 23 | Miscellaneous Provisions | 60 |
| Acknowledgments | | 64 |
| Scope of Services | | Exhibit A |
| Executive Order 50 (EO) Provisions | | Exhibit B |
| Section 230 Wage Rates | | Exhibit C |

THE CITY OF NEW YORK
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT

BID PACKAGE
PART A

INFORMATION FOR BIDDERS

ARTICLE 1
DESCRIPTION AND LOCATION OF WORK

The description and location of the work for which bids are requested are specified on Attachment 1, "Bid Information".

ARTICLE 2
TIME AND PLACE FOR RECEIPT OF BIDS

Sealed bids shall be received on or before the date and hour specified on Attachment 1, at which time they will be publicly opened and read aloud in the presence of the Commissioner or his or her representative, and of any bidders who may desire to be present.

ARTICLE 3
DEFINITIONS

The definitions set forth in the Procurement Policy Board Rules shall apply to this Invitation For Bids.

ARTICLE 4
INVITATION FOR BIDS AND CONTRACT DOCUMENTS

4.1 Except for titles, sub-titles, headings, running headlines, tables of contents and indices (all of which are printed herein merely for convenience) the following, except for such portions thereof as may be specifically excluded, shall be deemed to be part of this Contract and the Invitation for Bids.

1. The Advertisement and Proposal for Bids (Attachment 2 to this Information for Bidders).
2. The Bid.
3. The Agreement.
4. The Budget Director's Certificate.
5. The Specifications.
6. All addenda issued by the Commissioner prior to the receipt of bids.
7. All provisions required by law to be inserted in this Contract whether actually inserted or not.
8. The Notice of Award.
9. Performance and Payment Bonds.
10. Notice to Proceed with Work.
11. Information For Bidders.

4.2 For particulars as to this procurement, including quantity and quality of the purchase, extent of the work or labor to be performed, delivery and performance schedule, and any other special instructions, prospective bidders are referred to the Invitation For Bids

documents. A copy of such documents can be obtained at the location set forth on Attachment 1.

4.3 Deposit for Copy of Invitation For Bids Documents. Prospective bidders may obtain a copy of the Invitation For Bids documents by complying with the conditions set forth in the Advertisement for Bids. The deposit, if required, must be in the form of a money order or cashier's or certified check made payable to the City of New York, and drawn upon a state or national bank or trust company, or of a check of such bank or trust company signed by a duly authorized officer thereof.

4.4 Return of Invitation For Bids Documents. All Invitation For Bids documents must be returned to the Department upon request. If the bidder elects not to submit a bid thereunder, Invitation For Bids documents shall be returned to the Department along with a statement that no bid will be submitted.

4.5 Return of Deposit. Such deposit will be returned within thirty (30) days after the award of the contract or the rejection of all bids as set forth in the advertisement provided the Invitation For Bids documents are returned to the location specified in Attachment 1, in physical condition satisfactory to the Commissioner.

4.6 Additional Copies. Additional copies of the Invitation For Bids documents may be obtained, subject to the conditions set forth in the advertisement for bids.

## ARTICLE 5
## PRE-BID CONFERENCE

5.1 A pre-bid conference shall be held as set forth in Attachment 1.

5.2 Nothing stated at the pre-bid conference shall change the terms or conditions of the Invitation For Bids unless a change is made by written amendment as provided in Section 9, below, and the Procurement Policy Board Rules.

5.3 Failure to attend a mandatory pre-bid conference shall constitute grounds for the rejection of the bid.

Please notify the Agency Contact listed on Attachment 1 of the number of representatives from your firm that will attend the conference at least five (5) City working days before the date of the pre-bid conference.

## ARTICLE 6
## AGENCY CONTACT

Any questions or correspondence relating to this bid solicitation shall be addressed to the Agency Contact Person specified in Attachment 1.

## ARTICLE 7
## BIDDER'S OATH

7.1 The bid shall be properly signed by an authorized representative of the bidder and the bid shall be verified by the written oath of the authorized representative who signed the bid, that the several matters stated and information furnished therein are in all aspects true.

7.2 A materially false statement willfully or fraudulently made in connection with the bid or any of the forms completed and submitted with the bid may result in the termination of any contract between the City and the Bidder. As a result, the Bidder may be barred from participating in future City contracts as well as be subject to possible criminal prosecution.

**ARTICLE 8**
**EXAMINATION OF PROPOSED CONTRACT**

8.1 Request for Interpretation or Correction. Prospective bidders must examine the Contract Documents carefully and before bidding must request the Commissioner in writing for an interpretation or correction of every patent ambiguity, inconsistency or error therein which should have been discovered by a reasonably prudent bidder. Such interpretation or correction, as well as any additional contract provisions the Commissioner may decide to include, will be issued in writing by the Commissioner as an addendum to the contract, which will be sent to each person recorded as having received a copy of the contract documents from the Contract Clerk, and which also be posted at the place where the contract documents are available for the inspection of prospective bidders. Upon such mailing or delivery and posting, such addendum shall become a part of the contract documents, and binding on all bidders, whether or not actual notice of such addendum is shown.

8.2 Only Commissioner's Interpretation or Correction Binding. Only the written interpretation or correction so given by the Commissioner shall be binding, and prospective bidders are warned that no other officer, agent or employee of the City is authorized to give information concerning, or to explain or interpret, the contract.

**ARTICLE 9**
**FORM OF BIDS**

9.1 Each bid must be submitted upon the prescribed form and must contain: (a) the name, residence and place of business of the person or persons making the same; (b) the names of all persons interested therein, and if no other person is so interested, such fact must be distinctly stated; (c) a statement to the effect that it is made without any connection with any other person making a bid for the same purpose and that it is in all respects fair and without collusion or fraud; (d) a statement that no Councilman or other officer or employee or person whose salary is payable in whole or part from the City Treasury is directly or indirectly interested therein or in the supplies, materials or equipment and work or labor to which it relates, or in any portion of the profits thereof; (e) a statement that the bidder is not in arrears to the City or to any agency upon a debt or contract or taxes, and is not a defaulter as surety or otherwise upon any obligation to the City to any agency thereof, except as set forth in the bid.

9.2 The Bid shall be typewritten or written legibly in ink. The Bid shall be signed in ink. Erasures or alterations shall be initialed by the signer in ink. Failure to conform with the requirements of this paragraph 10 shall result in rejection of the bid.

**ARTICLE 10**
**IRREVOCABILITY OF BID**

The prices set forth in the bid cannot be revoked and shall be effective until the award of the contract, unless the bid is withdrawn as provided for in Sections 16 and 19, below.

**ARTICLE 11**
**ACKNOWLEDGMENT OF AMENDMENTS**

The receipt of any amendment to the contract documents shall be acknowledged by the bidder in its bid submission.

**ARTICLE 12**
**BID SAMPLES AND DESCRIPTIVE LITERATURE**

Bid samples and descriptive literature shall not be submitted by the bidder, unless expressly requested elsewhere in the contract or contract documents. Any unsolicited bid samples or descriptive literature which are submitted shall not be examined or tested and shall not be deemed to vary any of the provisions of this contract.

**ARTICLE 13**
**PROPRIETARY INFORMATION/TRADE SECRETS**

13.1 The bidder shall identify those portions of the bid which it deems to be confidential, proprietary information or trade secrets, and provide justification why such materials shall not be disclosed by the City. All materials the bidder desires to remain confidential shall be clearly indicated by stamping the pages on which such information appears, at the top and bottom thereof with the work "Confidential". Such materials stamped "Confidential" must be easily separable from the non-confidential sections of the bid.

13.2 All such materials so indicated shall be reviewed by the agency and any decision not to honor a request for confidentiality shall be communicated in writing to the bidder. For those bids which are unsuccessful, all such confidential materials shall be returned to the bidder. Prices, makes and model or catalog numbers of the items offered, deliveries, and terms of payment shall be publicly available after bid opening regardless of any designation of confidentiality made the bidder.

**ARTICLE 14**
**PRE-OPENING MODIFICATION OR WITHDRAWAL OF BIDS**

14.1 Bids may be modified or withdrawn by written notice received in the office designated in Attachment 1, before the time and date set forth the bid opening. A telegraphic, mailgram or facsimile modification or withdrawal shall be effective provided it was received in the manner set forth in the Procurement Policy Board Rules and Paragraph 10(a) above.

14.2 If a bid is withdrawn in accordance with this Section, the bid security, if any, shall be returned to the bidder.

**ARTICLE 15**
**BID EVALUATION AND AWARD**

15.1 In accordance with the New York City Charter, the Procurement Policy Board Rules and the terms and conditions of this Invitation For Bids, this contract shall be awarded, if at all, to the responsible bidder whose bid meets the requirements and evaluation criteria set forth in the Invitation For Bids, and whose bid price is either the most favorable bid price or, if the Invitation For Bids so states, the most favorable evaluated bid price. A bid may not be evaluated for any requirement or criterion that is not disclosed in the Invitation For Bids.

15.2 Restrictions. No negotiations with any bidder shall be allowed to take place except under the circumstances and in the manner set forth in Section 21. Nothing in this Section shall be deemed to permit a contract award to a bidder submitting a higher quality item than that designated in the Invitation For Bids if that bid is not also the most favorable bid.

**ARTICLE 16**
**LATE BIDS, LATE WITHDRAWALS AND LATE MODIFICATIONS**

16.1 Any bid received at the place designated in the solicitation after the time and date set for receipt of bids is late and shall not be considered. Any request for withdrawal or modification received at the place designated in the solicitation after the time and date set for receipt of bids is late and shall not be considered.

16.2 The exception to this provision if that a late modification of a successful bid that makes the bid terms more favorable to the City shall be considered at any time it is received.

**ARTICLE 17**
**WITHDRAWAL OF BIDS**

Except as provided for in Section 15, above, a bidder may not withdraw its bid before the expiration of forty five (45) days after the date of the opening of bids; thereafter, a bidder may withdraw its bid only in writing and in advance of an actual award. If within sixty (60) days after the execution of the contract, the Commissioner fails to fix the date for commencement of work by written notice to the bidder, the bidder, at his option, may ask to be relieved of his obligation to perform the work called for by written notice to the Commissioner. If such notice is given to the Commissioner, and the request to withdraw is granted the bidder waives all claims in connection with this agreement.

**ARTICLE 18**
**MISTAKE IN BIDS**

(a) Mistake Discovered Before Bid Opening

A bidder may correct mistakes discovered before the time and date set for bid opening by withdrawing or correcting the bid as provided in Section 15, above.

(b) Mistakes Discovered Before Award

1. In accordance with the Procurement Policy Board Rules, if a bidder alleges a mistake in bid after bid opening and before award, the bid may be corrected or withdrawn upon written approval of the Agency Chief Contracting Officer and Agency Counsel if the following conditions are met:

(i) Minor Informalities. Minor informalities in bids are matters of form rather than substance evident from the bid document, or insignificant mistakes that can be waived or corrected without prejudice to other bidders; that is, the effect on price, quantity, quality, delivery, or contractual conditions is negligible. The Contracting Officer may waive such informalities or allow the bidder to correct them depending on which is in the best interest of the City.

(ii)  Mistakes Where Intended Correct Bid is Evident.  If the mistake and the intended correct bid are clearly evident on the face of the bid document, the bid shall be corrected to the intended correct bid and may not be withdrawn.

(iii)  Mistakes Where Intended Correct Bid is Not Evident.  A bidder may be permitted to withdraw a low bid if:

a.  a mistake is clearly evident on the face of the bid document but the intended correct bid is not similarly evident; or

b.  the bidder submits proof of evidentiary value which clearly and convincingly demonstrates that a mistake was made.

(c)  Mistakes Discovered After Award.  Mistakes shall not be corrected after award of the contract except where the City Chief Procurement Officer subject to the approval of Corporation Counsel makes a written determination that it would be unconscionable not to allow the mistake to be corrected.

## ARTICLE 19
## LOW TIE BIDS

19.1  When two or more low responsive bids from responsible bidders are identical in price, meeting all the requirements and criteria set forth in the Invitation For Bids, the Agency Chief Contracting Officer will break the tie in the following manner and order of priority:

1.  Award to a certified New York City small minority or woman-owned business entity bidder;
2.  Award to a New York City bidder;
3.  Award to a certified New York State small, minority or woman-owned business bidder;
4.  Award to a New York State bidder.

19.2  If two or more bidders still remain equally eligible after application of paragraph (a) above, award shall be made by a drawing by lot limited to those bidders.  The bidders involved shall be invited to attend the drawing.  A witness shall be present to verify the drawing and shall certify the results on the bid tabulation sheet.

## ARTICLE 20
## REJECTION OF BIDS

20.1  Rejection of Individual Bids.  The Agency may reject a bid if:

1.  The bidder fails to furnish any of the information required pursuant to Section 25 or 30 hereof; or if
2.  The bidder is determined to be not responsible pursuant to the Procurement Policy Board Rules; or if
3.  The bid is determined to be non-responsive pursuant to the Procurement Policy Board Rules; or if
4.  The bid, in the opinion of the Agency Chief Contracting Officer, contains unbalanced bid prices and is thus non-responsive, unless the bidder can

show that the prices are not unbalanced for the probable required quantity of such items, or if the imbalance is corrected pursuant to Section 16.

(b) Rejection of All Bids. The Agency Chief Contracting Officer may reject all bids and may elect to resolicit by bid or by other methods authorized under the PPB Rules.

(c) Rejection of All Bids and Negotiation With All Responsible Bidders. The Agency may determine that it is appropriate to cancel the Invitation For Bids after bid opening and before award and to complete the acquisition by negotiation. This determination shall be based on one of the following reasons:

1. All otherwise acceptable bids received are at unreasonable prices, or only one bid is received and the Agency Chief Contracting Officer cannot determine the reasonableness of the bid price, or no responsive bid has been received from a responsible bidder; or

2. In the judgment of the Agency Chief Contracting Officer the bids were not independently arrived at in open competition, were collusive, or were submitted in bad faith.

20.2 When the Agency Head has determined that the Invitation for Bids is to be canceled and that use of negotiation is appropriate to complete the acquisition, the contracting officer may negotiate and award the contract without issuing a new solicitation subject to the following conditions:

1. prior notice of the intention to negotiate and a reasonable opportunity to negotiate have been given by the contracting officer to each responsible bidder that submitted a bid in response to the Invitation for Bids;

2. the negotiated price is the lowest negotiated price offered by any responsible bidder; and

3. the negotiated price is lower than the lowest rejected bid price of a responsible bidder that submitted a bid in response to the Invitation for Bids.

## ARTICLE 21
## RIGHT TO APPEAL DETERMINATIONS OF NON-RESPONSIVENESS OR NON-RESPONSIBILITY AND RIGHT TO PROTEST SOLICITATIONS AND AWARD

The bidder has the right to appeal a determination of non-responsiveness or non-responsibility and has the right to protest a solicitation and award. For further information concerning these rights, the bidder is directed to the Procurement Policy Board Rules.

## ARTICLE 22
## AFFIRMATIVE ACTION AND EQUAL EMPLOYMENT OPPORTUNITY

This Invitation to Bid is subject to applicable provisions of Federal, State and Local Laws and executive orders requiring affirmative action and equal employment opportunity.

## ARTICLE 23
## VENDEX QUESTIONNAIRE

Pursuant to Administrative Code section 6-116.2 and the Rules of the Procurement Policy Board (9 RCNY section 5-02), bidders may be obligated to submit completed VENDEX questionnaires. Generally, if this bid is $100,000 or more, or if this bid when added to the sum total of all contracts, concessions and franchises the bidder has received from the City and any subcontracts received from City contractors over the past twelve months equals or exceeds $100,000, VENDEX questionnaires must be completed and submitted. Any questions concerning this requirement must be submitted to the Agency Chief Contracting Officer or the contact person for this contract.

## ARTICLE 24
## COMPLAINTS ABOUT BID PROCESS

The New York City Comptroller is charged with the audit of contracts in New York City. Any vendor who believes that there has been unfairness, favoritism or impropriety in the bid process should inform the Comptroller, Office of Contract Administration, One Centre Street, Room 835, New York, New York; telephone number (212) 669-2323.

## ARTICLE 25
## BID, PERFORMANCE AND PAYMENT SECURITY

25.1    Bid Security.  The Mayor's Office of Operations or the Agency Chief Contracting Officer may require the submission of bid security, if any, in an amount and type specified on Attachment 1.  Bid security shall accompany the bid in the bid envelope.  Bid security shall be returned to unsuccessful bidders.

25.2    Performance Security.  The Mayor's Office of Operations or the Agency Chief Contracting Officer may require performance security in the amount specified on Attachment 1. The performance security shall be delivered by the contractor to the City at the same time the contract is signed by the Commissioner or his designee.  If a contractor fails to deliver the required performance security, the award shall be rescinded, its bid security shall be enforced and award of the contract may be made to the next lowest responsive and responsible bidder or the contract may be rebid.

25.3    Payment Security.  Payment security shall be delivered by the contractor to the City at the same time the contract is signed by the Agency Head or his designee.  If a contractor fails to deliver the required payment security, the award shall be rescinded, bid security enforced, and award of the contract may be made to the next lowest responsive and responsive bidder or the contract may be rebid.

25.4    Acceptable Security.  Acceptable security for bids, performance and payment shall be limited to:

1. a one-time bond in a form satisfactory to the City;
2. a bank certified check or money order;
3. City Bonds; or
4. other financial instruments as determined by the Office of Operations in consultation with the Comptroller.

**ARTICLE 26**
**FAILURE TO EXECUTE CONTRACT AND FURNISH SECURITY**

In the event of failure of the successful bidder to execute the contract and furnish the required security within ten (10) days after notice of the award of the contract, the deposit of the successful bidder or so much thereof as shall be applicable to the amount of the award made shall be retained by the City, and the successful bidder shall be liable for and hereby agrees to pay on demand the difference between the price bid and the price for which such contract shall be subsequently awarded, including the cost of any required reletting and less the amount of such deposit. No plea of mistake in such accepted bid shall be available to the bidder for the recovery of the deposit or as a defense to any action based upon such accepted bid. Further, should the bidder's failure to comply with this Article cause any funding agency, body or group (Federal, State, City, public, private, etc.) to terminate, cancel or reduce the funding on this project, the bidder in such event shall be liable also to the City for the amount of actual funding withdrawn by such agency on this project less the amount of the forfeited deposit.

**ARTICLE 27**
**POWER OF ATTORNEY**

Attorneys in fact who sign performance or payment bonds must file with each bond a certified copy of their power of attorney to sign said bond or bonds.

**ARTICLE 28**
**BIDDER RESPONSIBILITIES AND QUALIFICATION**

28.1 Bidders must include with their bids all information necessary for a determination of bidder responsibility, as set forth in the specifications.

28.2 The Agency may require any bidder or prospective bidder to furnish all books of account, records, vouchers, statements or other information concerning the bidder's financial status for examination as may be required by the Agency to ascertain the bidder's responsibility and capability to perform the contract. If required, a bidder must also submit a sworn statement setting forth such information as the Agency may require concerning present and proposed plant and equipment, the personnel and qualifications of his working organizations, prior experience and performance record.

28.3 Oral Examination on Qualifications. In addition thereto, and when directed by the Agency, the bidder, or a responsible officer, agent or employee of the bidder, must submit to an oral examination to be conducted by the Agency in relation to his proposed tentative plan and schedule of operations, and such other matters as the Agency may deem necessary in order to determine the bidder's ability and responsibility to perform the work in accordance with the contract. Each person so examined must sign and verify a stenographic transcript of such examination noting thereon such collections as such person may desire to make.

28.4 If the bidder fails or refuses to supply any of the documents or information set forth in paragraph (a) hereof or fails to comply with any of the requirements thereof, the Agency may reject the bid.

## ARTICLE 29
## EMPLOYMENT REPORTS (BUREAU OF LABOR SERVICES)

In accordance with Executive Order No. 50 (1980) as modified by Executive Order 108 (1986), the filing of a completed Employment Report (ER) is a requirement of doing business with the City of New York for contractors with contracts of $1,000,000 or more and subcontractors with subcontracts of $750,000 or more. The required forms and information are attached hereto.

## ARTICLE 30
## LABOR LAW REQUIREMENTS

The successful bidder will be required to comply strictly with all Federal, State and local labor laws and regulations, including but not limited to providing on-the-job training opportunities and payment of prevailing wages (See Exhibit A to the Contract).

## ARTICLE 31
## INSURANCE

Bidders are advised that the insurance requirements contained herein are regarded as a material term of this contract. During performance and up to the date of final acceptance, the contractor must effect and maintain with companies authorized to do business in the State of New York, the types and amounts of insurance specified in the Agreement.

## ARTICLE 32

## INTENTIONALLY BLANK

## ARTICLE 33
## LICENSE AND PERMITS

The successful bidder will be required to obtain all necessary licenses and permits necessary to perform the work.

## ARTICLE 34
## MULTIPLE PRIME CONTRACTORS

If more than one prime contractor will be involved on this project, all contractors are required to examine the Invitation for Bid packages for all other parts of the project.

## ARTICLE 35
## LOCALLY BASED ENTERPRISE REQUIREMENTS (LBE)

35.1 This contract is subject to the requirements of Administrative Code, Section 6-108.1, and the regulations promulgated thereunder. No Contract will be awarded unless and until these requirements have been complied with in their entirety.

35.2 Be advised that:

(a) If any portion of the contract is subcontracted, not less than ten percent of the total dollar amount of the contract shall be awarded to locally based enterprises ("LBEs"); except, where less than ten percent of the total dollar amount of the contract is subcontracted, such lesser percentage shall be so awarded.

(b) No contractor shall require performance and payment bonds from LBE subcontractors.

(c) No contract shall be awarded unless the contractor first identifies in its bid:

1. the percentage, dollar amount and type of work to be subcontracted; and

2. the percentage, dollar amount and type of work to be subcontracted; to LBEs.

(d) Within ten calendar days after notification of low bid, the apparent low bidder shall submit an "LBE Participation Schedule" to the contracting agency. If such schedule does not identify sufficient LBE subcontractors to meet the requirements of Administrative Code Section 6-108.1, the apparent low bidder shall submit documentation of its good faith efforts to meet such requirements.

1. The "LBE Participation Schedule" shall include:

   a. the name and address of each LBE that will be given a subcontract;
   b. the percentage, dollar amount and type of work to be subcontracted to the LBE, and
   c. the dates when the LBE subcontract work will commence and end.

2. The following documents shall be attached to the "LBE Participation Schedule":

   a. verification letters from each subcontractor listed in the "LBE Participation Schedule stating that the LBE will enter into a formal agreement for work,
   b. certification documents of any proposed LBE subcontractor which is not on the LBE certified list, and.
   c. copies of the certification letter of any proposed subcontractor which is an LBE.

3. Documentation of good faith efforts to achieve the required LBE percentage shall include as appropriate but not limited to the following:

   a. attendance at prebid meetings, when scheduled by the agency, to advise bidders of contract requirements;
   b. advertisement where appropriate in general circulation media, trade association publications, and small business media, trade association publications and small business media of the specific subcontracts that would be at least equal to the percentage goal for LBE utilization specified by the contractor;
   c. written notification to associations of small, minority and women contractors soliciting specific subcontractors;
   d. written notification by certified mail to LBE firms that their interest in the contract is solicited for specific work items and their estimated values;

e.    demonstration of efforts made to select portions of the work for performance by LBE firms in order to increase the likelihood of achieving the stated goal;

f.    documented efforts to negotiate with LBE firms for specific subcontracts including at a minimum;

(i)    The names, address and telephone numbers of LBE firms that are contacted,

(ii)    A description of the information provided to LBE firms regarding the plans and specifications for portions of the work to be performed;

(iii)    Documentation showing that no reasonable price can be obtained from LBE firms;

(iv)    A statement of why agreements with LBE firms were not reached;

g.    a statement of the reason for rejecting any LBE firm which the contractor deemed to be unqualified; and

h.    documentation of efforts made to assist the LBE firms contacted that needed assistance in obtaining required insurance.

(e)    Unless otherwise waived by the agency head with the approval of ODC, failure of a proposed contractor to provide the information required by paragraphs c and d above may render the bid non-responsive and the contract may not be awarded to the bidder. If the contractor states that it will subcontract a specific portion of the work, but can demonstrate despite good faith efforts it cannot achieve its required LBE percentage for subcontracted work until after award of contract, the contract may be awarded, subject to a letter of compliance from the contractor stating that it will comply with Administrative Code Section 6-108.1 and subject to approval by the agency head. If the contractor has not met its required LBE percentage prior to award, the contractor shall demonstrate that a good faith effort has been made subsequent to award to obtain LBEs on each subcontract until its meets the required percentage.

(f)    When a bidder indicates prior to award that no work will be subcontracted, no work may be subcontracted without the prior written approval of the Agency Head, which shall be granted only if the contractor in good faith seeks LBE subcontractors at least six weeks prior to the start of work.

(g)    The contractor may not substitute or change any LBE which was identified prior to award of the contract with the written permission of the Agency Head. The contractor shall make a written application to the contracting agency head for permission to make such substitution or change, explaining why the contractor needs to change its LBE subcontractor and how the contractor will meet its LBE subcontracting requirement. Copies of such application must be served on the originally identified LBE by certified mail return receipt requested as well as the proposed substitute LBE. The Agency Head shall determine whether or not to grant the contractor's request for substitution.

**ARTICLE 36**
**BID SUBMISSION REQUIREMENTS**

The following forms, all of which are contained in the Exhibits attached hereto, are to be completed and submitted with the bid:

1. Bid Form;
2. Bid Security (if required, see Attachment 1);
3. Bidder Qualification Statement (see Part B Supplemental Information For Bidders.)

The following forms shall be obtained by the Contractor from HPD's Office of Equal Opportunity:

1. a. Employment Report (if bid is in excess of $50,000)
   b. Contract Certificate (if bid is less than $1,000,000 and more than $750,000)

Non-compliance with any of the above bid submission requirements may result in the disqualification of the bid.

**ARTICLE 37**
**REGISTRATION**

This Contract shall not be binding or of any force unless it is registered by the Comptroller in accordance with Section 328 of the City Charter and the Procurement Policy Board Rules. This Contract shall continue in force only after annual appropriation of funds by the City of New York and certification as hereinabove set forth.

**ARTICLE 38**
**PROCUREMENT POLICY BOARD RULES**

This Information for Bidders is subject to the Rules of the Procurement Policy Board of the City of New York effective August 1, 1990. In the event of a conflict between said Rules and a provision of this Invitation for Bidders, the Rules shall take precedence.

**ARTICLE 39**
**PROMPT PAYMENT**

The Prompt Payment provisions set forth in the Procurement Policy Board Rules in effect at the time of this solicitation will be applicable to payments made under a contract resulting from this solicitation. The provisions require the payment to contractors of interest on payments made after the required payment date except as set forth in of the Rules.

The contractor must submit a proper invoice to receive payment, except where the contract provides that the contractor will be paid at predetermined intervals without having to submit an invoice for each scheduled payment.

Determinations of interest due will be made in accordance with the provisions of Procurement Policy Board Rules and General Municipal Law §3-a.

**ATTACHMENT 1**
**BID INFORMATION**

| | |
|---|---|
| DESCRIPTION OF WORK: | UNARMED SECURITY GUARD CONTRACT |
| LOCATION OF WORK: | VARIOUS SITES |
| DOCUMENTS AVAILABLE AT: | 100 GOLD STREET, ROOM 1-W, NEW YORK CITY, 10038; (212) 863-6930 |
| SUBMIT BIDS BEFORE BID OPENING TO: | HPD DISCIPLINARY UNIT, 100 GOLD STREET, RM. 1-W, NEW YORK CITY 10038 |
| TIME: | NO LATER THAN 11:00 AM ON TUESDAY, APRL 2, 2002. |
| BID OPENING PLACE: | 100 GOLD STREET, NEW YORK CITY, 1ST FLOOR CONFERENCE ROOM 1 R-3 |
| BID OPENING DATE AND HOUR: | TUESDAY, APRIL 2, 2002, at 11:00 AM |
| OPTIONAL PRE-BID CONFERENCE: | HPD, 100 GOLD STREET, RM. 1 R-3, NYC |
| PLACE, DATE, AND HOUR: | THURSDAY, MARCH 21, 2002 at 10:30 AM |
| BID SECURITY: | 5% OF THE BID AMOUNT |
| PERFORMANCE BOND: | $ 500,000.00 |
| PAYMENT BOND: | $ 1,500,000.00 |
| AGENCY CONTACT PERSON: | MARIO FERRIGNO, DIRECTOR OF DISCIPLINARY UNIT (212) 863-6930 |

**ATTACHMENT 2**
**COPY OF ADVERTISEMENT FOR BIDS**

**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

**PROPOSAL**

Sealed bids will be received by the Department of Housing Preservation and Development in Room 1 W, 100 Gold Street, New York City, New York 10038, no later than **11:00 AM on Tuesday, April 2, 2002.**

BIDS WILL BE PUBLICLY OPENED AND READ AT **11:00 AM** ON THE DATE AND PLACE SPECIFIED BELOW:

**Tuesday, April 2, 2002**
**HPD, 100 Gold Street, NY, NY 10038**
**Conference Room 1 R-3**

The Department of Housing Preservation and Development, Office of Administration (HPD) is accepting bids to provide unarmed uniform security guard services for approximately 10 HPD offices/construction sites throughout the metropolitan area for 12 months, beginning 30 days from the receipt of a Notice to Proceed.

A Pre-Bid Conference will be held in Conference Room 1 R-3, 100 Gold Street, New York, New York on **Thursday, March 21, 2002**, at **10:30 AM**.

Blank bid forms, the contract documents and further information may be obtained upon application to the Department of Housing Preservation and Development, Disciplinary Unit, Room 1W, 100 Gold Street, New York, New York 10038, telephone No. (212) 863-6930.

The Contract shall be subject to the prevailing wage rate established by the Comptroller of the City of New York, and to all Equal Opportunity provisions required by State or City statutes, rules and regulations.

**PART B**
**SUPPLEMENTAL INFORMATION FOR BIDDERS**

**ARTICLE 1**
**BIDDER QUALIFICATION STATEMENT**

In accordance with Section 36 of the Information for Bidders, the bidder shall complete the Bidder Qualification Statement set forth in Article 3 of Part C of this Bid Package in its entirety and submit it with the bid proposal prior to the date of the bid opening.

**ARTICLE 2**
**EQUAL EMPLOYMENT OPPORTUNITY**

2.1 Equal Employment Opportunity. HPD has adopted a policy to provide equal opportunity in employment for all qualified persons and to prohibit discrimination in employment because of race, creed, color, sex, national origin, age, and sexual orientation or affectional preference and to promote the full realization of equal employment opportunity through a continuing affirmative program of compliance. The Contractor must do more than merely support non-discrimination. It means taking positive steps to recruit, employ and develop qualified or qualifiable minority group members in all job categories of work and advancement. The bidder's attention is called to the various provisions set forth in the Contract Documents with respect to providing equal opportunity and prohibiting discrimination in employment.

Prior to the award of the Contract, if requested to do so by the Compliance Officer, the low bidder must attend a pre-award conference to be held in the offices of EOD for the purpose of acquainting the bidder with the statutory and contractual requirements and those specific measures which shall constitute an affirmative program of implementation. After a pre-award conference and prior to the award, the low bidder shall prepare a written statement which describes specific steps being undertaken for providing minority group members with equal opportunity in training and apprenticeship programs, journeyman recruitment, and all other aspects of employment ("Program of Equal Opportunity"). The result shall be to assure that there are minority group members employed in all trades and all phases of contracts. The Program of Equal Opportunity must be submitted to HPD for approval within seven (7) days after the preaward conference. HPD shall be the sole judge of the Program of Equal Opportunity's acceptability. No Contract will be awarded to a bidder unless the Program of Equal Opportunity has been accepted by HPD.

2.2 Program of Equal Opportunity. Examples of steps that a prospective contractor or subcontractor is expected to pursue shall include, but shall not be limited to, the following:

1. Developing an equal employment opportunity program, stating it in writing, and implementing it with controls to ensure compliance.

2. Notifying and thoroughly informing all responsible employees (e.g., all foremen and other supervisory personnel) that the firm is an equal opportunity employer and that they are required to comply with the firm's regulations concerning equal opportunity.

3. Designating an officer or top-level representative of the firm as Equal Employment Compliance Officer, whose responsibilities shall include, but shall not be limited to:

a. Consulting with union officials and/or industry representatives and reviewing collective bargaining agreements in order to ensure equal employment opportunity.

b. Cooperating with civil rights groups, community organizations, and other interested sources in order to recruit minority group workers for apprentice and journeyman entrance into employment and into the various craft unions under contract with the firm and its subcontractors.

c. Providing liaison with the Compliance Officer, including, but not limited to, reporting on the company's progress.

d. Notifying sources of recruitment in writing that the firm is an Equal Opportunity Employer and solicits referral of qualified minority group applicants for all jobs, including "white collar" jobs.

e. Acting affirmatively to ensure that minorities are hired, assigned, paid, developed, promoted, laid off, or terminated on the same basis as all employees.

f. Promoting apprenticeship training programs as a member of a joint apprenticeship committee or as an individual and requesting that the building trades give public notice that apprenticeship programs are open to everyone. Copies of such notices shall be submitted to HPD as an example of the company's affirmative compliance program.

g. Providing apprenticeship assistance to members of minority background who are potential candidates. This should include helping them obtain the information or documents needed to qualify for acceptance in particular apprenticeship programs, as well as information on how, when, or where to apply.

h. Developing other ways of encouraging minority youths to participate in apprenticeship programs such as sending a representative to local schools, community action centers, the local Labor Departments or other appropriate agencies to explain such apprenticeship programs and to encourage applications from such youths.

i. Selecting, when soliciting personnel in any category, a media format for advertisements which is likely to reach minority groups and submitting to HPD the number of copies of advertising or news releases used to accomplish this.

j. Encouraging greater participation in bidding for subcontracting work by (i) minority group subcontractors, and (ii) subcontractors with substantial minority group representation among their employees.

2.3 Additional Requirements. In addition to a written Program of Equal Opportunity, the contractor is required to:

1. Secure from its subcontractor(s) Program(s) of Equal Opportunity and other general requirements described above which are applicable to the Contractor.

No subcontractor may be engaged until its Program of Equal Opportunity is approved.

2. Send a notice to each labor union or representative of workers with whom it has collective bargaining agreements, with a copy to the Compliance Officer, of its commitments pursuant to the procedure as outlined above and consult with union officials to secure their full understanding and cooperation. A sample of such Notice of Equal Employment Opportunity will be furnished by the Compliance Officer.

3. Hire minority group members from other sources, should the unions with which it has collective bargaining agreements be unable or unwilling to supply them.

4. Post the provisions of the Equal Opportunity clauses of Executive Order No. 11216, or equivalent posters required by HPD or any other agency of appropriate jurisdiction, in conspicuous places available to all employees and applicants for employment. Such posters will be provided by the Compliance Officer.

5. Provide, if requested by the Compliance Officer, an estimate of the number of workers expected to be hired in each category and their racial and ethnic distribution.

No letter of award or approval of a subcontractor shall be issued without the prior approval of he Program of Affirmative Action by EOD.

## ARTICLE 3
## CONTRACTOR'S RATE

3.1 Bids for Contractor's hourly fee should reflect all charges payable to the contractor for all of the services the contractor will be required to furnish and perform at HPD sites under the Contract, excluding all costs identified in the Contract and Exhibit A thereto as Compensable Costs. Wages and salaries to be paid to the security guards will be reimbursed to the contractor by HPD as Compensable Costs. Bids should be expressed as an hourly fee to be paid to the contractor for each hour of employment by each guard.

**PART C**
**FORMS TO BE COMPLETED**
**BY BIDDER PRIOR TO BIDDING**

**ARTICLE 1**
**FORM OF BID**

**THE CITY OF NEW YORK**
**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
**OFFICE OF ADMINISTRATION**
**100 GOLD STREET**
**NEW YORK, NEW YORK 10038**
**CONTRACT NO.________**

**BID FOR FURNISHING ALL LABOR, MATERIALS AND EQUIPMENT NECESSARY AND REQUIRED FOR UNARMED SECURITY GUARD SERVICES**

ADDRESS:__________________BOROUGH_______________
Name of Bidder__________________________________

Bidder is (check one, as case may be, and state Social Security or Federal Employer Identification Number):
Individual ( ) __________________
Partnership ( ) __________________
Corporation ( ) __________________

Residence of Bidder (if Individual) ______________________
Place of Business of Bidder___________________________
Date of Bid ___________________________________

(If bidder is a partnership, fill in the following blanks:)

| Name of Partners | Residence of Partners |
|---|---|
| ______________ | __________________ |
| ______________ | __________________ |
| ______________ | __________________ |

(If bidder is a corporation, fill in the following blanks:)

Organized under the laws of the State of ____________________
Name and Home Address of President ______________________
________________________________________
Name and Home Address of Secretary ______________________
________________________________________
Name and Home Address of Treasurer ______________________
________________________________________

The above-named bidder affirms and declares:

1. The said bidder is of lawful age and the only one interested in this bid and that no person, firm or corporation other than the hereinabove named has any interest in this bid, or in the contract proposed to be taken.

2. By submission of this bid, each bidder and each person signing on behalf of any bidder certifies, and in the case of a joint bid each party thereto certifies that as to his own organization, under penalty of perjury, and to the best of its knowledge and belief: (i) The prices which have been quoted in this bid have been arrived at independently without collusion, consultation, communication, or agreement, for the purpose of restricting competition, with any other bidder or with any competitor or potential competitor; (ii) Unless otherwise required by law, the prices which have been quoted in this bid have not been knowingly disclosed by the bidder, prior to opening, directly or indirectly to any other bidder or to any competitor or potential competitor; and (iii) No attempt has been made or will be made by the bidder to induce any other person, partnership or corporation to submit or not to submit a bid for the purpose of restricting competition.

3. No councilman or other officer or employee or person whose salary is payable in whole or in part by the City of New York ("City") is directly or indirectly interested in this bid, or in the supplies, materials, equipment, work or labor to which it relates; or in any of the profits thereof.

4. Said bidder is not in arrears to the City upon debt, contract, or taxes, and is not in default, as surety or otherwise, upon any obligation to the City, and has not been declared not responsible, or disqualified, by any agency of the City or the State of New York ("State"), nor is there any proceeding pending relating to the responsibility or qualifications of the bidder to receive public contracts. The bidder shall also state in the bid the Employer Identification Number.

5. The bidder, as an individual, or as a member, partner, director or officer of the bidder if the same be a firm, partnership, or corporation, executes this document expressly warranting and representing that should this bid be accepted by the City and the Contract awarded him, he and his subcontractors engaged in the performance of the Contract (i) will comply with the provisions of Section 6-108 of the City Administrative Code and the nondiscrimination provisions of Section 220e of the State Labor Law as more expressly and in detail set forth in the Contract; (ii) will comply with the provisions of Section 6-109 of the Administrative Code of the City of New York in relation to minimum wages and other stipulations as more expressly and in detail set forth in the Contract; (iii) have complied with the provisions of the aforesaid laws since their respective effective dates; and (iv) will post notices, to be furnished by the City, setting forth the requirements of the aforesaid law in prominent and conspicuous places in each and every plant, factory, building and structure where employees engaged in the performance of the Contract can readily view it, and will continue to keep such notices posted until all the supplies, materials and equipment or all the work, labor and services required to be furnished or rendered by the Contractor has been accepted by the City.

In the event of breach or violation of any of the foregoing, the bidder may be subject to damages, liquidated or otherwise, cancellation of the contract and suspension as a bidder for a period of three (3) years.

(The words, "the bidder", "he", "his" and "him" where used herein shall mean the individual bidder, firm, partnership or corporation executing this bid form).

6. Said bidder has visited and examined the site of the work and has carefully examined the Contract in the form approved by the City's Corporation Counsel, and will execute the Contract and perform all its items, covenants and conditions, and will provide, furnish and

deliver all the work, materials, supplies, tools and appliances for all labor and materials necessary or required for the hereinbefore named work in strict conformity with the Contract.

7. The bidder agrees to be subject to and to perform all the covenants, terms and conditions of the General Conditions, the Special Conditions (if any), the Specifications, the Federal Conditions (if any), and the Equal Opportunity provisions annexed to the Contract.

8.(a)The City is exempt from payment of Federal, State, local taxes and Sales and Compensating Use Taxes of the State of New York and of cities and counties on all materials and supplies sold to the City pursuant to the provisions of this Contract. These taxes are not to be included in bids. However, this exemption does not apply to tools, machinery, equipment or other property leased by or to the bidder or a subcontractor, or to supplies and materials, which, even though they are consumed, are not incorporated into the completed work (consumable supplies), and the bidder and his subcontractors shall be responsible for any pay and all applicable taxes, including Sales and Compensating Use Taxes, on such leased tools, machinery, equipment or other property and upon all such unincorporated supplies and materials.

(b) The bidder and his subcontractors and materialmen shall obtain any and all necessary Contractor Exempt Purchase Certificates or resale certificates from the appropriate governmental agency or agencies, and furnish a Contractor Exempt Purchase Certificate or resale certificate to all persons, firms or corporations from which they purchase supplies and materials for the performance of the work covered by this Contract.

9.(a)The Contractor agrees to sell and the City agrees to purchase all materials other than consumable supplies, required, necessary or proper for or incidental to the construction of the Project covered by this Contract.

(b)The Contractor agrees to construct the Project and to perform all work, labor and services required, necessary or proper for or incidental thereto. The sum so paid pursuant to this Contract for supplies, materials, work, labor and services required hereunder shall be in full consideration for the performance by the Contractor for all his duties and obligations under this Contract.

(c)The purchase by the Contractor of the supplies and materials sold hereunder shall be a purchase of procurement for resale and therefore not subject to the State or City Sales or Compensating Use Taxes or any such taxes of cities or counties. The sales of such supplies and materials by the Contractor to the City is exempt from the aforesaid sales or compensating use taxes. With respect to such supplies and materials, the Contractor, at the request of the City, shall furnish to the City such bills of sale and other instruments as may be required by it, properly executed, acknowledged and delivered assuring to the City titles to such supplies and materials, free of liens and encumbrances, and the Contractor shall mark or otherwise identify all such materials as the property of the City.

(d) Title to all materials to be sold by the Contractor to the City pursuant to the provisions of this Contract, shall immediately vest in and become the sole property of the City upon delivery of such supplies and materials to the site and prior to its becoming a part of the permanent structure. Notwithstanding such transfer of title, the Contractor shall have the full and continuing responsibility to install such materials and supplies in accordance with the provisions of this Contract, protect them, maintain them in a proper condition and forthwith repair, replace and make good any damage thereto, theft or disappearance thereof, and furnish additional materials in place of any that may be lost, stolen or rendered unusable, without cost

to the City, until such time as the work covered by the Contract is fully accepted by the City. Such transfer of title shall in no way affect any of the Contractor's obligations hereunder. In the event that, after title has passed to the City, any of such supplies and materials are rejected as being defective or otherwise unsatisfactory, title to all such supplies and materials shall be deemed to have been transferred back to the Contractor.

(e)    The purchase by subcontractors of supplies and materials to be sold hereunder shall also be deemed a purchase or procurement for resale to the Contractor (either directly or through other subcontractors) and therefore not subject to the aforesaid Sales or Compensation Use Taxes, provided that the subcontract agreements provide for the resale of such supplies and materials prior to and separate and apart from the incorporation of such supplies and materials into the permanent construction.

10.    In the event any of the provisions of the Contract shall be deemed to be in conflict with the Bid Package or shall create any ambiguity, then the Contract shall control.

11.    Bids should reflect all charges payable to the contractor for all of the services the contractor will be required to furnish and perform at HPD sites under the Contract, excluding all costs identified in the Contract and Exhibit A thereto as Compensable Costs.

12.    Subject to Section 5.2 of Article 5 of this Agreement, HPD hereby estimates that the total number of service hours required to be performed by Contractor under this Agreement is approximately 189,500 hours.

13.    The direct cost of labor for guards shall always be at a minimum the prevailing wage as set forth in the Schedule of Prevailing Wages and Supplemental Benefits under section 230 of the New York State Labor Law (see Exhibit C).

14.    The direct cost of labor for all titles listed on the Bid Sheet shall be Compensable Costs as defined in the Scope of Services.

# EXHIBIT 6

PART 2 of 3

BID SHEET

C... ...tor's Hourly Fee: _____ per hour x 189,500 estimated hours = $__________.

NOTE: Contractor's hourly fee is a fixed rate which shall not change even if prevailing wage rates change.

Security Guards And Security Officer Sergeants $_____ per hour x 155,000 estimated hours = $__________.

Based on the current **prevailing wage,** the minimum rate per hour is **$10.99**, which includes hourly wage of $8.52, supplemental benefits of $.94 per hour and payroll taxes. Contractor must remain current with regard to prevailing wages; which are regularly amended by the Comptroller's office.

Security Coordinator: $_____ per hour x 6,900 estimated hours = $__________.

Minimum rate per hour is **$18.85**, which includes hourly wages, supplemental benefits, and payroll taxes.

Security Specialist: $_____ per hour x 6,900 estimated hours = $__________.

Minimum rate per hour is **$13.14**, which includes hourly wages, supplemental benefits, and payroll taxes.

Security Director: $_____ per hour x 6900 estimated hours = $__________.

Minimum rate per hour is **$54.69**, which includes hourly wages, supplemental benefits, and payroll taxes.

Clerical Support Aide/Receptionists: $_____ per hour x 13,800 estimated hours = $__________.

Based on the current **prevailing wage**, the minimum rate per hour is **$15.69**, which includes hourly wage of $12.64, supplemental benefits of $.48 per hour and payroll taxes. Contractor must remain current with regard to prevailing wages; which are regularly amended by the Comptroller's office.

Sanitation facilities and Construction Trailers: annual allowance for approx. 1 per year = $2,000.00

---

TOTAL: $__________

TOTAL BID AMOUNT IN WORDS: ______________________________ DOLLARS. (In case of any discrepancy between the price in words and that in figures, the price in words will be considered the bid price.)

Bidder: ______________________________

______________________________
Secretary of Corporate Bidder

By: ______________________________
Signature of Partner or Officer

Attest: (Corporate Seal)

**ACKNOWLEDGMENT OF PRINCIPAL**

STATE OF______)
) ss.:
COUNTY OF_____)

On the _________ day of _____________ in the year _________ before me, the undersigned, a Notary Public in and for said State, personally appeared ________________________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

____________________
Notary Public

## ARTICLE 2
## FORM OF BID BOND

**NOTE: BID BOND IS NOT REQUIRED FOR ANY BID WHICH DOES NOT EXCEED TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00)**

KNOW ALL MEN BY THESE PRESENTS, that we, ________________

("Principal"), and ________________

("Surety") are held and firmly bound to THE CITY OF NEW YORK ("City"), or to its successors and assigns in the penal sum of ________________ Dollars ($____________) lawful money of the United States, for the payment of which said sum of money well and truly to be made, we, and each of us bind ourselves, and our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

Whereas, the Principal is about to submit (or has submitted) to the City the accompanying proposal ("Proposal"), hereby made a part hereof, to enter into a contract in writing for ________________

NOW, THEREFORE, the conditions of this obligation are such that if the Principal shall not withdraw said Proposal without the consent of the City for a period of forty five (45) days after the opening of bids and in the event of acceptance of the Principal's Proposal by the City, if the Principal shall:

(a) Within ten (10) days after notification by the City execute in quadruplicate and deliver to the City all the executed counterparts of the contract in the form set forth in the Contract Documents, in accordance with the Proposal as accepted; and

(b) Furnish a performance bond and separate payment bond ("Payment and Performance Bond"), as may be required by the City for the faithful performance and proper fulfillment of such Contract, which bonds shall be satisfactory to the City in all respects and shall be executed by good and sufficient sureties; and

(c) In all respects perform the agreement created by the acceptance of the Proposal as provided in the article entitled "Information for Bidders," bound herewith and hereby made a part hereof, or if the City shall reject the Proposal, then this obligation shall be null and void; otherwise to remain in full force and effect.

In the event that the Proposal shall be accepted and the Contract be awarded to him, the Surety hereunder agrees subject only to the payment by the Principal of the premium therefor, if requested by the City, to write the Payment and Performance Bonds in the form set forth in the Contract Documents.

It is expressly understood and agreed that the liability of the Surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated.

There shall be no liability under this bond if, in the event of the acceptance of the Proposal by the City, either a performance bond or a payment bond, or both, shall not be

required by the City on or before the 39th day after the date on which the City signs the Contract.

The Surety, for the value received, hereby stipulates and agrees that the obligations of the Surety and its bond shall in no way be impaired or affected by any postponements of the date upon which the City will receive or open bids, or by any extension of the time within which the City may accept the Proposal, or by any waiver by the City of any of the requirements of the Information for Bidders, and the Surety hereby waives notice of any such postponements, extensions, or waivers.

IN WITNESS WHEREOF, the Principal and the Surety have hereunto set their hands and seals and such of them as are corporations have caused their corporate seals to be hereto affixed and these presents to be signed by their proper officers, the ___ day of _________, 20_.

(Seal) ______________

Principal

By:____________

______________

Surety

By: ___________

**ACKNOWLEDGMENT OF PRINCIPAL**

TATE OF______)
) ss.:
COUNTY OF_____)

On the ______________ day of _________________ in the year ______________ before me, the undersigned, a Notary Public in and for said State, personally appeared ______________________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

____________________
Notary Public

AFFIX ACKNOWLEDGMENTS AND JUSTIFICATION OF SURETIES

**ARTICLE 3**
**BIDDER QUALIFICATION STATEMENT**

Failure to submit this form, completed, along with the bid, shall render your bid non-responsive.

A bidder will not be considered qualified and his bid will be nonresponsive if the responses submitted on this form indicate (a) that the bidder will not be able to commence and finish the Contract Work promptly and (b) that the bidder has taken on or will be taking on so much work that, in the opinion of HPD, the bidder will not be able to perform in accordance with the terms of the Contract.

It is presently anticipated that the Contract will be executed on ______________ (the "Execution Date") and that Contract Work will commence on ______________ (the "Start Date") and finish on ______________ (the "Finish Date") These dates are estimates only which do not constitute a contractual obligation of the City.

1. (a) Will you be able to commence work on the Start Date? _____ _____
Yes No

(b) Will you be able to finish work on the Finish Date? _____ _____
Yes No

2. What is the total number of contracts (both public and private sector) under which you will be obligated to be working on the Start Date? _________. What is their total dollar amount?_________.

3. What is the number of additional contracts (both public and private) under which you will be obligated to start work before the Finish Date?_________. What is their total dollar amount?_______

4. How many qualified employees do you have who could work on this Contract?________.

5. How many of those qualified employees will be assigned to this Contract on the Start Date and for each business day until the Finish Date? ________.

6. How many additional qualified employees will be working on this Contract before the Finish Date?________.

7. How many qualified full-time supervisory employees or managers will be assigned to this Contract each business day?________.

8. What percentage of the materials required for the total Contract will you have available for this Contract on the Start Date? _______.

9. What percentage of the materials required to start this Contract will you have available on the Start Date?________.

10. Do you have the financial resources to continue working on this Contract while awaiting payment from the City for work performed on this or other contracts?

_____ Yes _____ No

11. Will you subcontract any portion of the Contract Work?

_____ Yes _____ No

If so, approximately how much? _____

If a portion of the Contract is to be subcontracted, the qualifications of the subcontractor will be considered in determining whether the prime contractor is qualified. When entering into subcontracts the bidder must comply with the requirements of Executive Order No. 53.

12. Are you performing all work on other Contracts with the City in a timely manner?

_____ Yes _____ No

13. Do you have at least two years experience in the type and magnitude of work which is required by the Contract?

_____ Yes _____ No

A bid may be deemed non-responsive and not considered for award of the Contract if the bidder does not comply with each of the following requirements:

(a) At present, the bidder must be performing all work on other contracts with the City in a timely manner.

(b) The bidder must meet with HPD's Office of Equal Opportunity, if necessary, on the first available meeting date.

(c) The bidder or a principal of the bidder must have two years experience in the type of magnitude of work, which is required by the Contract.

If a portion of the Contract is to be subcontracted, the subcontractor must also meet the above-mentioned requirements. Failure by the subcontractor to comply with these requirements will render the prime contractor's bid nonresponsive.

In determining a bidder's qualifications HPD reserves the right to ask for additional information from a bidder.

If the bidder shall misrepresent any of the information required to be provided on this form:

(a) the bid may be deemed nonresponsive; and/or

(b) it may be deemed a default of the Contract awarded in reliance on this qualification statement; and/or

(c) any future bid submitted by the bidder may be deemed nonresponsive.

**BIDDER'S CERTIFICATION**

BIDDER'S NAME:______________________________

Address:______________________________

1. Has Bidder participated in a previous contract or subcontract subject to the Equal Opportunity Clause? YES__ NO___

2. Were compliance reports required to be filed in connection with such contract or subcontract? YES___ NO___

If Yes, state what reports were filed and with what agency.

______________________________________

______________________________________

3. Has Bidder filed all compliance reports due under applicable instructions including EEO-1. YES___ NO___

4. If answer to item 3 is "NO", please explain in detail on reverse side of this certification.

---

Certification - The information above is true and complete to the best of my knowledge and belief. I understand that: A willfully false statement is punishable by law (U.S. Code, Title 18, Section 1001).

______________________________________

______________________________________
(NAME AND TITLE OF SIGNER - TYPE)

________________ ________________
(Signature) (Date)

THE CITY OF NEW YORK
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT

## AGREEMENT

THIS AGREEMENT, made and entered into this day of , 2001 by and between the City of New York, a municipal corporation ("City"), acting by and through its Department of Housing Preservation and Development, having offices at 100 Gold Street, New York, New York 10038 ("HPD") and , having a principal office at , ("Contractor").

WITNESSETH:

WHEREAS, HPD is the City agency charged with comprehensive responsibility for the City Housing stock; and

WHEREAS, HPD maintains offices throughout the City; and

WHEREAS, in order to better fulfill its functions it is necessary that HPD provide security guard services for the benefit of those persons who transact business with HPD and for those persons who are employed by HPD; and

WHEREAS, the Contractor represents that it has extensive experience in providing security guard services;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the term:

(a) "Article(s)" means an Article or Articles of this Agreement;

(b) "Certifiable Amount" has the meaning set forth in Section 6.2;

(c) "City" means the City of New York;

(d) "Commencement Date" means the July 1, 2002;

(e) "Comptroller" means the Comptroller of the City;

(f) "Contractor" means the party described as the Contractor on this first page of this Agreement, and it sometimes referred to in the Exhibits as the Consultant;

(g) "Contractor's Rate" means the hourly price per guard set forth in Article 5;

(h) "Expiration Date" means June 30, 2005 which date may be extended pursuant to Section 3.1 as set forth herein;

(i) "HPD" means the Department of Housing Preservation and Development;

(j) "HUD" means the United States Department of Housing and Urban Development;

(k) "Notice" means a communication given in accordance with the terms contained in Article 18;

(l) "Procurement Policy Board" shall mean the permanent agency of the City of New York whose function is to set policy and to adopt rules governing the procurement of all goods, services or construction to be paid out of the City treasury or out of monies under the control of or assessed or collected by the City in accordance with the New York City Charter.

(m) "Program Work" has the meaning set forth in Article 4;

(n) "Scope of Services" means Exhibit A to this Agreement;

(o) "Section(s)" means a Section or Sections of this Agreement;

(p) "State" means the State of New York.

**ARTICLE 2**
**THE AGREEMENT**

2.1 The following, except for such portions thereof as may be specifically excluded, are by this reference hereby made part of this Agreement:

a. The Advertisement;

b. Information for Bidders;

c. The Bid;

d. The Agreement;

e. Scope of Services: Exhibit A;

f. Exhibits B and C.

g. All addenda issued by HPD prior to the opening of bids;

h. Payment and Performance Bonds.

2.2 This Agreement is subject to the Procurement Policy Board Rules effective August 1, 1990. In the event of a conflict between the Procurement Policy Board Rules and a provision of the Agreement, the Procurement Policy Board Rules shall prevail.

**ARTICLE 3**
**TIME OF PERFORMANCE**

3.1 The term of this Agreement shall commence thirty (30) days from receipt by the Contractor of written notice to proceed and shall expire on the expiration date.

3.2 Extension of Time. Upon written application by the Contractor, the Agency Chief Contracting Officer may grant an extension of time for performance of the contract. Said application must state, at a minimum, in detail, each cause for delay, the date the cause of the alleged delay occurred, and the total number of delay in days attributable to such cause.

The ruling of the Agency Chief Contracting Officer shall be final and binding as to the allowance of an extension and the number of days allowed.

**ARTICLE 4**
**SCOPE OF SERVICES**

4.1 HPD hereby engages the Contractor and the Contractor agrees to provide unarmed security guard services, including all required or necessary manpower, supplies, materials and equipment to protect HPD sites (collectively "Program Work") as further described and set forth in the Scope of Services, Exhibit A.

**ARTICLE 5**
**PAYMENT**

5.1 Subject to all other terms of this Agreement, the City shall pay Contractor, and Contractor shall accept in full payment for work hereunder, a sum of â ($â) for each hour worked by each security guard ("Contractor's Rate") together with payments equal to what are hereinafter designated as Compensable Costs.

A pro rata amount of the Contractor's Rate shall be charged for less than one full hour worked.

5.2 It is agreed that the number of hours for which HPD will require security services as set forth in paragraph (13) of Exhibit A of this Agreement and the estimated amount of Compensable Costs as set forth in Exhibit A of this Agreement are based upon HPD's estimate of HPD's requirements under the Agreement. These estimates are approximate and are given solely for the purpose of providing a basis for the Comptroller to certify that certain funds or appropriations remain unapplied and unexpended in amounts sufficient to pay the estimated expenses of this Agreement in order that the sum sufficient to pay the expenses which may be incurred under this Agreement may be held and retained by the City Comptroller to be applied to this Agreement. The services actually required of the Contractor under the terms of this Agreement may be more or less than so estimated, and HPD will have the right, but not the obligation, to require the Contractor to provide such services as it may deem necessary and proper. If the services required to be performed by the Contractor under this Agreement vary from the estimates set forth in this Agreement, no action for damages or for loss of profits will accrue to the Contractor by reason thereof.

5.3 (a) Neither HPD nor the City will, under any circumstances, be deemed responsible for payment to the Contractor for any services rendered by the Contractor which were not in full compliance with the terms of this Agreement.

(b) Payments to be made by the City to the Contractor hereunder will solely cover those costs and charges enumerated in Article 5 and Exhibit A of this Agreement for the provision by the Contractor of certain specific guard services and Compensable Costs which the Contractor was authorized, in accordance with

this Agreement and the Scope of Services, to perform and did perform, in a manner satisfactory to HPD and for which the Contractor has submitted requisitions, and substantiating documentation, including, without limitation, such forms as may be required by HPD.

**ARTICLE 6**
**PAYMENT PROCEDURE**

6.1 A normal work week shall be from Saturday through Friday. Close of business shall be midnight Friday. Billing shall be done on a weekly basis and invoiced by site. An acceptable billing invoice in triplicate shall contain the Contractor's name and address, HPD's name and address, the site of coverage, site number, dates of coverage, an invoice number, job number, hours worked, and the Contractor's Rate. The invoice shall specify how many and which employees were paid at each wage rate and how many hours were worked by the employees being paid at each wage rate. In addition, any Compensable Costs incurred by Contractor shall be itemized.

Contractor shall use as a basis of all billing a Department of Housing Preservation and Development or similar attendance roster sheet for each site office. This roster shall be 8-1/2 x 14" size and consist of a minimum of three page copy "NCR" type or equivalent with Part I as the original for HPD Fiscal, Part II as Vendor's copy, and Part III as the Site Security Copy. The attendance roster sheet shall require each guard to sign in at the start of his tour, sign in/out for lunch, and sign out at the end of his tour.

At non-HPD supervised sites, each guard may maintain his own attendance sheet and sign-off shall be obtained by HPD. Such attendance sheet shall contain the same information as the attendance rosters.

Contractor shall be required to pick up each attendance sheet on a weekly basis. Additionally, Contractor shall be required to obtain a sign-off of the attendance sheet from an HPD site manager prior to pick-up and inclusion on any invoice.

In the event a guard leaves the Contractor's employment without having submitted a final, completed attendance sheet, a principal of the Contractor may submit to HPD a notarized statement, attesting to the actual days and hours worked by the former guard.

The original attendance rosters or sheets must be attached to each site billing invoice submitted for payment and must include a weekly summary sheet. All documents shall be submitted by hand to HPD, Disciplinary Unit, 100 Gold Street, first floor, New York, New York, 10038.

Contractor's failure to submit billing invoices on a weekly basis shall be a breach of contract compensable as a set-off to the City pursuant to the Liquidated Damages provision of Article 11.

6.2 HPD will, subject to its review and approval of the billing invoices submitted by the Contractor and certification of same, prepare and submit to the Comptroller a voucher for payment to the Contractor in the amount certified by HPD as payable under the terms of this Agreement ("Certifiable Amount"), less any amounts which may be withheld by HPD and the City pursuant to the terms of this Agreement, if any, and

upon the issuance of a check by the Comptroller for the Certifiable Amount, such check will be delivered to the Contractor.

6.3 Payment of the total Certifiable Amount of the last billing invoices submitted by the Contractor under this Agreement may be withheld by the City, in its sole discretion, until all obligations on the Contractor's part to be performed under this Agreement have been fully performed to HPD's satisfaction.

6.4 Payment shall be reduced by two (2%) per cent of the total Certifiable Amount only if payment is made to the Contractor within 15 days of submission of the invoice.

**ARTICLE 7**
**PROMPT PAYMENT**

7.1 The Prompt Payment provisions set forth in the Procurement Policy Board Rules in effect at the time of this solicitation will be applicable to payments made under this contract. The provisions require the payment to contractors of interest on payments made after the required payment date except as set forth in the Rules.

7.2 The contractor must submit a proper invoice to receive payment, except where the contract provides that the contractor will be paid at predetermined intervals without having to submit an invoice for each scheduled payment.

7.3 Determinations of interest due will be made in accordance with the provisions of the Procurement Policy Board Rules and General Municipal Law §3-a.

**ARTICLE 8**
**RECORDS AND AUDIT**

8.1 During the term of this Agreement and for an additional period of six (6) years after the later to occur of:

(i) final payment under this Agreement, or
(ii) termination of this Agreement,

the Contractor will keep separate, true, accurate, and complete books of account, together with vouchers, receipts and other records showing in detail all receipts and all expenses and charges incurred in the performance of the Program Work under this Agreement.

8.2 HPD, the City and the Comptroller or any of their duly authorized representatives, will have access to any of the books, documents, papers and records of the Contractor which are directly pertinent to this Agreement, to examine and audit them and to make transcripts and to take excerpts therefrom.

**ARTICLE 9**
**LIMITATIONS ON PAYMENTS**

9.1 It is understood and agreed that all payments made and to be made under this Agreement are subject to audit under the terms of Article 8 and under the applicable supplemental terms contained in the Exhibits to this Agreement and that any payment

to the Contractor may be reduced for prior overpayments or increased for prior underpayments made against preceding Requisitions.

9.2 If at any time before or within thirty (30) days after the expiration or other termination of this Agreement, any person or persons claiming to have performed any services or furnished any material toward the performance of this Agreement file with HPD or the Comptroller any notice(s) of claim or commence any proceeding against the City in a court of proper jurisdiction based upon such claim(s), the City will retain, from the monies due or to become due under this Agreement, so much of such monies as will be sufficient to pay the amount claimed in said notice, together with the reasonable costs of any action or actions brought or that may be brought to enforce such claim(s). The monies so retained will be held by the City until every judgment awarded or settlement reached on such claim(s) is fully discharged by the Contractor in a manner satisfactory to HPD and the City.

## ARTICLE 10
## INSURANCE

10.1 Throughout the term of this Agreement, Contractor will furnish and maintain Worker's Compensation Insurance, Disability Benefits Insurance and Unemployment Insurance in form required by the laws of the State of New York, covering all of the Contractor's employees performing Program Work under this Agreement.

10.2 In addition, Contractor will furnish and maintain Comprehensive General Liability Insurance, insuring the City and the Contractor against any and all claims, loss or damage, whether in contract or tort; for bodily injury and property damage arising out of or in connection with the liabilities and obligations of the Contractor under this Agreement, including, without limitation, claims for injuries to, or death of persons, or damage to property, whether such injuries, death or damages be attributable to statutory or common law negligence or any other acts of the Contractor, its employees or otherwise. The contractor shall notify the City of any loss or damage to property or of any accidents or injury at the site(s) within twenty four (24) hours of such occurrence. Notice to the Commissioner by the Contractor of an accident or claim on the site(s) shall constitute notice by the City to the Insurance Companies (as hereinafter defined).

The Comprehensive general Liability Insurance will be written for not less than One Million ($1,000,000) Dollars per occurrence for bodily injury and for not less than five Hundred Thousand ($500,000) Dollars per occurrence for property damages.

Automobile Liability Insurance: The **Contractor** shall provide commercial auto liability insurance covering all owned, non-owned and hired vehicles to be used in connection with this **Contract** (ISO Form CA0001, ed.6/92, code 1 "any auto").

10.3 All insurance required under this Article 10 will be satisfactory in form and substance to HPD and the City and will be obtained from companies of recognized competence which are acceptable to HPD and the City ("Insurance Companies").

10.4 Such insurance policies shall contain by riders annexed to such policy, the following provisions:

(a) Notice of Accident or Claim. Notice of accident shall be given to the Insurance Company within sixty (60) days after notice to the Commissioner of HPD of such accident and a notice of claim shall be given to the Insurance Company within sixty (60) days after such claim shall have been filed with the Comptroller of the City of New York. Notice to the Insurance Company by either party shall be deemed sufficient notice under the policy. Furthermore, notice of any claim or accident by the Contractor to the Insurance Company shall constitute notice of said claim or accident by HPD and the City to the Insurance Company.

(b) Notice of Cancellation of Policy. The policy shall not be canceled, terminated, modified or changed by the Company unless thirty (30) days prior written notice is sent to the Insured by registered mail and addressed to Director of Disciplinary Unit, Department of Housing Preservation and Development, 100 Gold Street, Room 1 , New York, New York 10038, nor shall it be canceled, terminated or modified by the Contractor securing this policy without the prior consent of the Deputy Commissioner of HPD.

10.5 Prior to or simultaneous with the execution of this Agreement, the Contractor will deliver to HPD a copy of each and every insurance policy, or in the case of Unemployment Insurance and Workers' Compensation, other evidence of coverage (in form acceptable to HPD) for all insurance required to be maintained by the Contractor under this Agreement; provide HPD with the name and address of the broker used, if any; and furnish evidence to HPD of premiums paid in full. Upon the request by the Contractor, HPD may grant an extension of the time within which certain evidence of insurance coverage must be provided to HPD under this Section 10.5, and may accept a copy of a binder in lieu of a copy of the insurance policy. If HPD accepts a copy of a binder in lieu of a copy of the insurance policy, the Contractor will provide a copy of the policy prior to the date on which any such binder expires.

10.6 Any failure to furnish such copies of insurance policies or other evidence of insurance coverage, as required by HPD, or any failure to keep such insurance coverage in full force and effect during the term of this Agreement and during the extended term, if any such extension be granted, will constitute cause for immediate termination of this Agreement.

10.7 If the Contractor is unable to procure insurance of the type or in the amounts set forth in this Article 9, or if the premium costs for such required insurance are so high as to cause a financial hardship to the Contractor, or if the type of insurance required is duplicative of other coverage, then the Contractor may submit a written request to HPD, requesting that such insurance requirements be modified. Any such request will set forth, in detail, the modification in insurance requirements that is requested and the rationale for such request. Such request will also describe the efforts made by the Contractor to procure the required coverage, and will be submitted to HPD together with supporting documentation regarding such rationale in the form of written materials supplied by licensed insurance broker(s). Based on such request, if HPD, in its sole discretion, determines that the request modifications are reasonable, HPD may modify the insurance requirements under this Agreement and such modification will be deemed effective upon HPD's written notice to the Contractor, provided, however, that should HPD modify the insurance requirements under this Section 10.7, it shall notify the Corporation Counsel of the City in writing, directed to the attention of the Chief, Contracts and Real Estate Division.

## ARTICLE 11
## LIQUIDATED DAMAGES

11.1    In view of the difficulty of accurately ascertaining the loss which the City will suffer by reason of incomplete compliance with the requirements of the contract specifications, it is hereby agreed that the deficiency schedule set forth in Section 11.2 hereinafter shall specify the liquidated damages that the City will suffer by reason of such incomplete compliance.

Liquidated damages received hereunder are not intended to be nor shall they be treated as either a partial or full waiver or discharge of City's right to indemnification under Article 14, or the Contractor's obligation to indemnify the City, or to any other remedy provided for by Contract or by Law. In the sole judgment of the Deputy Commissioner of HPD whose decision will be final and binding, the Comptroller will deduct and retain out of the moneys which may become due hereunder, the amount of such liquidated damages; and in case the amount which may become due hereunder shall be less than the amount of liquidated damages suffered by the City, the Contractor shall be liable to pay the difference upon demand by the Comptroller.

11.2    If the Contractor should fail to act in accordance with the Agreement specifications and under the terms and conditions of the contract, and at HPD's sole discretion, the Contractor shall not be paid for the time short and in addition shall be liable to pay liquidated damages in compliance with Section 11.1 above in accordance with the following schedule:

(a)    Manning Shortage: For each man-hour not staffed as a result of the failure of a scheduled person to report for duty for any reason, $20/man-hour for each hour beginning at the start of the shift.

(b)    Failure to provide training as per contract requirement, $150/guard.

(c)    Incorrect, or slovenly dressed, as determined by the Security Director or Security Coordinator, $40/per person/shift.

(d)    Failure to furnish necessary equipment and materials for the performance of service as specified in contract requirements, $50/item per person, per shift.

(e)    Failure to provide required security site inspections, per shift, $25/shift.

(f)    Failure to submit a complete copy of employees personnel folder as outlined in Exhibit A within 15 days after assignment (per instance) $50.00.

(g)    Failure to do the required background checks pursuant to Exhibit A (per instance), $100.00.

(h)    Any failure to perform not specifically listed in this section 11.2: $100 per failure/ per day.

**ARTICLE 12**
**PAYMENT AND PERFORMANCE BOND**

12.1 Prior to or simultaneously with the execution of this Agreement if the Agreement should exceed $250,000, Contractor shall deliver to HPD an executed bond in an amount of One Million Five Hundred Thousand Dollars ($1,500,000) as security for the payment of all persons performing labor under this Agreement, and an executed bond in the amount of Five Hundred Thousand ($500,000) Dollars to secure the faithful performance of the Agreement. Such bond shall be prepared on the annexed form of bond and have as surety hereunder such surety company or companies as are approved by the City (the "Surety Company").

**ARTICLE 13**
**PAYMENT GUARANTEE**

13.1 In the event that the terms of this Contract do not require the Contractor to provide a payment bond, the City shall, in accordance with the terms of this Article, guarantee payment of all lawful demands for (i) wages and compensation for labor performed and/or services rendered, and (ii) materials, equipment, and supplies provided, whether demands have been filed with the City as provided hereinafter by any person, firm or corporation which furnished labor, material, equipment, supplies or any combination thereof, in connection with the Work performed hereunder (hereinafter referred to as the "beneficiary") at the direction of the City or the Contractor.

13.2 The provisions of paragraph (a) above, are subject to the following limitations and conditions:

1. The guarantee is made for the benefit of all beneficiaries, provided that those beneficiaries strictly adhere to the terms and conditions of this paragraph (b).

2. Nothing in this Article shall prevent a beneficiary providing labor, services or material for the work from suing the Contractor for any amounts due and owing the beneficiary by the Contractor.

3. All demands made against the City pursuant to this Article shall be made within four (4) months from the date the payment is due on an invoice or invoices submitted by the beneficiary to the Contractor for labor or work done or for materials or supplies delivered, or, if the claim is for wages, four (4) months from the date the wages were due to be paid to the beneficiary.

4. All demands made against the City by such beneficiary shall be presented to the Assistant Commissioner along with all written documentation concerning the demand which the Assistant Commissioner deems appropriate or necessary which may include, but shall not be limited to, the subcontract, any invoices presented to the Contractor for payment, the notarized statement of the beneficiary that the demand is due and payable, that a request for payment has been made of the Contractor and that the demand has not been paid by the Contractor within the time allowed for such payment by the subcontract; and copies of any correspondence between the beneficiary and the Contractor concerning such demand. The City shall notify the Contractor that a demand has been made. The Contractor shall inform the City of any defenses to the demand, and shall forward to the City any documents the City requests concerning the demand.

5.    The City shall make payment only if, after considering all defenses presented by the Contractor, it determines that the payment is due and owing to the beneficiary making the claim.

6.    The City will not initiate the payment process of this Article or make payment on a demand where the beneficiary making the demand has filed a lien against the Work of otherwise sues the City prior to receiving a written notice from the City that it will not pay the claim.

7.    No beneficiary shall be entitled to interest from the City, or to any costs, including, but not limited to, attorney's fees.

13.3    Upon the receipt by the City of a demand pursuant to this Article, the City may withhold from any payment otherwise due and owing to the Contractor from this Agreement or any other contract between the City and the Contractor, an amount sufficient to satisfy the claim. Such amount will be paid to the Contractor only in the event that unless the City determines that such demand is invalid, or in the event that the Contractor satisfies such demand, and if no lien has been filed or other claim made in connection with such amount. In the event that the amount otherwise due and owing to the Contractor by the City is insufficient to satisfy such demand, the City may, at its option, require payment from the Contractor of an amount sufficient to cover such demand and exercise any other right to require or recover payment which the City may have under law or contract.

13.4    The provisions of this Article shall not prevent the City and the Contractor from resolving disputes in accordance with the Procurement Policy Board Rules, where applicable.

13.5    In the event the City determines that the beneficiary is entitled to payment pursuant to this Article, such determination and any defenses and counterclaims raised by the Contractor shall be taken into account in evaluating the Contractor's performance.

13.6    Nothing in this Article shall relieve the Contractor of the obligation to pay the claims of all persons with valid and lawful claims against the Contractor relating to the Work.

13.7    The Contractor shall not require any performance, payment or other bonds of any subcontractor if this Agreement does not require such bonds of the Contractor.

## ARTICLE 14
## CONTRACTOR'S EMPLOYEES AND LIABILITY FOR LOSS

14.1    In the event that any claim is filed against the City or in the event that the City suffers losses from injuries to, or death of persons or theft of or damage to property, any such claim and or loss is attributable to the negligent acts or willful misconduct of the Contractor, its agents or employees during any tour of duty (Losses and/or Claims), the Contractor shall indemnify and hold the City harmless against all such Losses and/or Claims which are not the result of the negligence of HPD. The Contractor shall be liable to and shall pay HPD upon demand the actual and reasonable amount of any and all such Losses and/or Claims.

14.2 At its option, HPD may deduct the actual and reasonable amount of any such Losses and/or Claims on a dollar for dollar basis from the outstanding balance due and owing the Contractor for the purpose of set-off in an amount sufficient to cover the cost incurred by HPD for such Losses and/or Claims. Contractor shall also be liable to and shall pay the City upon the City's demand any and all consequential damages attributable to any such Losses and/or Claims including but not limited to, reasonable attorney fees incurred by the City. The rights and remedies of the City provided for in this section 14.2 shall not be exclusive and are in addition to any other rights and remedies provided, by law or in equity.

## ARTICLE 15
## TERMINATION

15.1 In addition to any other rights to terminate this Agreement that may be contained herein, HPD may terminate this Agreement, in whole or in part, by giving written notice to the Contractor, specifying therein the date of such termination, if:

(a) The Contractor, for any reason, violates or fails to perform any term, covenant or condition required to be performed by the Contractor under this Agreement;

(b) HPD gives Notice to the Contractor that Federal, State, or local funding for this Agreement is unavailable or has been reduced; or

(c) HPD deems termination to be in the best interest of the City.

15.2 Prior to any termination by HPD for the reasons stated in subsection (a) of Section 15.1 of this Article 15, HPD will give written Notice to the Contractor of any breach or default by Contractor of any term, covenant or condition required on the Contractor's part to be performed under this Agreement, and if such breach or default is not cured within 5 days after such Notice of breach or default is given to Contractor, then HPD may proceed to terminate this Agreement in accordance with Section 15.1 of this Article 15.

15.3 In the event of any partial termination of this Agreement, the Contractor will continue to perform the remainder of this Agreement in strict conformity with the terms of this Agreement. The rights and remedies of the City and HPD provided for in this Article will not be exclusive and are in addition to all other rights and remedies to which the City and HPD may be entitled under this Agreement, at law or in equity, including but not limited to compelling specific performance of this Agreement.

15.4 If this Agreement is terminated under subsections 15.1(b) or 15.1(c) of this Article, the Contractor will be entitled to equitable compensation based upon the applicable Contractor's Rate set forth in Article 5 and the terms of Exhibit A of this Agreement for Program Work completed by the Contractor in accordance with the terms of this Agreement prior to the effective date of termination, as determined by HPD, provided and on condition that a Requisition is submitted therefor within thirty days after the effective date of termination.

15.5 If HPD terminates this Agreement, in whole or in part, for the reasons stated in subsection (a) of Section 15.1 of this Article 15, HPD may have the Program Work completed by whatever method it may deem expedient (with or without resort to public bid), and if the cost of HPD of having the Program Work completed, in part or in whole,

by some other method exceeds what the cost would have been under this Agreement, HPD may recover from the Contractor as damages an amount to be computed as follows:

(a) by ascertaining the difference in the cost for the Program Work under this Agreement and the cost to HPD of having such work completed by some other method;

(b) by multiplying, for each day or portion thereof the applicable cost difference times the number of guard tours for such day or portion thereof of Program Work completed by some other method; and

(c) by adding the results of the computations made for the Program Work pursuant to subsection (b) of this Section 15.5 of this Article 15 to arrive at the total amount of damages sustained by HPD.

The measure of damages as calculated by HPD will be conclusive and binding on the Contractor. The Contractor shall pay such damages to HPD upon HPD's demand therefor, or HPD may offset such damages against any monies due to the Contractor under this Agreement. Failure of HPD to recover damages pursuant to this Paragraph 15.5 does not bar it from any other remedy.

15.6 If this Agreement is terminated in its entirety, the Contractor will comply with HPD and City close-out procedures, including but not limited to:

(a) furnishing to HPD and to the City within sixty (60) days of the effective date of such termination the billing invoices for payments if any, due to the Contractor under Section 15.4 of this Article 15; and

(b) stopping work on the date and to the extent specified in the notice of termination; and

(c) carrying out any and all HPD or City directive(s) concerning the termination of City contracts; and

(d) cooperating fully with HPD, if HPD elects to transfer all or any part of the Program Work in progress to itself or to another Contractor, in order to effectuate an orderly transfer, including, without limitation, assigning to the City all or any commitments or subcontracts as HPD may request.

15.7 Upon termination of this Agreement under subsection 15.1(a) of this Article 15, the City will have the right to declare Contractor in default hereunder and a not responsible bidder pursuant to the provisions of the New York City Charter and Procurement Policy Board Rules. Such declaration will be made in accordance with the applicable provisions of law and procedures established by the City or HPD.

## ARTICLE 16
## RESOLUTION OF DISPUTES

16.1. All disputes between the City and the supplier of the kind delineated in this section that arise under, or by virtue of, this Contract shall be finally resolved in accordance with the

provisions of this section and the Rules of the Procurement Policy Board ("PPB Rules"). The procedure for resolving all disputes of the kind delineated herein shall be the exclusive means of resolving any such disputes.

(a) This section shall not apply to disputes concerning matters dealt with in other sections of the PPB Rules or to disputes involving patents, copyrights, trademarks, or trade secrets (as interpreted by the courts of New York State) relating to proprietary rights in computer software.

(b) For construction and construction-related services this section shall apply only to disputes about the scope of work delineated by the contract, the interpretation of contract documents, the amount to be paid for extra work or disputed work performed in connection with the contract, the conformity of the supplier's work to the contract, and the acceptability and quality of the supplier's work; such disputes arise when the Engineer makes a determination with which the supplier disagrees.

16.2. All determinations required by this section shall be clearly stated, with a reasoned explanation for the determination based on the information and evidence presented to the party making the determination. Failure to make such determination within the time required by this section shall be deemed a non-determination without prejudice that will allow application to the next level.

16.3. During such time as any dispute is being presented, heard, and considered pursuant to this section, the contract terms shall remain in full force and effect and the supplier shall continue to perform work in accordance with the contract and as directed by the Agency Chief Contracting Officer ("ACCO") or Engineer. Failure of the supplier to continue the work as directed shall constitute a waiver by the supplier of any and all claims being presented pursuant to this section and a material breach of contract.

16.4. Presentation of Dispute to Agency Head.

(a) Notice of Dispute and Agency Response. The supplier shall present its dispute in writing ("Notice of Dispute") to the Agency Head within the time specified herein, or, if no time is specified, within thirty (30) days of receiving written notice of the determination or action that is the subject of the dispute. This notice requirement shall not be read to replace any other notice requirements contained in the contract. The Notice of Dispute shall include all the facts, evidence, documents, or other basis upon which the supplier relies in support of its position, as well as a detailed computation demonstrating how any amount of money claimed by the supplier in the dispute was arrived at. Within thirty (30) days after receipt of the complete Notice of Dispute, the ACCO or, in the case of construction or construction-related services, the Engineer, shall submit to the Agency Head all materials he or she deems pertinent to the dispute. Following initial submissions to the Agency Head, either party may demand of the other the production of any document or other material the demanding party believes may be relevant to the dispute. The requested party shall produce all relevant materials that are not otherwise protected by a legal privilege recognized by the courts of New York State. Any question of relevancy shall be determined by the Agency Head whose decision shall be final. Willful failure of the supplier to produce any requested material whose relevancy the supplier has not disputed, or whose relevancy has been affirmatively determined, shall constitute a waiver by the supplier of its claim.

(b) Agency Head Inquiry. The Agency Head shall examine the material and may, in his or her discretion, convene an informal conference with the supplier and the ACCO and, in the case of construction or construction-related services, the Engineer, to resolve the issue by mutual consent prior to reaching a determination. The Agency Head may seek such technical or other expertise as he or she shall deem appropriate, including the use of neutral mediators, and require any such additional material from either or both parties as he or she deems fit. The Agency Head's ability to render, and the effect of, a decision hereunder shall not be impaired by any negotiations in connection with the dispute presented, whether or not the Agency Head participated therein. The Agency Head may or, at the request of any party to the dispute, shall compel the participation of any other supplier with a contract related to the work of this contract and that supplier shall be bound by the decision of the Agency Head. Any supplier thus brought into the dispute resolution proceeding shall have the same rights and obligations under this section as the supplier initiating the dispute.

(c) Agency Head Determination. Within thirty (30) days after the receipt of all materials and information, or such longer time as may be agreed to by the parties, the Agency Head shall make his or her determination and shall deliver or send a copy of such determination to the supplier and ACCO and, in the case of construction or construction-related services, the Engineer, together with a statement concerning how the decision may be appealed.

(d) Finality of Agency Head Decision. The Agency Head's decision shall be final and binding on all parties, unless presented to the Contract Dispute Resolution Board ("CDRB") pursuant to this section. The City may not take a petition to the CDRB. However, should the supplier take such a petition, the City may seek, and the CDRB may render, a determination less favorable to the supplier and more favorable to the City than the decision of the Agency Head.

16.5. Presentation of Dispute to the Comptroller. Before any dispute may be brought by the supplier to the CDRB, the supplier must first present its claim to the Comptroller for his or her review, investigation, and possible adjustment.

(a) Time, Form, and Content of Notice. Within thirty (30) days of receipt of a decision by the Agency Head, the supplier shall submit to the Comptroller and to the Agency Head a Notice of Claim regarding its dispute with the agency. The Notice of Claim shall consist of (i) a brief statement of the substance of the dispute, the amount of money, if any, claimed and the reason(s) the supplier contends the dispute was wrongly decided by the Agency Head; (ii) a copy of the decision of the Agency Head, and (iii) a copy of all materials submitted by the supplier to the agency, including the Notice of Dispute. The supplier may not present to the Comptroller any material not presented to the Agency Head, except at the request of the Comptroller.

(b) Agency Response. Within thirty (30) days of receipt of the Notice of Claim, the agency shall make available to the Comptroller a copy of all material submitted by the agency to the Agency Head in connection with the dispute. The agency may not present to the Comptroller any material not presented to the Agency Head, except at the request of the Comptroller.

(c) Comptroller Investigation. The Comptroller may investigate the claim in dispute and, in the course of such investigation, may exercise all powers provided in sections 7-201 and 7-203 of the New York City Administrative Code. In addition, the Comptroller may demand of either party, and such party shall provide, whatever additional material the Comptroller deems pertinent to the claim, including original business records of the supplier. Willful failure of the supplier to produce within fifteen (15) days any material requested by the Comptroller shall constitute a waiver by the supplier of its claim. The Comptroller may also schedule an informal conference to be attended by the supplier, agency representatives, and any other personnel desired by the Comptroller.

(d) Opportunity of Comptroller to Compromise or Adjust Claim. The Comptroller shall have forty-five (45) days from his or her receipt of all materials referred to in 5(c) to investigate the disputed claim. The period for investigation and compromise may be further extended by agreement between the supplier and the Comptroller, to a maximum of ninety (90) days from the Comptroller's receipt of all the materials. The supplier may not present its petition to the CDRB until the period for investigation and compromise delineated in this paragraph has expired. In compromising or adjusting any claim hereunder, the Comptroller may not revise or disregard the terms of the contract between the parties.

16.6 Contract Dispute Resolution Board. There shall be a Contract Dispute Resolution Board composed of:

(a) the chief administrative law judge of the Office of Administrative Trials and Hearings ("OATH") or his/her designated OATH administrative law judge, who shall act as chairperson, and may adopt operational procedures and issue such orders consistent with this section as may be necessary in the execution of the CDRB's functions, including, but not limited to, granting extensions of time to present or respond to submissions;

(b) the City Chief Procurement Officer ("CCPO") or his/her designee, or in the case of disputes involving construction, the Director of the Office of Construction or his/her designee; any designee shall have the requisite background to consider and resolve the merits of the dispute and shall not have participated personally and substantially in the particular matter that is the subject of the dispute or report to anyone who so participated , and

(c) a person with appropriate expertise who is not an employee of the City. This person shall be selected by the presiding administrative law judge from a prequalified panel of individuals, established and administered by OATH, with appropriate background to act as decision-makers in a dispute. Such individuals may not have a contract or dispute with the City or be an officer or employee of any company or organization that does, or regularly represent persons, companies, or organizations having disputes with the City.

16.7 Petition to CDRB. In the event the claim has not been settled or adjusted by the Comptroller within the period provided in this section, the supplier, within thirty (30) days thereafter, may petition the CDRB to review the Agency Head determination.

(a) Form and Content of Petition by Supplier. The supplier shall present its dispute to the CDRB in the form of a Petition, which shall include (i) a brief statement of the substance of the dispute, the amount of money, if any, claimed, and the reason(s) the supplier contends that the dispute was wrongly decided by the Agency Head; (ii) a copy of the decision of the

Agency Head; (iii) copies of all materials submitted by the supplier to the agency; (iv) a copy of the decision of the Comptroller, if any, and (v) copies of all correspondence with, and material submitted by the supplier to, the Comptroller's Office. The supplier shall concurrently submit four complete sets of the Petition: one to the Corporation Counsel (Attn.: Commercial and Real Estate Litigation Division), and three to the CDRB at OATH's offices, with proof of service on the Corporation Counsel. In addition, the supplier shall submit a copy of the statement of the substance of the dispute, cited in (i) above, to both the Agency Head and the Comptroller.

(b) Agency Response. Within thirty (30) days of receipt of the Petition by the Corporation Counsel, the agency shall respond to the statement of the supplier and make available to the CDRB all material it submitted to the Agency Head and Comptroller. Three complete copies of the agency response shall be submitted to the CDRB at OATH's offices and one to the supplier. Extensions of time for submittal of the agency response shall be given as necessary upon a showing of good cause or, upon the consent of the parties, for an initial period of up to thirty (30) days.

(c) Further Proceedings. The Board shall permit the supplier to present its case by submission of memoranda, briefs, and oral argument. The Board shall also permit the agency to present its case in response to the supplier by submission of memoranda, briefs, and oral argument. If requested by the Corporation Counsel, the Comptroller shall provide reasonable assistance in the preparation of the agency's case. Neither the supplier nor the agency may support its case with any documentation or other material that was not considered by the Comptroller, unless requested by the CDRB. The CDRB, in its discretion, may seek such technical or other expert advice as it shall deem appropriate and may seek, on it own or upon application of a party, any such additional material from any party as it deems fit. The CDRB, in its discretion, may combine more than one dispute between the parties for concurrent resolution.

(d) CDRB Determination. Within forty-five (45) days of the conclusion of all submissions and oral arguments, the CDRB shall render a decision resolving the dispute. In an unusually complex case, the CDRB may render its decision in a longer period of time, not to exceed ninety (90) days, and shall so advise the parties at the commencement of this period. The CDRB's decision must be consistent with the terms of the contract. Decisions of the CDRB shall only resolve matters before the CDRB and shall not have precedential effect with respect to matters not before the CDRB.

(e) Notification of CDRB Decision. The CDRB shall send a copy of its decision to the supplier, the ACCO, the Corporation Counsel, the Comptroller, the CCPO, the Office of Construction, the PPB, and, in the case of construction or construction-related services, the Engineer. A decision in favor of the supplier shall be subject to the prompt payment provisions of the PPB Rules. The Required Payment Date shall be thirty (30) days after the date the parties are formally notified of the CDRB's decision.

(f) Finality of CDRB Decision. The CDRB's decision shall be final and binding on all parties. Any party may seek review of the CDRB's decision solely in the form of a challenge, filed within four months of the date of the CDRB's decision, in a court of competent jurisdiction of the State of New York, County of New York pursuant to Article 78 of the Civil Practice Law and Rules. Such review by the court shall be limited to the question of whether or not the CDRB's decision was made in violation of lawful procedure, was affected by an error of law, or

was arbitrary and capricious or an abuse of discretion. No evidence or information shall be introduced or relied upon in such proceeding that was not presented to the CDRB in accordance with the PPB Rules.

16.8 Any termination, cancellation, or alleged breach of the contract prior to or during the pendency of any proceedings pursuant to this section shall not affect or impair the ability of the Agency Head or CDRB to make a binding and final decision pursuant to this section.

**ARTICLE 17**
**ASSIGNMENTS**

17.1 The Contractor shall not assign, transfer, convey or otherwise dispose of this Agreement or of Contractor's rights, obligations, duties, in whole or in part, including its right to execute this Agreement, or its right, title or interest in the Agreement or any part thereof, or assign, by power of attorney or otherwise, any of the monies due or to become due under this Agreement, unless the prior written consent of the Commissioner of HPD shall be obtained. Any such assignment, transfer, conveyance or other disposition without such consent shall be void and cause for termination, at the option of the Commissioner. If this Agreement is so terminated, the City shall thereupon be relieved and discharged from any further liability and obligation to the Contractor, its assignees or transferees, and all monies that may become due under this Agreement shall be forfeited to the City except so much thereof as may be necessary to pay the Contractor's employees.

17.2 This Agreement may be assigned by the City or HPD to any public corporation, agency or instrumentality having authority to accept such assignment provided written notification is made to Contractor.

**ARTICLE 18**
**NOTICES**

18.1 Unless otherwise provided herein, all notices or other communications given under the terms of this Agreement will be in writing and mailed by registered or certified mail, return receipt requested, correct postage prepaid, or delivered in person, to the following addresses:

(a) If to the City or HPD, to the Director of the Disciplinary Unit, HPD, 100 Gold Street, 1st Floor, New York, New York 10038, and

(b) If to the Contractor, at the address first set forth above.

Any notice or other communication given will be deemed received on the day on which the same is deposited in a United States general or branch post office or personally delivered. Either party may, by written Notice, designate other addresses or persons at which or to whom subsequent notice or communication shall be given.

**ARTICLE 19**
**CITY SUPPLEMENTAL TERMS AND CONDITIONS**

Contractor acknowledges that this Agreement is subject to and the Contractor will observe and comply with the additional provisions of the City set forth below

19.1    Participation in an International Boycott.

    (a)    The Contractor agrees that neither the Contractor nor any substantially-owned affiliated company is participating or shall participate in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, or the regulations of the United States Department of Commerce promulgated pursuant thereto.

    (b)    Upon the final determination by the Commerce Department or any other agency of the United States as to, or conviction of the Contractor or a substantially-owned affiliated company thereof for, participation in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, or the regulations promulgated pursuant thereto, the Comptroller may, at his option, render this Contract forfeit and void.

    (c)    The Contractor shall comply in all respects with the provisions of Section 6-114 of the Administrative Code and the rules and regulations issued by the Comptroller pursuant thereto.

19.2    MacBride Principles.
    (a)  In accordance with Section 6-115.1 of the Administrative Code of the City of New York, the Contractor stipulates that such Contractor and any individual or legal entity in which the Contractor holds a ten (10) percent or greater ownership interest and any individual or legal entity that holds a ten percent or greater ownership interest in the Contractor either (1) have no business operations in Northern Ireland, or (2) shall take lawful steps in good faith to conduct any business operations they have in Northern Ireland in accordance with the MacBride Principles (defined hereinafter), and shall permit independent monitoring of their compliance with such principles.

    (b)  The Contractor agrees that the covenants and representations set forth in Subparagraph 19.2(a) are material conditions to this Contract.  In the event HPD receives information that the Contractor who made the stipulation required by this Section is in violation thereof, HPD shall review such information and give the Contractor an opportunity to respond.  If HPD finds that a violation has occurred, HPD shall have the right to declare the Contractor in default and procure the supplies, services or work from another source in any manner HPD deems proper.  In the event of such default, the Contractor shall pay to the City, or the City, in its sole discretion, may withhold from any amounts otherwise payable to the Contractor, the difference between the Total Contract Price for the uncompleted portion of this Contract and the cost to HPD of completing performance of this Contract either itself or by engaging another contractor or contractors.  HPD shall also have the right to hold the Contractor in partial or total default in accordance with the default provisions of this Contract, and/or may seek debarment or suspension of the Contractor.  The rights and remedies of HPD hereunder shall be in addition to, and not in lieu of, any rights and remedies HPD has pursuant to this Contract or by operation of law.

(c) For purposes of this Section 19.2:

"MacBride Principles" shall mean those principles relating to nondiscrimination in employment and freedom of workplace opportunity which require employers doing business in Northern Ireland to:

(1) increase the representation of individuals from underrepresented religious groups in the work force, including managerial, supervisory, administrative, clerical and technical jobs;

(2) take steps to promote adequate security for the protection of employees from underrepresented religious groups both at the workplace and while traveling to and from work;

(3) ban provocative religious or political emblems from the workplace;

(4) publicly advertise all job openings and make special recruitment efforts to attract applicants from underrepresented religious groups;

(5) establish layoff, recall and termination procedures which do not in practice favor a particular religious group;

(6) abolish all job reservations, apprenticeship restrictions and different employment criteria which discriminate on the basis of religion;

(7) develop training programs that will prepare substantial numbers of current employees from underrepresented religious groups for skilled jobs, including the expansion of existing programs and the creation of new programs to train, upgrade and improve the skills of workers from underrepresented religious groups;

(8) establish procedures to assess, identify and actively recruit employees from underrepresented religious groups with potential for further advancement; and

(9) appoint a senior management staff member to oversee affirmative action efforts and develop a timetable to ensure their full implementation.

19.3 Termination By The City. In addition to termination pursuant to any other Section of this Contract, the Commissioner may, at any time, terminate this Contract by written notice to the Contractor and, in such event:

(a) The Contractor shall, upon receipt of such notice, unless otherwise directed by the Commissioner:

1. Stop work on the date specified in the notice;

2. Take such action as may be necessary for the protection and preservation of the City's materials and property;

3. Cancel all cancelable orders for materials and equipment;

4. Assign to the City and deliver to the Site, or to any other location designated by the Commissioner, any non-cancelable orders for materials and equipment which are not capable of use except in the performance of this Contract and have been specifically fabricated for the sole purpose of this Contract and not incorporated in the Work; and

5. Take no action which will increase the amounts payable by the City pursuant to this Contract.

(b) 1. a) "Direct Costs", as used in this Section, shall mean (i) the actual purchase price of material and equipment plus necessary and reasonable delivery costs, plus (ii) the actual cost of labor involved in construction and installation at the Site, plus (iii) the actual cost of necessary bonds and insurance purchased pursuant to requirements of this Contract, less any amounts which have been or should be refunded by the Contractor's sureties or insurance carriers. Direct Cost shall not include overhead.

b) "Notice to Proceed" as used in this section shall mean, Contractor requesting the Contractor to commence the Work.

c) "Notice of Termination" as used in this Section shall mean, written notice from the City to the Contractor notifying said Contractor that this Contract has been terminated pursuant to Article 19.3 of this Contract.

2. On all lump sum contracts:

a) Where the Contract has not been registered, the City will pay Contractor, in the manner prescribed in Subparagraph 19.3:

i) The actual cost of necessary bonds and insurance purchased pursuant to the requirements of this Contract, less any amounts which have been or should be refunded by the Contractor's sureties or insurance carriers; plus

ii) Non-cancelable material and equipment that is not capable of use except in the performance of this Contract and has been specifically fabricated for the sole purpose of this Contract less all payments for such made prior to the Notice of Termination.

b) Where the Contract has been registered, the City will pay Contractor, in the manner prescribed in Subparagraph 19.3:

i) Its Direct Cost, less all payments made for such Direct Cost prior to the Notice of Termination, or the fair and reasonable value, whichever is less for (A) the portion of the Work completed up to the time of termination of this Contract, less all payments made for such Work prior to the Notice of Termination, and (B) non-cancelable material and equipment that is not capable of use except in the performance of this Contract and has been specifically

fabricated for the sole purpose of this Contract but not incorporated in the Work, less all payments made for such material and equipment prior to the Notice of Termination.

3. On all unit price contracts, the City will pay the Contractor:

a. For all completed units, the unit price stated in the contract.

b. For all incomplete units, an amount determined in accordance with the provisions of Subparagraph 19.3(b)(2)(b)(i), for each incomplete unit.

4. In no event shall any payment pursuant to this Section exceed the Contract price for such items.

5. All payments made pursuant to this Section shall be in the nature of liquidated damages and shall be accepted by the Contractor in full satisfaction of all claims against the City arising out of the termination.

(c) The City may deduct from or set off against any sums due and payable pursuant to this Section, any claims it may have against the Contractor.

(d) Where the Work has been substantially completed, as evidenced by a duly executed certificate of substantial completion, termination of the Work shall be handled as a change order pursuant to the provisions contained in this Contract, in which case a change order shall be issued to reflect an appropriate reduction in the Total Contract Price, or if the amount is determined after final repayment, it shall be paid by the Contractor.

19.4 Investigations. The parties to this Contract agree to cooperate fully and faithfully with any investigation, audit, or inquiry conducted by a State or City governmental agency or authority which is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency which is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit, or inquiry.

(a) The Commissioner shall convene a hearing, upon not less than five (5) days' written notice to the parties involved, to determine if any penalties should attach for the failure of a person to testify:

1. If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance pursuant to any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York

and New Jersey, or any local development corporation within the City, or any public benefit corporation organized pursuant to the laws of the State; or

      2.     If any person refuses to testify for a reason other self incrimination in an investigation, audit, or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance pursuant to, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City.

(b)     If any non-governmental party to the hearing described in Paragraph 19.4(a) requests an adjournment, the Commissioner may, upon granting such adjournment, suspend this Contract and any other contract, lease, permit, or license, pending the final determination pursuant to Paragraph 19.4(d), without the City incurring any penalty or damages for delay or otherwise.

(c)     The penalties which may attach after a final determination by the Commissioner may include, but shall not exceed:

      1.     The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit, or license with or from the City; and/or

      2.     The cancellation or termination of any and all such existing City contracts, leases, permits, or licenses which the refusal to testify concerns and which have not been assigned as permitted pursuant to this Contract, nor the proceeds of which pledged to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; provided, however, that monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

(d)     The Commissioner shall consider and address in reaching his determination and in assessing an appropriate penalty the factors in Paragraphs 19.4(d)(1) and (2). He or she may also consider, if relevant and appropriate, the criteria established in Paragraphs 19.4(d)(3) and (4) and any other information.

      1.     The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including, but not limited to, the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees, or fiduciaries whose testimony is sought.

2.    The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

3.    The nexus of the testimony sought to the subject entity and its contracts, leases, permits, or licenses with the City.

4.    The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties pursuant to Paragraph 19.4(a), provided that the party or entity has given actual notice to the Commissioner upon the acquisition of the interest, or at the hearing called for in Paragraph 19.4(a) gives notice and proves that such interest was previously acquired. In either circumstance, the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

(e)    1.    The term "license" or "permit", as used in this Section, shall be defined as a license, permit, franchise, or concession not granted as a matter of right.

2.    The term "person", as used in this Section, shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal, or employee.

3.    The term "entity", as used in this Section, shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

4.    The term "member", as used in this Section, shall be defined as any person associated with another person or entity as a partner, director, officer, principal, or employee.

(f)    In addition to and notwithstanding any other provision of this Contract, the Commissioner may, in his sole discretion, terminate this Contract upon not less than three (3) days written notice in the event Contractor fails to promptly report in writing to the Commissioner of Investigation of the City any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation, or entity for any purpose which may be related to the procurement or obtaining of this Contract by the Contractor, or affecting the performance of this Contract.

19.5    Noise Control Code Provisions. In accordance with the provisions of Section 24-216 of the Administrative Code, devices and activities which will be operated, conducted, constructed, or manufactured pursuant to this Contract and which are subject to the provisions of the City Noise Control Code shall be operated, conducted, constructed, or manufactured without causing a violation of such

Code. Such devices and activities shall incorporate advances in the art of noise control developed for the kind and level of noise emitted or produced by such devices and activities, in accordance with regulations issued by the City's Department of Environmental Protection.

19.6 Officers, Employees, and Officials. No member, officer, or employee of the City or its designees or agents, no member of the governing body of the City, and no other public official of the City who exercises any functions or Responsibilities with respect to the Project during his or her tenure or for one year thereafter shall have any interest, direct or indirect, in any contract or subcontract, or the proceeds thereof, for work to be performed in connection with the Project.

19.7 Conditions Precedent. This Contract shall neither be binding nor effective unless:

1. Approved by the Mayor pursuant to the provisions of Executive Order No. 42, dated October 9, 1975, in the event such Executive Order requires such approval; and

2. Certified by the Mayor (Mayor's Fiscal Committee created pursuant to Executive Order No. 43, dated October 14, 1975) that performance thereof will be in accordance with the City's financial plan; and

3. Approved by the New York State Financial Control Board pursuant to the New York State Financial Emergency Act for the City of New York, as amended, in the event regulations of such board pursuant to such act require such approval.

The requirements of this Section shall be in addition to, and not in lieu of, any approval or authorization otherwise required for this Contract to be effective and for the expenditure of City funds.

19.8 Conflicts of Interest. Section 2604 and other related provisions of the City Charter, the Administrative Code and the Penal Law are applicable under the terms of this Contract in relation to conflicts of interest and shall be extended to Subcontractors authorized to perform Work, labor and services pursuant to this Contract and further, it shall be the duty and responsibility of the Contractor to so inform its respective Subcontractors. Notice is hereby given that, under certain circumstances, penalties may be invoked against the donor as well as the recipient of any form of valuable gift.

## ARTICLE 20
## EQUAL EMPLOYMENT OPPORTUNITY

20.1 Contractor will not discriminate against any employees or applicants for employment because of race, creed, color, national origin, sex, age, sexual orientation or affectional preference with respect to hiring or any of the terms and conditions of employment, including, but not limited to, upgrading, demotion, transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for

training, including apprenticeship. Contractor will take affirmative action to assure that the above requirements are met and will otherwise comply with the provisions of:

(a) Mayoral Executive Order No. 50 of April 25, 1980;

(b) HDA Administrator's Order No. 4;

(c) HPD Equal Employment Opportunity Regulations Nos. 1, 2 and 3;

(d) New York State Labor Law Section 220(e);

(e) New York City Administrative Code Section 343-8.0 and the rules, regulations, and requirements issued thereunder.

A summary of a portion of the requirements of the above laws, orders, rules and regulations is attached hereto as Exhibit B. In addition Contractor will observe and comply with the Federal non-discrimination provisions set forth in Exhibit D annexed hereto.

## ARTICLE 21
## CONDITIONS PRECEDENT

21.1 This Agreement will not become effective and binding unless:

(a) the City Comptroller shall have endorsed his certificate hereon that there remains unexpended and unapplied a balance of the appropriation of funds applicable hereto sufficient to pay the estimated expenses of executing this Agreement;

(b) approved by the Mayor pursuant to the provisions of Executive Order No. 42 dated October 9, 1975, if Executive Order No. 42 requires such approval;

(c) certified by the Mayor's Fiscal Committee created pursuant to Executive Order No. 43, dated October 14, 1975 that performance thereof will be in accordance with the City's financial plan if Executive Order No. 43 requires such approval; and

(d) approved by the New York State Financial Control Board ("FCB") pursuant to the New York State Financial Emergency Act for the City of New York ("Act") if the regulations of FCB pursuant to the Act require such approval.

## ARTICLE 22
## CHANGES

22.1 Changes may be made to this contract only as duly authorized by the Agency Chief Contracting Officer or his or her designee. Vendors deviating from the requirements of an original purchase order or contract without a duly approved change order document, or written contract modification or amendment, do so at their own risk. All such changes, modifications and amendments will become a part of the original contract.

22.2 Contract changes will be made only for work necessary to complete the work included in the original scope of the contract, and for non-material changes to the scope of the contract. Changes are not permitted for any material alteration in the scope of work. Contract changes may include any contract revision deemed necessary by the Contracting Officer.

22.3 The contractor shall be entitled to a price adjustment for extra work performed pursuant to a written change order. If any part of the contract work is necessarily delayed by a change order, the contract will be entitled to an extension of time for performance. Adjustments to price shall be computed in one or more of the following ways: (i) by agreement of a fixed price; (ii) by unit prices specified in the contract; (iii) by time and material record; and/or (iv) in any other manner approved by the City Chief Procurement Officer.

22.4 Where the cost of the change order has been negotiated in the absence of established cost history, the costs are subject to verification by post audit. If the post-audit reveals that the contractor's costs for the change order work were inaccurately stated during negotiations, the agency shall recoup the amount by which the costs were inaccurately stated by proportionately reducing the price of the change order. This remedy is not exclusive and in addition to all other rights and remedies of the City.

22.5 Except in the case of requirements contracts, any contract increases which cumulatively exceed the greater of 10% or $100,000 must be approved in writing by the City Chief Procurement Officer. Any contract amendment which either amends a unit price, cancels required units, or adds a new type of unit item to the contract must be approved in writing by the Agency Chief Contracting Officer.

## ARTICLE 23
## MISCELLANEOUS PROVISIONS

23.1 Governing Law. The validity, construction and performance of this Agreement and the transactions to which it relates will be governed by the laws of the State of New York. The Contractor will bring any actions, claims or legal proceeding in any way pertaining to this Agreement in the courts of the State of New York or in a federal court of the United States physically situated in the City of New York and in no other court or tribunal whatsoever.

23.2 Headings. The titles and headings contained in this Agreement are for reference only and will not be deemed to affect in any way the meaning or interpretation of this Agreement.

23.3 Counterparts. This agreement may be executed simultaneously in several counterparts, each of which will be deemed to be an original, and it will not be necessary in making proof of this Agreement to produce or account for more than one counterpart.

All other terms and conditions remain unchanged.

Approved for Issuance:

Jay Bernstein
Deputy Agency Chief Contracting Officer

Issued By:

Bernard Schwarz
Assistant Commissioner

ADDENDUM #2 ACKNOWLEDGEMENT

PIN # 806011000110

PRINTED NAME: ______________________

SIGNATURE: ______________________

POSITION/TITLE: ______________________

COMPANY: ______________________

NOTARY PUBLIC: ______________________

**NOTE: SIGNED AND NOTARIZED COPIES (IN BLUE INK) OF THIS ADDENDUM MUST BE INCLUDED WITH THE BID SUBMISSION. FAILURE TO COMPLY MAY RENDER YOUR BID NON-RESPONSIVE.**



**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth on page 1 of this Agreement.

**THE CITY OF NEW YORK
DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT**

By:______________________________
Bernard Schwarz, Assistant Commissioner

By:______________________________
(Print Name and Title)

APPROVED AS TO FORM AND
CERTIFIED AS TO LEGAL AUTHORITY

______________________________
Acting Corporation Counsel

**ACKNOWLEDGMENT BY ASSISTANT COMMISSIONER**

S' ATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK)

On the ______________ day of _________________ in the year ______________ before me, the undersigned, a Notary Public in and for said State, personally appeared _______________________, _________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

__________________
Notary Public

**ACKNOWLEDGMENT BY CONTRACTOR**

STATE OF NEW YORK )
) ss.:
OUNTY OF NEW YORK )

On the ______________ day of _________________ in the year ______________ before me, the undersigned, a Notary Public in and for said State, personally appeared ________________________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

__________________
Notary Public

**EXHIBIT A**
**SCOPE OF SERVICES**

1. Upon request by HPD, Contractor shall provide uniformed unarmed security guard services (approximately 30 security guards will be needed, in addition to support staff such as, Security Coordinator, Clerical Support Aide, Security Specialist and Security Receptionist as described in Section 3(e), (f), (g) and (h) of this Exhibit A), to be utilized at approximately 10 HPD sites to include.

| SITE | HPD OFFICE SITE |
|---|---|
| 100 Gold Street, NYC | • |
| 560 West 133rd Street, NYC | • |
| Parking Lot (East Houston Street and Chrystie Street, NYC) | |
| 965 Longwood Avenue, Bronx | • |
| 701 Euclid Avenue, Brooklyn | • |
| 516 Bergen Street, Brooklyn | • |

2. **License**

Contractor shall be licensed as promulgated by the New York State, Department of State, Division of Licensing Services, 84 Holland Avenue, Albany, New York 12208-3490, in conformance with the 1992 Security Guard Act.

3. **General Description**

a) Each security guard shall work an eight-hour work shift and a 40-hour week unless otherwise approved by HPD. At no time shall the wage rate paid to any guard be less than the rate required by Section 230 of the New York State Labor Law (the "Section 230 Wage Rate"). Any increase or decrease in the wage rate paid to any guard or guards shall not result in any change in the Contractor's Rate.

b) "Compensable Costs" shall mean the actual expenses and costs incurred by the Contractor in its performance of this Agreement for which the Contractor will be reimbursed by HPD. Except as otherwise specifically provided in this Exhibit A, Compensable Costs shall cover:

1. Contractor's actual cost of wages and salaries including fringe benefits approved by HPD and paid to personnel employed by Contractor.

2. A full-time security guard who works more than eight hours in any one day or more than 40 hours in any work week shall be paid wages for such overtime at a rate of one-and-one-half times his/her hourly rate, provided that HPD has authorized such overtime work. Said overtime payments shall be paid by HPD as Compensable Costs. Contractor shall give priority to "in house" security guards in the assignment of overtime work, whenever possible.

3. Upon written request and as directed and approved in advance by HPD, Contractor shall rent, install or cause to be installed, portable sanitation facilities at HPD site for the use of guards. The cost for the rental, installation and maintenance of such facilities shall be a Compensable Cost which shall be actual and reasonable costs in no event to exceed One Hundred Twenty-five ($125.00) Dollars per unit per month.

4. Upon written request and as described and approved in advance by HPD, Contractor shall rent, install or cause to be installed portable construction trailers at HPD sites for use by the guards. The cost of the rental, installation and maintenance of such facilities shall be a Compensable cost.

NOTE: The maximum annual Allowance for the costs incurred by the Contractor for the portable sanitation facilities and the construction trailers shall be $2,000.00.

**Work Hours**

(a) Guards shall arrive at their assigned HPD site not more than 15 minutes prior to the commencement of their shift and shall vacate the site within 15 minutes of the end of their respective shifts, or immediately upon being relieved from duty during the course of shift. No guard shall leave his/her shift until relieved from duty if such relief is required pursuant to this Agreement. At HPD office sites only, as indicated above, an eight hour work shift is exclusive of the one-half hour lunch period. Unless otherwise specified, guards working in excess of five continuous hours shall not be on duty during their respective lunch periods. No charge shall be made by Contractor or paid by the City for such lunch periods, except where specifically requested and authorized by HPD. However, at non-office locations, and at HPD office locations during non-business hours (4pm - 12 Midnight and Midnight to 8am), guards working in excess of five continuous hours shall take an on-site one-half hour meal period and time chargeable to HPD. The following are the legal holidays to be recognized under this agreement: New Year's Day; Martin Luther King's Birthday; Washington's Birthday; Memorial Day; Independence Day; Labor Day; Columbus Day; Election Day; Veteran's Day; Thanksgiving Day; and Christmas Day. If HPD, in its sole discretion, should determine that a guard should work on any of the above noted holidays at any HPD location, then the guard shall be paid for the holiday at the rate of time and one-half, and HPD shall bear the cost as a Compensable Cost. Otherwise, the costs of wages paid for such legal holidays shall not be reimbursed by HPD as Compensable Costs but shall be borne entirely by Contractor. Holidays shall be separated from fringe benefits and are not to be included as part of the costs which cover fringe benefits. For each legal holiday, each security guard shall be paid for the hours that such guard ordinarily works in a day. Paychecks are to be delivered by non-assigned HPD security personnel. Paychecks shall not be cashed during a guard's tour of duty.

**Support Personnel**

(a) At HPD's option, the Contractor shall provide a Security Director whose placement at an HPD site is subject to the approval of HPD and whose salary shall be borne by HPD as a Compensable Cost. (See attached job description).

(b) At HPD's option, the Contractor shall provide a Security Coordinator whose placement at an HPD site is subject to the approval of HPD and whose salary shall be borne by HPD as a Compensable Cost. (See attached job description).

(c) At HPD's option, the Contractor shall provide a Clerical Support Aide whose placement at an HPD site is subject to the approval of HPD and whose salary shall be borne by HPD as a Compensable Cost. (See attached job description).

(d) At HPD's option, the contractor shall provide a Security Specialist whose placement at an HPD site is subject to the approval of HPD and whose salary shall be borne by HPD as a Compensable Cost. (See attached job description).

(e) At HPD's option, the Contractor shall provide a Security Receptionist whose placement at an HPD site is subject to the approval of HPD and whose salary shall be borne by HPD as a Compensable Cost. (See attached job description).

**4. Employment/Qualification Requirements**

The Contractor shall provide Security Officer Sergeants, the number of which shall be determined solely by HPD.

Contractor shall employ and provide qualified and competent personnel who shall meet minimum guard requirements to at least include the following requirements:

(a) All security guards shall conform with all of the requirement set forth in the Security Guard Act of 1992. All security guards prior to assignment with HPD shall be registered with the New York State, Department of State, Division of Licensing Services, 84 Holland Avenue, Albany, New York 12208-3490. Guards shall have undergone finger printing pursuant to regulation promulgated by the NYS Division of Licenses.

(b) All newly appointed guards shall receive training at 100 Gold Street, NYC for a minimum of eight (8) hours. All scheduled training shall be approved by HPD. The cost of wages paid to security guards for such training shall be borne entirely by the Contractor.

(c) Guards must possess either a high school diploma or a General Equivalency Diploma, and shall have completed an HPD approved employee disclosure form, copies of which shall be retained by the Contractor and HPD. At HPD's sole discretion a high school diploma or GED requirement may substituted by four (4) years of employment by a licensed security contractor.

(d) Guards shall be able to understand, speak, read, and write English and be able to: (1) communicate with visitors intelligently and (2) prepare accurate incidents reports.

(e) No guard shall be appointed to any HPD Site who has not been employed by a licensed Security Contractor for at least two (2) years, or has at least two (2) years of prior military, law enforcement, or post high school educational experience.

(f) Guards shall be in excellent physical condition and must submit to a medical exam and receive a medical certification of fitness and good health within ten (10) business days of assignment to an HPD Site. The medical exam shall include a urine drug screen test performed by a licensed testing laboratory, which should test for the following substances: amphetamines, barbiturates, benzodiazipines, cocaine, marijuana, methadone, methaqualine, opiates, PCPs propoxyphene. Drug screen test results shall be made part of the employees personnel file and forwarded to HPD by Contractor within five (5) days of receipt.

**5. Other General Requirements and Guard Duties**

The Contractor shall:

    (a) be responsible for the necessary supervision of the guards

    (b) adhere to all policies, practices, procedures and directives prescribed by HPD

    (c) immediately notify the appropriate police precinct, if in the judgment of the Contractor such action becomes necessary because of the presence of any unauthorized person or persons or the occurrence of any untoward event

    (d) make a report by telephone to HPD's Disciplinary Unit (212) 863-6930 soon after the happening of such event, considering the date and time of such event, but no later than the first hour of the first business day after the happening of such event or occurrence

    (e) provide the Disciplinary Unit with a detailed report in writing of any occurrence or incident requiring action by the guards within twenty-four hours of such incident.

The security guard shall provide services to include:

- observe and screen all visitors, issue passes and check identification;

- keep a written record of all visitors including name, address, time of arrival and departure, and HPD person being visited;

- maintain a site security log, recording any security-related incidents that occur during that shift and recording the date, time and name of inspector performing an HPD and/or guard supervisor inspection;

- direct and, if necessary, escort visitors to the appropriate HPD person sought;

- enforce reasonable HPD office rules approved by HPD;

- enforce reasonable building rules approved by HPD;

- maintain the HPD office in orderly manner;

- protect the HPD offices from intrusion by vandals and unauthorized persons;

- guard against loitering, theft, personal assaults and all other types of suspicious, wrongful or unlawful acts;

- where directed by HPD, make periodic tours or rounds of the report to the Contractor the presence of any unauthorized pe could cause or bring about harm or damage to the site or p
- Guards shall execute their duties and responsibilities in a cc manner.

6.   **Personnel Folder Requirements**

a) Contractor shall be required to submit to HPD a copy of the security officer's personnel folder containing the following employee disclosure information:

Name
Home Address
Date of Birth
Social Security number
Photograph - duplicate of Photo Identification card
Copy of employment application (if applicable)
Copy of NYS Division of Licensing Application Form 307
Copy of birth certificate (or acceptable proof of birth date)
Copy of Alien Registration Form I9
Copy of high school diploma or GED
Military records
Equipment Inventory Form
Copy of NYS fingerprint card
Record of security training
Medical exam certificate
Urine analysis results
Certificate citing security officer's receipt of Security Training
Contract Exhibit A Scope of Services

b) Alternate proof of any of the above shall be accepted only at the sole discretion of HPD. This folder, complete with all documentation, must be forwarded to HPD within fifteen (15) business days after appointment of any guard or related personnel to any HPD site.

**7. Appropriate Attire/Accompaniment**

(a) Each guard shall be appropriately dressed in a uniform supplied by Contractor. Guards shall wear shoes. HPD may, in it sole discretion, require the Contractor to provide a different color uniform for those guards stationed at 100 Gold Street. Standard uniforms shall include an outdoor jacket, gloves and hat (if outdoors), tie, shirt, trousers, indoor jacket (if indoors), and belt. Uniforms shall be neat and clean at all times and appropriate for whatever working and weather conditions will be encountered by guard. Appropriately displayed, each guard shall:

wear a patch that identifies him/her as a security guard
wear badges and carry a photo identification cards
carry personal log books and if on a 4:00 P.M. to Midnight or Midnight to 8:00 A.M. shift
carry working flashlights.

(b) Photo identification cards shall be issued by the Contractor to be worn by each guard and shall be either a photo-insert or all-photo type card. Each card shall indicate the Contractor's name, the full name of the guard, and the guard's signature. Such identification cards shall be laminated. A duplicate photo shall be submitted to the HPD Disciplinary Unit and made part of each employees personnel folder.

**8. Uniform Requirements**

Security officers shall be required to complete an equipment inventory form acknowledging receipt of equipment and quantities received of each. Said form shall be made part of each

sec[illegible] fficers personnel file. (See sample equipment form attached hereto as Appendix A). Quan[illegible] of uniform items supplied by the Contractor to full time guards shall include not less than [illegible] following:

| Item | Quantity |
|---|---|
| TIE | 2 each (blue). Female officers may wear cross ties; male officers shall wear standard ties. |
| SHIRTS | 10 each - 5 long sleeve 5 short sleeve with company emblem sewn on left sleeve (color to be determined by HPD, form-fit type with badge tabs.) |
| TROUSERS | 4 each. |
| BELT | 1 each (black). |
| JACKETS | 1 each with company emblem on left sleeve. Jackets are to be security guard type, blue to match trousers. Jackets are required for indoor guards. |
| HAT* | 1 each hat should be blue, winter type. |
| BADGE | 1 |
| OUTDOOR COAT* | 1 each with company emblem on left sleeve. Jacket should have provision for badge to be attached. Jacket (insulated). |
| GLOVES* | 1 pair (winter wear). |

*For outdoor posts only.

Note: Guards working part time shall be equipped according to their schedules:

**9. General Performance Requirements**

All Security Guards employed by the Contractor and assigned to HPD Shall:

a) not bring any weapon of any sort into any office including firearms, knives, billys, nightsticks, blackjacks, gas discharge guns or containers or any other similar item.

b) not bring into any office or carry any television, recorder, radio, reading material, music maker, game, or pictorial material unless approved in writing by HPD.

c) not be under the influence or carry the odor of alcoholic beverages while on duty, nor shall any guard carry or consume any alcoholic beverage while on duty.

d) not be under the influence of, carry or ingest a controlled substance as defined in the Penal Law of the State of New York while on duty, except as prescribed by medical authorities and then only if the guard's performance of his duties will not be impaired in any way. Any such prescribed drugs shall be carried in a bona fide pharmaceutical container indicating the doctor's name, patient's name and date of issuance.

e) ... rry any packages, cartons, containers, or luggage larger than a purse to or from any HPD site unless permitted or directed to by HPD personnel, which consent shall be in writing signed by an HPD representative.

A.. Security Guards employed by the Contractor and assigned to HPD Shall:

a) receive basic training as required under the New York State Security Guard Act of 1992. All costs will not be borne by HPD. A representative of HPD may attend any and all training sessions at HPD's sole discretion.

b) receive from the Contractor a copy of this Scope of Services as well as a copy of HPD's Equal Opportunity guidelines.

c) on an annual basis receive a medical drug screen as outlined in section 4(f) above. Additionally, the Contractor shall be required to reissue to each assigned security guard a copy of this Scope of Services and a copy of HPD's Equal Opportunity guidelines.

d) answer any questions by the HPD Disciplinary Unit and/or its designee relating to the performance of his/her official duties

e) answer any questions by the HPD Disciplinary Unit and/or its designee regarding any events witnessed by the security guard at his/her work location during the assigned hours of work whether or not those events directly involved the performance of his/her official duties

f) surrender to the HPD Disciplinary Unit and/or its designee any documents, weapons or other evidence obtained by the security guard while performing his/her official duties or while witnessing any events at his/her work location during the assigned hours of work

g) submit to the HPD Disciplinary Unit sworn statements regarding any incident witnessed by the security guard

h) immediately report to the HPD Disciplinary Unit and/or its designee any corrupt or criminal activity or conflict of interest regarding security guards and/or employees of the Department of Housing Preservation and Development

i) cooperate fully with the Office of the Disciplinary Unit in regard to any investigations conducted by it and any administrative and/or judicial proceedings resulting from said investigations

HPD may at its discretion issue operating guidelines to Contractor, prescribing procedures or changes in procedures for the performance of Program Work. Such guidelines shall be fully complied with by Contractor

**10. Site/ Maintenance and Coverage**

a) Contractor must maintain a 24 hour per day office. Such office shall: (i) be manned for all of the 24 hours by a trained and qualified dispatcher; (ii) contain a toll-free incoming telephone line; and (iii) contain a FAX (facsimile) machine.

b) HPD reserves the right to move guards from one site office to another, from one floor to another and to increase or decrease the hours of guard service as the need arises.

c) HPD reserves the right to order any additional security coverage at any site as it deems appropriate, and to reduce or eliminate the security coverage at any site during the term of this Agreement. Work so ordered by HPD must be performed by the Contractor in accordance with the terms of this Agreement.

**11. Shift/ Supervisory Functions**

At Contractor's expense, the Contractor shall designate shift supervisors who shall make inspections of guards at HPD sites in order to confirm that said guards are acting in conformance with the terms and conditions of this Agreement. Supervisors shall record the date and time of such inspection on the guards attendance sheet. Inspections shall be made in accordance with the schedule hereinafter set forth:

(a) Guards working shifts at HPD office sites shall be inspected once per shift;

(b) Guards working the 8:00 A.M. - 4:00 P.M. shift at HPD office sites shall be inspected twice per shift including weekends and holidays. Such inspections shall be at least four (4) hours apart, or at varying times that HPD has agreed to and finds acceptable.

(c) Guards working the 8:00 A.M. - 4:00 P.M. shift at building construction sites shall be inspected twice per shift including weekends and holidays. Such inspections shall be at least four (4) hours apart, or at varying times that HPD has agreed to and finds acceptable.

(d) Guards working the 4:00 P.M. - 12:00 MIDNIGHT shift at building construction sites as well as HPD office sites shall be inspected twice per shift including weekends and holidays. Such inspections shall be at least four (4) hours apart, or at varying times that HPD has agreed to and finds acceptable.

(e) Guards working the 12:00 MIDNIGHT - 8:00 A.M. shift at building construction sites as well as HPD office sites shall be inspected twice per shift including weekends and holidays. Such inspections shall be at least four (4) hours apart, or at varying times that HPD has agreed to and finds acceptable.

12. Equipment

The Contractor shall provide UHF Motorola Radius GP350 two channel type walkie-talkie or an HPD approved equivalent model and manufacturer, including, carrying case or belt clip, one rechargeable battery and re-charger per unit to the Security sites, as listed in Appendix B. HPD maintains a limited number of **agency owned** walkie-talkies and one (1) UHF repeater at 100 Gold Street. HPD shall provide the Contractor with the UHF-FM operating frequencies at the time of contract award. The number of such radios shall not exceed seventeen (17). The cost of rental or purchase, maintenance and security of such walkie-talkies shall be borne exclusively by the Contractor. All equipment shall be returned to HPD upon expiration or termination of the contract.

## APPENDIX A
## EQUIPMENT INVENTORY FORM

SECURITY OFFICER'S NAME: ______________________

SOCIAL SECURITY NUMBER: ______________________

Security officer must initial next to each item received to confirm receipt and quantity required:

| | | | AMOUNT RECEIVED |
|---|---|---|---|
| TIES: | 2 each Navy Blue | ________ | ( ) |
| SHIRTS: | 5 each Long Sleeve Uniform Type | ________ | ( ) |
| | 5 each Short Sleeve Uniform Type | ________ | ( ) |
| TROUSERS: | 4 each Navy Blue Uniform Type | ________ | ( ) |
| BELT: | 1 each Black | ________ | ( ) |
| JACKETS: | 1 each Indoor | ________ | ( ) |
| BADGE: | 1 | ________ | ( ) |

**FOR OUTDOOR POSTS ONLY:**

| | | | |
|---|---|---|---|
| HAT: | 1 each | ________ | ( ) |
| COATS: | 1 | ________ | ( ) |
| GLOVES: | 1 pair winter wear | ________ | ( ) |

A copy of completed form is to be inserted in each employee's personnel folder and the personnel folder then forwarded to H.P.D.

## APPENDIX B

### SITES REQUIRING TWO-WAY RADIOS

| | No. of Radios |
|---|---|
| Parking Lot | 1 |
| 965 Longwood | 4 |
| 100 Gold Street | 6 |
| Anticipated number of radios for use at construction sites throughout the term of this Contract | 6 |
| TOTAL RADIOS REQUIRED | 17 |

Qualification Requirements:

- A four (4) year high school diploma or a General Equivalence Diploma (GED); or
- Four (4) years of experience performing receptionist related duties.

Number of Temporary Personnel and Hours of Work Requirements:

- One (1) person is required.
- Personnel will be assigned to work 40 hours/5 days per week, exclusive of a one-half hour lunch period.

E. SECURITY SPECIALIST

**General Statement of Duties and Responsibilities**

Although the Security Specialist is an employee of the Contractor, he/she will report directly to HPD for their assigned duties, which are specific to HPD. The Security Specialist shall be required to conduct security surveys, perform supervisory functions and have a working knowledge of agency access control systems.

Qualifications Requirements

- 1. A four (4) year high school diploma or a General Equivalence Diploma (GED) and 2 years of experience with a licensed Security Firm/Service performing guard related duties, one year should be performing supervisory related duties; or
- 2. Four (4) years of experience as described in number one above with some prior military or law enforcement experience.

Special Requirement:

- HPD may at its discretion issue the Security Specialist a City-owned/leased vehicle. The Security Specialist must possess a Motor Vehicle Driver's License valid in the State of New York.

Number of Personnel and Hours of Work Requirements:

- One (1) person required.
- Personnel will be assigned to work 40 hours/ 5 days per week, exclusive of a one-half hour lunch period.

EXHIBIT B.

BUREAU OF LABOR SERVICES
REC
1986 DEC 31 PM 1:36

THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

Executive Order No. 108
December 29, 1986

Amendment of Executive Order No. 50
(April 25, 1980)

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. Prior Order Amended.

a. Section 6(a) of Executive Order No. 50, dated April 25, 1980, is amended to read as follows:

"Submission Requirements. No contracting agency shall enter into a contract with any contractor unless such contractor's employment report is first submitted to the Bureau for its review. Unless otherwise required by law, an employment report shall not be required for the following:

(i) a construction contract in the amount of less than $1 million; a construction subcontract in the amount of less than $750,000; or a supply and service contract in the amount of $50,000 or less or of more than $50,000 in which the contractor employs fewer than 50 employees at the facility or facilities involved in the contract;

(ii) an emergency contract or other exempt contract except as the Bureau may direct by regulation; and

contract to which it becomes a party such provisions requiring the contractor to ensure equal employment opportunity as the Bureau may direct, consistent with this Order."

d. Section 12 of such Order is amended to read as follows:

"Regulations. The Bureau shall promulgate such regulations, subject to the approval of the Mayor, as may be necessary to discharge its responsibilities under this Order, including regulations increasing the dollar amounts and number of employees referred to in this Order. Any regulations of the Bureau establishing terms and conditions for contractors shall be approved as to form by the Corporation Counsel.

Nothing contained herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment or giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained. The regulations shall set forth this exemption for religiously-sponsored organizations and provide for the discharge of the Bureau's responsibilities in a manner consistent with such exemption."

Section 2. Effective Date. This Order shall take effect immediately.

Edward I. Koch
MAYOR

# EXHIBIT 6

PART 3 of 3



File / Exec Order

THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EXECUTIVE ORDER NO. 50

APRIL 25, 1980

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. Purpose. It is the purpose of this Order to ensure compliance with the equal employment opportunity requirements of City, State and Federal law in City contracting.

§ 2. Bureau Continued. The Bureau of Labor Services shall continue to serve such purposes and to have such responsibilities as restated by this Order.

§ 3. Definitions. Whenever used in this Executive Order, the following terms shall have the following meanings:

(a) Bureau means the Bureau of Labor Services;

(b) construction project means any construction, reconstruction, rehabilitation, alteration, conversion, extension, improvement, repair or demolition of real property contracted by the City;

(c) contract means any written agreement, purchase order or instrument whereby the City is committed to expend or does expend funds in return for work, labor, services, supplies, equipment, materials, or any combination of the foregoing;

(i) Unless otherwise required by law, the term "contract" shall include any City grant, loan, guarantee or other City assistance for a construction project.

(ii) The term "contract" shall not include:

(A) contracts for financial or other assistance between the City and a government or government agency;

(B) contracts, resolutions, indentures, declarations of trust, or other instruments authorizing or relating to the authorization, issuance, award, and sale of bonds, certificates of indebtedness, notes or other fiscal obligations of the City, or consisting thereof; or

(C) employment by the City of its officers and employees which is subject to the equal employment opportunity requirements of applicable law.

(d) contracting agency means any administration, board, bureau, commission, department or other governmental agency of the City of New York, or any official thereof, authorized on behalf of the City to provide for, enter into, award or administer contracts;

(e) contractor means a person, including a vendor, who is a party or a proposed party to a contract with a contracting agency, first-level subcontractors of supply or service contractors, and all levels of subcontractors of construction contractors;

(f) Director means the Director of the Bureau of Labor Services;

(g) economically disadvantaged person means a person who, or a member of a family which, is considered economically disadvantaged under applicable law.

(h) employment report means a report filed by a contractor containing information as to the employment practices, policies and programs, employment statistics and collective bargaining agreements, if any, of the contractor in such form as the Bureau may direct by regulation;

(i)  equal employment opportunity means the treatment of all employees and applicants for employment without unlawful discrimination as to race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment except as provided by law;

(j)  trainee means an economically disadvantaged person who qualifies for and receives training in one of the construction trades pursuant to a program other than apprenticeship programs, approved by the Bureau and, where required by law, the State Department of Labor or the United States Department of Labor, Bureau of Apprenticeship and Training.

§ 4.  Responsibilities of Bureau.  The responsibilities of the Bureau shall be as follows:

(a)  To implement, monitor compliance with, and enforce this Order and programs established pursuant to City, State and Federal law requiring contractors to provide equal employment opportunity;

(b)  To implement, monitor compliance with, and enforce on-the-job training requirements on construction projects;

(c)  To monitor compliance by contractors with State and Federal prevailing wage requirements where required;

(d)  To advise and assist contractors and labor unions with respect to their obligations to provide equal employment opportunity;

(e)  To advise and assist persons in the private sector with respect to employment problems;

(f)  To establish advisory committees, including representatives of employers, labor unions, community organizations and others concerned with the enforcement of this Order; and

(g)  To serve as the City's principal liaison to Federal, State and local contract compliance agencies.

§ 5. Contract Provisions.

(a) Equal Employment Opportunity. A contracting agency shall include in every contract to which it becomes a party such provisions requiring the contractor to ensure equal employment opportunity as the Bureau may direct by regulation.

(b) On-the-Job Training. A contracting agency shall include in every contract concerning a construction project to which it becomes a party such provisions requiring the contractor to provide on-the-job training for economically disadvantaged persons as the Bureau may direct by regulation.

(c) Subcontractors. A contracting agency shall include in every contract to which it becomes a party such provisions requiring the contractor not to discriminate unlawfully in the selection of subcontractors as the Bureau may direct by regulation.

§ 6. Employment Reports.

(a) Submission Requirements. No contracting agency shall enter into a contract with any contractor unless such contractor's employment report is first submitted to the Bureau for its review. Unless otherwise required by law, an employment report shall not be required for the following:

(i) a contract in the amount of $50,000 or less;

(ii) an emergency contract or other exempt contract except as the Bureau may direct by regulation; and

(iii) a contract with a contractor who has received a certificate of compliance with the equal employment opportunity requirements of applicable law from the Bureau, or an appropriate agency of the State of New York or the United States within the preceding twelve months, except as the Bureau may direct by regulation.

(b) Bureau Review. The Bureau shall review all employment reports to determine whether contractors are in compliance with the equal employment opportunity requirements of City, State and Federal law and the provisions of this Order. The contracting agency shall transmit the employment report to the Bureau within ten business days after the selection of a proposed contractor. A contracting agency may thereafter award a contract unless the Bureau gives prior written notice to the contracting agency and the contractor as follows:

(i) If the Bureau notifies the contracting agency and the contractor within five business days after the receipt by the Bureau of the employment report that the contractor has failed to submit a complete employment report, the Director may require the contracting agency to disapprove the contractor unless such deficiency is corrected in a timely manner;

(ii) If the Bureau notifies the contracting agency and the contractor within fifteen business days of the receipt by the Bureau of the completed employment report that the Bureau has found reason to believe that the contractor is not in substantial compliance with applicable legal requirements and the provisions of this Order, the Bureau shall promptly take such action as may be necessary to remedy the contractor's noncompliance as provided by this Order.

Provided that a contracting agency may award a requirements contract or an open market purchase agreement prior to review by the Bureau of the contractor's employment report, but may not make a purchase order against such contract or agreement until it has first transmitted such contractor's employment report to the Bureau and the Bureau has completed its review in the manner provided by this Section.

(c) Employment Program. The Bureau may require a contractor to adopt and adhere to a program designed to ensure equal employment opportunity.

(d) Periodic Reports. Contractors shall file periodic employment reports after the award of a contract in such form and frequency as the Bureau may direct by regulation to determine whether such contractors are in compliance with applicable legal requirements and the provisions of this Order.

§ 7. Training Programs. The Bureau shall monitor the recruitment, training and placement of economically disadvantaged persons in on-the-job training programs on construction projects. Contracting agencies shall require contractors to make a good faith effort to achieve the ratio of one trainee to four journey-level employees of each craft on each construction project.

(a) The Bureau shall determine the number of trainees and hours of training required by each contractor or subcontractor for each construction project.

(b) In the event that a contractor fails to make a good faith effort to train the required number of individuals for the required amount of hours, the Bureau, after consultation with the contracting agency, shall direct such agency to reduce the contractor's compensation by an amount equal to the amount of wages and fringe benefits which the contractor failed to pay to trainees.

(c) On-the-job training of economically disadvantaged persons shall not be required on construction contracts in the amount of $125,000 or less.

§ 8. Compliance Investigations and Hearings. The Bureau shall conduct such investigations and hold such hearings as may be necessary to determine whether contractors are in compliance with the equal employment opportunity requirements of City, State and Federal law and the provisions of this Order.

(a) Voluntary Compliance. The Bureau shall seek to obtain the voluntary compliance of contractors and labor unions with applicable legal requirements and the provisions of this Order.

(b) Noncompliance. Upon receiving a complaint or at its own instance, the Bureau shall determine whether there is reason to believe a contractor is not in compliance with applicable legal requirements and the provisions of this Order.

(c) Hearings. The Bureau shall hold a hearing on prior written notice to a contractor and the contracting agency before any adverse determination is made with respect to such contractor's employment practices or imposing any sanction or remedy for noncompliance with applicable legal requirements and the provisions of this Order. The hearing shall be held before a City hearing officer, or such other person designated by the Director, who shall submit a report containing findings of fact and recommendations to the Director. Based on the record as a whole, the Director shall determine whether a contractor has failed to comply with applicable legal requirements or the provisions of this Order and the appropriate sanctions for noncompliance.

(d) Notices. The Bureau shall give prior notice of any hearing and shall provide a copy of any hearing report and determination of the Director under paragraph (c) of this Section to the contracting agency, the Corporation Counsel and the Comptroller. The Bureau shall notify appropriate City, State and Federal agencies of violations of law and may, with the approval of the Corporation Counsel, initiate proceedings in such agencies.

§ 9. Sanctions and Remedies. After making a determination that a contractor is not complying with applicable legal requirements and the provisions of this Order, the Director may direct that such sanctions as may be permitted by law or contractual provisions be imposed, including the disapproval of a proposed contractor, the suspension or termination of a contract and the reduction of a contractor's compensation, except as follows:

(a) Within five business days of the issuance of a determination by the Director under Section 8(c), a contracting agency head may file with the Director written objections to the sanctions to be imposed. Where such objections have been filed, the Director and the contracting agency head shall jointly determine the appropriate sanctions to be imposed.

(b) In lieu of any of the foregoing sanctions, the Director may require a contractor to adopt and adhere to a program to ensure equal employment opportunity.

§ 10. Public Agencies. Any administration, board, bureau, commission, department or other public agency, not subject to this Order, which imposes by rule, regulation or order equal employment opportunity requirements, may, with the consent of the Mayor, delegate such responsibilities to the Bureau as may be consistent with this Order.

§ 11. Confidentiality. To the extent permitted by law and consistent with the proper discharge of the Bureau's responsibilities under this Order, all information provided by a contractor to the Bureau shall be confidential.

§ 12. Regulations. The Bureau shall promulgate such regulations, subject to the approval of the Mayor, as may be necessary to discharge its responsibilities under this Order, including regulations increasing the dollar amounts referred to in this Order. Any regulations of the Bureau establishing terms and conditions for contractors shall be approved as to form by the Corporation Counsel.

§ 13. Annual Report. The Bureau shall submit an annual report to the Mayor concerning its responsiblities under this Order.

§ 14. Separability. If any provision of this Order or the application thereof is held invalid, the remainder of this Order and the application thereof to other persons or circumstances shall not be affected by such holding and shall remain in full force and effect.

§ 15. Revocation of Prior Orders. Executive Orders No. 71 (1968), No. 20 (1970), No. 23 (1970), No. 27 (1970), No. 31 (1971), No. 74 (1973), No. 7 (1974), and No. 80 (1977) are hereby revoked and the first paragraph of Section 2 of Executive Order No. 4 (1978) is hereby deleted. Nothing in this Order shall be deemed to relieve any person of any obligation not inconsistent with this Order assumed or imposed pursuant to an Order superseded by this Order.

§ 16. Effective Date. This Order shall take effect immediately.

EDWARD I. KOCH
MAYOR

BUREAU OF LABOR ...
'86 DEC 31 PM 1:36

THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

Executive Order No. 108
December 29, 1986

Amendment of Executive Order No. 50
(April 25, 1980)

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. Prior Order Amended.

a. Section 6(a) of Executive Order No. 50, dated April 25, 1980, is amended to read as follows:

"Submission Requirements. No contracting agency shall enter into a contract with any contractor unless such contractor's employment report is first submitted to the Bureau for its review. Unless otherwise required by law, an employment report shall not be required for the following:

(i) a construction contract in the amount of less than $1 million; a construction subcontract in the amount of less than $750,000; or a supply and service contract in the amount of $50,000 or less or of more than $50,000 in which the contractor employs fewer than 50 employees at the facility or facilities involved in the contract;

(ii) an emergency contract or other exempt contract except as the Bureau may direct by regulation; and

contract to which it becomes a party such provisions requiring the contractor to ensure equal employment opportunity as the Bureau may direct, consistent with this Order."

d. Section 12 of such Order is amended to read as follows:

"Regulations. The Bureau shall promulgate such regulations, subject to the approval of the Mayor, as may be necessary to discharge its responsibilities under this Order, including regulations increasing the dollar amounts and number of employees referred to in this Order. Any regulations of the Bureau establishing terms and conditions for contractors shall be approved as to form by the Corporation Counsel.

Nothing contained herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment or giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained. The regulations shall set forth this exemption for religiously-sponsored organizations and provide for the discharge of the Bureau's responsibilities in a manner consistent with such exemption."

Section 2. Effective Date. This Order shall take effect immediately.

Edward L. Koch
MAYOR



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

Executive Order No. 94
June 20, 1986

Amendment of Executive Order No. 50
(April 25, 1980)

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. Prior Order Amended.

a. Section 1 of Executive Order No. 50, dated April 25, 1980, is amended to read as follows:

"Purpose. It is the purpose of this Order to ensure equal employment opportunity in City contracting."

b. Section 3(i) of such Order is amended to read as follows:

"equal employment opportunity means the treatment of all employees and applicants for employment without unlawful discrimination as to race, creed, color, national origin, sex, age, disability, marital status or sexual orientation in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment;"

c. Section 5(a) of such Order is amended to read as follows:

"Equal Employment Opportunity. A contracting agency shall include in every

(iii) a contract with a contractor who has received a certificate of compliance with the equal employment opportunity requirements of applicable law from the Bureau within the preceding twenty-four months, or an appropriate agency of the State of New York or of the United States within the preceding twelve months, except as the Bureau may direct by regulation."

b. Section 7(c) of such Order is amended to read as follows:

"On-the-job training of economically disadvantaged persons shall be required on all construction contracts covered by the submission requirements of this Order."

Section 2. Effective Date. This Order shall take effect immediately, but shall have no retrospective effect with respect to the two (2) year approval period provided for in Section 1(a) of this Order, amending Section 6(a) (iii) of Executive Order No. 50, dated April 25, 1980.

Edward I. Koch
MAYOR

EXHIBIT C

THIS SCHEDULE OF PREVAILING WAGES MUST BE POSTED AT THE PUBLIC WORK SITE PURSUANT TO NEW YORK CITY ADMINISTRATIVE CODE § 6-109.

SECURITY, TEMPORARY(CLERICAL), CLEANING AND FOOD SERVICE EMPLOYEES.

PURSUANT TO NYC ADMINISTRATIVE CODE § 6-109, THE COMPTROLLER OF THE CITY OF NEW YORK HAS PROMULGATED THIS SCHEDULE OF PREVAILING WAGES FOR SECURITY, TEMPORARY (CLERICAL), CLEANING AND FOOD SERVICE EMPLOYEES ENGAGED ON PUBLIC WORK CONTRACTS IN EXCESS OF THE SMALL PURCHASE LIMIT SET BY THE PROCUREMENT POLICY BOARD. THE PREVAILING RATE SCHEDULE AS PROMULGATED BY THE COMPTROLLER, MUST, IN COMPLIANCE WITH LAW, BE ANNEXED TO AND FORM PART OF THE CONTRACT.

PURSUANT TO ARTICLE 9, § 230 ET SEQ. OF THE NEW YORK STATE LABOR LAW, SECURITY AND CLEANING SERVICE EMPLOYEES EMPLOYED UNDER A PUBLIC BUILDING SERVICE CONTRACT IN EXCESS OF $1,500.00, MUST RECEIVE NOT LESS THAN THE PREVAILING RATE OF WAGE AND SUPPLEMENTAL BENEFITS FOR THE CLASSIFICATION OF WORK PERFORMED. WHERE THERE IS A CONFLICT BETWEEN NEW YORK CITY ADMINISTRATIVE CODE § 6-109 AND NEW YORK STATE LABOR LAW § 230 THE PROVISIONS OF § 230 ET SEQ. SHALL CONTROL.

THE APPROPRIATE SCHEDULE OF PREVAILING WAGES MUST BE POSTED AT ALL PUBLIC WORK SITES PURSUANT TO NYC ADMINISTRATIVE CODE § 6-109 SUBSECTION D.

THIS SCHEDULE IS APPLICABLE FOR WORK PERFORMED FROM JANUARY 1, 2002 THROUGH DECEMBER 31, 2002, UNLESS OTHERWISE NOTED. YOU WILL BE NOTIFIED OF ANY CHANGES TO THIS SCHEDULE BY ADDENDA PUBLISHED IN THE CITY RECORD. SCHEDULES FOR FUTURE ONE YEAR PERIODS WILL BE PUBLISHED ANNUALLY IN THE CITY RECORD ON OR ABOUT JANUARY 1ST OF EACH SUCCEEDING YEAR.

THE WAGE RATES PUBLISHED IN THIS SCHEDULE MAY NOT INCLUDE ALL HOURLY WAGE CALCULATIONS FOR OVERTIME, SHIFT DIFFERENTIAL, HOLIDAY, SATURDAY, SUNDAY OR OTHER PREMIUM TIME WORK. SIMILARLY, THIS SCHEDULE DOES NOT SET FORTH EVERY PREVAILING PRACTICE WITH WHICH EMPLOYERS MUST COMPLY. HOWEVER, ALL SUCH UNPUBLISHED RATES ARE NONETHELESS PART OF THE EMPLOYER'S PREVAILING WAGE RATE OBLIGATION.

ANSWERS TO QUESTIONS CONCERNING THE APPLICATION OF PREMIUM RATES AND OR PREVAILING TRADE PRACTICES MAY BE FOUND IN THE COLLECTIVE BARGAINING AGREEMENTS OF THE PREVAILING UNION. SUCH AGREEMENTS ARE AVAILABLE FOR INSPECTION BY APPOINTMENT. REQUESTS FOR APPOINTMENTS MAY BE MADE BY CALLING (212) 669-4437, MONDAY THROUGH FRIDAY BETWEEN THE

HOURS OF 9 A.M. TO 5 P.M. ALL OTHER INQUIRIES CONCERNING COMPLIANCE WITH THIS LAW, SHOULD BE DIRECTED TO; BUREAU OF LABOR LAW, ATTENTION: THOMAS NODELL, OFFICE OF THE COMPTROLLER, 1 CENTRE STREET, ROOM 629, NEW YORK, N.Y. 10007; FAX (212) 669-8747.

CONTRACTORS ARE SOLELY RESPONSIBLE FOR MAINTAINING ORIGINAL PAYROLL RECORDS WHICH DELINEATE, AMONG OTHER THINGS, THE HOURS EACH EMPLOYEE WORKED WITHIN A GIVEN CLASSIFICATION. CONTRACTORS USING RATES AND/OR CLASSIFICATIONS NOT PROMULGATED BY THE COMPTROLLER DO SO AT THEIR OWN RISK. ADDITIONALLY, PRIOR TO BID, AGENCY CHIEF CONTRACT OFFICERS MUST CONTACT THE BUREAU OF LABOR LAW WHEN THE NEED ARISES FOR A WORK CLASSIFICATION NOT PUBLISHED IN THIS SCHEDULE.

PREVAILING RATE SCHEDULE INFORMATION

THE INFORMATION LISTED BELOW IS INTENDED TO ASSIST YOU IN MEETING YOUR PREVAILING WAGE RATE OBLIGATION. COVERED WORKERS: ANY AND ALL INDIVIDUALS WHO ARE ENGAGED, EMPLOYED OR OTHERWISE OCCUPIED AS SECURITY, TEMPORARY (CLERICAL), CLEANING AND FOOD SERVICE EMPLOYEES ON THE PUBLIC WORK SITE.

CONTRACTORS ARE ADVISED TO REVIEW THE APPLICABLE COLLECTIVE BARGAINING AGREEMENTS AND THE COMPTROLLER'S PREVAILING RATE SCHEDULE BEFORE BIDDING ON PUBLIC WORK. ANY PREVAILING WAGE RATE ERROR MADE BY THE CONTRACTING AGENCY IN THE CONTRACT DOCUMENTS WILL NOT PRECLUDE A FINDING AGAINST THE CONTRACTOR OF PREVAILING WAGE VIOLATION.

THIS SCHEDULE SETS FORTH THE PREVAILING WAGE RATES REQUIRED TO BE ANNEXED TO AND FORM PART OF THE CONTRACT SPECIFICATIONS FOR NEW YORK CITY PUBLIC WORK PURSUANT TO NEW YORK CITY ADMINISTRATIVE CODE § 6-109. HOWEVER, ONLY THE PREVAILING RATES FOR THE SPECIFIC SECURITY, TEMPORARY (CLERICAL), CLEANING AND FOOD SERVICE EMPLOYEE OR CLASSIFICATION ANTICIPATED BY THE CONTRACTING AGENCY TO BE UTILIZED UPON SUCH PUBLIC WORK NEED BE ANNEXED TO THE CONTRACT.

THE ATTACHED SCHEDULE OF WAGES ARE THE PREVAILING RATES AND THE CONTRACTOR ENGAGED IN PUBLIC WORK IS OBLIGATED TO PAY EACH SECURITY, TEMPORARY(CLERICAL), CLEANING AND FOOD SERVICE WORKER NOT LESS THAN THE RATES SPECIFIED IN THIS SCHEDULE FOR THE TRADE OR OCCUPATION UTILIZED UPON SUCH PUBLIC WORK.

THOMAS C. NODELL
BUREAU OF LABOR LAW

HOLIDAY LEGEND

The following is an explanation of the code(s) in the HOLIDAY section of each classification contained in this prevailing rate schedule. The Holidays as listed below are to be paid at the wage rates at which the employee is normally classified.

( 1) None
( 2) New Years Day
( 3) Martin Luther King Jr. Day
( 4) Lincoln's Birthday
( 5) Washington's Birthday
( 6) President's Day
( 7) Good Friday
( 8) Memorial Day
( 9) Independence Day
(10) Labor Day
(11) Columbus Day
(12) Election Day
(13) Presidential Election Day
(14) 1/2 day on Presidential Election Day
(15) Veteran's Day
(16) Thanksgiving Day
(17) Day after Thanksgiving
(18) Day Before Christmas
(19) 1/2 day before Christmas Day
(20) Christmas Day
(21) Day before New Year's Day
(22) 1/2 day before New Year's Day
(23) Employee's Birthday

OVERTIME LEGEND

The following is an explanation of the code(s) listed in the OVERTIME section of each classification contained in this prevailing rate schedule. Additional requirements may also be listed in the OVERTIME section.

( 1) Time and one half the regular rate after a 7 hour day.
( 2) Time and one half the regular rate after an 8 hour day.
( 3) Double time the regular rate after a 7 hour day.
( 4) Double time the regular rate after an 8 hour day.
( 5) Time and one half the regular rate for Saturday.
( 6) Double time the regular time rate for Saturday.
( 7) Time and one half the regular rate for Sunday.
( 8) Double time the regular rate for Sunday.
( 9) Saturday may be used as a make-up day at straight time when a day is lost during that week to inclement weather.
(10) Saturday and Sunday may be used as a make-up day at straight time when a day is lost during that week due to inclement weather.
(11) Regular straight time rate for work on a paid holiday.
(12) Time and one half the regular rate for work on a paid holiday.
(13) Double time the regular rate for work on a paid holiday.

*NOTE:* Benefits are paid for *EACH HOUR WORKED* unless otherwise noted.

CLASSIFICATION:

LOFT CLEANING

LOFT BUILDING CLASS "A": (Over 280,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.89 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

LOFT BUILDING CLASS "B": (Between 120,000 and 280,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.84 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

LOFT BUILDING CLASS "C": (Less than 120,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.80 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

NEW EMPLOYEES: EFFECTIVE FEBRUARY 4, 1996, A NEW HIRE EMPLOYED IN THE PORTER/CLEANER TITLE, MAY BE PAID A STARTING RATE OF EIGHTY (80%) OF THE HOURLY RATE PUBLISHED ABOVE.

THIS PROVISION SHALL NOT APPLY TO ANY EXPERIENCED EMPLOYEE ("EXPERIENCED EMPLOYEE") WHO WAS EMPLOYED IN THE NEW YORK CITY BUILDING INDUSTRY ("INDUSTRY") AS OF FEBRUARY 3, 1996. "EXPERIENCED EMPLOYEE" SHALL BE DEFINED AS A PERSON WHO HAS WORKED FOR THIRTY (30) DAYS IN THE "INDUSTRY" WITHIN THE 24 MONTHS IMMEDIATELY PRECEDING HIRING (EXCLUDING EMPLOYMENT AS A VACATION RELIEF).

THESE CLASSIFICATIONS INCLUDE, BUT ARE NOT LIMITED TO, CLEANING AND DISINFECTING OF CURTAINS, RUGS, AND DRAPES, JANITORIAL AND CUSTODIAL SERVICES (OTHER THAN SCHOOL CUSTODIAN), WASHING AND WAXING FLOORS.

ADDITIONAL SUPPLEMENTAL BENEFITS FOR ALL CLASSES OF LOFT CLEANERS:

PAID HOLIDAYS: (2, 3*, 5, 7# , 8, 9, 10, 11, 16, 17#, 20, plus the employees birthday) see holiday legend

continued on following page -

* may be exchanged for Yom Kippur or a personal day
# may be exchanged for Lincoln's birthday and/or Veteran's Day

VACATION:
Less than six months of work - no vacation.
Six months of work but less than one year of work - three days.
One year of work but less than five years of work - two weeks.
Five years of work but less than 15 years of work - three weeks.
15 years of work but less than 25 years of work - four weeks.
25 years or more of work - five weeks.

SICK LEAVE:
Ten sick days per year. Unused sick leave paid in the succeeding January, one full days pay for each unused sick day.

OVERTIME: (2, 5, 7, 12 in addition to the days pay) see overtime legend

THIS CLASSIFICATION IS SUBJECT TO NEW YORK STATE LABOR LAW SECTION 230 ET SEQ.

(Local 32B/J)

*CLASSIFICATION:* OFFICE CLEANING

OFFICE BUILDING CLASS "A": (Over 280,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.92 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

OFFICE BUILDING CLASS "B": (Between 120,000 and 280,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.89 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

continued on following page -

OFFICE BUILDING CLASS "C": (Less than 120,000 square feet gross area)

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $16.85 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 4.00 |

NEW EMPLOYEES: EFFECTIVE FEBRUARY 4, 1996, A NEW HIRE EMPLOYED IN THE PORTER/CLEANER TITLE, MAY BE PAID A STARTING RATE OF EIGHTY (80%) OF THE HOURLY RATE PUBLISHED ABOVE.

THIS PROVISION SHALL NOT APPLY TO ANY EXPERIENCED EMPLOYEE ("EXPERIENCED EMPLOYEE") WHO WAS EMPLOYED IN THE NEW YORK CITY BUILDING INDUSTRY ("INDUSTRY") AS OF FEBRUARY 3, 1996.. "EXPERIENCED EMPLOYEE" SHALL BE DEFINED AS A PERSON WHO HAS WORKED FOR THIRTY (30) DAYS IN THE "INDUSTRY" WITHIN THE 24 MONTHS IMMEDIATELY PRECEDING HIRING (EXCLUDING EMPLOYMENT AS A VACATION RELIEF).

THESE CLASSIFICATIONS INCLUDE, BUT ARE NOT LIMITED TO, CLEANING AND DISINFECTING OF CURTAINS, RUGS, AND DRAPES, JANITORIAL AND CUSTODIAL SERVICES (OTHER THAN SCHOOL CUSTODIAN), WASHING AND WAXING FLOORS.

ADDITIONAL SUPPLEMENTAL BENEFITS FOR ALL CLASSES OF OFFICE CLEANERS:

PAID HOLIDAYS: (2, 3*, 5, 7# , 8, 9, 10, 11, 16, 17#, 20, plus the employees birthday) see holiday legend
* may be exchanged for Yom Kippur or a personal day
# may be exchanged for Lincoln's birthday and/or Veteran's Day

VACATION:
Less than six months of work - no vacation.
Six months of work but less than one year of work - three days.
One year of work but less than five years of work - two weeks.
Five years of work but less than 15 years of work - three weeks.
15 years of work but less than 25 years of work - four weeks.
25 years or more of work - five weeks.

SICK LEAVE:
Ten sick days per year. Unused sick leave paid in the succeeding January, one full days pay for each unused sick day.

Continued on following page -

OVERTIME: (2, 5, 7, 12 in addition to the days pay) see overtime legend

THIS CLASSIFICATION IS SUBJECT TO NEW YORK STATE LABOR LAW SECTION 230 ET SEQ.

(LOCAL 32B/J)

*CLASSIFICATION:*

RESIDENTIAL CLEANING

Residential Building Class"A": buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $4,000.00 a room.

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $15.99 |
| Effective April 21, 2002 | $16.52 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 3.98 |

Residential Building Class"B": buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $2,000.00 a room and not over $4,000.00 a room.

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $15.93 |
| Effective April 21, 2002 | $16.46 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 3.98 |

Residential Building Class"C": buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of $2,000.00 or less a room.

| Title | Wage Rate per Hour |
|---|---|
| Porter/Cleaner | $15.88 |
| Effective April 21, 2002 | $16.40 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 3.98 |

THIS CLASSIFICATION IS SUBJECT TO NEW YORK STATE LABOR LAW SECTION 230 ET SEQ. ACCORDINGLY, SUPPLEMENTAL BENEFITS IN ADDITION TO THE WAGE RATES SET FORTH ABOVE, MUST BE PAID OR PROVIDED AS FOLLOWS: Continued on following page -

THESE CLASSIFICATIONS INCLUDE, BUT ARE NOT LIMITED TO, CLEANING AND DISINFECTING OF CURTAINS, RUGS, AND DRAPES, JANITORIAL AND CUSTODIAL SERVICES (OTHER THAN SCHOOL CUSTODIAN), WASHING AND WAXING FLOORS.

ADDITIONAL SUPPLEMENTAL BENEFITS FOR ALL CLASSES OF RESIDENTIAL CLEANERS:

PAID HOLIDAYS: (2, 3*, 5, 7# , 8, 9, 10, 11, 16, 17#, 20, plus the employees birthday) see holiday legend
* may be exchanged for Yom Kippur or a personal day
# may be exchanged for Lincoln's birthday and/or Veteran's Day

VACATION.
Less than six months of work - no vacation.
Six months of work but less than one year of work . - three days.
One year of work but less than five years of work - two weeks.
Five years of work but less than 15 years of work - three weeks.
15 years of work but less than 25 years of work - four weeks.
25 years or more of work - five weeks.

SICK LEAVE: After one year of service - 10 days per year.

OVERTIME: (2, 5, 7, 12 in addition to the days pay) see overtime legend

THIS CLASSIFICATION IS SUBJECT TO NEW YORK STATE LABOR LAW SECTION 230 ET SEQ.

(Local 32B/J)

| CLASSIFICATION | WAGE RATE PER HOUR |
|---|---|
| EXTERMINATOR | $14.83 |
| SUPPLEMENTAL BENEFIT RATE PER HOUR: | $ 2.53 |

THIS CLASSIFICATION IS SUBJECT TO NEW YORK STATE LABOR LAW SECTION 230 ET SEQ.

*CLASSIFICATION:*

FOOD SERVICE EMPLOYEES

| TITLE | WAGE RATE PER HOUR | SUPPLEMENTAL BENEFITS PER HOUR |
|---|---|---|
| Cook (Level 1) | $18.56 | $ 4.54 |

(Under supervision performs non-supervisory work of moderate difficulty and responsibility, or supervisory work of ordinary difficulty and responsibility in the preparation, distribution and service of pre-prepared meals, sandwiches, etc.)

| TITLE | WAGE RATE PER HOUR | SUPPLEMENTAL BENEFITS PER HOUR |
|---|---|---|
| Assistant Cook (Level 1) | $11.88 | $ 2.91 |
| Cook (Level 2) | $20.35 | $ 4.98 |

(Under general supervision, performs non-supervisory work of a difficult and responsible nature, or supervisory work of moderate difficulty and responsibility in the preparation, distribution, and service of meals using standard procedures and quantity recipes where less than 1200 meals per day are prepared)

| TITLE | WAGE RATE PER HOUR | SUPPLEMENTAL BENEFITS PER HOUR |
|---|---|---|
| Assistant Cook (Level 2) | $18.56 | $ 4.54 |
| Cook (Level 3) | $21.57 | $ 5.28 |

(Under general supervision, performs supervisory work of a difficult and responsible nature in the preparation, distribution, and service of meals, using standard procedure and quantity recipes where in excess of 1199 meals per day are prepared)

| TITLE | WAGE RATE PER HOUR | SUPPLEMENTAL BENEFITS PER HOUR |
|---|---|---|
| Assistant Cook (Level 3) | $20.28 | $ 4.96 |
| Kitchen Helper | $11.51 | $ 2.82 |
| Cafeteria/Counter Attendant | $11.88 | $ 2.91 |

OVERTIME: (2) see overtime legend

PAID HOLIDAYS: (1) see holiday legend

(Local 372; DC 37)

*CLASSIFICATION:*

SECURITY

| Title | Wage Rate Per Hour | Supplemental Benefit Rate Per Hour |
|---|---|---|
| Security Guard (unarmed) | $ 8.52* | $ .94* |
| Security Guard (armed) | $ 15.14* | $ 1.82* |

OVERTIME: (2) see overtime legend
HOLIDAYS: (1) see holiday legend

*Rates expire June 30, 2002 addendum to follow

*CLASSIFICATION:*

TEMPORARY OFFICE SERVICES

TITLE

Secretary (various) WAGE RATE PER HOUR: $16.08
SUPPLEMENTAL BENEFIT RATE PER HOUR: $ .12

OVERTIME: (2, 5, 7, 12 if worked performed on holiday) see overtime legend
PAID HOLIDAYS: (1) see holiday legend

Typist / Word Processing Machine Operator / Data Entry Clerk
WAGE RATE PER HOUR: $12.64
SUPPLEMENTAL BENEFIT RATE PER HOUR: $ .48

OVERTIME: (2, 5, 7, 12 if work performed on holiday) see overtime legend
PAID HOLIDAYS: (1) see holiday legend

Clerk (various) WAGE RATE PER HOUR: $ 9.05
SUPPLEMENTAL BENEFIT RATE PER HOUR: $ .13

OVERTIME: (2, 5, 7, 12 if work performed on holiday) see overtime legend
PAID HOLIDAYS: (1) see holiday legend

Stenographer WAGE RATE PER HOUR: $17.06
SUPPLEMENTAL BENEFIT RATE PER HOUR: $ 1.89

OVERTIME: (2, see overtime legend)

PAID HOLIDAYS: (1) see holiday legend

Continued on following page -

Cashier

WAGE RATE PER HOUR: $10.07
SUPPLEMENTAL BENEFIT RATE PER HOUR: $.99

OVERTIME: (2, see overtime legend)
PAID HOLIDAYS: (1) see holiday legend

Messenger

WAGE RATE PER HOUR: $ 9.47
SUPPLEMENTAL BENEFIT RATE PER HOUR: $ .50
OVERTIME: (2, 5, 7, 12 if work performed on holiday) see overtime legend
PAID HOLIDAYS: (1) see holiday legend

CLASSIFICATION:

WINDOW CLEANER

| TITLE | WAGE RATE PER HOUR |
|---|---|
| Window Cleaner | $19.93 |
| Power Operated Scaffolds, Manual Scaffolds, and Boatswain Chairs | $21.55 |

SUPPLEMENTAL BENEFIT RATE PER HOUR: $ 4.77

PAID HOLIDAYS: (2, 3, 5, 7, 8, 9, 10, 11, 16, 17, 20, plus one personal day) see holiday legend

VACATION:

After seven months but less than one year of service - one week.
One year but less than five years of service- two weeks.
Five years of service but less than 15 years of service- three weeks.
15 years of service but less than 25 years of service- four weeks.
21 years - 21 days.
22 years - 22 days.
23 years - 23 days.
24 years - 24 days.
25 years or more of service - five weeks.
Plus one day per year for medical visit

SICK LEAVE:

Ten days after one year worked. Unused sick days to be paid in cash. An employee who is entitled to and receive a payment of 10 days of unused sick days shall also receive a hundred dollar bonus.

OVERTIME: (4, 5, 8, 12 plus the days pay) see overtime legend

(Local No. 2)

Contract expires February 28, 2002 - addendum to follow

# NYCHA

## SECURITY GUARD SIGN-IN REGISTER

NAME OF FIRM ____________________

CONTRACT NO. ____________________

POST ADDRESS : ____________________

DATE FROM ____________________ DATE TO ____________________

| | DATE | TIME IN | | PRINT NAME | TIME OUT | | SIGNATURE |
|---|---|---|---|---|---|---|---|
| GUARD | | 12AM | | | 8AM | | |
| SUPV. | | | | | | | |
| GUARD | | 8AM | | | 4PM | | |
| SUPV. | | | | | | | |
| GUARD | | 4PM | | | 12AM | | |
| SUPV. | | | | | | | |
| GUARD | | 12AM | | | 8AM | | |
| SUPV. | | | | | | | |
| GUARD | | 8AM | | | 4PM | | |
| SUPV. | | | | | | | |
| GUARD | | 4PM | | | 12AM | | |
| SUPV. | | | | | | | |

I CERTIFY that I and or my duly authorized representatives have checked and verified guard service for the period ________________, 20_____, to ____________________, inclusive: that to the best of my knowledge and belief it is a true and correct statement of services performed; that such service has been verified by me and or my duly authorized representative(s), and that it has been authenticated or approved by the duly authorized agent of

SIGNED: ____________________ DATE: ____________________

Firm's Corporate Officer

# EXHIBIT 2

**Exhibit 2**

List of NYCHA field office locations

COPSTAT SECURITY
SITE LISTING

**LOBBY MONITORING SITES**

| Locations | Post Address | Hours | Number of Guards per shift |
|---|---|---|---|
| Meltzer- Hernandez | 94 East 1st St. NY 10002 | 9pm-5am | 1 |
| Morris Park Senior Citizen | 17 east 124th St. NY 10035 | 10pm-6am | 1 |
| UPACA 5 | 1980 Lexington Av. NY 10035 | 10pm-6am | 1 |
| UPACA 6 | 1940 Lexington Av. NY 10035 | 5pm-1am | 1 |
| Chelsea Addition | 436 West 27th Dr. NY 10001 | 6pm-2am | 1 |
| Robbins Plaza | 341 E. 70th St. NY 10028 | 3pm-11pm | 1 |
| Baruch Addition | 72 Columbia St. NY 10002 | 6pm-2am | 1 |
| LaGuardia Addition | 282 Cherry St. NY 10002 | 4pm-12am | 1 |
| Bethune | 1945 Amsterdam Ave. NY 10032 | 9pm-5am | 1 |
| Sandra Thomas Apts. | 102 W. 91th St. NY 10024 | 10pm-6am | 1 |
| Thurgood Marshall | 1970 Amsterdam Ave. NY 10032 | 9pm-5am | 1 |
| Ft. Washington Rehab | 99 Ft Washington Ave. NY 10032 | 4pm-12am | 1 |
| P.S. 139 Conversion | 120 West 140th Street NY 10030 | 4pm-12am | 1 |
| Harborview | 530 West 55th Street NY 10019 | 8pm-4am | 1 |
| L.E.S. I (INFILL) | 175 Eldridge Street NY 10002 | 9pm-5am | 1 |
| Middletown Plaza | 3033 Middletown Rd. Bronx 10469 | 6pm-2am | 1 |
| Bronx River | 1350 Manor Ave Bronx 10472 | 8pm-4am | 1 |
| | 1630 E. 174 St. Bronx 10472 | 8pm-4am | 1 |
| West Tremont | 228 W. Tremont Ave. Bronx 10453 | 10pm-6am | 1 |
| Twin Park East | 2070 Clinton Ave. Bronx 10457 | 8pm-4am | 1 |
| Betances I | 551 E. 143rd St. Bronx 10455 | 4pm-12am | 1 |
| Morissania Air Right | 3135 Park ave. Bronx 10451 | 9pm-5am | 1 |
| Boston Road | 2440 Boston Rd. Bronx 10467 | 8pm-4pm | 1 |
| Glebe Ave | 2125 Glebe Ave Bronx 10462 | 10pm-6am | 1 |
| 1020 College Ave | 1020 College Ave. Bronx 10451 | 10pm-6am | 1 |
| Union Ave. East 163 Street | 950 Union Ave. Bronx 10459 | 8pm-4am | 1 |
| Claremont Pkwy-Fran | 1325 franklyn Ave, Bronx 10459 | 8pm-4am | 1 |
| Davidson | 1150 Union Ave. Bronx 10459 | 8pm-4am | 1 |
| Randall Balcom | 2700 Randall Ave. Bronx 10465 | 9pm-5am | 1 |
| | 2705 Schley Ave. Bronx 10465 | 9pm-5am | 1 |
| | 650 Buttrick Ave. Bronx 10465 | 9pm-5am | 1 |
| Mitchel | 188-190 Lincoln Ave. Bronx 10454 | 7pm-3am | 1 |
| E. 152 St-Courtlandt | 372 E. 152nd St. Bronx 10451 | 8pm-4am | 1 |

**SECURITY GUARD SERVICES SITES**

| | | | |
|---|---|---|---|
| Markham Gardens | Various | Monday-Friday 4pm-8am<br>Weekends & Holidays<br>2pm-8am | 2 |

**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
SHAUN DONOVAN, Commissioner

**Office of Administration**
100 GOLD STREET, NEW YORK, N.Y. 10038

BERNARD SCHWARZ, Deputy Commissioner

June 21, 2004

Copstat Security, Inc.
1800 East Tremont Avenue
Bronx, New York 10460
ATTN: Mr. Thomas Murray

**Re: Unarmed Security Guard Services**
**Proposed Billing Rates**

Dear Mr. Murray:

The New York City Office of the Comptroller has established new hourly wage ($9.10) and supplemental benefit ($1.50) rates for unarmed security guards for the period of July 1, 2004 through June 30, 2005 (schedule enclosed). The following represents the proposed billing rates (regular and overtime) for the Level I and II Security Guards effective July 1, 2004.

| | S/O (Level I) | S/O Level I (Overtime) | S/O Level II | S/O Level II (Overtime) |
|---|---|---|---|---|
| Wage | 9.10 | 13.65 | 10.23 | 15.35 |
| Supplemental Benefits | 1.50 | 1.50 | 1.50 | 1.50 |
| Profit & Overhead | 1.70 | 1.70 | 1.70 | 1.70 |
| FICA | .80 | 1.14 | .88 | 1.26 |
| SUI | .07 | .00 | .08 | .00 |
| FUTA | .08 | .00 | .09 | .00 |
| Disability | .03 | .05 | .03 | .05 |
| Worker's Comp. | .31 | .66 | .34 | .49 |
| General Liability | .33 | .50 | .33 | .50 |
| Health Insurance | n/a | n/a | n/a | n/a |
| Vacation/Sick Days | n/a | n/a | n/a | n/a |
| Holidays | n/a | n/a | n/a | n/a |
| | | | | |
| Approved Hourly Billing Rate | $13.92 | $19.20 | $15.18 | $20.85 |

Accordingly, please review the proposed billing rates and make the necessary arrangements for Copstat Security, Inc. to bill HPD at the approved hourly rates effective July 1, 2004. If you have any questions or require additional information, please contact me directly at (212) 863-8032.

Very truly yours,

Mario Ferrigno
Security Director

nyc.gov/hpd

# Exhibit 7

## Excerpts from Deposition of NYCHA (Patrick O'Hagan Designee)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

ANDREWS INTERNATIONAL, INC.

Plaintiff

vs. Civil Action No.

NEW YORK CITY HOUSING AUTHORITY 08-cv-1580 (HB)

Defendant

_______________________________________/

The deposition of PATRICK O'HAGAN was held on Tuesday, June 10, 2008, commencing at 12:20 p.m., at The New York City Housing Authority, 250 Broadway, 9th Floor, New York, New York 10007, before Ronald A. Marx, a Notary Public of the State of New York.

Reported By: Ronald A. Marx

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

BRYAN D. BOLTON, ESQUIRE

Funk & Bolton

36 South Charles Street, 12th Floor

Baltimore, Maryland 21201-3111

Telephone: 410.659.7754

Facsimile: 410.659.7773

E-mail: bbolton@fblaw.com

and

CHRISTOPHER DUNNE, ESQUIRE

325 Chestnut Street Suite 403

Philadelphia, Pennsylvania 19106

Telephone: 267-761-1131

E-mail: cdunne@cedunne.us

(APPEARANCES CONTINUED ON THE NEXT PAGE)

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:

STEPHEN W. GOODMAN, ESQUIRE
New York City Housing Authority
Law Department
250 Broadway, 9th Floor
New York, New York 10007
Telephone: 212.776.5089
Facsimile: 212.776.5401
E-mail: goodmans@nycha.nyc.gov

INDEX

Deposition of PATRICK O'HAGAN

June 10, 2008

| Examination By: | | Page |
|---|---|---|
| Mr. Bolton | | 6 |

| Exhibit No. | | Marked |
|---|---|---|
| 1 | Notice to take deposition | 8 |
| 2 | Agreement dated 2/28/05 | 17 |
| 3 | E-mail dated 12/18/06 | 25 |
| 4 | E-mail dated 12/22/06 | 32 |
| 5 | E-mail string | 34 |
| 6 | E-mail dated 5/7/07 | 42 |
| 7 | Letter dated 5/21/07 | 65 |
| 8 | E-mail dated 5/24/07 | 70 |
| 9 | Letter dated 6/4/07 | 74 |
| 10 | E-mail string | 77 |
| 11 | E-mail string | 80 |
| 12 | Remittance advice dated 8/14/07 | 85 |
| 13 | Letter dated 7/16/07 | 88 |

INDEX (cont.)

| Exhibit No. | | Marked |
|---|---|---|
| 14 | Letter dated 8/6/07 | 92 |
| 15 | Documents | 101 |
| 16 | E-mail dated 5/11/07 | 105 |

PROCEEDINGS

Whereupon,

PATRICK O'HAGAN,

a witness on behalf of the Defendant herein, residing at 80 Fifth Avenue, Holtsville, New York 11742, having been duly sworn by a Notary Public of the State of New York, upon being examined, testified as follows:

DIRECT EXAMINATION BY MR. BOLTON:

Q. Can you state your full name and your business address, please?

A. Certainly. It's Patrick Frances O'Hagan, Junior. Business address, 90 Church Street, Ninth Floor, New York, New York 10007.

Q. And where are you currently employed?

A. New York City Housing Authority.

Q. Is it okay if we refer to that as NYCHA, N-Y-C-H-A, today?

A. Yes, sir.

Q. And what is your current position at NYCHA?

A. My current position is the security director for NYCHA.

Q. Now, have you ever had your deposition taken before?

A. No, I have not.

Q. I want to make certain that the transcript accurately reflects your testimony, so I just want to review the process for a moment or two to make certain that, in fact, it accurately represents your testimony.

You need to make certain that you always wait for me to finish my question before you answer my question, because if not the transcript becomes very garbled, and it's hard to figure out what -- whether what you were answering is what I was asking, so please be patient with me.

I may sometimes meander, but be patient. Wait for me to finish my question. Then when I finish, I will allow you to answer. Do you understand that? Do you understand?

A. Yes.

Q. Okay. And if you don't understand my question for whatever reason today, could be you didn't hear something, the question could be confusing on my

part, just please let me know and I'll try to rephrase and clarify my question. Do you understand that?

A. Yes.

Q. Okay. Do you understand that you've given an oath to tell the truth today?

A. Yes.

Q. And do you also understand that you're testifying today as the designee of NYCHA?

A. Yes.

MR. BOLTON: And let's mark this as NYCHA Deposition Exhibit 1. Steve, is that okay? We'll mark them as NYCHA exhibits.

MR. GOODMAN: That's fine.

MR. BOLTON: We'll mark as Deposition Exhibit 1 the amended agreed-upon notice to take deposition for NYCHA, pursuant to which we're here today.

(NYCHA Exhibit 1, notice to take deposition, was marked for identification, as of this date.)

Q. I'm placing before you what I've had marked

matters?

A. I have reviewed my case file regarding my conversations with Andrews International management as well as their representation.

Q. Did you do anything other than review the case file?

A. I've spoken with Mr. Goodman.

Q. I'm not asking about what you said with Mr. Goodman. That's privileged. I'm not asking what was discussed. I understand you spoke with him.

Other than speaking with Mr. Goodman and reviewing your case file, did you take any other steps to prepare to testify here today as NYCHA's designee with respect to the matters designated in NYCHA Deposition Exhibit 1?

A. No, sir.

Q. Now, a moment ago you told me you are the security director for NYCHA.

When did you become the security director for NYCHA?

A. September 2006.

Q. Is there an exact day in September that you can identify, or is it unclear at this juncture?

A. It is September 6th.

Q. September 6th, 2006?

A. 2006.

Q. And was there another security director before you that you replaced? Took their job is maybe a fair way to say it.

A. I replaced a -- there was a vacancy.

Q. There was a vacancy.

A. My predecessor, Sean Ryan, had left and the position was vacant.

Q. And prior to becoming security director for NYCHA on September 6, 2006, where were you employed?

A. I was employed for -- with Guardsmark, Incorporated.

Q. Guardsmark?

A. G-U-A-R-D-S-M-A-R-K.

Q. Where is -- where was Guardsmark, Incorporated located when you were working for them?

A. 10 Rockefeller Plaza, New York, New York.

Q. And how long were you employed by Guardsmark?

A. 12 years.

Q. And what did you do for Guardsmark immediately before your departure? What was your last position?

A. I was a regional manager.

Q. And what region did you manage for Guardsmark?

A. Greater New York and New Jersey.

Q. And how long were you a regional manager for Guardsmark?

A. Two years.

Q. And what about before that? What position did you hold at Guardsmark?

A. I was the manager in charge of the New York midtown branch.

Q. And how long were you the manager in charge of the midtown -- New York midtown branch for Guardsmark?

A. Four years.

your staff on the nature of the contractual relationship between the parties?

A. If you could clarify the question for me.

Q. Sure. As I understand it, someone on the staff informed you about the involvement with Copstat, Andrews' precessor, when you became security director.

I was trying to find out if that briefing included any discussion of the contractual terms that had been entered into between NYCHA and Copstat or Andrews.

A. What was discussed were the locations that Andrews, Copstat provided service, as well as the billing rate.

Q. Did there come a time when you asked a company named Veritas Vox to conduct an audit of Copstat/Andrews?

A. Yes, sir.

Q. And how were you familiar with this company, Veritas Vox?

A. They were founded by former employees of Guardsmark.

Q. So am I correct in understanding from your answer that you were acquainted with the former employees of Guardsmark from your tenure at Guardsmark?

A. Correct.

Q. And when you engaged Veritas Vox to audit Andrews, did you ask them to audit any specific aspects of Copstat or Andrews' functioning?

A. It was adherence to the contract standards.

Q. And was there any other specific guidance given to Veritas Vox, other than to audit for adherence to the contract standards?

A. No, sir.

MR. BOLTON: Now, let's mark as Deposition Exhibit 2 -- it's a series of documents.

I'll represent to you, Mr. Goodman, this is what was marked as Exhibit A to the Complaint.

This is -- I think it's a complete copy of the contract, but I'll show it to the witness in a second.

This document, which is a multi-page document, that says Agreement Number 4020633 by and

between New York City Housing Authority and Copstat Security, LLC on the first page.

And then it has three attachments which are exhibits, I believe, to the actual original contract, which is dated February 28, 2005. That will be marked as Exhibit 2.

(NYCHA Exhibit 2, agreement dated 2/28/05, was marked for identification, as of this date.)

Q. Mr. O'Hagan, I'm placing before you what I have marked as Deposition Exhibit Number 2.

And without asking you to verify page by page, because I realize that's probably an impossible task, but if you can just generally from reviewing this document tell us what this appears to be.

A. You have the agreement between NYCHA and Copstat as -- in its entirety. There's also included some pre-bid questions and sign-in sheets, which I do not recall being in the original agreement or pertaining then to the agreement.

Q. How many pages -- what pages are you talking about specifically?

A. I don't believe this is marked. It's a pre-bid conference. There's also Q and A from the HPD.

Q. It's a Q and A, so I can identify it for record.

That's a document that says -- dated March 27, 2002. It says questions and answers pursuant to the March 21, 2002 pre-bid conference.

You're saying that should not be in there?

A. It's not relative to the agreement or is in my files for the agreement.

Q. Okay. And then the other document was the sign-in sheet for the pre-bid conference, which is also not in your files?

A. Yes, sir.

Q. Okay. Other than that, does what I've had marked as NYCHA Exhibit 1 [sic] appear to be a copy of the original contract between NYCHA and Copstat Security, LLC?

A. Yes, sir.

Q. Okay. Now, am I correct in understanding that Veritas Vox would have been provided a copy of

Q. And do you know who at the tech service division was involved in negotiating the terms of NYCHA Exhibit 2?

A. No, sir.

Q. How about from the office of security?

Do you know who was involved from that office with respect to the negotiation that led to the agreement marked as NYCHA Exhibit 2?

A. I cannot say with any degree of certainty that my predecessor did negotiate the responsibilities for Copstat, so no, I cannot.

Q. And am I correct by your predecessor you're referring to Mr. Ryan?

A. Yes, sir.

Q. Now, when you became security director at NYCHA, did you have any meetings with Mr. Ryan in terms of him advising you of the work that was ongoing at NYCHA, whether he was involved with in any way?

A. No, sir.

Q. Have you ever had a meeting with Mr. Ryan where you've sat down and talked about what was going

 on at NYCHA under his tenure as opposed to your tenure?

A. No, sir.

Q. What was it that led you to ask Veritas Vox to conduct an audit of Copstat Security?

A. As they were assigned to our central office locations right here in our -- this building.

Q. I'm sorry. They meaning who?

A. Andrews, Copstat --

Q. Okay.

A. -- provided service at central office facilities, which is 250 Broadway, 90 Church Street, Long Island City, that I wanted to start with the provider that provided service here in my home base.

Q. And do you recall when approximately it was that you engaged Veritas Vox to undertake the audit of Copstat Security?

A. December of '06.

Q. That would be December 2006?

A. Yes, sir.

Q. Now, at the time you engaged Veritas Vox to undertake this audit of Copstat, did you send either a

written letter or an e-mail to anyone at Copstat or Andrews, advising them that you would ask Veritas Vox to undertake an audit of Copstat's adherence to the contract standards?

A. No, I did not.

Q. Did you ask any of your subordinates to contact Copstat at the time you asked Veritas Vox to initiate this audit of Andrews with respect -- excuse me. Of Copstat with respect to contract adherence, to advise Copstat that Veritas Vox would be performing that audit?

A. Yes, sir, I did.

Q. Who did you ask to perform that function?

A. Raymond Rodriguez.

Q. And at that time what position did Mr. Rodriguez hold?

A. Security manager.

Q. Security manager. Is Mr. Rodriguez still a security manager at NYCHA today?

A. Yes, he is.

Q. Did you ask Veritas Vox to keep you

2007.

Q. And how soon after that did anyone provide a copy of that report to anyone at Copstat or Andrews?

A. The report was reviewed with Andrews senior management on April 26th.

Q. Prior to April 26, 2007, had anyone at Andrews or Copstat seen a copy of this Veritas Vox audit report?

A. I do not believe so, no.

Q. Was there some reason why the Veritas Vox report was withheld from Copstat or Andrews from sometime in late January until April 26, 2007?

A. As I mentioned earlier, the inspector general's office department of equal opportunity were briefed up on the issues identified in the audit, and they were conducting their investigation.

Q. And did either of those authorities to your knowledge take any action against Copstat or Andrews?

A. Not to my knowledge.

MR. BOLTON: Let's mark this as NYCHA Deposition Exhibit 6, an e-mail dated May 7, 2007 from

regarding supplemental benefit pay of the report to him verbatim in the second paragraph.

Does that indicate to you that as of May 7, 2007, that Mr. Topf did not at that time have a copy of any audit report from Veritas Vox?

A. Not necessarily, sir.

Q. Okay. At the -- I think you said there was a meeting in April of 2006, correct?

A. Yes, sir.

MR. GOODMAN: I think that was 2007.

MR. BOLTON: I'm sorry. You're right, Mr. Goodman. Thank you so much. April 2007. His good ears caught us. April 2007.

Q. Do you remember what the date of that meeting was?

A. April 26, 2007.

Q. At this meeting on April 26th, 2007 who was present?

A. From NYCHA, myself and Raymond Rodriguez. As I recall, from Andrews International, John Dorton, Jim Woods, Michael Topf, Dennis Fagan, Bill Flores. I

think that was it. We were slightly outnumbered.

Q. And where was that meeting held?

A. In a conference room on the 9th floor of 90 Church Street.

Q. Now, the meeting on April 26, 2007, what was the purpose of that meeting?

A. There had been some correspondence from Michael Topf to Raymond Rodriguez inquiring about payments, delinquent payments I believe.

Mr. Topf was actually quite aggressive in his attempts to contact Mr. Rodriguez.

I was on jury duty in March to April, early April. And then requested to meet Mr. Topf to go over the issues that were brought to my attention within the audit.

Q. Prior to the meeting on April 26, 2007, had you or anyone provided a copy of the Veritas Vox audit report to anyone at Copstat or Andrews, to your knowledge?

A. No. I believe I had answered that question previous. No.

Q. Your answer was -- I'm sorry.

A. No, sir.

Q. On April 26, 2007, when you met with the individuals from Andrews at 90 Church Street, what do you recall being said during that meeting by you first?

A. Well, in summary, I believe the way I opened the conversation was to identify the issues that we had with the service at that point.

I had received -- I came on board September. Within five or six months I had been on board, there were service issues brought to my attention from staff.

We had conducted this audit which proved there was no supervision in the field. There were also some concerns, as mentioned earlier, about the supplemental, the prevailing wage.

And I informed Mr. Woods that I was not pleased with the service I was provided, considering the amount of money that NYCHA was spending.

Q. Anything else you can recall you said?

A. I recall closed -- well, including in that

conversation that Andrews needed to offer me credit, because I'm paying for supervision within my bill rate.

I'm not getting the supervision, so the Housing Authority was due a credit at that point.

Q. Anything more specific than that, or was that sort of the context of it?

A. That was the context of it. We had a subsequent meeting, where I informed Mr. Woods that I was going to apply liquidated damages, and his reply was "Do what you need to do. Just don't hurt us too bad."

Q. When was the subsequent meeting with Mr. Woods?

A. It was in early May.

Q. 2007?

A. Yes, sir.

Q. Now, at the meeting, how does Andrews respond to your concerns?

A. Well, in the April meeting --

Q. We're talking about just April now.

A. Yes, sir. April 2007 meeting I was

promised that my account would receive the most attention.

"You have brought this to our -- you know, we're going to take care of business for you, Pattie." And I said okay. Let's see. You know, the proof is in the pudding.

So prior to that subsequent meeting, I believe Mr. Kestecher was there, Leonard, I had staff pull the inspection records from 250 Broadway, as I was prepared to go into the meeting, and there were no visits once again from supervision for Andrews International.

So I believe at that point is when Mr. Dorton lost his position with Andrews for failing to respond to what Mr. Woods had promised me.

So I'm sitting there with the president of your firm -- I'm sorry. Not your firm. Your client's firm. And they promised me the world and failed to deliver.

Q. I think you mentioned earlier that Copstat/Andrews were providing services to some of your

main offices, and I think you said 250 Broadway, 90 Church Street. Was there another one?

A. Long Island City.

Q. Long Island City. Is that -- is that a specific address, or is that how it's referred to?

A. That's how we refer to it in the Housing Authority.

Q. And were some of the concerns about lack of supervision, I take it from what you just said a moment ago about the lack of supervision, at 250 Broadway, 90 Church Street and Long Island City?

A. The lack of supervision was at our field locations, which are the senior developments, which is what this agreement that you presented before me is -- covers.

Q. When you say senior developments, what do you mean by that? What does that mean?

A. Senior housing developments exclusively for seniors. This agreement also covered the satellite offices. There's one in each borough.

Q. I'm sorry. You said satellite -- what do

you call them, satellite --

A. Offices.

Q. Satellite offices. Okay. And you said there's one in each borough?

A. Yes, sir.

Q. You said they're also covered by the agreement. I take it you're referring to NYCHA Exhibit 2?

A. Yes, sir.

Q. And the senior developments are also covered, I think you said, by NYCHA Exhibit 2 as well?

A. Yes, sir.

Q. If we look back at Tab 2 in Exhibit 2 to the NYCHA Exhibit 2. Maybe you can help enlighten a little bit here.

There's a -- looking at the page that says Copstat Security site listing, and then looking first at the column that says lobby monitoring sites, do you have that before you?

A. Yes, I do.

Q. Okay. Are there certain locations amongst

these lobby monitoring sites that have what you said are the satellite offices?

A. No, sir.

Q. Okay. Are the -- are the satellite offices under the security guard services sites?

A. No, sir.

Q. Where -- maybe I just missed it somewhere.

Where -- you tell me. Where are the satellite offices located in each borough? Let's start with that.

A. Street addresses or --

Q. That would be great.

A. Okay. The Bronx location is One Fordham Plaza.

Q. One Fordham --

A. Correct.

Q. -- Plaza?

A. Correct.

Q. Okay.

A. Manhattan is 55 West 125th Street.

Q. Okay.

A. Queens is 5555 Junction Boulevard. Brooklyn is 350 Livingston Street.

Q. 350 did you say?

A. Yes, sir. And Staten Island is 120 Stuyvesant Place.

Q. Am I correct then that the list I'm looking at now, which is part of Exhibit 2, the lobby monitoring sites, the locations under that heading are what you call senior developments?

A. Yes, sir.

Q. Okay. And then there's a second category on that page.

It says security guard services sites. It says Markham Gardens. Is that still another senior development?

A. That is actually a depopulation site.

Q. What?

A. Depopulation.

Q. What does that mean?

A. Meaning they moved the population off the grounds, and these are buildings that were set for

demolition.

Q. So these are buildings that people are moving out of?

A. Right. In a phased move-out.

Q. In a phased move-out.

A. They were a senior population.

Q. That's what I'm trying -- are these senior developments that were being depopulated?

A. Yes, sir.

Q. Took me a minute, but I got it. Now, I believe, if I understand your testimony correctly, these five satellite offices in each borough were staffed by Copstat/Andrews security guards, correct?

A. Yes, sir.

Q. And I also understand it correctly, they were covered by the contract marked as NYCHA Exhibit 2, correct?

A. Yes, sir.

Q. Okay. Were you aware of any written amendments specifically undertaking these sites as part of the Copstat/Andrews contract?

A. No, sir.

Q. Do you know how it was that Andrews/Copstat got into those sites in terms of being covered by NYCHA Exhibit 2?

A. My understanding was there was a previous vendor. They were not performing. They were removed from the satellite offices, and my office -- well, it wasn't my office at the time. Contacted Copstat to provide coverage.

Q. Do you know when approximately that occurred?

A. I don't want to guess. I do not. But this office did assume responsibility for this contract in 2005.

Q. Okay. Now, I believe that you mentioned -- strike that. Let me back up a second.

How long did the meeting on April 26, 2007 last?

A. I would say an hour.

Q. And you indicated there was another meeting with Mr. Woods in early May of 2007, correct?

Q. Was that how the meeting adjourned?

A. Pretty much, yes.

Q. And how did you proceed after that meeting with Mr. Woods?

A. We began to apply the liquidated damages.

Q. As of May 2007, when you had -- when you met with Mr. Woods, had you authorized payment of any of the 2007 invoices submitted by Copstat or Andrews?

A. I did not approve any invoices.

Q. Did you subsequently approve invoices?

A. After the liquidated damages were applied, I did approve invoices.

Q. Let me go back up a step. When the invoice would come in, and we'll talk about Copstat or Andrews now and focus on 2007, when it would arrive at NYCHA's office, where would it go first?

A. It would be received in the office of security.

Q. Okay. And would it at some point land on your desk?

A. After the hours had been -- the bill had

And then if you look down at the next paragraph, 3.1, NYCHA shall have the sole option of renewing this agreement for two additional one-year periods. Do you see that?

A. Yes, sir.

Q. Were you aware of NYCHA renewing the agreement for any additional period?

A. No, sir.

Q. So what was your understanding -- given that the contract had not been renewed by NYCHA and had not been terminated prior to February 28, 2007, what was your understanding of the parties' relationship as of April 26, 2007?

A. That we were continuing on this agreement.

Q. And what was the basis for that belief?

A. Well, the basis for that belief was that we had not notified them that we were terminating, and we would continue as agreed upon through this agreement.

There was no notification that we were terminating services, so we would continue on a month-to-month basis.

February 28, 2007?

A. That is the time period that the original agreement expired.

Q. And looking at the first whereas clause on that same page, it says, "Whereas pursuant to the agreement with NYCHA, the contractor is providing security services at various senior developments (the Services)." Do you see that?

A. Yes, sir.

Q. Am I correct that's the same senior developments we reviewed earlier that are part of NYCHA Exhibit 2?

A. Yes, sir.

Q. As of June 4, 2007, had any payments been released as of that juncture to Andrews pursuant to the invoices dating back to January of 2007?

A. I don't know if payments were released. I know that the invoices were processed in my department and sent to their next step, which is the accounts payable division.

Q. Were you waiting for the contract amendment

marked as NYCHA Exhibit 9 before processing the invoices?

A. No, sir. We were -- I approved and processed the invoices prior to this amendment.

MR. BOLTON: Let's mark this as NYCHA Exhibit 10. It's a two-page exhibit. The top e-mail is from Mr. O'Hagan to Mr. Kestecher. It's dated June 5, 2007.

(NYCHA Exhibit 10, e-mail string, was marked for identification, as of this date.)

Q. I'm placing before you what I have marked as your Deposition Exhibit Number 10 -- NYCHA Exhibit Number 10. I'm sorry.

And I'm focussing your attention, if you would, specifically on the June 5, 2007 e-mail.

Do you see that e-mail from you to Mr. Kestecher at Andrews International?

A. Yes, sir.

Q. It says, "Your January invoices left my office on Monday." Do you see that?

A. Yes, sir.

Q. This is Tuesday, June 5, 2007, correct?

A. Yes, sir.

Q. Which would mean Monday, June 4, 2007, correct?

A. Yes, sir.

Q. So doesn't that mean that you did not approve invoices until June 4, 2007, when the amendment was finally fully executed and you received a copy of it?

A. No, sir. They were approved prior to June 4th, approved meaning reviewed for accuracy, liquidated damages applied, and then sent on their way.

Q. What does "left my office on Monday" mean? I guess we misinterpreted that.

A. Certainly. They were sent down to accounts payable, but they were approved prior to that, approved internally after being reviewed.

Q. So -- but if you approved them and do nothing with them, you don't give them to anyone else, they're not going to get paid, correct?

A. Correct.

Q. So leaving your office is a critical step in this process, correct?

A. Correct.

Q. And until they leave your office, Andrews or Copstat is not getting a dime, correct?

A. Correct.

Q. So it's not until June 4, 2007, the same date that the amendment is sent to Andrews, that you then allow the January 2007 invoices to leave your office and be processed for payment, correct?

A. Correct.

Q. Then you continue on and you say, "February and March will be in AP by COB Wednesday." What does all that mean?

A. February, March invoices that had been reviewed and approved would be in accounts payable by the close of business Wednesday.

Q. Then you say, "I expect April to be completed Thursday." Is that referring to the April 2007 invoices?

A. Yes, sir.

A. No, sir.

Q. Prior to June 4, 2007, had you sent any written notice or e-mail notice to either Andrews or Copstat stating that liquidated damages were being assessed under any of these agreements?

A. Outside of my verbal notification to Mr. Woods?

Q. Correct.

A. No, sir.

Q. Prior to June 4, 2007, did you or anyone on your staff via written letter or e-mail advise Copstat or Andrews that supervisory services were not being performed in accordance with the contract?

A. Prior to what date?

Q. June 4th of 2007.

A. Outside of myself during April 26, 2007?

Q. I understand you had conversations. I'm not disputing your conversation.

I'm just trying to find out -- I'm focussing on a very specific date now. Talking about June 4, 2007.

What I'm trying to find out is at any time prior to June 4, 2007, did you either in writing or via e-mail communicate to Copstat or Andrews that supervisory services were not being performed in accordance with the contract?

A. Not specifically.

Q. When you say "not specifically," what do you mean by that?

A. In general it was -- I notified -- no, I did not.

Q. Just so the record is clear, when you say no you did not, am I correct in understanding you say no, you did not notify Andrews or Copstat in writing or e-mail -- or by e-mail on or before June 4, 2007 that you believed that Copstat and Andrews were not living up to the supervisory responsibilities set forth in the agreement?

A. Not in writing, no.

Q. Or by e-mail?

A. Or by e-mail, no.

Q. Am I also correct in understanding that the

Q. Was there any other reason that you're aware of, other than these alleged failures to provide required security site inspections?

A. The lack -- if you failed to cover a post, post no-show, post abandonment, as well as out of uniform.

Q. You believe they formed some small part of the deductions?

A. Very small part.

Q. Now, you refer to security site inspections that were required by agreement.

What provision of the agreement were you relying upon that required security site inspections? If you could just point that out to me.

A. Certainly.

Q. Are you looking at NYCHA Exhibit 2 now?

A. Yes, sir.

Q. Okay.

A. I believe it's Article 11 of the HPD contract. I'm sorry. That's liquidated damages.

Q. Article 11. Which contract is that now,

the HPD contract?

A. Correct.

Q. Okay. What page number are you looking at?

A. It's Page 38.

Q. Okay. And that HPD contract we're referring to, so the record is clear, that's Exhibit 1 attached to NYCHA Exhibit 2.

That refers to the actual liquidated damages that may be assessed, correct?

A. Correct.

Q. And what provision were you relying upon for the actual security site inspections?

A. It's Page 8.

Q. Page 8 of -- which one of the documents are we looking at?

I just want to make sure we're looking at the same page.

A. Exhibit 1.

Q. Exhibit 1. Page 8.

A. Exhibit A. I'm sorry. Page 8, Exhibit A.

Q. I think what you're referring to is Exhibit

1, which has I think -- yes. Exhibit 1 attached to NYCHA Exhibit 2 has an Exhibit A attached to it. Is that what we're talking about, Page 8?

A. Yes, sir.

Q. Okay. And what on Page 8 specifically -- take your time.

A. Certainly.

Q. What specifically on Page 8 were you relying upon as the required security site inspections?

A. It's Section 11, Subsection A.

Q. Anything else other than that?

A. No, sir.

MR. BOLTON: Let's mark this as NYCHA Exhibit 14. It's a letter dated August 6, 2007 from Marguerite Ohmstedt to Christopher Dunne.

And there's an attachment to that which refers to Andrews International liquidated damages. One is for January 2007 on the first page.

(NYCHA Exhibit 14, letter dated 8/6/07, was marked for identification, as of this date.)

Q. Mr. O'Hagan, I've had this marked as NYCHA

Deposition Exhibit 14. It's a letter dated August 6, 2007.

I'm really interested in the attachment, so let's turn to the second page if you would, please.

The first page refers at the top, if you will, Andrews International liquidated damages on invoices for January 2007. Do you see that page?

A. Yes, I do.

Q. Okay. And do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's a spread sheet delineating the liquidated damages applied to each invoice.

Q. And am I correct, is this an example of one of the spread sheets that you talked about your administrative assistant would generate?

A. Yes, sir.

Q. And is it your belief that this first spread sheet, which is Bates stamped down at the lower right-hand corner NYCHA 60, for January 2007, this would have been generated by your administrative

assistant?

A. Yes, sir.

Q. And am I correct that the same would be true with respect to the other attachments which cover the months of February 2007, March 2007 and April 2007?

A. Yes, sir.

Q. Okay. And just to make sure I understand this spread sheet process, maybe we can look at the first one on the first page, January 2007.

The invoice number, is that referring to the invoice number as submitted by Copstat/Andrews?

A. Yes.

Q. And then the site/location, that's the site of location, correct?

A. Yes, sir.

Q. And then the uninspected shift at $25 each shift, correct?

A. Yes, sir.

Q. Then it says what, "All three shifts"? Is that what that says right there?

A. Correct.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

ANDREWS INTERNATIONAL, INC.,

Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,

Defendant.

Civil Action No.: 08-cv-1580 (HB)

---------------------------------------x

250 Broadway
New York, New York

July 25, 2008
3:00 p.m.

Continued Deposition of the Defendant NEW YORK CITY HOUSING AUTHORITY, by PATRICK O'HAGAN, held at the above-mentioned time and place, before Linda A. Schilt, a Notary Public of the State of New York.

b4d5530f-88fa-4875-9468-c6c5ea04449d

A P P E A R A N C E S:

FUNK & BOLTON
Attorneys for Plaintiff
36 South Charles Street
Baltimore, Maryland 21201-3111
BY: BRYAN D. BOLTON, ESQ.

NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
Attorneys for Defendant
250 Broadway, 9th Floor
New York, New York 10007
BY: STEPHEN W. GOODMAN, ESQ.

b4d5530f-88fa-4875-9468-c6c5ea04449d

P A T R I C K O ' H A G A N, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. BOLTON:

Q. Back on the record. We're continuing the deposition of the designee of NYCHA, and that is Mr. O'Hagan, and he's here with us today. Thank you for coming back.

A. Pleasure to be here.

MR. BOLTON: Let's mark as NYCHA 17 a one-page document.

(Letter dated 9/25/06 was marked as NYCHA Exhibit 17 for identification; 7/25/08, L.S.)

Q. Placing before you what I had marked as deposition Exhibit 17. Can you identify that document for us?

A. Certainly. It's a copy of an E-mail sent from Forhan Razzaque to myself.

Q. I think we talked about Mr. Razzaque before. He's with the firm Veritas Vox, correct?

b4d5530f-88fa-4875-9468-c6c5ea04449d

A. Yes, sir.

Q. If I remember your testimony correctly, this E-mail is dated September 25, 2006, which would be within roughly about 10 days or so after you started in your position at NYCHA, correct?

A. Actually within three weeks.

Q. Within three weeks, okay. Was it September 6th-something?

A. Yes.

Q. September 6th was your start date, 2006?

A. Yes, sir.

Q. Now, how was it that Mr. Razzaque knew that you were now at NYCHA by September 25, 2006?

A. We had formerly worked together at my previous employment, which was Guardsmark.

Q. Okay.

A. He knew that I had taken a position with the Housing Authority.

Q. Had you talked to him about that's what you were doing?

A. Correct.

b4d5530f-88fa-4875-9468-c6c5ea04449d

Q. Just trying to understand how Mr. Razzaque knew you were now at NYCHA and how to send you an E-mail at NYCHA, that is what I was trying to understand.

Was that a conversation between you two?

A. Correct. He knew I had taken a position with NYCHA as security director.

Q. When approximately was that conversation?

A. I would assume that it was once I was notified that I was leaving my former employment and taking the position.

Q. Let me see if I can understand the time line a little bit here.

At the time you accepted the position as NYCHA security director, was Mr. Razzaque still working for the same company as you?

A. No.

Q. So Mr. Razzaque had already left Guardsmark and had already founded Veritas Vox?

A. Correct.

Q. So did you call or E-mail or how did you communicate to Mr. Razzaque that you had accepted this position at NYCHA?

A. I believe we had spoken over the telephone.

Q. And prior to your accepting the position at NYCHA, how long before that was it when you had actually worked together with Mr. Razzaque?

A. Somewhere in the neighborhood of six to eight months prior.

Q. Is that roughly the same time prior that led to the forming of Veritas Vox as you understand it?

A. Correct. That's why he left the company we worked for was to form that other company.

Q. Other than the phone call that you mentioned a moment ago where you informed Mr. Razzaque about your new position at NYCHA, had you been in touch with him in that six to eight-month period?

A. He had contacted me just to apprise me of how his business was going and

b4d5530f-88fa-4875-9468-c6c5ea04449d

how life was after leaving our former company.

Q. Now, in this E-mail of September 25, 2006, Mr. Razzaque indicates he wants to set up a day and a time to meet with you, correct?

A. Yes, sir.

Q. Is it your best recollection that sometime shortly after this E-mail that you actually did end up having a meeting with Mr. Razzaque?

A. Yes, I believe so.

MR. BOLTON: Let's mark as Exhibit 18 another one-page exhibit. Appears to be an E-mail dated October 20, 2006.

(E-mail dated 10/20/06 was marked as NYCHA Exhibit 18 for identification; 7/25/08, L.S.)

Q. I place before you what we had marked as NYCHA Exhibit 18.

Can you identify that document for us, please?

A. Certainly. An E-mail from Forhan

b4d5530f-88fa-4875-9468-c6c5ea04449d

Razzaque to myself dated October 20, 2006.

Q. In this particular E-mail, it appears to be referring to a meeting that day at 2:30 in the afternoon; is that correct?

A. That's what it seems like, yes.

Q. Do you recall sitting here today whether you actually did meet with Mr. Razzaque on October 20, 2006?

A. No, I do not.

MR. BOLTON: Let's mark as the next exhibit, it's a three-page exhibit and it is dated October 23, 2006.

(Proposal was marked as NYCHA Exhibit 19 for identification; 7/25/08, L.S.)

Q. Placing before you what I had marked as NYCHA Exhibit 19.

Do you recognize that document?

A. Yes. It is a proposal from Veritas Vox to myself from Anthony Picciano.

Q. Now, this particular document marked as NYCHA Exhibit 19 is dated October 23, 2006, which if you look back at NYCHA Exhibit 18, is roughly three days later.

A. Yes, sir.

Q. And the E-mail at the bottom of the page, does that appear to be a response to Mr. Picciano's E-mail?

A. Yes, sir.

Q. Was it your understanding that the point that Mr. Topf is making about the discrepancies is that the total discrepancy amount was $53?

A. Yes, sir.

Q. Now, Mr. Topf refers for the entire period. I think we talked earlier the entire period was roughly a 90-day period, correct?

A. Yes, sir.

Q. Mr. Topf makes the comment that he thought that was excellent considering the hundreds of thousands of payroll dollars that were disbursed during that period. Did you disagree with that comment?

A. No, sir.

MR. BOLTON: Let's mark as NYCHA Exhibit 23, this is a document that on the first page says Veritas Vox, Inc.

audit report for New York City Housing Authority and dated February 1, 2007 on the first page.

(Audit report was marked as NYCHA Exhibit 23 for identification; 7/25/08, L.S.)

Q. Can you please identify for us what I had marked as NYCHA deposition Exhibit 23, please?

A. Certainly. It's the audit report produced by Veritas Vox for New York City Housing Authority on the performance of Copstat Security versus our contracted agreement.

Q. If we look over at the first page of the exhibit, second page, the first textual page, if you will, inside the cover page, is apparently a letter addressed to you from Mr. Picciano of Veritas Vox, correct?

A. Yes, sir.

Q. Am I correct that it is your recollection you received this report on or about February 1, 2007?

A. Yes, sir.

b4d5530f-88fa-4875-9468-c6c5ea04449d

Q. Now, at the time you received this report, marked as NYCHA Exhibit 23, as of February 1, 2007 when you received this report from Veritas Vox, had you by that time either E-mailed or sent written notice to anyone at Copstat or Andrews apprising them of your position as security director at NYCHA?

A. No, sir.

Q. Now, if we look over at the page number three at the bottom, look at the bottom. Should start, it says "objective." Do you see at the top of that page?

A. Yes, sir.

Q. It talks about the objective of the audit is determine if the New York City Housing Authority's security provider Copstat Security, Inc. complies with contractual and regulatory standards, correct?

A. Yes, sir.

Q. Am I correct, I think you testified to this before, that you provided a copy of the contract to Veritas Vox, correct?

A. Yes, sir.

b4d5530f-88fa-4875-9468-c6c5ea04449d

Q. Am I correct that the contract that you would have provided to Veritas Vox is the contract we previously had marked at your last deposition as NYCHA deposition Exhibit 2?

A. Yes, sir.

Q. That would have included the attachments, including the HPD contract and the separate Exhibit 2 and the Exhibit 3 as well? I may have messed you up there. I think I messed you up there.

So what you provided, just so I make sure I understand, what you provided to Veritas Vox was a complete copy of what we previously marked as NYCHA Exhibit 2?

A. Yes, sir.

Q. Other than the amendment that occurred to NYCHA Exhibit 2 in May of 2007, were there any other written amendments to NYCHA Exhibit 2 that you're aware of?

A. No, sir, there was not.

Q. Now, directing your attention to NYCHA Exhibit 2, place that before you, if we look over at the bottom of page 3 of NYCHA

is the date of your E-mail marked as Defendant's Exhibit E, that, in fact, none of the invoices from January, February, March, April of 2007 had been paid as of May 30, 2007?

A. May 30th was probably January through March had not been paid yet, because we had not received April.

Q. So as of May 30, 2007, if Andrews wanted to be paid for the services rendered through May 30, 2007 -- they were still providing services at that juncture, correct?

A. Yes, sir.

Q. If they wanted to be paid, they had to sign the addendum?

A. To facilitate payment.

Q. Well, if they didn't sign the addendum, would you have paid them?

A. Certainly.

Q. I thought you needed the addendum to get -- facilitate the payment?

A. It would ease the process. As explained in my previous testimony, if we do not have the amendment, I would have to open

b4d5530f-88fa-4875-9468-c6c5ea04449d

up and pay each invoice with a purchase order.

Q. So the contract addendum was a matter of administrative convenience for you?

A. At that point in the relationship.

MR. BOLTON: Let's mark appendix one. This is going to be marked as NYCHA 24 collectively. It's a number of pages of documents provided by counsel today. I will have the witness identify it for the record.

Steve, I don't have copies, sorry.

(Multipage document was marked as NYCHA Exhibit 24 for identification; 7/25/08, L.S.)

Q. Looking at what I had marked as NYCHA Exhibit 24 and comparing that with the last page of NYCHA Exhibit 23, could you just tell me if NYCHA Exhibit 24 are the appendices identified in NYCHA Exhibit 23?

A. As -- as one through seven. Appendices one through seven. Yes, that is 24.

MR. BOLTON: That's what I wanted

b4d5530f-88fa-4875-9468-c6c5ea04449d

time of your meeting about the audit issue that was raised by Mike Topf in NYCHA Exhibit 27?

A. No, sir, not that I recall.

Q. Do you know why that was, because I notice that you're proposing a Tuesday meeting, and if you look at NYCHA Exhibit 27, E-mail from Mr. Topf is dated Monday, May 7th, which would mean you met with Mr. Picciano the following day, May 8, 2007. Do you recall why there was no discussion you can recall about the issue of auditing as suggested by Mr. Topf?

A. Only conversation I might have said it's not necessary to go forward and go back and reaudit what they already demonstrated to us, that I needed to move forward.

Q. When you say you need to move forward, what do you mean by that?

A. I need to move forward and find a replacement.

Q. As of May 7, 2007, you decided to replace Andrews?

b4d5530f-88fa-4875-9468-c6c5ea04449d

A. That was my plan.

MR. BOLTON: I don't believe I have further questions. That's all I have. Thank you very much.

(Time noted: 3:55 p.m.)

---------------------

PATRICK O'HAGAN

Subscribed and sworn to before me this day of 2008.

---------------------------------------

b4d5530f-88fa-4875-9468-c6c5ea04449d

# EXHIBIT 8



**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
JERILYN PERINE, Commissioner

**Office of Administration**
DIVISION OF RESOURCES MANAGEMENT AND LABOR RELATIONS
100 GOLD STREET, NEW YORK, N.Y. 10038

BERNARD SCHWARZ, Assistant Commissioner

**ADDENDUM #2**

To: Prospective Bidders

Subject: Addendum to Invitation For Bid for Unarmed Security Guard Services, PIN # 806011000110

Date: March 27, 2002

---

The following changes are made to the subject Invitation for Bid ("IFB"):

1. Exhibit A, Scope of Services, page 1, paragraph 1:
   The list of HPD sites shall be as follows:

   *100 Gold Street, NYC – 496 hrs per week
   Parking Lot (manned by Security Specialist) – 40 hours per week
   *516 Bergen Street, Brooklyn 45 hours per week
   *965 Longwood Avenue, Bronx – 233.5 hours per week
   *701 Euclid Avenue, Brooklyn – 90 hours per week
   *560 West 133 Street, NYC – 42.5 hours per week
   **320 Sterling Street, Brooklyn – 336 hours per week

   *HPD Office Site

   **320 Sterling Street, Brooklyn is a current security site which is not an HPD office site.

It should be noted that these are estimates based on the hours currently required. HPD makes no representations that these will be the actual hours required under the resultant contract and any renewals or extensions made thereto.

2. Exhibit A, Scope of Services, page 8, Paragraph 11, Sub-paragraph (b) is deleted. Sub-paragraph (a) is amended by adding the word "day" between "working shifts".



Addendum #2
PIN #806011000110
March 27, 2002
Page 2

All other terms and conditions remain unchanged.

Approved for Issuance:

Jay Bernstein
Deputy Agency Chief Contracting Officer

Issued By:

Bernard Schwarz
Assistant Commissioner

ADDENDUM #2 ACKNOWLEDGEMENT

PIN # 806011000110

PRINTED NAME: ____________________

SIGNATURE: ____________________

POSITION/TITLE: ____________________

COMPANY: ____________________

NOTARY PUBLIC: ____________________

NOTE: SIGNED AND NOTARIZED COPIES (IN BLUE INK) OF THIS ADDENDUM MUST BE INCLUDED WITH THE BID SUBMISSION. FAILURE TO COMPLY MAY RENDER YOUR BID NON-RESPONSIVE.

HPD
nyclink.org/hpd

# EXHIBIT 9

REDACTED

**From:** jade4l@aol.com [mailto:jade4l@aol.com]
**Sent:** Friday, October 14, 2005 12:23 AM
**To:** Sean.Ryan@nycha.nyc.gov
**Cc:** Raymond.Rodriguez1@nycha.nyc.gov; Leonard Kestecher; jim.wood@coptat.com; jocu@aol.com
**Subject:** Re: Copstat/Lenny message

Sean,

We will do our very best.

We are very appreciative of your trust and confidence.

Regards,

Lenny, Jim and Joe

-----Original Message-----
From: Ryan, Sean <Sean.Ryan@nycha.nyc.gov>
To: jade4l@aol.com; Leonard Kestecher <lkestecher@copstat.com>
Cc: Rodriguez, Raymond <Raymond.Rodriguez1@nycha.nyc.gov>
Sent: Thu, 13 Oct 2005 13:06:17 -0400
Subject: RE: Copstat/Lenny message

Lenny - We are electing not to use any "supervisory-level" guards at prospect Plaza at this point. We're requesting two guards 24x7 at the same level and bill/wage rates we currently utilize at all NYCHA field locations. Ray will coordinate with Joe Chinea.

Thanks for your efforts on this.

SR

---

**From:** jade4l@aol.com [mailto:jade4l@aol.com]
**Sent:** Thursday, October 13, 2005 11:12
**To:** Ryan, Sean
**Subject:** Re: Copstat/Lenny message

Thank you so very much

Lenny

-----Original Message-----
From: Ryan, Sean <Sean.Ryan@nycha.nyc.gov>
To: jade4l@aol.com
Sent: Thu, 13 Oct 2005 10:28:49 -0400
Subject: RE: Copstat/Lenny message

Lenny ? Im off to a meeting on this in a few minutes.  I?ll see what we come up with and Ill give you a call on your cell as soon as possible.

Fyi my office number is 212-306-8660

Thanks
SR

---

**From:** jade4l@aol.com [mailto:jade4l@aol.com]
**Sent:** Thursday, October 13, 2005 10:20
**To:** Ryan, Sean
**Cc:** jim.wood@Copstat.com; JoCu@aol.com
**Subject:** Copstat/Lenny message

Hi Sean,

I did not have the opportunity to see the most current HPD contract, but was advised by Michele in our billing Department that there is a Coordinator rate of $20.56.

If you allow for this rate, we can position one of the two, at all times, to be the shift coordinator, mixing the rates to allow for a lead officer at a superior rate.

Of course, this would be in the event your boss doesn?t allow for us to utilize the $25.18 rate for one of the two (168 hours per week), which really is a good compromise and would effect a more positive result.

I am out today and do not have your cell and office #, (I can get it later).

Maybe you would be so kind as to call me by cell @ 201-532-6072.

Regards and thank you,

This email is being sent from Jade4L@aol.com  as well (my home email address.

Lenny

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

-----------------------------------------------------------------------X

**ANDREWS INTERNATIONAL, INC.**

**Plaintiff,**

**-against-**

**NEW YORK CITY HOUSING AUTHORITY,**

**Defendant.**

-----------------------------------------------------------------------X

**ECF Case**

**Civil Action No. 08-cv-1580 (HB)**

**Declaration of Michael Topf in Support of Andrews International, Inc.'s Motion for Summary Judgment**

**DECLARATION OF MICHAEL TOPF**

I, Michael Topf, affirm under penalty of perjury and based upon personal knowledge that the facts set forth herein are true and correct:

1. I am over eighteen years of age and am competent to testify about the facts and circumstances stated herein.

2. I am currently employed by Andrews International, Inc. ("Andrews") as Chief Financial Officer. In my position, I supervise all aspects of finances and accounting for Andrews.

3. Prior to the merger of Copstat Security, Inc. ("Copstat") and Andrews in 2006, I was employed by Copstat as Chief Financial Officer.

4. I am trained as a Certified Public Accountant.

5. From 2005 through 2007, I supervised the receipt of payments for services from the New York City Housing Authority ("NYCHA") under Contract 4020633 (the "NYCHA Contract").

6. Between March 1, 2005, and December 31, 2006, NYCHA regularly paid the invoices submitted by Copstat and Andrews. Between March 1, 2005, and December 31, 2006,

NYCHA never advised Copstat or Andrews that it made deductions for any alleged failure to perform supervisory obligations under the NYCHA Contract.  Andrews does not contend that NYCHA owes any money for services performed on or before December 31, 2006.

7.      As of April 26, 2007, Andrews had not received any payments from NYCHA for services rendered by Andrews after December 31, 2006.

8.      On April 26, 2007, James Wood and I met with Patrick O'Hagan of NYCHA. This meeting was the first time I met Mr. O'Hagan.  At the meeting, Mr. O'Hagan revealed the existence of a report by Veritas Vox, but did not provide it to us.  Mr. O'Hagan also informed us that supervision under the NYCHA Contract was inadequate and Andrews needed to offer him a credit.

9.      On May 4, 2007, James Wood and I met with Anthony Picciano of Veritas Vox to discuss Veritas Vox's analysis of Andrews's payroll.  Andrews's supervision of security guards was not discussed at the meeting.

10.     On June 20, 2007, Andrews received a payment of $121,819.33 from NYCHA, but $16,251.26 due under the invoices was deducted by NYCHA.  Andrews did not receive from NYCHA a written or email explanation for the deduction.  The June 20, 2007, payment was the first payment Andrews received from NYCHA for services rendered in 2007.

11.     On June 22, 2007, Andrews received a second payment of $355,464.91 from NYCHA, but $47,875.02 due under the invoices was deducted by NYCHA.  Andrews did not receive from NYCHA a written or email explanation for the deduction.

12.     On June 29, 2007, I wrote to Mr. O'Hagan regarding the outstanding balance of $64,126.68 due on invoices submitted to NYCHA and requested either immediate remittance or a detailed written explanation of the reason for the withholdings.  A true and correct copy of my

June 29, 2007, letter (NYCHA 0051) is attached to Andrews's Motion for Summary Judgment as Exhibit 25.

13.    Also on June 29, 2007, Andrews received a third payment of $9,229.28 from NYCHA, but $1,000 due under the invoices was deducted by NYCHA.  Andrews did not receive from NYCHA a written or email explanation for the deduction.

14.    On July 13, 2007, Andrews received a fourth payment of $2,914.72 from NYCHA, but $450.00 due under the invoices was deducted by NYCHA.  Andrews did not receive from NYCHA a written or email explanation for the deduction.

15.    On July 16, 2007, I received a letter from Mr. O'Hagan informing me that the deductions were not inadvertent, but reflected liquidated damages applied to the invoices based on a purported failure to perform supervisory shift inspections.

16.    On August 1, 2007, Andrews received a fifth payment of $110,575.30 from NYCHA, but $6,410.81 due under the invoices was deducted by NYCHA.

17.    On August 3, 2007, Andrews received a sixth payment of $48,851.46 from NYCHA, but $4,275.02 due under the invoices was deducted by NYCHA.

18.    On September 25, 2007, Andrews received a seventh payment of $462,210.40 from NYCHA, but $35,934.47 due under the invoices was deducted by NYCHA.

19.    The deductions taken by NYCHA as liquidated damages total $112,196.58.

20.    Andrews has asked NYCHA to remit the amount improperly withheld as liquidated damages, but NYCHA has refused.

I SOLEMNLY AFFIRM under the penalty of perjury and upon personal knowledge that the foregoing statements are true and correct.

Dated: August 6, 2008

Michael Topf

# Exhibit 11
## Excerpts from Deposition of James Wood

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

ANDREWS INTERNATIONAL, INC.,

Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,

Defendant.

Civil Action No.: 08-cv-1580 (HB)

---------------------------------------x

475 Park Avenue South
New York, New York

July 25, 2008
12:50 p.m.

Deposition of the Plaintiff ANDREWS INTERNATION, INC., by JAMES WOOD, held at the above-mentioned time and place, before Linda A. Schilt, a Notary Public of the State of New York.

ORIGINAL

A P P E A R A N C E S:

FUNK & BOLTON
Attorneys for Plaintiff
36 South Charles Street
Baltimore, Maryland 21201-3111
BY: BRYAN D. BOLTON, ESQ.

NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
Attorneys for Defendant
250 Broadway, 9th Floor
New York, New York 10007
BY: STEPHEN W. GOODMAN, ESQ.

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except asto the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

J A M E S W O O D, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. GOODMAN:

Q. Good afternoon, Mr. Wood.

A. How are you, sir?

Q. Good, thank you.

Would you state your full name and address for the record?

A. James Wood. 475 Park Avenue South, New York, New York.

Q. My name is Stephen Goodman. I'm an attorney from the New York City Housing Authority. I'll ask you a series of questions. If you don't understand one of my questions, please just say so and I'll rephrase it. But if you answer a question, I will assume that you understood it; is that clear?

A. Okay.

Q. For the sake of a nice, clear written record, I'll ask that you make all

your answers in verbal form rather than through gestures or nods of your head; is that clear?

A. Yes.

Q. If you want to take a break, just say so and we'll do it; is that clear?

A. Yes.

Q. Mr. Wood, are you taking any medication today that might make it difficult for you to understand my questions?

A. No.

Q. Do you have any medical, physical, emotional conditions that might make it difficult for you to understand my questions?

A. No.

Q. Great.

Mr. Wood, did you attend college?

A. Yes.

Q. Where?

A. New York Tech.

Q. Did you graduate with a degree?

A. Yes.

Q. What degree?

A. BS in behavioral science.

Q. Did you do any postgraduate studies?

A. No.

Q. Have you taken any continuing education in your profession, course work?

A. No.

Q. Could you give us a chronological description of your work history from the time you graduated from college?

A. Actually went to college at night while I was a policeman, so...

Q. Okay.

A. I joined the NYPD in January of 1970 after serving two years in the Navy. I retired from the police force in July of 1992, and I've been with Copstat/Andrews since, over 16 years.

Q. Thanks.

When you began working for Copstat in 1992, what was your position with the company?

A. Vice president of operations.

Q. How long did you stay in that job?

A. I'm not exactly sure.

Q. From that job what was your next job?

A. I was promoted to president.

Q. Do you remember when that was?

A. No.

Q. Has it been more than 10 years?

A. Close to 10 years.

Q. Now I gather Copstat merged with Andrews International sometime in 2006; is that correct?

A. Yes.

Q. Mr. Kestecher said it was about February of 2006?

A. March.

Q. March, thank you.

In your current position, are you involved with supervising the operational details of ongoing contracts with clients?

A. I supervise my management staff who supervises the ongoing operations.

Q. Who reports to you directly?

A. Who reports to me? Just about every manager I have in the company, all the area managers and vice presidents.

Q. So you have no opinion about what the contract required in terms of supervisory inspections; is that correct?

A. Opinion?

Q. Right.

A. I don't recall.

Q. Right now the time period we're talking about is February 2005 when you first began the contract. At that time you had no opinion about --

A. I didn't say that. I don't recall what my opinion was at that time.

Q. Okay.

Did there come a time when you became interested in the question of supervisory inspections under this contract, under this agreement?

A. Yes.

Q. When was that?

A. In April of '07.

Q. How did this issue come to your attention?

A. By Mr. O'Hagan.

Q. Patrick O'Hagan?

A. Yes.

Q. Who is he?

A. He is a security director, I don't know his exact title, at NYCHA.

Q. How did Mr. O'Hagan bring this issue to your attention?

A. At a meeting in his office or conference room in his building.

Q. Tell me about the meeting. What happened?

A. A meeting was arranged, which I thought was a meeting where we're going to introduce ourselves to Mr. O'Hagan, and at the meeting he pulled out a report and said you realize you're out of compliance with the supplemental, supplemental benefit, which was really surprising. We had a discussion about that.

You want me to go into the discussion?

Q. Frankly, I'm not so much interested in the supplemental benefits.

Was there --

A. That is a part of it. I mean,

a written notation of that?

A. I don't believe so.

Q. Did anyone ever say in a written communication to Mr. O'Hagan so, you know, Pat, at the meeting on April 26, 2007 you yourself said you didn't expect us to inspect every guard every night, did anybody write --

A. I don't believe so. If you look at the sites, it's an impossibility to hit every site every night.

Q. Why is it impossible?

A. They're so spread out. There were nights when officers were assaulted and supervisors would have to go to the hospital with them. There were nights -- they wouldn't leave the bathrooms in the building open for the guards to use at night, so the supervisor would have to go to the building and hold post while he walked a couple of blocks to go to the bathroom. Just the sheer geography of the locations.

Q. How many supervisors were assigned to the contract?

A. At night there was probably three.

Q. If the contract had required that a supervisor inspect every site every night, could you have hired more supervisors?

A. I wouldn't have taken the contract.

Q. Let me show you what's been marked as -- now I'm showing you what's been marked Defendant's Exhibit B.

Can you take a look at that and when you have finished reviewing it quickly, tell me.

Are you done?

A. I scanned through it.

Q. Have you seen that document before?

A. Recently, yes.

Q. When was the first time you saw it?

A. Mr. --

MR. BOLTON: Please don't reveal communications with counsel. You can tell him when without revealing the nature of the communication, if you can recall.

A. No.

Q. Did Mr. O'Hagan or anyone else from NYCHA summarize the inspection analysis that we just looked at on page 9 of Exhibit B at your meeting in April of 2007?

A. No.

Q. How much did he tell you about the inspection issue?

A. He said we were out of compliance.

Q. That's all that you recall?

A. Yes, that I recall.

Q. Did he mention to you that he would expect Copstat/Andrews to give NYCHA a credit for inspections that were not done?

A. Yes.

Q. At that meeting in April of 2007?

A. I'm not sure if at that meeting, but it was conveyed to me at some point that he had an expectation I was going to come to him and give him a number. He wanted me to give him a dollar value.

Q. Did you ever communicate with him about that expectation either orally or in writing?

A. I never gave him a dollar value, because it was very confusing to me, because we had this contract for many, many years and there was never any fines for not inspecting. So, you know, I would have supposed when he came into this position that he would have met with us and told us his expectations if they were different from what we had been doing.

Q. But when he mentioned that he expected or that he would like Andrews to give NYCHA a credit, did you say anything to him in response?

A. I think at some point I said how much are you looking for.

Q. What did he say?

A. Not sure.

Q. Do you remember approximately when you had this conversation?

A. I only met the gentleman twice and it was at one of the two meetings.

Q. Do you remember when the second meeting was?

A. Sometime in May.

# EXHIBIT 12

**O'Hagan, Patrick**

**From:** Forhad R. Razzaque [forhad@veritasvox.com]
**Sent:** Monday, September 25, 2006 9:34 AM
**To:** O'Hagan, Patrick
**Subject:** Meeting

Pat,

Let's set up a day and time for next week. What is good for you? Let me know. Thanks.

Regards,

EXHIBIT
NYCHA 17
7/25/08

NYCHA-62508-0129

# EXHIBIT 13

**O'Hagan, Patrick**

**From:** Forhad R. Razzaque [forhad@veritasvox.com]

**Sent:** Friday, October 20, 2006 10:15 AM

**To:** O'Hagan, Patrick

**Subject:** Meeting

We are still good for 2:30, right?

Seeking Truth in Security

**Forhad R. Razzaque**
*Chief Sales Executive, COO*

**Veritas Vox, Inc.**
106 Central Park South, Suite 9F
New York, NY 10019

tel: (646) 225-5200
fax: (646) 753-9262
mobile: (646) 270-1116

forhad@veritasvox.com
www.veritasvox.com

*Add me to your address book...* *Want a signature like this?*

EXHIBIT
NYCHA 18
KB 7/25/08

NYCHA-62508-0124

# EXHIBIT  14

October 23, 2006

Mr. Patrick O'Hagan
Administrator of Investigations
New York City Housing Authority
90 Church Street, 9th Fl.
New York, NY 10007

**RE: Veritas Vox, Inc. Proposal Letter**

Dear Mr. O'Hagan:

Thank you for your interest in Veritas Vox, Inc.'s audit services. By employing our services, you are investing in your security program and acknowledging that protecting your employees and assets is critical to your success. When performing the audits, Veritas Vox will bring its extensive contract security experience to bear on an in-depth analysis designed to save you money, improve your security provider's performance and reduce your liability exposure.

Per your request, the attached proposal outlines multiple options with the following guidelines:

- All options are based upon approximately 2,500 hours per week, or roughly 80 Copstat Security, LLC guards.
- Veritas Vox will perform NYS registration, payroll and inspection audits, as defined in the Review of Proposed Services and Financial Value.

Please contact us at your convenience. We look forward to working with you.

Best regards,

Anthony L. Picciano

NYCHA-62508-0126

**Review of Proposed Services and Financial Value**[1]

Veritas Vox, Inc. will provide the following services for the New York City Housing Authority (NYCHA):

**New York State Registration Audit Service**

Veritas Vox will review Copstat guard registration with the NYS Department of State Division of Licensing Services to determine vendor compliance with the 1992 Security Guard Act, as well as Exhibit A, Sections 2 (License) and 4(a) (Employment/Qualification Requirements) of the HPD contract.

**Payroll Audit Service**

Veritas Vox will review Copstat records to determine compliance with the regular wage rate for Security Guards (Unarmed) as outlined in NYC Administrative Code Section 6-109 Schedule of "Living Wages". The audit will include neither the holiday nor overtime provisions of the code.

If permitted, Veritas Vox will interview a mutually agreed-upon random sample of Copstat guards to help substantiate the records provided by the vendor.

**Inspection Audit Service**

Veritas Vox will review Copstat records to determine contractual compliance with inspections as outlined in Exhibit A, Section 11 (Shift/Supervisory Functions) of the HPD contract.

**Pricing**

Veritas Vox will provide NYCHA the aforementioned audit services with the following options:

Option A

Audit a random sampling of 50% of the Copstat guards assigned to NYCHA within the past forty-five (45) days

Cost: $3,750

Option B

Audit 100% of the Copstat guards assigned to NYCHA within the past forty-five (45) days

Cost: $5,500

Option C

Audit a random sampling of 50% of the Copstat guards assigned to NYCHA within the past ninety (90) days

Cost: $5,500

Option D

Audit 100% of the Copstat guards assigned to NYCHA within the past ninety (90) days

Cost: $7,500

**Projected Timeline and Deliverables**

Upon approval, and with schedules permitting, Veritas Vox will conduct the audit services listed above within twenty (20) days. A formal report detailing the findings of the audit services will be delivered to Mr. Patrick O'Hagan at 90 Church Street, 9th Floor, New York, NY 10007 within thirty (30) days. Veritas Vox will meet with NYCHA at a mutually agreeable time to discuss findings within forty-five (45) days.

On this _______ day of ________________, 20_____, I hereby agree to Option ___ and authorize Veritas Vox, Inc. to begin providing services.

______________________________________

Signature

______________________________________

Title

______________________________________

Date

[1] Veritas Vox will provide unlimited consultations within the scope of this proposal for the duration of the project.

# EXHIBIT 15

**ANDREWS**
INTERNATIONAL

November 15, 2006

NYCHA (NEW YORK CITY HOUSING
90 CHURCH STREET - 9TH FLR
NEW YORK NY 10007
RAY RODRIGUEZ

Dear Valued Client

Please review the attached press release.

Copstat Security has merged with Andrews International. Effective as of January 1, 2007 all invoices will be listed as Andrews International Inc.

All remittances should be payable to Andrews International Inc. and addressed to the following address effective as of January 1, 2007

**Andrews International Inc.**
**Post Office Box 27137**
**Newark, New Jersey 07189-7137**

This new address will be listed accordingly on our new Andrews International Invoice.

You may remit funds by either Wire Transfer or by Automated Clearing House (ACH)

- **Wire Transfer:**
  **Bank of America**
  **ABA # 026009593**
  **Account # 1459241018**
  **Andrews International Inc.**

- **ACH**
  **Bank of America**
  **ABA # 121000358**
  **Account # 1459241018**
  **Andrews International Inc**

We have enclosed a W9 Form which lists our new Federal Tax Identification Number.

I greatly appreciate your continued support during this transition.

Regards,

**James Wood**
**Co President & Chief Operating Officer**

East Coast Headquarters • 1860 E. Tremont Ave. • Bronx, NY 10460
T 718.518.8055 • Corporate 866.594.0454 • F 718.518.8053
www.andrewsinternational.com

NYCHA 0001

# EXHIBIT 16



# Veritas Vox, Inc.

## Audit Report
## for
## New York City Housing Authority

*Document ID: NYCHA Audit #1001*

*February 1, 2007*

CONFIDENTIAL

February 1, 2007

Mr. Patrick O'Hagan
Director
New York City Housing Authority
90 Church Street, Rm. 9-600
New York, NY 10007

**RE: Veritas Vox, Inc. Audit Services for New York City Housing Authority (NYCHA)**

Dear Mr. O'Hagan:

We have completed the following audits of your security vendor, Copstat Security Inc., located in Bronx, New York as of January 31, 2007:

- Inspection Analysis
- Payroll Analysis

We are currently waiting for information from the New York State Department of State, Division of Licensing Services to complete the following audit:

- New York State Registration/Licensing Analysis

The attached report is categorized as outlined above. At the end of our report, you will find a summary score sheet and an executive summary of our audit, as well as supporting documentation.

Please feel free to contact us at your convenience so that we may discuss our findings with you.

Sincerely,

Anthony L. Picciano

## Confidentiality Notice

This document details an audit conducted solely for the New York City Housing Authority (NYCHA) and may contain legally privileged and confidential information intended solely for the addressee. Veritas Vox, Inc. does not waive any rights, privileges or other protections regarding this information. If you are not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this document is strictly prohibited. If you have received this document in error, please notify Veritas Vox, Inc. immediately by telephone (646-225-5200) or by electronic mail (info@veritasvox.com), and delete and/or destroy this document and all copies and backups thereof.

# Table of Contents

INTRODUCTION ..... 3

OBJECTIVE ..... 3
PURPOSE ..... 3
SCOPE ..... 3
METHODOLOGY ..... 6
TIMEFRAME ..... 7

OPERATIONAL AUDIT ..... 8

1.0 NEW YORK STATE REGISTRATION/LICENSING ANALYSIS ..... 8
2.0 INSPECTION ANALYSIS ..... 9
*2.0.1 Minimum Standard – One (1) Inspection Per Shift* ..... *9*
*2.0.2 Maximum Standard – Two (2) Inspections Per Shift* ..... *9*
3.0 PAYROLL ANALYSIS ..... 10
*3.0.1 Part I (Wage Rate Per Hour)* ..... *10*
*3.0.2 Part II (Supplemental Benefit Rate Per Hour)* ..... *11*
*3.0.3 Totals* ..... *15*

SUMMARY SCORE SHEET ..... 17

EXECUTIVE SUMMARY ..... 18

APPENDIX ..... 20

NYCHA-62508-0092



# Introduction

## Objective

The objective of the audit is to determine if the New York City Housing Authority's (NYCHA) security provider, Copstat Security Inc., complies with contractual and regulatory standards.

## Purpose

The audit is designed to help reduce NYCHA's liability exposure by highlighting areas requiring corrective measures and to provide NYCHA a means to recoup monies in the event of security provider noncompliance.

The Veritas Vox Operational Audit is a comprehensive and objective review of Copstat's compliance with contractual and regulatory standards. The audit consists of the following:

- New York State Registration/Licensing Analysis
- Inspection Analysis

The Veritas Vox Financial Audit is a comprehensive and objective review of Copstat's compliance with contractual and regulatory pricing standards. The audit consists of the following:

- Payroll Analysis

## Scope

*Time Period*

The audit encompassed a ninety-two (92) day period, from May 28, 2006 through August 27, 2006.

*Locations*

The following NYCHA site locations were included in the audit:

| EDP/TDS # | ADDRESS | "DEPARTMENT" / "FULL DEVELOPMENT NAME" |
|---|---|---|
| 71 | 55 W. 125th St. | Housing Applications – Manhattan |
| 472 | 55 W. 125th St. | Leased Housing – Manhattan |
| 169 | 1 Fordham Plaza | Housing Applications – Bronx |

| EDP/TDS # | ADDRESS | "DEPARTMENT" / "FULL DEVELOPMENT NAME" |
|---|---|---|
| 473 | 1 Fordham Plaza | Leased Housing – Bronx |
| 172 | 120-34 Queens Blvd. | Housing Applications – Queens |
| 475 | 59-17 Junction Blvd. | Leased Housing – Queens |
| 157 | 120 Stuyvesant Pl. | Housing Applications – Staten Island |
| 41 | 350 Livingston St. | Energy / REI – Brooklyn |
| 156 | 350 Livingston St. | Housing Applications – Brooklyn |
| 474 | 350 Livingston St., B | Leased Housing – Brooklyn |
| 474 | 350 Livingston St, L | Leased Housing – Brooklyn |
| 474 | 350 Livingston St, 3 | Leased Housing – Brooklyn |
| 474 | 350 Livingston St., 4 | Leased Housing – Brooklyn |
| 198 | 72 Columbia Street | Bernard M. Baruch Houses Addition |
| 160 | 1945 Amsterdam Ave. | Mary McLeod Bethune Gardens |
| 189 | 2440 Boston Rd. | Boston Road Plaza |
| 157 | 1350 Manor Ave. | Bronx River Addition |
| 157 | 1630 E. 174th St. | Bronx River Addition |
| 176 | 436 W. 27th Dr. | Chelsea Addition |
| 236 | 1020 College Ave. | College Ave. / E. 165th Street |
| 309 | 99 Ft. Washington Ave. | Fort Washington Ave. Rehab |
| 225 | 2125 Glebe Ave. | Glebe Ave. / Westchester Ave. |
| 152 | 282 Cherry St. | Mayor Fiorello H. LaGuardia Addition |
| 344 | 1970 Amsterdam Ave. | Justice Thurgood Marshall Plaza |
| 183 | 94 E. 1st St. | Judge Max Meltzer Tower |
| 191 | 3033 Middletown Rd. | Middletown Plaza |
| 277 | 17 E. 124th St. | Morris Park Senior Citizens Home |
| 340 | 120 W. 140th St. | P.S. 139 (Conversion) |
| 245 | 2700 Randall Ave. | Randall Ave. / Balcolm Ave. |
| 245 | 2705 Schley ave. | Randall Ave. / Balcolm Ave. |
| 245 | 650 Buttrick Ave. | Randall Ave. / Balcolm Ave. |
| 218 | 341 E. 70th St. | Ira S. Robbins Plaza |
| 268 | 102 W. 91st St. | Sondra Thomas Apartments |
| 287 | 2070 Clinton Ave. | Twin Parks East (Site 9) |
| 342 | 950 Union Ave. | Union Avenue / E. 163rd St. |
| 343 | 1980 Lexington Ave. | Upper Park Avenue Community Association (Site 5) |
| 355 | 1940 Lexington Ave. | Upper Park Avenue Community Association (Site 6) |
| 246 | 228 W. Tremont Ave. | West Tremont Ave. / Sedgewick Ave. |
| 211 | 551 E. 143rd St. | Doctor Ramon E. Betances I |
| 334 | 1325 Franklin Ave. | Claremont Pkwy / Franklin Ave. Area |
| 190 | 1150 Union Ave. | Lewis S. Davidson, Sr. |
| 237 | 372 E. 152nd St. | E. 152nd St. / Courtland Ave. |



| EDP/TDS # | ADDRESS | "DEPARTMENT" / "FULL DEVELOPMENT NAME" |
|---|---|---|
| 262 | 530 W. 55th St. | Harbor View Terrace |
| 326 | 175 Eldridge St. | Lower East Side I – (INFILL) |
| 145 | 188/190 Lincoln Ave. | Mayor John Purroy Mitchel |
| 267 | 3135 Park Ave. | Morrisania Air Rights |
| 013 | 101 Broadway | Edwin Markham Gardens |

*New York State Registration/Licensing Analysis*

Veritas Vox is in the process of completing the analysis by working closely with the New York State Department of State, Division of Licensing Services to determine Copstat's compliance with the 1992 Security Guard Act, as well as Exhibit A, Section 4(a) (Employment/Qualification Requirements) of the HPD contract.

*Inspection Analysis*

Veritas Vox evaluated compliance with inspections as outlined in Exhibit A, Section 11 (Shift/Supervisory Function) of the HPD contract. Subsection (a) states that "guards working shifts at HPD office sites shall be inspected once per shift". Subsections (b) – (e) state that guards working at HPD office and construction sites on the 8:00 A.M – 4:00 P.M., 4:00 P.M – 12:00 A.M., and 12:00 A.M. – 8:00 A.M. shifts are to be inspected twice per shift "at least four (4) hours apart, or at varying times that HPD has agreed to and finds acceptable."

Veritas Vox established two baseline standards to measure Copstat's compliance. The first standard was one (1) inspection per shift. The second standard was two (2) inspections per shift.

*Payroll Analysis*

Veritas Vox evaluated compliance with the regular wage rate for Security Guards (Unarmed) as outlined in NYC Administrative Code Section 6-109 Schedule of "Living Wages". The audit determined if Copstat paid its guards $9.60/hr. prior to July 1, 2006 and $10.00/hr. after July 1, 2006. Additionally, the audit determined if any guard not provided health insurance received the supplemental benefit rate of $1.50/hr. The audit included neither the holiday nor overtime provisions of the code.

**Methodology**

Veritas Vox, Inc. reviewed NYCHA and Copstat's records for a ninety-two (92) day period (05/28/2006 – 08/27/2006), interviewed NYCHA and Copstat employees, conducted on-site, unannounced interviews of a randomly selected sample of security guards, utilized the New York State Department of State Division of Licensing Services Licensee ID Search Database, and is currently working with the New York State Division of Licensing Services personnel.

Please note that the results of the audit depended significantly on Copstat's cooperation as well as the authenticity of their statements and documents provided to Veritas Vox.

*New York State Registration/Licensing Analysis*

Veritas Vox conducted a license ID search by utilizing the New York State Department of State, Division of Licensing Services Licensee ID Search Database for every Copstat guard that worked within the scope of the audit. The search, however, did not indicate which company the guard was registered to at the time. Additionally, any guard who had to renew their license during or after the audit period has to be researched further to ensure that their licensing/registration did not lapse during the period in question. Veritas Vox is working with the New York State Division of Licensing Services to obtain a detailed licensing/registration history of each Copstat guard that worked at a NYCHA location during the time period outlined in the scope of the audit.

*Inspection Analysis*

During interviews with NYCHA employees, Veritas Vox was informed that all inspections are documented on Copstat timesheets, which are then submitted to NYCHA with the invoices on a monthly basis. The inspecting Copstat supervisor is required to sign their name in red below the on-duty guard's name. Veritas Vox reviewed the NYCHA invoices that fell within the scope of the audit to determine when a guard was inspected. Veritas Vox conducted on-site, unannounced interviews of a randomly selected sample of security guards to help validate the data (see Appendix 1). If an invoice was missing, Veritas Vox notified NYCHA management. Invoices not provided to Veritas Vox could not be analyzed.

The following invoices were missing and not included in the audit analysis:

| EDP/TDS # | MISSING INVOICE PACKAGE (MONTH) |
|---|---|
| 475 | July |
| 218 | 8/22 – 8/26 (Illegible) |
| 268 | 8/21 – 8/27 (Illegible) |
| 342 | 5/28, 6/26 |
| 013 | August |



*Payroll Analysis*

Veritas Vox reviewed Copstat's payroll records and NYCHA invoices. In addition, Veritas Vox interviewed Copstat management and conducted on-site, unannounced interviews of a randomly selected sample of security guards.

**Timeframe**

The audits were conducted from November 2006 through January 2007.



# Operational Audit

## 1.0 New York State Registration/Licensing Analysis

At this time, the results of the New York State Registration/Licensing Analysis are inconclusive. Veritas Vox is working with the New York State Division of Licensing Services to obtain the necessary information to conclude this analysis.

NYCHA-62508-0098

## 2.0 Inspection Analysis

Veritas Vox's analysis of Exhibit A, Section 11 (Shift/Supervisory Functions) of the HPD contract revealed ambiguity regarding the inspection standards required of the security vendor. Specifically, Section 11 (a) states that "guards working shifts at HPD office sites shall be inspected once per shift"; however, Sections 11 (b) – (e) indicate that guards are to be inspected twice per shift and at least four hours apart.

For the purpose of this audit, Veritas Vox conducted two separate analyses (see Appendix 2). The first analysis determined Copstat's compliance with Section 11 (a) which states that guards are to be inspected once per shift (Minimum Standard). The second analysis determined Copstat's compliance with Sections 11 (b) – (e) which states that guards are to be inspected twice per shift (Maximum Standard).

### 2.0.1 Minimum Standard – One (1) Inspection Per Shift

| | |
|---|---|
| Total Number of Shifts | 3,930 |
| Number of Shifts Inspected Once | 1,232 |

| | |
|---|---|
| Compliance % | 31% |

### 2.0.2 Maximum Standard – Two (2) Inspections Per Shift

| | |
|---|---|
| Total Number of Shifts | 3,930 |
| Number of Shifts Inspected Twice | 0 |

| | |
|---|---|
| Compliance % | 0% |



## Financial Audit

### 3.0 Payroll Analysis

Veritas Vox reviewed and analyzed Copstat payroll records[1] to determine if the guards who worked during the scope of the audit received compensation as outlined in NYC Administrative Code Section 6-109 Schedule of "Living Wages" (see Appendix 3). Supervisory, holiday and overtime pay were not included in the analysis. If any guard received incorrect pay or benefits at any time during the scope of the audit, the guard was considered to be incorrectly compensated per NYC Administrative Code Section 6-109.

### 3.0.1 Part I (Wage Rate Per Hour)

The first part of the analysis focused on the "wage rate per hour". According to the code, all security guards working at a NYCHA site prior to July 1, 2006 were to be paid at least $9.60/hr. and $10.00/hr. after July 1, 2006. The guards did not receive the raise to $10.00 until pay period ending August 13, 2006; however, they received retroactive pay for the time lag it took to implement the rate. Veritas Vox analyzed the retroactive pay to determine if all guards received the proper compensation. Overpayments are not in violation of the code and are therefore not included in the analysis below.

| GUARD NAME | DISCREPANCY | DISCREPANCY AMOUNT |
|---|---|---|
| Ballard, Timothy | a. Missing 36 hours of vacation at $0.40/hr.<br>b. Missing 9 hours of OT at $0.60/hr. | a. ($14.40)<br>b. ($5.40) |
| Bamfield, Carolyn | Missing 4 hours of OT at $0.20/hr. | ($0.80) |
| Brown, Joseph | Missing 8 hours of OT at $0.20/hr. | ($1.60) |
| Bux, Azad | Missing 6 hours OT at $0.20/hr. | ($1.20) |
| D'Andrea, Raymond (10104) | a. Missing 6 hours of holiday at $0.60/hr.<br>b. Missing 2 hours of OT at $0.60/hr. | a. ($3.60)<br>b. ($1.20) |
| Doran, Carl | Missing 8 hours of holiday at $0.60/hr. | ($4.80) |
| Henry, Robert | Missing 4 hours of holiday at $0.20/hr. | ($0.80) |
| James, Francis | Missing 4 hours of holiday at $0.20/hr. | ($0.80) |
| Jones, Myrna | Missing 4 hours of OT at $0.20/hr. | ($0.80) |
| Ogun, Gbolahan | Missing 8 hours of OT at $0.60/hr. | ($4.80) |
| Orengo, Ephraim | Missing 8 hours of OT at $0.20/hr. | ($1.60) |
| Thompson, James | Missing 8 hours of OT at $0.20/hr. | ($1.60) |
| Young, Charlene | a. Missing 15 hours of OT at $0.60/hr.<br>b. Missing 3 hours of OT at $0.20/hr. | a. ($9.00)<br>b. ($0.60) |

| Total Discrepancy Amount | ($53.00) |
|---|---|

[1] The Copstat payroll starts on Monday and ends on Sunday.

In addition, Veritas Vox performed a "blended rate" analysis. Copstat's payroll system calculates a blended pay rate, which is simply a weighted average, if a guard worked at multiple locations with different rates of pay. For example, if a guard worked 20 hours at one site that paid $10.00/hr. and another 20 hours at a different site that paid $8.00/hr., the guard would receive a weighted average pay rate of $9.00/hr. for 40 hours[1]. Overpayments are not in violation of the code and, therefore, not included in the analysis below.

| GUARD NAME | PAY PERIOD ENDING | VERITAS VOX CALCULATED RATE | ACTUAL RATE PAID | DISCREPANCY PER HOUR |
|---|---|---|---|---|
| Adiro, Kabir | 06/18 | $9.40 | $9.35 | ($0.05) |
| Aponte, Julio | 08/06 | $7.62 | $7.53 | ($0.09) |
| Cranmore, Ferdinand | 07/09 | $8.37 | $8.30 | ($0.07) |
| Fernandez, Ramon | 08/13 | $10.00 | $9.94 | ($0.06) |
| Jones, Cherry | 08/06 | $9.67 | $9.33 | ($0.34) |
| Khan, Rezaur | 06/11 | $8.62 | $8.50 | ($0.12) |
| | 08/06 | $10.57 | $9.26 | ($1.31) |
| | 08/20 | $10.58 | $9.42 | ($1.16) |
| | 08/27 | $10.22 | $8.88 | ($1.34) |
| Ortiz, David | 08/06 | $9.87 | $9.52 | ($0.35) |
| Shaw, Dave | 07/16 | $9.14 | $9.06 | ($0.08) |
| Velez, Robert | 08/06 | $8.67 | $8.62 | ($0.05) |
| Williams, Nigel[2] | 08/27 | Unknown | 0 | Unknown |
| Wright, Lonnie | 06/18 | $9.60 | $9.42 | ($0.18) |

| | |
|---|---|
| Total # of Guards | 132 |
| # of Guards Paid Correct Wage Rate Per Hour | 108 |
| % of Guards Paid Correct Wage Rate Per Hour | 82% |

### 3.0.2 Part II (Supplemental Benefit Rate Per Hour)

The second part of the analysis focused on the "supplemental benefit rate per hour". According to the code, all security guards working at a NYCHA site not receiving health benefits should receive a supplemental benefit rate of $1.50/hr.

[1] Copstat uses the blended rate to calculate overtime pay. This may be an issue if the guard worked overtime at a NYCHA location, but worked at another site during the week at a lower straight rate of pay. Instead of earning 1.5 times the wage rate per hour as defined in NYS Administrative Code 6-109, they would receive 1.5 times a lower, average wage rate.

[2] Invoice records indicate that Nigel Williams worked on 08/21/2006 at Harbor View Terrace (530 W. 55th St.), TDS # 262; however, Copstat was not able to provide a payroll record for him.

According to records provided by Copstat, the following guards received health benefits during the audit period. Please note that the same 18 guards received health insurance during each period outlined below:

| PERIOD COVERED | NAME |
|---|---|
| 05/01/06 – 06/01/06 | - Bazza, James<br>- Burgess, Darrin<br>- Carter, Manley<br>- Cashaw, Donald<br>- Cropper, Walter<br>- D'Andrea, Raymond L.<br>- Diop, Mouhamed<br>- Groves, John<br>- Jennings, Frederick<br>- Moore Alston, Alison<br>- Morris, Robin<br>- Neal, Frank<br>- Ogun, Gbolahan<br>- Ragland, Corey<br>- Rayner, Michael<br>- Rivers, Marc<br>- Wifamoriyo, Folorunsho<br>- Williams, Nakia |
| 06/01/06 – 07/01/06 | - Bazza, James<br>- Burgess, Darrin<br>- Carter, Manley<br>- Cashaw, Donald<br>- Cropper, Walter<br>- D'Andrea, Raymond L.<br>- Diop, Mouhamed<br>- Groves, John<br>- Jennings, Frederick<br>- Moore Alston, Alison<br>- Morris, Robin<br>- Neal, Frank<br>- Ogun, Gbolahan<br>- Ragland, Corey<br>- Rayner, Michael<br>- Rivers, Marc<br>- Wifamoriyo, Folorunsho<br>- Williams, Nakia |



| PERIOD COVERED | NAME |
|---|---|
| 07/01/06 – 08/01/06 | - Bazza, James<br>- Burgess, Darrin<br>- Carter, Manley<br>- Cashaw, Donald<br>- Cropper, Walter<br>- D'Andrea, Raymond L.<br>- Diop, Mouhamed<br>- Groves, John<br>- Jennings, Frederick<br>- Moore Alston, Alison<br>- Morris, Robin<br>- Neal, Frank<br>- Ogun, Gbolahan<br>- Ragland, Corey<br>- Rayner, Michael<br>- Rivers, Marc<br>- Wifamoriyo, Folorunsho<br>- Williams, Nakia |

The following guards received the supplemental benefit rate of $1.50 per hour as outlined in NYS Administrative Code Section 6-109[1]:

| | LAST NAME | FIRST NAME | SUPPLEMENTAL BENEFITS |
|---|---|---|---|
| 1 | Acevedo | Gilberto | Yes |
| 2 | Agripin | Daniel | Yes |
| 3 | Alford | Denise | Yes – 6/11 & 6/18 |
| 4 | Ballard | Timothy | Yes – 7/23 – 8/13 |
| 5 | Bamfield | Carolyn | Yes |
| 6 | Brown | Joseph | Yes |
| 7 | Brumaire | DeGaulle | Yes |
| 8 | Burgess | Darrin | Yes – 7/2 – 8/27 |
| 9 | Bux | Azad | Yes |
| 10 | Dieudonne | Mario | Yes |
| 11 | Doran | Carl | Yes |

[1] The guards in red only received the $1.50/hr supplemental rate for the pay periods ending noted. Since they worked at NYCHA sites during other pay periods within the scope of the audit, they did not receive the proper supplemental health benefits. Consequently, these guards were not defined as properly compensated in the calculations.



| | LAST NAME | FIRST NAME | SUPPLEMENTAL BENEFITS |
|---|---|---|---|
| 12 | Ernest | Frantz | Yes |
| 13 | Fernandez | Ramon | Yes |
| 14 | Gardner | Bryan | Yes |
| 15 | Guirand | Jean C. | Yes |
| 16 | Hamit | William | Yes |
| 17 | Hemmans | Horace | Yes |
| 18 | Johnson | Cuthbert | Yes |
| 19 | Jones | Myrna | Yes |
| 20 | Joselin | Zamor | Yes |
| 21 | Kohli | Gandherb S. | Yes |
| 22 | Leach | Clinton | Yes |
| 23 | Marquez | Billy | Yes |
| 24 | Orengo | Ephrain | Yes |
| 25 | Ortiz | David | Yes |
| 26 | Paul | Subhash | Yes |
| 27 | Pritchett | Frederick D. | Yes |
| 28 | Shaw | Dave | Yes - 6/25 |
| 29 | Singh | Sucha | Yes |
| 30 | Small | Andre | Yes |
| 31 | Smith | Garry | Yes |
| 32 | Smith | Gerald | Yes |
| 33 | Soto | Francis | Yes |
| 34 | Thompson | James | Yes |
| 35 | White | Richard | Yes |
| 36 | Young | Charlene | Yes |

| | |
|---|---|
| Total # of Guards | 132 |
| # of Guards Who Received Health Benefits or the Supplemental Health Benefit Wage Rate Per Hour | 50 |
| % of Guards Who Received Health Benefits or the Supplemental Health Benefit Wage Rate Per Hour | 38% |

### 3.0.3 Totals

| Total # of Guards | 132 |
|---|---|
| # of Guards Who Were Paid Correct Wage Rate Per Hour AND Received Health Benefits or the Supplemental Health Benefit Wage Rate Per Hour | 38 |
| % of Guards Who Were Paid Correct Wage Rate Per Hour AND Received Health Benefits or the Supplemental Health Benefit Wage Rate Per Hour | 29% |

NOTE: In interviews with Copstat CFO, Michael Topf, and payroll department employees Paula Rodriguez and Rachel Quiones, Veritas Vox was informed that some guards elected to "accrue" their supplemental benefit wages. In other words, the guards elected to have Copstat hold onto their money in exchange for vacation, personal or sick time. According to information obtained during the interviews, the accruals are managed by Rachel Quiones in a database on a weekly basis (see Appendix 4).

Veritas Vox was told that guards working at NYCHA sites are supposed to complete an "election" form to indicate how they wish to receive their supplemental benefit (see Appendix 5). The form grants the guards the following options:

They may elect to:

1. "accrue $1.50 for each hour worked at an HPD site, and defray the cost of Medical Insurance."
2. "accrue $1.50 for each hour worked at an HPD site, to be utilized to accrue Vacation, Personal or Sick time."
3. collect their "Supplemental Benefit of $1.50 for each hour worked at an HPD site" in their paycheck.

According to Copstat's records, of the 132 guards who worked at a NYCHA site during the audit period, the following 14 guards completed the "election" form:

| | NAME | OPTION # SELECTED |
|---|---|---|
| 1. | Acevedo, Gilberto | #3 |
| 2. | Orengo, Ephraim | #3 |
| 3. | Pritchett, Frederick | #3 |
| 4. | Smith, Garry | #2 |
| 5. | Burgess, Darrin | #3 |
| 6. | Young, Charlene | #3 |
| 7. | Thompson, James | #3 |



| | NAME | OPTION # SELECTED |
|---|---|---|
| 8. | Singh, Sucha | #3 |
| 9. | Jones, Myrna | #3 |
| 10. | Guirand, Jean | #3 |
| 11. | Dieudonne, Mario | #3 |
| 12. | Brown, Joseph | #3 |
| 13. | Bux, Azad | #3 |
| 14. | Belton, George | #2 |

In addition, Copstat provided a copy of a handwritten note from Horace Hemmans "requesting supplement Horizon Health Benefit ended effective 9/1/05" and a typed note from David Ortiz deciding "not to take the medical benefits" and electing to "take the supplemental instead".

Copstat stated that records were missing because guards probably did not return them. When asked when the guards were supposed to receive the election forms, Veritas Vox was told that they should have received them before working at a NYCHA site; however, Copstat does not have a system in place to ensure that the guards receive these forms. The guards who do not submit the election forms are automatically enrolled in the accrual for vacation, personal or sick time program (option #2 on the election forms) and do not receive health insurance or the $1.50/hr. supplemental wage rate. Furthermore, Copstat does not have a system to keep guards informed about their accrual balances (i.e. monthly statements or other forms of notification). Copstat was not able to provide evidence that all of the guards know that money is accruing or that they are aware of their right to supplemental benefits.

For the abovementioned reasons, the "accrual" database was not included in the audit analysis and, therefore, not reflected in the totals calculations above.



## Summary Score Sheet

| | AUDIT SUBJECT | COMPLIANCE PERCENTAGE |
|---|---|---|
| 1.0 | New York State Registration/Licensing Analysis | Pending |
| 2.0.1 | Inspection Analysis (Minimum Standard) | 31% |
| 2.0.2 | Inspection Analysis (Maximum Standard) | 0% |
| 3.0.1 | Payroll Analysis (Wage Rate Per Hour) | 82% |
| 3.0.2 | Payroll Analysis (Supplemental Benefit Rate Per Hour) | 38% |
| 3.0.3 | Payroll Analysis (Totals) | 29% |



## Executive Summary

The audits took place from November 2006 through January 2007 at the following locations:

- Andrews International (Copstat) East Coast Headquarters– 1860 East Tremont Avenue Bronx, NY 10460
- New York City Housing Authority – 90 Church Street, 9th Fl. New York, NY 10007
- Veritas Vox, Inc. – 106 Central Park South, Ste. 9F New York, NY 10019

The inspection and payroll audits revealed deficiencies in the following areas:

- Inspection Quota (Minimum Standard – 2,698 Missed Shifts; Maximum Standard – 3,930 Missed Shifts)
- Payroll Compliance (94 Guards Without Proper Pay and/or Supplemental Health Benefits During the Audit Scope)

The deficiencies revealed during these audits indicate that Copstat is neither meeting contractual nor regulatory standards. It is our recommendation that these deficiencies be addressed with Copstat as soon as possible. Based on the results of these audits, it is also recommended that Copstat records be audited to determine compliance with other components of service (i.e. selection/screening process, initial and ongoing training, etc.).

Recommendations regarding the inspection analysis follow:

- Veritas Vox's analysis of Exhibit A, Section 11 (Shift/Supervisory Functions) of the HPD contract revealed ambiguity regarding the inspection standards required of the security vendor. It is recommended that the language be more clearly defined to provide the security vendor a singular, definitive performance standard. In addition, a clearly defined performance standard will aid NYCHA's efforts to monitor vendor compliance.
- Work with the security vendor to determine the cost per inspection to NYCHA as defined in their pricing structure and agreed to in the contract. If the vendor does not meet the inspection standards outlined in the contract, establish a cost reimbursement system to recoup monies. For example, if the cost is determined to be $10.00 per inspection and the vendor is deficient 1,000 times per the standard outlined in the contract, then NYCHA should be reimbursed $10,000 ($10.00 times 1,000 missing inspections).
- At a minimum, inspection compliance should be monitored on a monthly basis.

Recommendations regarding the payroll analysis follow:

- If Copstat's accrual for vacation, personal or sick time program (option #2 on the election forms) is determined to comply with the NYC Administrative Code Section 6-109 Schedule of "Living Wages", a fail-safe system of enrollment and guard notification should be established. The database that is maintained should be reconciled with payroll records and audited, at a minimum, on a monthly basis.
- The "supplemental benefit rate per hour" component of the NYC Administrative Code Section 6-109 Schedule of "Living Wages" should be investigated beyond the scope of this audit.
- At a minimum, payroll compliance should be monitored on a monthly basis.

# Appendix[1]

Appendix 1 – Veritas Vox, Inc. Guard Interview Reports SM

Appendix 2 – Inspection Analysis Documentation

Appendix 3 – Payroll Analysis Documentation

Appendix 4 – Copstat Supplemental Benefit Database

Appendix 5 – Copstat "Election" Forms

Appendix 6 – Email Correspondence

Appendix 7 – Additional Observations

[1] Additional source materials available upon request.

# EXHIBIT   17

**O'Hagan, Patrick**

---

**From:** O'Hagan, Patrick

**Sent:** Wednesday, May 09, 2007 4:12 PM

**To:** 'Mike Topf'

**Subject:** RE: Supplemental Benefits-NYCHA

Mike:

11 am is fine with me. I look forward to hearing your proposals.

-----Original Message-----
**From:** Mike Topf [mailto:mtopf@andrewsinternational.com]
**Sent:** Wednesday, May 09, 2007 4:09 PM
**To:** O'Hagan, Patrick
**Cc:** Jim Wood; Leonard Kestecher
**Subject:** RE: Supplemental Benefits-NYCHA

Pat

Thanks for your prompt response.

Michelle Stuart has provided you with a current aging as you have requested in a separate email. Jim Wood will be happy to meet with you Monday to finalize the issues (I will be away on vacation). Jim asked if you could move the meeting to 11AM. If not, he will change his schedule to accommodate you.

I also understand that you are meeting with Lenny Kestecher tomorrow. He will update you on some of the improved procedures we have regarding the supplemental benefits.

Best regards,

Mike Topf

---

**From:** O'Hagan, Patrick [mailto:Patrick.O'Hagan@nycha.nyc.gov]
**Sent:** Wed 5/9/2007 12:08 PM
**To:** Mike Topf
**Cc:** Jim Wood
**Subject:** RE: Supplemental Benefits-NYCHA

Mike:

I understand that the employer has the option to offer a benefit package in lieu of the $1.50 per hour supplemental rate. My concern is with the "tracking" mechanism and the documentation of benefits paid, accrual, etc I believe the system is flawed and I need to be assured it is transparent. I welcome the opportunity to discuss your system further and to test the employees the auditors considered exceptions. Additionally, I have not received your proposal on crediting NYCHA for services that were not performed, as I mentioned in our meeting on April 26. If you and your team are available, let's meet on Monday at 10am at 90 Church Street to finalize these issues. In the meantime, please send me a list of your open invoices by close of business today, so that I can make sure we pay you correctly.

Patrick O'Hagan
Security Director

New York City Housing Authority
90 Church Street, 9th Floor
(212) 306-8660

-----Original Message-----
**From:** Mike Topf [mailto:mtopf@andrewsinternational.com]
**Sent:** Monday, May 07, 2007 10:23 AM
**To:** O'Hagan, Patrick
**Cc:** Jim Wood
**Subject:** Supplemental Benefits-NYCHA
**Importance:** High

Pat

We met with Anthony Picciano and Forhad Razzaque, whom NYCHA contracted to perform an audit on our payment of NYC prevailing wages  and supplemental benefits. The purpose of the meeting was to elaborate on the statistics regarding supplemental benefits that you presented at the April 26th meeting which indicated that there was a 71% error rate in payment of supplemental benefits. As you know, the auditors found $53 paid incorrectly in prevailing wage payments for the period as well as $96 overpaid, due to blended rate calculations performed by our payroll software. We paid the $53 to the employees and did not ask for the $96 overpayments, clearly demonstrating our sincerity to pay these employees correctly.

Anthony and Forhad described the "exceptions" in supplemental benefit pay that they identified. These types of "exceptions" are clearly identified in their report to you, which was read to us verbatim. These exceptions were not in the supplemental pay itself, but in the fact that the applicable employees did not complete an election form, which stipulates that they will accept a package of medical insurance and vacation pay in lieu of a $1.50 cash payment per hour. Please note that Labor Law 230 does not stipulate the method by which the employee is paid the supplemental benefit. We are, therefore, perfectly within our rights to offer the medical/sick/vacation package for the $1.50 per hour benefit. We showed the auditors the tracking mechanism by which we make certain that the employees who are in this category have their benefits accrued and paid. Unfortunately, the auditors did not perform any tests on these employees because of time constraints they stated were imposed by NYCHA. Generally accepted auditing procedures state that these items would have been tested and we welcome you to do so. Again, the "exceptions" cited were that there was no election form in the employee's personnel folder, not that payments were not made or made improperly. As previously stated, it is perfectly legal to use the medical/sick/vacation supplemental as an alternative to a cash per hour payment.

Based on the above, since it is clear that we are in compliance with Labor Law 230, kindly release all payments to Andrews International that you are withholding.

Michael Topf, CPA
CFO
Andrews International, Inc.

# Exhibit 18
## Excerpts from Deposition of Leonard Kestecher

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

ANDREWS INTERNATIONAL, INC.,

Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,

Defendant.

Civil Action No.: 08-cv-1580 (HB)

---------------------------------------x

475 Park Avenue South
New York, New York

July 25, 2008
10:40 a.m.

Deposition of the Plaintiff ANDREWS INTERNATIONAL, INC., by LEONARD KESTECHER, held at the above-mentioned time and place, before Linda A. Schilt, a Notary Public of the State of New York.

a3365c9d-b63c-419f-827c-968075f1d28b

A P P E A R A N C E S:

FUNK & BOLTON
Attorneys for Plaintiff
36 South Charles Street
Baltimore, Maryland 21201-3111
BY: BRYAN D. BOLTON, ESQ.

NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
Attorneys for Defendant
250 Broadway, 9th Floor
New York, New York 10007
BY: STEPHEN W. GOODMAN, ESQ.

a3365c9d-b63c-419f-827c-968075f1d28b

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except asto the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

L E O N A R D K E S T E C H E R,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

(Agreement was marked as Defendant's Exhibit A for identification; 7/25/08, L.S.)

EXAMINATION BY

MR. GOODMAN:

Q. Good morning, Mr. Kestecher.

A. Call me Lenny.

Q. Lenny, all right. Just so that if things get more formal, I want to get your last name right. Where is the accent?

A. Kestecher.

Q. All right. Kestecher, is that close enough?

A. That's perfect.

Q. So it will be Lenny this morning.

A. Make it easy for you.

Q. Could you state your address for the record, please?

A. Home address?

Q. Yes. That will be fine.

a3365c9d-b63c-419f-827c-968075f1d28b

A. 15 Dudley Court, Wayne, New Jersey.

Q. My name is Stephen Goodman. I'm an attorney for the New York City Housing Authority. This morning I will ask a series of questions. If I ask a question that you don't understand, please tell me you don't understand it and I will try to rephrase it.

If you do answer a question, I will assume that you have understood it. Is that clear?

A. Yes.

Q. Because the court reporter is making a written record of the deposition, I'm going to ask that you make all your answers verbally rather than by gestures or nods of the head. Is that clear?

A. Yes.

Q. If you want to take a break at any time during what I think will be a short deposition, just say so and we will do it, okay?

A. Yes.

Q. Lenny, are you taking any

medication this morning that might make it difficult for you to understand my questions?

A. No.

Q. Do you have any mental or physical condition that might make it difficult for you to understand my questions?

A. No.

Q. Did you attend college?

A. Yes.

Q. Where?

A. Now known as the College of New Jersey, at the time it was Trenton State College.

Q. Did you receive a degree?

A. Yes.

Q. What degree?

A. Bachelor of science.

Q. When was that?

A. The degree was in 1975.

Q. Did you focus in a particular area of science?

A. Criminal justice was my major. Psychology and sociology were my minors.

Q. Did you do any graduate school

Q. How did you find out that he was at Metro-North rather than at NYCHA?

A. Because Metro-North Railroad is a client of ours.

Q. So you knew when you called him he was no longer employed by NYCHA?

A. Oh, yes.

Q. Now, did you call Mr. O'Hagan at approximately the same time?

A. I may have talked with Mr. O'Hagan in that same time frame in order to set up a meeting to speak with him, yes. I would expect it would have had to be that time frame, because I met with Mr. O'Hagan the 10th or 11th of May of that year.

Q. You spoke to Mr. Ryan before you spoke to Mr. O'Hagan; is that correct?

A. I believe so, yes.

Q. After you had this phone conversation with Mr. Ryan, did you make any notes of your conversation?

A. I can't remember.

Q. If you did, would they be in your files anywhere?

a3365c9d-b63c-419f-827c-968075f1d28b

A. I believe so.

Q. Do you remember to whom that memo would have gone?

A. Not specifically.

RQ MR. GOODMAN: Mr. Bolton, if you can have your client check to see if there was such a memo.

A. I also told Pat O'Hagan as well.

Q. Okay. How did you tell Pat O'Hagan?

A. When I met with him. I guess it was on 5/10 or possibly before when I set up the appointment when I called him, but I know I discussed that with him.

Q. Before you called Mr. Ryan, did you read the HPD contract on which the NYCHA agreement was piggybacked?

A. Yes.

Q. Was it your understanding that the HPD contract required a supervisory inspection at least once per shift?

A. This sounds difficult. It was hard for me to evaluate -- it was hard for me to evaluate what the intent of the HPD

a3365c9d-b63c-419f-827c-968075f1d28b

inspections at this meeting?

A. Yes.

Q. Tell me about that.

A. Separate and apart from any discussion about the audit group or the supplemental, he said to me that, you know, I also found you to be -- he didn't actually say found you to be. He said I looked over the supervisory requirements and you guys were not compliant with -- you were not compliant with the supervisory requirements of the agreement. I said, you know, I have to tell you that I believe that we were and I said, in fact, I have to tell you that the contract is missing something that's very, very key. He said, "What?" Because most of the sites we handled were residential and the contract specifically, HPD section in the contract specifically did not mention residential. So how could a piggyback contract that was geared towards, for the most part, residential facilities incorporate a contract that didn't make any reference to residential facilities. And he got very

excited. He was -- he yelled out, "That's all legalese, and if you're going to start with me now, I'll end this meeting." So I said, "I'm sorry, let's get past this. Let's talk." We talked about it.

I told him that I talked with each of our managers to try and understand this. I said I'm here to try and understand and see if we can make this work, understand what's required, do the right thing going forward. I said I called our managers individually and asked them what their understanding was. I said it was very similar to the original NYCHA agreement that was, as I referred to, back in '02. I believe I told him I called Sean Ryan and asked him for his interpretation, if there was anything that I was missing in terms of my own assessment of this. I told him that he advised me that, if I remember correctly, that we were meeting his expectations and that this contract was not intended to do anything more than change some of the obligations that the state required under the payment terms, but had

a3365c9d-b63c-419f-827c-968075f1d28b

Was May 10, 2007 the first time you met with O'Hagan?

A. Yes.

Q. Between May 10, 2007 and May 30, 2007 when you sent this E-mail, had you met with Mr. O'Hagan?

A. Yes, I believe it was the 18th. I think it was Friday the 18th we had a meeting with Mr. O'Hagan at his offices. We showed up for a meeting on Monday the 14th to find out that he canceled it and we were trying to reschedule it through the week and finally on Friday the 18th of May, I believe in the afternoon, we had a meeting with Mr. O'Hagan.

Q. When you say "we," who is we?

A. It was Pat O'Hagan, myself, Jim Wood. There were some management representatives from Andrews there. I think Bill Flores. I don't recall who the other managers were, but there were a few other managers from Andrews International, and I don't recall, but I think Ray Rodriguez may have been there.

Q. That was at NYCHA's offices?

a3365c9d-b63c-419f-827c-968075f1d28b

A. Yes.

Q. Was the subject of supervisory inspections discussed at that meeting?

A. Yes.

Q. Did Mr. O'Hagan mention a possible credit from Andrews to NYCHA for the lack of supervisory inspections at that meeting?

A. I don't know what exactly the wording he used was, and I'm not sure if he, in fact, used the word credit, but he asked Jim, I think he asked Jim, did you come up with a number.

Q. Okay. What did Jim say?

A. If I remember correctly, what are you looking for, it may have been what he said. That's what I recall.

Q. What did Pat say to that?

A. I don't recall, but the nature of it was you tell me.

Q. Mr. O'Hagan wanted Andrews to make a proposal; is that correct?

A. It seemed that way.

Q. Returning now to Exhibit E and back to that section that I read into the

# EXHIBIT  19

NEW YORK CITY
HOUSING
AUTHORITY

NEW YORK CITY HOUSING AUTHORITY
90 CHURCH STREET • NEW YORK, NY 10007
TEL: (212) 306-3000 • http://nyc.gov/nycha

TINO HERNANDEZ
CHAIRMAN
EARL ANDREWS, JR.
VICE CHAIRMAN
MARGARITA LÓPEZ
MEMBER
VILMA HUERTAS
SECRETARY
DOUGLAS APPLE
GENERAL MANAGER

May 21, 2007

Mr. James Woods
President
Andrews International
1860 East Tremont Avenue
Bronx, New York 10460

RE: Election Not To Renew and Termination of Agreement No. 4020633 (the "**Agreement**") for Convenience by and between the New York City Housing Authority ("**NYCHA**") and Andrews International ("**Andrews**")

Dear Mr. Woods:

NYCHA has elected not to renew the Agreement with your firm and is hereby terminating for convenience the Agreement for security services at various NYCHA field locations.

The last day under which your firm shall provide security guard services at these locations shall be June 22, 2007 (the "Final Completion Date").

Your firm is required to submit its last invoice for payment within 30 days after the Final Completion Date.

Very truly yours

Patrick O'Hagan
Security Director
New York City Housing Authority

EXHIBIT
NYCHA
7 for ID
[illegible] 6/10/08

# EXHIBIT 20

**O'Hagan, Patrick**

**From:** O'Hagan, Patrick
**Sent:** Wednesday, May 30, 2007 3:06 PM
**To:** 'Leonard Kestecher'
**Cc:** 'Jim Wood'; 'Mike Topf'
**Subject:** RE: Contract Amendment

Leonard:

This language will not be entered into this amendment as its sole purpose is to authorize payment for services rendered. Additionally, as I have mentioned before, the language in the City contract is clear on the requirements of the vendor and remained in the contract that NCYHA negotiated with your firm.

Patrick O'Hagan
Security Director
New York City Housing Authority
90 Church Street, 9th Floor
(212) 306-8660

-----Original Message-----
From: Leonard Kestecher [mailto:lkestecher@andrewsinternational.com]
Sent: Wednesday, May 30, 2007 1:43 PM
To: O'Hagan, Patrick
Cc: Jim Wood; Mike Topf
Subject: RE: Contract Amendment
Importance: High

Hi Pat,

Thank you

Please allow us to make one simple addition so that we may clarify the matter of inspections for this addendum. As previously indicated, our guide by practice, by direction of your predecessor and the original contract with NYCHA, was that we must provide an adequate number of supervisory personnel to monitor the performance of our guards and make periodic unscheduled visits.

We would like to add in this language as written in the agreement dated 12/11/2003, page 3, so that there is no confusion.

In the meantime, kindly process the receivables that are from the pre addendum period

Thank you,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

-----Original Message-----
From: O'Hagan, Patrick [mailto:Patrick.O'Hagan@nycha.nyc.gov]
Sent: Thursday, May 24, 2007 10:14 AM
To: Leonard Kestecher
Subject: Contract Amendment

Leonard:

Please have Mr. Woods sign five "original" copies of the following amendment to facilitate payment of the outstanding invoices and return them to my attention. Thank you.

Patrick O'Hagan
Security Director
New York City Housing Authority
90 Church Street, 9th Floor
(212) 306-8660

EXHIBIT  21

NEW YORK CITY HOUSING AUTHORITY

NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
250 BROADWAY • NEW YORK, NY 10007
http:/nyc.gov/nycha

TINO HERNANDEZ
CHAIRMAN
EARL ANDREWS, JR.
VICE-CHAIRMAN
MARGARITA LOPEZ
MEMBER
VILMA HUERTAS
SECRETARY
DOUGLAS APPLE
GENERAL MANAGER

EXHIBIT
NYCHA 9 for ID
Rer 6/10/08

Ricardo Elias Morales
General Counsel

WRITER'S DIRECT LINE
212-776-5104

June 4, 2007

**Via Certified Mail No.** 7003 2260 0007 5191 9361

Mr. James Wood
President
Andrews International, Inc.
1860 Tremont Avenue
Bronx, New York 10460

Re: Amendment to Agreement No. 4020633 by and between New York City Housing Authority and Copstat Security L.L.C.

Dear Mr. Wood:

Enclosed for your records is a fully-executed original of the above-referenced Amendment . If you have any questions, please do not hesitate to call me at (212) 776-5104.

Sincerely,

Stacie Nelson

Stacie Nelson
Chief of Contracts Division

c: Patrick O'Hagan (w/original)

**AMENDMENT TO**
**AGREEMENT NO. 4020633**
**BY AND BETWEEN**
**NEW YORK CITY HOUSING AUTHORITY**
**AND**
**COPSTAT SECURITY L.L.C.**

This amendment (the "**Amendment**"), dated as of February 28, 2007, modifies Agreement No. 4020633 dated as of February 28, 2005 (the "**Agreement**"), between the New York City Housing Authority ("**NYCHA**"), a public benefit corporation organized under the laws of the State of New York, having its principal office at 250 Broadway, New York, New York 10007, and Copstat Security L.L.C., which recently merged with Andrews International, Inc. and is now doing business under the name of Andrews International, Inc. (the "**Contractor**" or "**Andrews**"), a corporation organized and existing under the laws of the State of Delaware, having its principal office at 1860 Tremont Avenue, Bronx, New York 10460.

Capitalized terms used in this Amendment have the meanings set forth in the Agreement, unless otherwise specified in this Amendment.

WHEREAS, pursuant to the Agreement with NYCHA, the Contractor is providing security services at various senior developments (the "**Services**"); and

WHEREAS, the Agreement Term expires on February 28, 2007; and

WHEREAS, NYCHA desires, and the Contractor is willing to continue to perform the Services for an additional period of three months; and

WHEREAS, NYCHA and the Contractor desire to increase the total amount of compensation payable to the Contractor under the Agreement;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, NYCHA and the Contractor hereby agree as follows:

1. The Contractor, Andrews, agrees that effective as of January 1, 2007, it has assumed the performance of the Services under the Agreement and agrees, represents, and covenants that it will continue to perform the Services as set forth in the Agreement, as amended herein.

2. Section 2.1 of the Agreement is hereby amended to read as follows:

   2.1 Article 3 of the City Contract is hereby deleted in its entirety and replaced with the following: "The term of the Agreement will commence on March 1, 2005 and shall continue through June 22, 2007 (the "**Term**"), unless earlier terminated by NYCHA at its sole option."

3. Section 5.3 of the Agreement is hereby amended to read as follows:

5.3 NYCHA's maximum liability under this Agreement for all payments will not exceed $4,267,920.24 (the "**Not-To-Exceed Amount**") for the Term of this Agreement.

4. Except as specifically modified herein, all other terms and conditions of the Agreement remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment to the Agreement as of the date first above written.

ANDREWS INTERNATIONAL, INC.

By: [signature]
Name: JAMES WOOD
Title: PRESIDENT

NEW YORK CITY HOUSING AUTHORITY

By: [signature]
Natalie Rivers
Deputy General Manager

# EXHIBIT 22

## O'Hagan, Patrick

**From:** O'Hagan, Patrick
**Sent:** Tuesday, June 05, 2007 3:06 PM
**To:** 'Leonard Kestecher'
**Subject:** RE: Andrews International

Lenny:

Your January invoices left my office on Monday. February and March will be in A/P by COB Wednesday. I expect April to be completed Thursday.

Patrick O'Hagan
Security Director
New York City Housing Authority
90 Church Street, 9th Floor
(212) 306-8660

-----Original Message-----
**From:** Leonard Kestecher [mailto:lkestecher@andrewsinternational.com]
**Sent:** Tuesday, June 05, 2007 2:50 PM
**To:** O'Hagan, Patrick
**Subject:** RE: Andrews International
**Importance:** High

Sorry to be of trouble. Can you please help me to answer the below question/s?

Thank you,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

---

**From:** Leonard Kestecher
**Sent:** Monday, June 04, 2007 12:38 PM
**To:** O'Hagan, Patrick
**Subject:** Andrews International

Hi Pat,

Can you please advise as to the schedule for issuing the outstanding payments. You had indicated the

first week of June. We would really like to understand what we can expect and when.

Hope all is well

Regards,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

EXHIBIT 23

**O'Hagan, Patrick**

**From:** O'Hagan, Patrick
**Sent:** Wednesday, June 13, 2007 8:26 AM
**To:** 'Leonard Kestecher'
**Subject:** RE: Andrews

Lenny:

I will check on the progress of your invoices. All invoices, to include April, have been processed by this office.

Pat

-----Original Message-----
**From:** Leonard Kestecher [mailto:lkestecher@andrewsinternational.com]
**Sent:** Tuesday, June 12, 2007 8:11 PM
**To:** O'Hagan, Patrick
**Subject:** Andrews
**Importance:** High

Hi Pat,

Can you please help me determine **when and how much** of our outstanding receivables are scheduled to be paid? To date, we have not received anything and it is really hurting us.

Please

Thank you,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

# EXHIBIT 24

**O'Hagan, Patrick**

**From:** O'Hagan, Patrick
**Sent:** Friday, June 15, 2007 4:15 PM
**To:** 'Leonard Kestecher'
**Subject:** RE: NYCHA

Lenny:

In researching what the miscommunication is internally, the error lies within this department and our failure to complete all processing steps. That has now been completed and the invoices for Jan-April will be in our AP department Monday morning. I have spoken with them to put a rush on the payment. I apologize for the delay.

Patrick O'Hagan
Security Director
New York City Housing Authority
90 Church Street, 9th Floor
(212) 306-8660

-----Original Message-----
**From:** Leonard Kestecher [mailto:lkestecher@andrewsinternational.com]
**Sent:** Friday, June 15, 2007 10:39 AM
**To:** O'Hagan, Patrick
**Cc:** Mike Topf; Jim Wood
**Subject:** RE: NYCHA
**Importance:** High

Thanks Pat.

Please let me know ASAP and hopefully within the next few hours.

Wram regards,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

---

**From:** O'Hagan, Patrick [mailto:Patrick.O'Hagan@nycha.nyc.gov]
**Sent:** Friday, June 15, 2007 10:30 AM
**To:** Leonard Kestecher
**Subject:** RE: NYCHA

Lenny,

I do not know why they are telling you nothing has been processed. All fund releases have been completed by my buying group, up to April and all invoices have been processed out of this department. I'll check on it and get back to you.

-----Original Message-----
**From:** Leonard Kestecher [mailto:lkestecher@andrewsinternational.com]
**Sent:** Friday, June 15, 2007 9:46 AM
**To:** O'Hagan, Patrick
**Subject:** FW: NYCHA
**Importance:** High

Pat,

Please look into this and advise. AP has indicated the below.

This is really a serious issue.

I am available by cell and email.

Thank you,

Lenny

Leonard N. Kestecher
Vice President, East Coast Business Development
Andrews International
347-220-6938 (Direct)
718-518-8053 (fax)
201-532-6072 (cell)
LKestecher@andrewsinternational.com

---

**From:** Mike Topf
**Sent:** Friday, June 15, 2007 9:33 AM
**To:** Leonard Kestecher
**Cc:** Jim Wood
**Subject:** NYCHA
**Importance:** High

Lenny

I spoke to Linda Zhang in NYCHA AP. The PO for Andrews has been set up-it is 7010281; however, **no invoices** have been processed against the PO at this time.

Please reach out to Pat O'Hagan, either by phone or email, as we are at a crucial juncture. We really need to know where we stand.

Thanks,

Mike

# EXHIBIT 25

Andrews International, Inc.
1860 East Tremont Avenue, Bronx, New York 10460
Tel: 718 518-80__ Fax: 718 518-8053

June 29, 2007

Mr. Patrick O'Hagan
Director of Security
New York City Housing Authority
90 Church Street
New York, NY 10007

Dear Mr. O'Hagan:

Over the past several months, Andrews International, Inc. (Andrews) submitted invoices to the New York City Housing Authority (NYCHA) for services rendered pursuant to contracts between Andrews and NYCHA and Andrews and the Department of Housing Preservation and Development (HPD); a list of those invoices is set for as Exhibit A of this letter. Our records indicate that the Andrews invoices total $541,410.52, but that NYCHA only paid Andrews $477,284.24, leaving a balance due Andrews of $64,126.68. Thank you for your assistance regarding this matter.

If this is an inadvertent oversight on the part of NYCHA, please immediately remit the balance due Andrews of $64,126.28 within 15 days. If this is not an oversight, please provide Andrews a complete and detailed written explanation justifying withholding this money from Andrews. It is my hope that we can resolve this matter expeditiously and amicably.

Yours truly,

Michael Topf
Chief Financial Officer

# EXHIBIT 26



NEW YORK CITY HOUSING AUTHORITY
90 CHURCH STREET • NEW YORK, NY 10007
TEL: (212) 306-3000 • http://nyc.gov/nycha

NEW YORK CITY HOUSING AUTHORITY

TINO HERNANDEZ
CHAIRMAN
EARL ANDREWS, JR.
VICE CHAIRMAN
MARGARITA LÓPEZ
MEMBER
VILMA HUERTAS
SECRETARY
DOUGLAS APPLE
GENERAL MANAGER

July 16, 2007

Mr. Michael Topf
Chief Financial Officer
Andrews International
1860 East Tremont Avenue
Bronx, New York 10460

Re: Unpaid Balances

Mr. Topf,

In regards to your inquiry dated June 29, 2007, the differences you cite were not inadvertent oversights. The totals paid by NYCHA accurately reflect the balances due to Andrews after liquidated damages were applied to each invoice. In most cases the failure to provide required security site inspections, which per our agreement allows NYCHA to apply a $25.00 per un-inspected shift penalty, account for the difference between invoiced totals and totals paid to Andrews International.

Please feel free to contact me if I can be of further assistance.

Sincerely,

Patrick F. O'Hagan
Security Director
New York City Housing Authority

EXHIBIT
NYCHA
13 for ID
RW 6/10/08

EXHIBIT 27



ATTORNEYS AT LAW

A PROFESSIONAL ASSOCIATION
1717 ARCH STREET
46TH FLOOR
PHILADELPHIA, PENNSYLVANIA
19103-2713
PHONE: 215.568.4104
FAX: 215.568.4105
www.fblaw.com

DAVID M. FUNK (MD)
BRYAN D. BOLTON (MD, PA)
REN L. TUNDERMANN (MD)
CHARLES D. MACLEOD (MD)
GERALD I. H. STREET (DE)
TIFFANY HANNA ANDERSON (MD)
DARYN RUSH (PA, NJ)
DEREK B. YARMIS (MD, DC)
JEFFERSON L. BLOMQUIST (MD)
MICHAEL P. CUNNINGHAM (MD, DC)
LINDSEY A. RADER (MD)
CHERYL A. C. BROWN (MD)
JAMES F. TAYLOR (MD)
ERNEST A. CROFOOT (MD)
JOHN I. ELLIS (DE)

SENIOR COUNSEL
HISHAM M. AMIN (MD)

ASSOCIATES
AMY L. STRACHAN (PA, NJ)
MITCHELL W. MAY (VA, DE)
THOMAS KLEMM (MD, DC)
TAMAL A. BANTON (MD)
DESIRÉE S. WILLIAMS (MD, IL, DC)
SEIGRID T. RICH (MD)
MARYAM ZAFAR (MD)
PATRICK W. THOMAS (MD)
NICOLE M. SANDUSKY (MD)

OF COUNSEL
STEPHEN P. CARNEY (MD)
AMANDA STAKEM CONN (MD)
CHRISTOPHER E. DUNNE (PA, NY, DC)
GARY C. HARRIGER (MD)
DONNA B. IMHOFF (MD)
MARK A. MCNULTY (DE)
DEBORAH R. RIVKIN (MD)
RONALD L. SOUDERS (PA, DC)
JOHN R. STIERHOFF (MD)

Patrick F. O'Hagan
Security Director
New York Housing Authority
90 Church Street
New York, NY 10007

July 20, 2007
_Via Facsimile and Express Mail_

Re: Unpaid Balances on Andrews Invoices Pertaining to Agreement No. 4020633 by and between the New York City Housing Authority ("NYCHA") and Andrews International ("Andrews") (the "Agreement")

Dear Mr. O'Hagan:

This firm has been retained by Andrews International, Inc. ("Andrews") in connection with certain matters pertaining to the above-referenced Agreement. Michael Topf, Chief Financial Officer of Andrews, wrote you on June 29, 2007 about $64,126.68 which was withheld from Andrews for services rendered pursuant to the Agreement. Mr. Topf specifically requested "a complete and detailed written explanation justifying withholding" any money due Andrews. A copy of Mr. Topf's letter is attached as Attachment A.

By letter dated July 16, 2007, you advised Mr. Topf that NYCHA applied liquidated damages to each of the invoices Andrews submitted to NYCHA for payment, but you failed to provide any further explanation about such assessments. Your letter is attached as Attachment B. My preliminary assessment is that the Agreement does not permit liquidated damages of "$25.00 per un-inspected shift penalty" for the work performed by Andrews.

Please provide to me by no later than the close of business on Wednesday July 25, 2007, a detailed accounting of the service locations and shifts that are the subject of the shift penalty assessed by your office and the date each such penalty was assessed.

Thank you for your immediate attention to this matter.

Yours truly,

Christopher E. Dunne

CED/dms

cc: Michael Topf (via regular mail and facsimile)
Natalie Rivers (via Express mail and facsimile)

# EXHIBIT 28

 

ATTORNEYS AT LAW

A PROFESSIONAL ASSOCIATION
1717 ARCH STREET
46TH FLOOR
PHILADELPHIA, PENNSYLVANIA
19103-2713
PHONE: 215.568.4104
FAX: 215.568.4105
www.fblaw.com

DAVID M. FUNK (MD)
BRYAN D. BOLTON (MD, PA)
REN L. TUNDERMANN (MD)
CHARLES D. MACLEOD (MD)
GERALD I. H. STREET (DE)
TIFFANY HANNA ANDERSON (MD)
DARYN RUSH (PA, NJ)
DEREK B. YARMIS (MD, DC)
JEFFERSON L. BLOMQUIST (MD)
MICHAEL P. CUNNINGHAM (MD, DC)
LINDSEY A. RADER (MD)
CHERYL A. C. BROWN (MD)
JAMES F. TAYLOR (MD)
ERNEST A. CROFOOT (MD)
JOHN I. ELLIS (DE)

SENIOR COUNSEL
HISHAM M. AMIN (MD)

ASSOCIATES
AMY L. STRACHAN (PA, NJ)
MITCHELL W. MAY (VA, DE)
THOMAS KLEMM (MD, DC)
TAMAL A. BANTON (MD)
DESIRÉE S. WILLIAMS (MD, IL, DC)
SEIGRID T. RICH (MD)
MARYAM ZAFAR (MD)
PATRICK W. THOMAS (MD)
NICOLE M. SANDUSKY (MD)

OF COUNSEL
STEPHEN P. CARNEY (MD)
AMANDA STAKEM CONN (MD)
CHRISTOPHER E. DUNNE (PA, NY, DC)
GARY C. HARRIGER (MD)
DONNA B. IMHOFF (MD)
MARK A. MCNULTY (DE)
DEBORAH R. RIVKIN (MD)
RONALD L. SOUDERS (PA, DC)
JOHN R. STIERHOFF (MD)

**Via: Facsimile, Certified Mail, Return Receipt Requested and by Federal Express**

NEW YORK CITY HOUSING AUTHORITY
Attention: Mr. Sean Ryan, Assistant Director for Security
General Services Department
90 Church Street, 9th Floor
New York, NY 10007

July 30, 2007

Re: Agreement No. 4020633 by and between the New York City Housing Authority ("NYCHA") and Andrews International ("Andrews") (the "Agreement")

Dear Mr. Ryan:

This firm has been retained by Andrews International, Inc.("Andrews") in connection with the above-referenced Agreement. This is to advise you that pursuant to Article 10 of the Agreement, a dispute has arisen between Andrews and NYCHA over certain improper deductions that NYCHA has withheld from Andrews, which is discussed more fully below.

On June 29, 2007, Michael Topf, Chief Financial Officer of Andrews, wrote Patrick O'Hagan, Security Director of the New York City Housing Authority, about an arrearage in the amount of $64, 126.68 in amounts owed Andrews for services provided pursuant to the Agreement (a copy of Mr. Topf's June 29, 2007 letter explaining this calculation is enclosed.). On July 16, 2007, Mr. O'Hagan responded to Mr. Topf stating that NYCHA "applied liquated damages to each invoice" relating to the alleged failure of Andrews to provide "required site inspections"; NYCHA assessed a $25.00 per un-inspected shift penalty. This arrearage totals $64,126.68

On July 20, 2007, I wrote to Patrick F. O'Hagan requesting substantiation for the deduction for the alleged improper penalties (a copy of my letter to Mr. O'Hagan is attached); to date, no documentation has been provided to me or to Andrews.

As of today, NYCHA owes Andrews $64,126.68, due to the deduction of improperly assessed liquidated damages by NYCHA. This sum should be remitted to Andrews immediately. On behalf of Andrews, this letter is to put you on notice that a dispute has arisen as a result of the July 16, 2007 letter from Mr. O'Hagan to Michael Topf. Pursuant to Article 10 of Agreement No. 4020633 (the "Agreement"), Andrews disputes NYCHA's purported right to deduct $25 per un-inspected shift as stated in the July 16, 2007 letter.

NYCHA also owes Andrews $838,117.30 for services rendered by Andrews pursuant to the Agreement. An aging list of Andrews' invoices indicating the amount due from NYCHA by invoice, and in total, also is enclosed. By e-mail dated July 25, 2007, I advised Ms. Marguerite Ohmstedt, an attorney for NYCHA, of this arrearage and provided the Andrews aging. Please note that $368,606.96 has been due for more than 90 days; $88,050.17 has been due for between 60 to 90 days; and $196,329.17 has been due for more than 30 days. NYCHA's recent contract termination in no way excuses NYCHA from its obligation to process and pay these invoices in a timely fashion. Indeed, NYCHA historically paid invoices within 45 days. Please remit $838,117.30 to Andrews no later than five (5) days from the date of this letter. If any of these invoices are not being paid based on the improper penalty claimed in the July 16, 2007 letter, then please be advised that a further dispute exists and Andrews requests payment of the full sum of $838,117.30 from NYCHA.

Please understand Andrews has authorized me to take all steps necessary to recover the money owed by NYCHA.

Sincerely,

Christopher E. Dunne

cc: Deputy General Counsel for Corporate Matters (via regular mail)
Ms. Natalie Rivers (via regular mail)
Mr. Patrick F. O'Hagan (via facsimile and express mail)
Marguerite Ohmstedt, Esquire (by e-mail)
Comptroller of the City of New York (via regular mail)
Corporation Counsel of the City of New York (via regular mail)

# EXHIBIT 29

 

ATTORNEYS AT LAW

A PROFESSIONAL ASSOCIATION
1717 ARCH STREET
46TH FLOOR
PHILADELPHIA, PENNSYLVANIA
19103-2713
PHONE: 215.568.4104
FAX: 215.568.4105
www.fblaw.com
Writers Direct Dial - 215.399.5775
cdunne@fblaw.com

DAVID M. FUNK (MD)
BRYAN D. BOLTON (MD, PA)
REN L. TUNDERMANN (MD)
CHARLES D. MACLEOD (MD)
GERALD I. H. STREET (DE)
TIFFANY HANNA ANDERSON (MD)
DARYN RUSH (PA, NJ)
DEREK B. YARMIS (MD, DC)
JEFFERSON L. BLOMQUIST (MD)
MICHAEL P. CUNNINGHAM (MD, DC)
LINDSEY A. RADER (MD)
CHERYL A. C. BROWN (MD)
JAMES F. TAYLOR (MD)
ERNEST A. CROFOOT (MD)
JOHN I. ELLIS (DE)

SENIOR COUNSEL
HISHAM M. AMIN (MD)

ASSOCIATES
AMY L. STRACHAN (PA, NJ)
MITCHELL W. MAY (VA, DE)
THOMAS KLEMM (MD, DC)
TAMAL A. BANTON (MD)
DESIRÉE S. WILLIAMS (MD, IL, DC)
SEIGRID T. RICH (MD)
MARYAM ZAFAR (MD)
PATRICK W. THOMAS (MD)
NICOLE M. SANDUSKY (MD)

OF COUNSEL
STEPHEN P. CARNEY (MD)
AMANDA STAKEM CONN (MD)
CHRISTOPHER E. DUNNE (PA, NY, DC)
GARY C. HARRIGER (MD)
DONNA B. IMHOFF (MD)
MARK A. MCNULTY (DE)
DEBORAH R. RIVKIN (MD)
RONALD L. SOUDERS (PA, DC)
JOHN R. STIERHOFF (MD)

**Via: Facsimile, Certified Mail, Return Receipt Requested and by Federal Express**

NEW YORK CITY HOUSING AUTHORITY
Attention: Mr. Sean Ryan, Assistant Director for Security
General Services Department
90 Church Street, 9th Floor
New York, NY 10007

August 2, 2007

Re: Agreement No. 4020633 by and between the New York City Housing Authority ("NYCHA") and Andrews International ("Andrews") (the "Agreement")

Dear Mr. Ryan:

This firm has been retained by Andrews International, Inc. ("Andrews") in connection with the above-referenced Agreement. This is to advise you that pursuant to Article 10 of the Agreement, a dispute has arisen between Andrews and NYCHA over certain improper deductions that NYCHA has withheld, and continues to withhold, from Andrews.

On August 1, 2007, Andrews received payment by ACH in the amount of $110,575.30; NYCHA withheld $6,410.81 without any explanation (a copy of the Andrews account aging is attached).

As of today, NYCHA owes Andrews $70,537.49, due to improper deductions by NYCHA of amounts due Andrews pursuant to the Agreement. This sum should be remitted to Andrews immediately. On behalf of Andrews, this letter is to put you on notice that, pursuant to Article 10 of the Agreement, Andrews disputes NYCHA's deduction of $6,410.81 from amounts due Andrews. NYCHA's recent contract termination in no way excuses NYCHA from its obligation to process and pay these invoices in a timely fashion.

I have been authorized by Andrews to take all steps necessary to recover the money owed by NYCHA.

Sincerely,

Christopher E. Dunne

CED/dms
Enclosures
cc: Deputy General Counsel for Corporate Matters (via regular mail)
Ms. Natalie Rivers (via regular mail)
Mr. Patrick F. O'Hagan (via facsimile and express mail)
Marguerite Ohmstedt, Esquire (by e-mail)
Comptroller of the City of New York (via regular mail)
Corporation Counsel of the City of New York (via regular mail)

| Account No. | Invoice Date | Invoice Amt | Amt Paid | Balance |
|---|---|---|---|---|
| 117989 | 05/27/07 | 2,841.55 | 2,366.55 | 475.00 |
| 117990 | 05/27/07 | 2,780.20 | 2,330.20 | 450.00 |
| 117991 | 05/27/07 | 2,341.56 | 1,916.56 | 425.00 |
| 117992 | 05/27/07 | 2,780.20 | 2,555.20 | 225.00 |
| 117994 | 05/27/07 | 19,881.03 | 19,306.03 | 575.00 |
| 409549 | 05/27/07 | 3,319.68 | 3,319.68 | 0.00 |
| 409551 | 05/27/07 | 3,319.68 | 3,094.68 | 225.00 |
| 409554 | 05/27/07 | 3,248.10 | 3,198.10 | 50.00 |
| 409556 | 05/27/07 | 3,290.04 | 3,165.04 | 125.00 |
| 409558 | 05/27/07 | 2,780.20 | 2,280.20 | 500.00 |
| 409559 | 05/27/07 | 3,304.86 | 3,254.86 | 50.00 |
| 409560 | 05/27/07 | 3,319.68 | 3,269.68 | 50.00 |
| 409563 | 05/27/07 | 3,319.68 | 3,219.68 | 100.00 |
| 409564 | 05/27/07 | 3,304.86 | 3,269.68 | 35.18 |
| 516388 | 05/27/07 | 3,304.86 | 3,104.86 | 200.00 |
| 516390 | 05/27/07 | 3,260.40 | 3,085.40 | 175.00 |
| 516391 | 05/27/07 | 3,297.45 | 3,047.45 | 250.00 |
| 516392 | 05/27/07 | 3,319.68 | 3,119.68 | 200.00 |
| 516393 | 05/27/07 | 3,315.98 | 3,115.98 | 200.00 |
| 516395 | 05/27/07 | 3,319.68 | 3,194.68 | 125.00 |
| 516397 | 05/27/07 | 3,301.16 | 3,076.16 | 225.00 |
| 516398 | 05/27/07 | 4,742.40 | 4,617.40 | 125.00 |
| 516399 | 05/27/07 | 3,319.68 | 3,144.68 | 175.00 |
| 516400 | 05/27/07 | 2,780.20 | 2,655.20 | 125.00 |
| 516401 | 05/27/07 | 3,282.63 | 3,057.00 | 225.63 |
| 516402 | 05/27/07 | 3,319.68 | 3,144.68 | 175.00 |
| 516403 | 05/27/07 | 3,319.68 | 3,244.68 | 75.00 |
| 516404 | 05/27/07 | 3,319.68 | 3,119.68 | 200.00 |
| 516405 | 05/27/07 | 3,312.27 | 2,987.27 | 325.00 |
| 516406 | 05/27/07 | 3,319.68 | 3,194.68 | 125.00 |
| 516407 | 05/27/07 | 3,319.68 | 3,119.68 | 200.00 |

| Invoice Amt | Amt Paid | Balance |
|---|---|---|
| 116,986.11 | 110,575.30 | 6,410.81 |

# EXHIBIT 30



NEW YORK CITY HOUSING AUTHORITY
LAW DEPARTMENT
250 BROADWAY • NEW YORK, NY 10007
TEL: 212-306-3000 • http:/nyc.gov/nycha

NEW YORK CITY HOUSING AUTHORITY

TINO HERNANDEZ
CHAIRMAN
EARL ANDREWS, JR.
VICE-CHAIRMAN
MARGARITA LÓPEZ
MEMBER
VILMA HUERTAS
SECRETARY
DOUGLAS APPLE
GENERAL MANAGER
Ricardo Elias Morales
General Counsel

August 6, 2007

Christopher E. Dunne
Funk & Bolton
1717 Arch Street
46th Floor
Philadelphia, PA 19103

Re: Liquidated damages pursuant to Agreement No. 4020633 (the "**Agreement**") by and between the New York City Housing Authority ("**NYCHA**") and Andrews International ("**Andrews**")

Dear Mr. Dunne:

I have been placed in receipt of your correspondence of July 20, 2007, regarding the above-captioned matter. As you have requested, I have enclosed a list of the invoices from Andrews wherein NYCHA applied liquidated damages.

The Agreement provides in Article 1 that the New York City Department of Housing Preservation and Development contract #2003-000618 (the "**City Contract**") with Copstat is incorporated into the NYCHA Agreement. Please note that Article 11 of the City Contract, specifically provides for liquidated damages. Further, note that NYCHA did not specifically exclude this provision of the City Contract from the Agreement. Accordingly, NYCHA correctly applied liquidated damages to Copstat/Andrews under the terms of the Agreement as incorporated from the City Contract.

If you have any further questions, please do not hesitate to contact me at 212-776-5209.

EXHIBIT
NYCHA 14-for ID
[illegible] 6/10/08

Very truly yours,

Marguerite Ohmstedt
Agency Attorney

cc: ~~Patrick O'Hagan~~

NYCHA 0058

ANDREWS INTERNATIONAL LIQUIDATED DAMAGES ON INVOICES FOR JANUARY - 2007

| INVOICE # | SITE/LOC. | UN-INSPECTED SHIFT @ $25.00 Each Shift | TOTAL AMOUNT OF DAMAGES APPLIED |
|---|---|---|---|
| 116561 | 1776 Prospect Plaza | All 3 shifts | $2,100 |
| 408651 | 530 West 55th Street, Harborview | 1/2; 1/3; 1/5 - 1/8; 1/15; 1/17 - 1/20; 1/24 - 1/27 | $425.00 |
| 408652 | 175 Eldridge St - LES. | 1/1; 1/3; 1/4; 1/5; 1/6; 1/7; 1/10; 1/11;1/12; 1/13;1/16; 1/17; 1/19; 1/20; 1/23; 1/24; 1/25; 1/27; 1/28 | $475.00 |
| 408657 | 94 E. 1st Street Meltzer-Hernandez | 1/1; 1/5 - 1/7; 1/10 - 1/13; 1/16; 1/17; 1/19; 1/20; 1/23 - 1/28 | $425.00 |
| 408650 | 120 W. 140th St. - P.S. 139 | 1/2 - 1/7; 1/13; 1/15 - 1/18; 1/20; 1/21; 1/24; 1/27; 1/28 | $400.00 |
| 408813 | 99 Ft. Washington Rehab | 1/2 - 1/5; 1/13; 1/15 - 1/18; 1/20; 1/21; 1/23; 1/24; 1/26; 1/27 | $525.00 |
| 408647 | 102 W. 91st St. Sondra Thomas | 1/1; 1/2; 1/4 - 1/6; 1/8; 1/10; 1/12; 1/13; 1/15; 1/17 - 1/21; 1/23 - 1/27 | $475.00 |
| 408663 | 282 Cherry St. LaGuardia Addition | 1/1; 1/3 - 1/8; 1/11 - 1/14; 1/16 - 1/22; 1/24 - 1/28 | $425.00 |
| 408662 | 72 Columbia-Baruch Addition | 1/3; 1/4/; 1/5; 1/6; 1/7; 1/11; 1/12; 1/13/; 1/16; 1/17; 1/18; 1/19; 1/20; 1/22; 1/24; 1/25; 1/26; 1/27; | $450.00 |
| 408661 | 341 E. 70th St. Robbins Plaza | | $450.00 |
| 408660 | 436 W. 27th Drive, Chelsea Add. | 1/3; 1/5; 1/6; 1/7; 1/8; 1/11; 1/12; 1/13; 1/17; 1/18; 1/19; 1/20; 1/24; 1/25; 1/26; 1/27; 1/28 | $450.00 |
| 515020 | 372 E. 152nd St. - Courtlandt | 1/1 - 1/7; 1/13; 1/15; 1/16; 1/18; 1/22; | $300.00 |
| 515026 | 1020 College Ave.- College | 1/1; 1/2; 1/3; 1/4; 1/7; 1/15; 1/16; 1/17; 1/18; 1/22; 1/24; 1/26; 1/27; 1/28 | $400.00 |
| 515032 | Boston Road Plaza | 1/1 - 1/7; 1/11; 1/13 - 1/16; 1/18; 1/19; 1/21 - 1/23; 1/25 | $475.00 |
| 515033 | Twin Parks East | 1/1 - 1/7; 1/11; 1/14 - 1/19; 1/21 1/23; 1/28 | $400.00 |
| 515021 | Morrisania | 1/1- 1/7; 1/9; 1/10; 1/12; 1/13; 1/15;1/16; 1/18- 1/21 | $600.00 |
| 515018 | Betances 1 | 1/1; 1/2; 1/4; 1/5; 1/7; 1/8-1/11; 1/13; 1/14;1/15-1/21; 1/22- 1/25; 1/27-1/28; | $475.00 |
| 515031 | Mitchel | 1/1; 1/8; 1/10; 1/15; 1/16; 1/17; 1/18; 1/22; 1/25 | $225.00 |
| 515029 | Middletown Plaza | 1/1; 1/3; 1/4; 1/6 - 1/9; 1/14 - 1/16; 1/18; 1/19; 1/21; 1/22; 1/23; 1/25 - 28 | $475.00 |
| 515027 | West Tremont | 1/1 -1/4; 1/6 - 1/7; 1/8; 1/10 - 1/14; 1/15 - 1/21; 1/22 - 1/28 | $650.00 |
| 515025 | Glebe | 1/1-1/3; 1/6;1/8; 1/11; 1/12; 1/15 - 1/18; 1/20; 1/22 - 1/25; 1/27 | $450.00 |
| 515034 | Bronx River 1 | 1/2 - 1/6;1/8 - 1/13; 1/16-1/18; 1/20; 1/28 | $425.00 |
| 515035 | Bronx River 2 | 1/1 - 1/7; 1/10; 1/11;1/13; 1/14;1/16; 1/18; 1/22; 1/23; 1/24 | $450.00 |
| 408653 | 17 E. 124th St., Morris Park Senior | 1/5; 1/22; 1/26 - 1/28 | $150.00 |
| 408658 | 1980 Lexington Ave., UPACA 5 | 1/1; 1/5; 1/7; 1/9; 1/11; 1/12; 1/15; 1/16; 1/20; 1/21; 1/26; 1/27; 1/29 | $350.00 |
| 408659 | 1940 Lexington Ave., UPACA 6 | 1/4; 1/5; 1/7; 1/13; 1/17; 1/20; 1/21; 1/24; 1/27 | $225.00 |
| 408646 | 1945 Amsterdam Ave., Bethune | 1/2; 1/3; 1/5; 1/6; 1/9; 1/13; 1/17 - 1/19; 1/22; | $225.00 |
| 408648 | 1970 Amsterdam Ave., Marshall | 1/1; 1/2; 1/3; 1/5; 1/6; 1/7; 1/8; 1/10; 1/17; 1/18; 1/20; 1/21; 1/24; 1/25; 1/27; 1/28 | $400.00 |
| 515019 | 950 Union Ave., - Union | | $275.00 |
| 515036 | 1325 Franklin Ave., - Claremont | 1/1-1/7; 1/11;1/14; 1/15; 1/16; 1/18; 1/20; 1/21; 1/22; 1/23 | $400.00 |
| 515037 | 1150 Union Ave., Davidson | | $475.00 |
| 515022 | Randall Balcom 1 | 1/1; 1/7; 1/8; 1/14 - 1/16; 1/18 - 1/20; 1/22; 1/23 | $275.00 |
| 515023 | Randall Balcom 2 | 1/1; 1/7; 1/8; 1/14; 1/15; 1/16; 1/18; 1/19; 1/22; 1/23; | $250.00 |
| 515024 | Randall Balcom 3 | 1/1; 1/7; 1/8; 1/14; 1/15; 1/16; 1/18; 1/19; 1/22; 1/23; 1/26; | $275.00 |
| | | | $15,225 |

ANDREWS INTERNATIONAL LIQUIDATED DAMAGES ON INVOICES FOR FEBRUARY - 2007

| INVOICE # | SITE/LOC. | UN-INSPECTED SHIFT @ $25.00 Each Shift | TOTAL AMOUNT OF DAMAGES APPLIED |
|---|---|---|---|
| 116911 | 1776 Prospect Plaza | All Shifts | $2,100.00 |
| 408869 | 530 West 55th Street, Harborview | 1/30; 2/8; 2/9; 2/12; 2/13; 2/14; 2/17; 2/19; 2/20; 2/22; 2/24; | $275.00 |
| 408870 | 175 Eldridge St - LES. | 1/30 - 2/3; 2/5 - 2/11; 2/14 - 2/18; 2/20; 2/21; 2/23; 2/24 | $525.00 |
| 408875 | 94 E. 1st Street Meltzer-Hernandez | 1/29; 1/30; 2/1 - 2/3; 2/5; 2/8 - 2/12; 2/14 - 2/18; 2/20 - 2/25 | $525.00 |
| 408868 | 120 W. 140th St. - P.S. 139 | 2/1 - 2/3; 2/13; 2/14; 2/17; 2/19; 2/20; 2/24 | $225.00 |
| 408867 | 99 Ft. Washington Rehab | 2/1; 2/2; 2/3; 2/5; 2/6; 2/8; 2/9; 2/12; 2/13; 2/14; 2/15; 2/16; 2/17; 2/18; 2/20; 2/21; 2/24; | $425.00 |
| 408865 | 102 W. 91st St. Sondra Thomas | 1/29; 2/3; 2/5; 2/6; 2/9; 2/10; 2/12 - 2/17; 2/19; 2/20; 2/22; 2/24 | $400.00 |
| 408882 | 282 Cherry St. LaGuardia Addition | | $475.00 |
| 408881 | 72 Columbia-Baruch Addition | 1/29; 1/30; 2/1 - 2/3; 2/10; 2/11; 2/14 - 2/18; 2/23 - 2/25 | $350.00 |
| 408880 | 341 E. 70th St. Robbins Plaza | 1/30 - 2/2; 2/6; 2/8; 2/14; 2/15; 2/17 - 2/20; 2/23; 2/24 | $350.00 |
| 408879 | 436 W. 27th Drive, Chelsea Add. | 1/30 - 2/1; 2/3; 2/6 - 2/8; 2/10; 2/12; 2/14; 2/16; 2/17; 2/19; 2/22; 2/24; 2/25 | $375.00 |
| 515325 | 372 E. 152nd St. - Courtlandt | 1/29 - 1/31; 2/2 - 2/4; 2/6; 2/7; 2/10; 2/11; 2/13 - 2/16; 2/18; 2/20; 2/23; | $425.00 |
| 515331 | 1020 College Ave.- College | | $450.00 |
| 515339 | Boston Road Plaza | 1/29 - 1/31; 2/2 - 2/7; 2/9 - 2/21; 2/23; 2/25 | $600.00 |
| 515340 | Twin Parks East | 1/29 - 1/31; 2/2; 2/4 - 2/7; 2/9 - 2/16; 2/18 - 2/20; 2/23; 2/25 | $525.00 |
| 515326 | Morrisania | 1/29; 1/30; 2/2; 2/3; 2/6; 2/8; 2/10; 2/11; 2/13 - 2/18; 2/20; 2/21; 2/23; 2/24 | $525.00 |
| 515323 | Betances 1 | 1/29 - 2/6; 2/8 -2/14; 2/17 - 2/21; 2/23 - 2/25 | $600.00 |
| 515338 | Mitchel | 1/29 - 2/15; 2/17; 2/18; 2/20 - 2/23 | $600.00 |
| 515334 | Middletown Plaza | 1/29 - 2/25 | $700.00 |
| 515332 | West Tremont | 1/29; 1/29 - 2/4; 2/6; 2/8 - 2/11; 2/13 - 2/20; 2/22 - 2/25 | $650.00 |
| 515330 | Glebe | 1/29 - 2/2; 2/5 - 2/8; 2/10; 2/11; 2/14 - 2/25 | $625.00 |
| 515341 | Bronx River 1 | 1/29 - 1/31; 2/2 - 2/7; 2/9 - 2/16; 2/19; 2/20; | $525.00 |
| 515342 | Bronx River 2 | 1/29 - 1/31; 2/2; 2/4 - 2/7; 2/9 - 2/12; 2/14 - 2/16; 2/18 - 2/20; 2/23 | $525.00 |
| 408871 | 17 E. 124th St., Morris Park Senior | 1/29; 1/30; 1/31; 2/3; 2/4; 2/10; 2/12; 2/15; 2/16; 2/17; 2/19; 2/20; 2/23; | $300.00 |
| 408877 | 1980 Lexington Ave., UPACA 5 | 1/29 - 2/4; 2/10; 2/12; 2/14; 2/16; 2/17; 2/20; 2/21; 2/23; | $375.00 |
| 408878 | 1940 Lexington Ave., UPACA 6 | 1/30; 1/31; 2/2; 2/8; 2/11;2/14; 2/17 2/19; 2/20 | $225.00 |
| 408864 | 1945 Amsterdam Ave., Bethune | 2/6; 2/10; 2/12; 2/17; 2/18; 2/19; 2/20; 2/23; 2/24; 2/25 | $275.00 |
| 408866 | 1970 Amsterdam Ave., Marshall | 2/4; 2/6; 2/10;2/12; 2/16; 2/19; 2/20; 2/23; 2/24; | $225.00 |
| 515324 | 950 Union Ave., - Union | 1/29; 1/30; 1/31; 2/2; 2/4; 2/5; 2/6; 2/10 - 2/16; 2/18; 2/20; 2/23; 2/25 | $450.00 |
| 515343 | 1325 Franklin Ave., - Claremont | 1/29; 1/30; 1/31; 2/2; 2/4 - 2/7; 2/10 - 2/16; 2/18; 2/19; 2/20; 2/23; | $450.00 |
| 515344 | 1150 Union Ave., Davidson | 1/29 - 1/31; 2/2; 2/5 - 2/7; 2/10 - 2/20; 2/23 | $500.00 |
| 515327 | 1151 Union Ave., Davidson | 1/29 - 2/3; 2/5; 2/6; 2/10 - 2/16; 2/18 - 2/20; 2/23 - 2/25 | $525.00 |
| 515328 | 1152 Union Ave., Davidson | 1/29 - 2/6; 2/10 - 2/16; 2/18 - 2/20; 2/23; 2/25 | $525.00 |
| 515329 | 1153 Union Ave., Davidson | 1/29 - 2/6; 2/10 - 2/16; 2/18 - 2/20; 2/23; 2/25 | $525.00 |
| | | | $17,150.00 |

ANDREWS INTERNATIONAL LIQUIDATED DAMAGES ON INVOICES FOR MARCH - 2007

| INVOICE # | SITE/LOC. | UN-INSPECTED SHIFT @ $25.00 Each Shift | TOTAL AMOUNT OF DAMAGES APPLIED |
|---|---|---|---|
| 117250 | 1776 Prospect Plaza | All Shifts | $2,100.00 |
| 409082 | 530 West 55th Street, Harborview | 2/26; 2/27; 3/4 - 3/7; 3/8; 3/10; 3/14; 3/16; 3/23 | $300.00 |
| 409083 | 175 Eldridge St - LES. | 2/28; 3/1; 3/2; 3/3; 3/4; 3/7 - 3/10; 3/16 - 3/18; 3/21; 3/23 - 3/25 | $400.00 |
| 409087 | 94 E. 1st Street Meltzer-Hernandez | 2/26; 2/28; 3/2 -3/4; 3/7; 3/10; 3/14 - 3/18; 3/20; 3/21; 3/23 - 3/25 | $425.00 |
| 409081 | 120 W. 140th St. - P.S. 139 | 3/3; 3/4; 3/6; 3/8; 3/9; 3/11; 3/15; 3/19 - 3/21 | $250.00 |
| 409080 | 99 Ft. Washington Rehab | 2/27; 2/28; 3/3; 3/4; 3/6 - 3/8; 3/12; 3/14 - 3/17; 3/19 - 3/24 | $450.00 |
| 409078 | 102 W. 91st St. Sondra Thomas | 2/28; 3/1; 3/3 - 3/6; 3/8; 3/11 - 3/13; 3/16; 3/17; 3/19; 3/20; 3/22 - 3/24 | $425.00 |
| 409093 | 282 Cherry St. LaGuardia Addition | 2/26; 2/28; 3/1; 3/2; 3/3; 3/4; 3/5; 3/7; 3/8; 3/9; 3/10; 3/11; 3/12; 3/14; 3/15; 3/16; 3/17; 3/18; 3/22; 3/24; 3/25. | $525.00 |
| 409092 | 72 Columbia-Baruch Addition | 2/28; 3/3; 3/4; 3/7; 3/10; 3/16; 3/17; 3/18:3/22; 3/24; 3/25. | $275.00 |
| 409091 | 341 E. 70th St. Robbins Plaza | 2/26; 3/1; 3/4; 3/7; 3/9; 3/10; 3/14; 3/15; 3/16; 3/17; 3/20; 3/21; 3/22; 3/23; 3/25. | $375.00 |
| 409090 | 436 W. 27th Drive, Chelsea Add. | 2/27; 2/28; 3/6; 3/7;3/10; 3/11; 3/16; 3/17 | $125.00 |
| 515647 | 372 E. 152nd St. - Courtlandt | 2/26; 3/6; 3/7; 3/9; 3/11; 3/16; 3/19; 3/20; 3/25 | $250.00 |
| 515653 | 1020 College Ave.- College | 2/26; 3/3 - 3/11; 3/13; 3/18; 3/20; 3/21; 3/24; 3/25 | $400.00 |
| 515659 | Boston Road Plaza | 2/28; 3/2; 3/4; 3/6; 3/10; 3/11; 3/13; 3/17 - 3/20; 3/22; 3/24; 3/252/26 - 2/28; 3/2; 3/4; 3/5; 3/8 - 3/11; 3/13; 3/16; 3/18 - 3/20; 3/22; 3/25 | $375.00 |
| 515660 | Twin Parks East | | $425.00 |
| 515648 | Morrisania | 2/26; 3/1; 3/3; 3/5 - 3/12; 3/14 - 3/18; 3/20 - 3/22; 3/24; 3/25 | $525.00 |
| 515645 | Betances 1 | 2/26 - 3/8; 3/10; 3/11; 3/13; 3/15 - 3/17; 3/19 - 3/21; 3/23 - 3/25 | $575.00 |
| 515658 | Mitchel | 2/26; 2/27; 3/3; 3/5; 3/6; 3/8; 3/10; 3/11; 3/13; 3/15; 3/16; 3/19; 3/20; 3/25 | $350.00 |
| 515656 | Middletown Plaza | 2/28 - 3/11; 3/13; 3/17 - 3/22; 3/24; 3/25 | $525.00 |
| 515654 | West Tremont | 2/26 - 3/1; 3/3 - 3/18; 3/20 - 3/25 | $675.00 |
| 515652 | Glebe | 2/27 - 3/5; 3/8; 3/10 - 3/25 | $625.00 |
| 515661 | Bronx River 1 | 2/26; 2/28; 3/1; 3/4 - 3/7; 3/9; 3/11; 3/12; 3/16 - 3/25 | $325.00 |
| 515662 | Bronx River 2 | 2/26; 2/28; 3/1; 3/4 - 3/7; 3/9; 3/11; 3/19 - 3/24 | $375.00 |
| 409084 | 17 E. 124th St., Morris Park Senior | 2/26; 3/2; 3/3; 3/4; 3/8; 3/12; 3/15 - 3/17; 3/22; 3/24 | $275.00 |
| 409088 | 1980 Lexington Ave., UPACA 5 | 2/26; 2/27; 3/2; 3/4; 3/5; 3/7; 3/8; 3/10; 3/12; 3/14; 3/16; 3/17; 3/19 - 3/22; 3/24 | $425.00 |
| 409089 | 1940 Lexington Ave., UPACA 6 | 3/3; 3/4; 3/8; 3/20; 3/21 | $125.00 |
| 409077 | 1945 Amsterdam Ave., Bethune | 2/26; 2/27; 3/4 - 3/6; 3/8; 3/11; 3/12; 3/13; 3/19; 3/22; 3/23; 3/25 | $350.00 |
| 409079 | 1970 Amsterdam Ave., Marshall` | 2/27; 3/2; 3/4 - 3/6; 3/8; 3/13; 3/16; 3/19; 3/20; 3/22; 3/23 | $300.00 |
| 515646 | 950 Union Ave., - Union | 2/26; 3/2; 3/4; 3/5; 3/7 - 3/10; 3/13; 3/15; 3/17 - 3/20; 3/25 | $375.00 |
| 515663 | 1325 Franklin Ave., - Claremont | 2/26; 3/4 - 3/11; 3/13; 3/14; 3/16; 3/18 - 3/20; 3/22; 3/24; 3/25 | $450.00 |
| 515664 | 1150 Union Ave., Davidson | 2/26; 3/4; 3/5; 3/7 - 3/10 3/13; 3/16; 3/18; 3/19; 3/20; 3/25 | $325.00 |
| 515649 | Randall Balcom 1 | 2/26; 3/4; 3/5; 3/7; 3/9; 3/11; 3/13; 3/16; 3/18 - 3/20; 3/24 | $300.00 |
| 515650 | Randall Balcom 2 | | $275.00 |
| 515651 | Randall Balcom 3 | 2/26; 2/27; 3/4; 3/5; 3/7; 3/9; 3/11; 3/13; 3/18 - 3/20; 3/24 | $300.00 |
| | | | $14,575.00 |

ANDREWS INTERNATIONAL LIQUIDATED DAMAGES ON INVOICES FOR APRIL - 2007

| INVOICE # | SITE/LOC. | UN-INSPECTED SHIFT @ $25.00 Each Shift | TOTAL AMOUNT OF DAMAGES APPLIED |
|---|---|---|---|
| 117645 | 1776 Prospect Plaza | All Shifts | $2,275.00 |
| 409343 | 530 West 55th Street, Harborview | 3/28; 4/4; 4/8; 4/9; 4/11; 4/14; 4/16; 4/17; 4/23 | $225.00 |
| 409344 | 175 Eldridge St - LES. | 3/27; 3/28; 3/29; 3/30; 3/31; 4/2; 4/3; 4/5; 4/6; 4/7; 4/8; 4/11; 4/12; 4/13; 4/14; 4/15; 4/18; 4/19; 4/20; 4/21; 4/22; 4/24; 4/25; | $575.00 |
| 409348 | 94 E. 1st Street Meltzer-Hernandez | 3/27; 3/29; 3/30; 3/31 4/3; 4/7; 4/9; 4/10; 4/11; 4/12; 4/13; 4/14; 4/16; 4/18; 4/19; 4/21; 4/22; 4/24; 4/25; | $450.00 |
| 409342 | 120 W. 140th St. - P.S. 139 | 3/27; 3/28; 4/3; 4/4/; 4/5; 4/10; 4/17; 4/20; 4/21; 4/25 | $300.00 |
| 409341 | 99 Ft. Washington Rehab | 3/27; 3/28; 3/29; 4/2 - 4/7; 4/9 - 4/12; 4/14; 4/17 - 4/21; 4/23; 4/24; 4/25; 5/5. | $625.00 |
| 409339 | 102 W. 91st St. Sondra Thomas | 3/27; 3/28; 3/31; 4/5; 4/7; 4/8; 4/9; 4/11; 4/12; 4/16; 4/20; 4/21; | $300.00 |
| 409354 | 282 Cherry St. LaGuardia Addition | 3/27; 3/28; 3/30; 3/31; 4/1; 4/2; 4/3; 4/4; 4/6; 4/7; 4/8; 4/12; 4/13; 4/14; 4/15; 4/16; 4/18; 4/19; 4/20; 4/21; 4/22; 4/25; 4/28; 4/29. | $600.00 |
| 409353 | 72 Columbia-Baruch Addition | 3/27; 3/29; 3/30; 3/31; 4/3; 4/7; 4/8; 4/12; 4/13; 4/14; 4/15; 4/16; 4/19; 4/20; 4/21; 4/22; 4/26; 4/28; 4/29; | $450.00 |
| 409352 | 341 E. 70th St. Robbins Plaza | 3/27; 3/29; 3/30; 4/3 - 4/6; 4/8; 4/12; 4/13; 4/15; 4/18 - 4/20; 4/22; 4/25; 4/26; . | $425.00 |
| 409351 | 436 W. 27th Drive, Chelsea Add. | 3/29; 4/5; 4/8; 4/24 | $100.00 |
| 516038 | 372 E. 152nd St. - Courtlandt | 3/27; 3/31; 4/2; 4/3; 4/5; 4/7; 4/9; 4/10; 4/13; 4/14; 4/16 - 4/18; 4/20; 4/21; 4/23 - 4/27 | $525.00 |
| 516044 | 1020 College Ave.- College | 3/27; 3/28; 3/31; 4/2; 4/4; 4/9; 4/10; 4/11; 4/16; 4/19; 4/20; 4/21; 4/23; 4/25; 4/26; 4/27. | $400.00 |
| 516050 | Boston Road Plaza | 3/26; 3/27; 3/30; 3/31; 4/1; 4/2; 4/3; 4/5; 4/8; 4/9; 4/10; 4/13; 4/14; 4/15; 4/17; 4/19; 4/20; 4/21; 4/22; 4/23; 4/25; 4/26; 4/27; 4/28. | $600.00 |
| 516219 | Twin Parks East | 31-Mar | $0 |
| 516051 | Twin Parks East | 3/27; 3/30; 4/1; 4/2; 4/7; 4/9; 4/10; 4/16; 4/17; 4/19; 4/20; 4/21; 4/22; 4/23; 4/26; 4/27; 4/28. | $475.00 |
| 516039 | Morrisania | 3/27; 3/29 - 3/31; 4/2; 4/3; 4/5 - 4/7; 4/9 - 4/15; 4/16; 4/19 - 4/22; 4/23; 4/24; 4/28; | $550.00 |
| 516036 | Betances 1 | 3/26; 3/27; 3/28; 3/29; 4/2; 4/3; 4/4; 4/5; 4/6; 4/8; 4/9-4/15; 4/16 4/21; 4/23-4/26; 4/28 | $700.00 |
| 516049 | Mitchel | 3/26; 3/28; 3/31; 4/1; 4/2; 4/6; 4/7; 4/8; 4/9; 4/10; 4/13; 4/14; 4/18; 4/19; 4/20; 4/21; 4/23; 4/24; 4/25; 4/28; | $500.00 |
| 516047 | Middletown Plaza | 3/26; 3/27; 3/30 - 4/1; 4/2; 4/4 - 4/6; 4/8; 4/9 - 4/12; 4/14; 4/15; 4/16 - 4/18; 4/20 - 4/22; 4/23; 4/25 - 4/28; | $650.00 |
| 516045 | West Tremont | 3/26 - 3/31; 4/2 - 4/7; 4/10 - 4/15; 4/16; 4/17; 4/19; 4/21; 4/22; 4/23; 4/24; 4/26; 4/27; 4/28; . | $700.00 |
| 516043 | Glebe | 3/26; 3/30; 3/31; 4/1; 4/2; 4/5; 4/6; 4/7; 4/9; 4/11; 4/13; 4/14;4/16; 4/17; 4/22; 4/26; 4/27; 4/28. | $425.00 |
| 516052 | Bronx River 1 | 3/26; 3/27; 3/31; 4/1; 4/2; 4/3; 4/7; 4/8; 4/11; 4/15; 4/20; 4/21; 4/23; 4/24; 4/25; 4/26; 4/27; | $450.00 |
| 516053 | Bronx River 2 | 3/26; 3/27; 3/31; 4/1; 4/2; 4/4; 4/6 - 4/8; 4/15; 4/17; 4/20; 4/21; 4/24 - 4/29. | $475.00 |
| 409450 | 17 E. 124th St., Morris Park Senior | 3/25; 3/29; 3/30; 4/2; 4/5; 4/6; 4/7; 4/8; 4/12; 4/13; 4/15; 4/16; 4/19; 4/21; 4/22; 4/25; 4/26; 4/27; 4/28; 4/29 | $550.00 |
| 409349 | 1980 Lexington Ave., UPACA 5 | 3/27; 3/31; 4/2; 4/5; 4/6; 4/7; 4/10; 4/15; 4/16; 4/17; 4/19; 4/21; 4/24; 4/25 | $350.00 |
| 409350 | 1940 Lexington Ave., UPACA 6 | 3/27; 4/3; 4/11; | $75.00 |
| 409338 | 1945 Amsterdam Ave., Bethune | 3/27; 3/28; 4/1; 4/2; 4/4; 4/5; 4/6; 4/10; 4/12; 4/13; 4/14; 4/15; 4/16; 4/17; 4/19; 4/20; 4/21; 4/24; | $300.00 |
| 409340 | 1970 Amsterdam Ave., Marshall | 3/27; 3/31; 4/2; 4/4; 4/5; 4/6; 4/8; 4/10; 4/12; 4/13; 4/14; 4/16; 4/17; 4/19; 4/20; 4/21; 4/24; | $475.00 |
| 516037 | 950 Union Ave., - Union | 3/26; 3/31; 4/1; 4/4; 4/5; 4/9; 4/10; 4/16; 4/17; 4/20 - 4/22; 4/23 - 4/26; 4/28; 4/29. | $450.00 |
| 516054 | 1325 Franklin Ave., - Claremont | 3/26; 3/31; 4/1; 4/2; 4/5; 4/7; 4/9; 4/10; 4/15; 4/16; 4/17; 4/19 - 4/22; 4/23; 4/25 - 4/29. | $525.00 |
| 516055 | 1150 Union Ave., Davidson | 3/26; 3/31; 4/1; 4/2; 4/6; 4/7; 4/9; 4/10; 4/14; 4/15 - 4/18; 4/20 - 4/22; 4/23 - 4/26; 4/28; 4/29. | $450.00 |
| 516040 | Randall Balcom 1 | 3/26; 3/27; 3/30 - 4/1; 4/2; 4/5; 4/8; 4/9; 4/13; 4/15; 4/17; 4/19 - 4/22; 4/25; 4/28 | $450.00 |
| 516041 | Randall Balcom 2 | 3/26; 3/27; 3/30 - 4/1; 4/2; 4/5; 4/8; 4/9; 4/10; 4/17; 4/19 - 4/22; 4/25 | $425.00 |
| 516042 | Randall Balcom 3 | 3/26; 3/27; 3/30 - 4/1; 4/2; 4/5; 4/6; 4/8; 4/9; 4/13; 4/17; 4/19 - 4/22; 4/23; 4/25 | $450.00 |
| | | | $17,275.00 |

# EXHIBIT  31



FUNK & BOLTON
ATTORNEYS AT LAW

A PROFESSIONAL ASSOCIATION
1717 ARCH STREET
46TH FLOOR
PHILADELPHIA, PENNSYLVANIA
19103-2713
PHONE: 215.568.4104
FAX: 215.568.4105
www.fblaw.com

Writers Direct Dial: 215-399-5775
cdunne@fblaw.com

DAVID M. FUNK (MD)
BRYAN D. BOLTON (MD, PA)
REN L. TUNDERMANN (MD)
CHARLES D. MACLEOD (MD)
GERALD I. H. STREET (DE)
TIFFANY HANNA ANDERSON (MD)
DARYN RUSH (PA, NJ)
DEREK B. YARMIS (MD, DC)
JEFFERSON L. BLOMQUIST (MD)
MICHAEL P. CUNNINGHAM (MD, DC)
LINDSEY A. RADER (MD)
CHERYL A. C. BROWN (MD)
JAMES F. TAYLOR (MD)
ERNEST A. CROFOOT (MD)
JOHN I. ELLIS (DE)

SENIOR COUNSEL
HISHAM M. AMIN (MD)

ASSOCIATES
AMY L. STRACHAN (PA, NJ)
REBECCA S. BESTTE (DE, MD)
MITCHELL W. MAY (VA, DE)
THOMAS KLEMM (MD, DC, PA)
TAMAL A. BANTON (MD)
DESIRÉE S. WILLIAMS (MD, IL, DC)
SEIGRID T. RICH (MD)
PATRICK W. THOMAS (MD)
NICOLE M. SANDUSKY (MD)

OF COUNSEL
STEPHEN P. CARNEY (MD)
AMANDA STAKEM CONN (MD)
CHRISTOPHER E. DUNNE (PA, NY, DC
GARY C. HARRIGER (MD)
DONNA B. IMHOFF (MD)
ELISSA D. LEVAN (MD)
ROBERT H. LEVAN (MD, DC, NY)
MARK A. MCNULTY (DE)
CHRISTOPHER W. POVERMAN (MD, DC
DEBORAH R. RIVKIN (MD)
KAREN P. RUFF (MD)
RONALD L. SOUDERS (PA, DC)
JOHN R. STIERHOFF (MD)

NEW YORK CITY HOUSING AUTHORITY
Attention: Patrick F. O'Hagan
Security Director
90 Church Street, 9th Floor
New York, NY 10007

August 16, 2007

*Via Federal Express*

Re: Agreement No. 4020633 by and between the New York City Housing Authority ("NYCHA") and Andrews International ("Andrews") (the "Agreement")

Dear Mr. O'Hagan:

As you know, this firm represents Andrews International, Inc. in a dispute with NYCHA over certain wrongful deductions from amounts owed by NYCHA to Andrews (which total $70,537.48), and $686,313.59 in unpaid invoices. Andrews has been in contact with you and your staff for months by e-mail, by telephone and by written correspondence to ask that you expedite payment and explain in detail any deductions, all to no avail. Your failure to process the Andrews' invoices in a timely fashion, and your failure to provide detail about the exact nature of any deductions, constitutes an egregious breach of your duty of good faith and fair dealing with Andrews and is actionable. This firm intends to file suit based on your breach of the Agreement and your failure to deal with Andrews in good faith.

Andrews fully complied with the provisions of the Agreement as it pertains to the Senior Citizen facilities, which were added to the Agreement on February 28, 2005. Although the NYCHA Agreement incorporated by reference the terms of the 2001 HPD Agreement (#2003-000618) and its Exhibit A which contained (at Section 11) supervisory inspection requirements for "HPD office Sites" and "building construction sites", the residential Senior Citizen Housing sites were not "office sites" or "building construction sites".

If NYCHA intended to treat the residential Senior Citizen Housing Developments as either office sites or as building construction sites, then the Agreement should have so specified. Indeed, it is patently unreasonable to suggest that residential Senior Citizen Housing Developments are either "office sites" or "construction sites".

Even the Amendment to Agreement No. 4020633 between NYCHA and Copstat Security L.L.C. extending the service period of the Agreement from February 28, 2007 through June 22, 2007, refers to the provision of services by Andrews at "various senior developments", not "office sites" or "building

construction sites". Thus, at best, NYCHA's agreement is ambiguous as to whether a residential senior center development is an "office site" or "building construction site" and any ambiguity must be construed against NYCHA.

Furthermore, Andrews was in close contact with Sean Ryan, the then-assistant Director for Security of NYCHA, about its responsibilities under the Agreement. At no time did Mr. Ryan, or his assistant, Ray Rodriguez, suggest that residential Senior Housing Developments require inspections with the same frequency or process as the office sites or building construction sites. Indeed, any issues pertaining to the scope of Andrews' duties under the Agreement were handled with directness, clarity and fairness by Mr. Ryan.

Given the number of years NYCHA worked under the Agreement without even the slightest suggestion that inspections were required at residential Senior Citizens Developments based on a schedule for inspection of "office sites" and "construction sites," it was incumbent upon NYCHA to notify Andrews of this purported change in the contract requirements. NYCHA never provided any such written notice up through and including the termination of the Agreement in June 2007.

Andrews' invoices for services were paid on the average of 45 days after submission from NYCHA from the date services were first performed at the Senior Centers in 2007, until March of 2007 when NYCHA stopped processing the invoices on a timely basis. Again, between July 1, 2005 and March of 2007, Andrews had a very good working relationship with NYCHA.

When NYCHA stopped paying the Andrews invoices in March 2007, Lenny Kestecher, Vice President, East Coast Business Development, and Michael Topf, Chief Financial Officer, wrote to you and your staff, requesting expeditious payment of invoices, many of which at that time were significantly past due. On March 23, 2007, you wrote to Mr. Topf and stated that the problem is a little more complex than what was presented to you, and that you were going to meet with "Finance and Budget on Tuesday to clear the issue". You concluded by stating "I'll keep you posted and apologize for the delay". Months later, when NYCHA finally paid some of the invoices, substantial deductions were taken by NYCHA.

During a meeting in April with Messers Wood, Topf and Dorton, you stated, without any authority or documentation, that Andrews failed to perform under the Agreement and asked Andrews to suggest an appropriate credit. In a follow up e-mail to Mr. Topf, dated May 9, 2007, you said "Additionally, I have not received your proposal on crediting NYCHA for services that were not performed, as I mentioned in our meeting on April 26". Only after Andrews declined to offer a credit to did you begin deducting from the Andrews invoices, because Andrews did not, and does not, believe that it breached the Agreement and NYCHA has failed to provide detailed substantiation for its claim to the contrary,. NYCHA did not make another payment to Andrews until June, 2007 and it withheld substantial sums from that payment.

Your letter to Mike Topf, dated July 16, 2007, states that liquidated damages were applied to each invoice and that "In most cases the failure to provide required security site inspections, which per our agreement allows NYCHA to apply a $25.00 per un-inspected shift penalty, account for the difference

---

between invoiced totals and totals paid to Andrews International" (emphasis added). Andrews disagrees; the party in breach of the Agreement is NYCHA, not Andrews.

Andrews has been a provider of services to NYCHA and HPD for many years. Recently, the Andrews Agreement with HPD was extended for another year. Andrews has a long history of providing excellent service to NYCHA and HPD and has worked diligently to maintain a good working relationship based upon fairness and honesty. Currently, there is an outstanding balance of $686,313.59 due Andrews, exclusive of wrongfully withheld penalties in the amount of 76,262.11; some of the overdue invoices date back to November of 2006. If Andrews does not receive payment by August 29, 2007, of all amounts due Andrews, which now total $756,575.70, it will file suit against NYCHA for breach of the Agreement and for NYCHA's and your continued failure to deal in good faith with Andrews.

Yours truly,

Christopher E. Dunne

CED/dms

Enclosures

cc: Deputy General Counsel for Corporate Matters (via regular mail)
Tino Hernandez (via Federal Express)
Ms. Natalie Rivers (via regular mail)
Marguerite Ohmstedt, Esquire (by e-mail)
Comptroller of the City of New York (via regular mail)
Corporation Counsel of the City of New York (via regular mail)
Hon. Patricia E. Harris, First Deputy Mayor (via Federal Express)
Hon. Carol A. Robles-Roman, Deputy Mayor for Legal Affairs, and Counsel to the Mayor (via Federal Express)



| Payment Date | Billed Amount | Amount Paid | Unpaid Balance |
|---|---|---|---|
| ACH 06-20-07 | 138,070.59 | 121,819.33 | 16,251.26 |
| ACH 06-22-07 | 403,339.93 | 355,464.91 | 47,875.02 |
| ACH 06-29-07 | 10,229.28 | 9,229.28 | 1,000.00 |
| ACH 07-13-07 | 3,364.72 | 2,914.72 | 450.00 |
| ACH 08-01-07 | 116,986.11 | 110,575.30 | 6,410.81 |
| ACH 08-03-07 | 53,126.48 | 48,851.46 | 4,275.02 |
| ACH 09-25-07 | 498,144.87 | 462,210.40 | 35,934.47 |
| ACH 10-03-07 | 120,598.98 | 120,598.98 | 0.00 |
| ACH 10-05-07 | 407.84 | 407.84 | 0.00 |
| ACH 10-24-07 | 34,376.76 | 34,376.86 | 0.00 |
| **Grand Total** | **1,378,645.56** | **1,266,449.08** | **112,196.58** |