UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
------------------------------------------------------------------X

ANDREWS INTERNATIONAL, INC.

          Plaintiff,

-against-

NEW YORK CITY HOUSING AUTHORITY,

          Defendant.
------------------------------------------------------------------X

ECF Case

Civil Action No. 08-cv-1580 (HB)

Statement of Undisputed Material Facts In Support of Motion for Summary Judgment Filed By Andrews International, Inc.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Andrews International, Inc. ("Andrews") submits the following statement of undisputed material facts in support of its motion for summary judgment.

1. Beginning in November 2001, Copstat Security, Inc. ("Copstat"), Andrews's predecessor-in-interest,[1] contracted with the New York City Housing Authority ("NYCHA") to provide security services. (*See* Copstat's Initial Contract with NYCHA, attached as Exhibit 1; Declaration of James Wood (Aug. 6, 2008) ¶ 5, attached as Exhibit 2.)

2. This initial contract called for Copstat to provide security services at three "Central Office Locations:" 90 Church Street, 250 Broadway, and the "L.I.C. Facility." The initial contract further required Copstat to provide an "adequate number of supervisory personnel to monitor the performance of Guards assigned to each Central Office Location." (*See* Ex. 1 at ¶ 5.5.)

3. In accordance with the terms of the initial contract, NYCHA extended the contract through November 7, 2003. (*See* Contract Amendment (Nov. 7, 2003), attached as Exhibit 3.)

---

[1] Copstat merged into Andrews in March 2006.

4. Effective November 7, 2003, the initial contract was formally amended to extend the contract term through November 7, 2004. (*See* Ex. 3 at ¶ 1.)

5. On November 1, 2004, Laurence Redican, Assistant General Counsel, NYCHA Law Department, wrote an email to Sean Ryan, the Security Director at NYCHA at that time, providing a "Copstat Piggyback Agreement for review (based on HPD agreement)." (*See* Redican's Email (Nov. 1, 2004), attached as Exhibit 4.) Although Mr. Redican reported on the "major changes" he had discussed with Mr. Ryan from the prior Copstat agreement, he made no mention of any change in the supervisory requirements. (*See id.*)

6. On November 3, 2004, Mr. Ryan forwarded Mr. Redican's email, including the draft Copstat agreement, to Tom Murray at Copstat. (*See id.*) Mr. Ryan did not mention any additional "major changes" to Copstat. (*See* Deposition of Sean Ryan (July 25, 2008) 16:10-18:18, attached as Exhibit 5.)

7. On February 28, 2005, NYCHA and Copstat executed agreement number 4020633 (the "NYCHA Contract") whereby Copstat agreed to provide "Services" to NYCHA. (*See* NYCHA Contract, attached as Exhibit 6; s*ee also* Deposition of Patrick O'Hagan (June 10, 2008 and July 25, 2008) 16:13-18:19, attached as Exhibit 7.)[2]

8. The NYCHA Contract was drafted by NYCHA. (*See* Am. Compl. ¶ 6; Ans. to Am. Compl. ¶ 6.)

9. The NYCHA Contract term was two years, beginning on March 1, 2005, and ending on February 28, 2007. (*See* NYCHA Contract ¶ 2.1.)

10. The NYCHA Contract confirmed that the written agreement represented the entire agreement between the parties and prohibited any modification not in writing and signed by an authorized representative of each party. (*See* NYCHA Contract ¶ 1.1.)

---

[2] Mr. O'Hagan was the corporate designee for purposes of NYCHA's deposition. (*See* O'Hagan Dep. 8:7-9.)

11. The NYCHA Contract was signed by Robert Podmore, Deputy General Manager, of NYCHA, on behalf of NYCHA. (*See* NYCHA Contract p. 13.)

12. The NYCHA Contract incorporated by reference an agreement between Copstat and the New York City Department of Housing Preservation and Development (the "HPD Contract"), which was attached to the NYCHA Contract as Exhibit 1. (*See* NYCHA Contract ¶ 1.2.1.) The NYCHA Contract adopted various provisions of the HPD Contract because NYCHA's procurement guidelines permitted NYCHA to "piggyback" on an existing agreement with another city agency in order to streamline the procurement process. (*See* Ryan Dep. 12:12-13:5.) Indeed, Mr. Ryan could not recall any changes in the function of the NYCHA Contract from the prior contracts, although he was certain the locations and hours were different from the HPD Contract. (*See* Ryan Dep. 13:6-25.) There is no evidence that Copstat made any changes to the NYCHA Contract as drafted by NYCHA. (*See* Ryan Dep. 18:9-18.)

13. The NYCHA Contract incorporated by reference a list of purported NYCHA field office locations referenced as Exhibit 2. (*See* NYCHA Contract ¶ 1.2.2.) The second page of Exhibit 2 is entitled "Copstat Security Site Listing," which sets forth the locations where Copstat was to provide security services under the NYCHA Contract. (*See* NYCHA Contract, Exhibit 2, p. 2.) Under the heading "Copstat Security Site Listing," the locations are further broken down between "Lobby Monitoring Sites" and "Security Guard Services Sites." (*See id.*) All the "Lobby Monitoring Sites" were located in senior developments, meaning residences used exclusively for seniors. (*See* O'Hagan Dep. 48:6-49:9; *see also* Ryan Dep. 21:18-22:25.) The "Security Guard Services Sites" were located in senior developments that were in the process of being depopulated because the buildings were set for demolition. (*See id.*) Exhibit 2 to the NYCHA Contract also identified the specific shifts covered by the NYCHA Contract. (*See*

NYCHA Contract, Exhibit 2, p. 2.) Exhibit 2 further specified the number of guards per shift at each location. (*See id.*)

14. NYCHA's satellite offices are located at One Fordham Plaza, 55 West 125th Street, 5555 Junction Boulevard, 350 Livingston Street, and 120 Stuyvesant Place. (*See* O'Hagan Dep. 47:7-48:5.) NYCHA's satellite offices are not listed on Exhibit 2 to the NYCHA Contract under either "Lobby Monitoring Sites" or "Security Guard Services Sites." (*See* O'Hagan Dep. 46:13-47:6.)

15. NYCHA's central office locations are located at 250 Broadway, 90 Church Street, and Long Island City. (O'Hagan Dep. 22:7-13.) NYCHA's central office locations are not listed on Exhibit 2 to the NYCHA Contract under either "Lobby Monitoring Sites" or "Security Guard Services Sites." (*See* NYCHA Contract, Exhibit 2, p. 2.)

16. The NYCHA Contract provided that the terms "NYCHA" or "the Authority" shall substitute for all references to "City," "HPD," and "Agency Chief Contracting Officer" found in the HPD Contract. (*See* NYCHA Contract ¶ 1.4.)

17. The Scope of Services provision in the NYCHA Contract states that "[t]he Scope of Services shall be performed in accordance with Exhibit A to the [HPD Contract] except as modified herein." (*See* NYCHA Contract ¶ 4.1.)

18. The Scope of Services, Exhibit A to the HPD Contract, was modified by Addendum #2, which became part of the NYCHA Contract. (*See* Addendum #2 (Mar. 27, 2002), attached as Exhibit 8;[3] NYCHA Contract, Exhibit 1, p. 3; O'Hagan Dep. 17:7-18:19.)

19. Although the NYCHA Contract modified certain aspects of the Scope of Services provision in Exhibit A to the HPD Contract, and redefined some of the terms defined in the HPD

---

[3] Addendum #2 is also attached to the NYCHA Contract.

Contract, NYCHA did not modify or redefine the "NYCHA sites" or "NYCHA Office Sites," identified in Addendum #2. (*See* NYCHA Contract ¶¶ 1.4-1.6; *see also* Addendum #2.)

20. Addendum #2 to the HPD Contract also modified the Scope of Services in Exhibit A to the HPD Contract by deleting subparagraph (b) from paragraph 11, which referred to inspections of the 8 a.m. to 4 p.m. shift, and amended subparagraph (a) by adding the word "day" between "working shifts." (*See* Addendum #2.) As amended, therefore, subparagraph 11(a) of the Scope of Services to the NYCHA Contract provided: "Guards working day shifts at NYCHA office sites shall be inspected once per shift." Subparagraph 11(b) was deleted from the NYCHA Contract entirely. (*See id.*)

21. Based on the change in subparagraph 11(a), the deletion of subparagraph 11(b), as well as the inclusion of different inspection obligations for the remaining two shifts, 4 p.m. to midnight, and midnight to 8 a.m., the "day" shift under the HPD Contract was 8 a.m. to 4 p.m. (*Id.*)

22. The NYCHA Contract never defined "day" shift differently than as originally defined in the HPD Contract.

23. Exhibit 2 of the NYCHA Contract, according to the page entitled "Copstat Security Site Listing," did not require any Copstat security guards to work the 8 a.m. to 4 p.m. day shift. (*See* NYCHA Contract, Exhibit 2, p. 2.)

24. Effective March 1, 2005, Copstat, and later, its successor-in-interest, Andrews, began providing Services to NYCHA under the NYCHA Contract. (Wood Decl. ¶ 7.)

25. On October 13, 2005, Mr. Ryan requested two guards for a new site at Prospect Plaza at the same level and bill/wage rates "currently utilize[d] at all NYCHA field locations." (*See* Ryan's Email (Oct. 13, 2005), attached as Exhibit 9.) Mr. Ryan explained that NYCHA

5

specifically elected "not to use any supervisory-level guards at prospect Plaza at this point." (*See id.*)

26. The NYCHA Contract was never amended in writing signed by both parties specifying that Copstat would provide any security services at Prospect Plaza. (*See* O'Hagan Dep. 49:19-50:14.) Thus, any security services provided at the Prospect Plaza site are not governed by the NYCHA Contract.

27. Between March 2005 and December 31, 2006, Copstat regularly invoiced NYCHA for security services and remittances were received from NYCHA on a regular basis. Between March 1, 2005, and December 31, 2006, NYCHA never indicated that it was making a deduction from a Copstat or Andrews invoice based on an alleged failure to perform supervisory obligations under the NYCHA Contract. (*See* Declaration of Michael Topf (Aug. 6, 2008) ¶ 6, attached as Exhibit 10.) Andrews does not contend that NYCHA owes money for services rendered on or before December 31, 2006.

28. During Sean Ryan's tenure as Security Director at NYCHA, Copstat provided the same shift supervisory services to NYCHA that were provided after Patrick O'Hagan took over for NYCHA. (Wood Decl. ¶ 8.) According to Mr. Ryan, he never provided any written notice or email notice to Andrews that its supervisory performance was deficient in any way. (*See* Ryan Dep. 15:7-23.) Indeed, Mr. Ryan was satisfied with Andrews's performance under the NYCHA Contract during his tenure. (*See* Ryan Dep. 19:16-21.)

29. Mr. Ryan was the person designated to receive notices under the NYCHA Contract. (*See* NYCHA Contract ¶ 14.1.) Mr. Ryan testified it was not his understanding that Andrews was required to provide supervisory visits once per shift for all locations listed in the NYCHA Contract. (*See* Ryan Dep. 19:22-20:15.) Indeed, according to Mr. Ryan, if he had

expected Andrews to conduct one supervisory visit per shift and Andrews had failed to do so, then he would have acted on that. (*See* Ryan Dep. 15:7-23, 20:7-15.) Mr. Ryan testified he could not recall any instance where he advised Andrews or Copstat of any contractually deficient performance under the NYCHA Contract. (*See* Ryan Dep. 24:12-25.)

30.    According to Mr. Ryan, another reason he did not believe Andrews was required to conduct supervisory inspections on every shift was because of the large number of sites covered by the NYCHA Contract. (*See* Ryan Dep. 20:7-15.) Mr. Wood similarly explained inspecting guards on every shift at every NYCHA senior development was a physical impossibility because the senior developments were so spread out. (*See* Deposition of James Wood (July 25, 2008) 17:4-22, attached as Exhibit 11.) Mr. Wood further explained that NYCHA, for example, did not provide lavatory facilities at the senior development sites so the supervisors had to cover for the guards while they walked a "couple of blocks to go to the bathroom." (Wood Dep. 17:12-22.) Indeed, if anyone had told Mr. Wood the NYCHA Contract required one supervisory visit per shift, then he would not have taken the NYCHA Contract. (*See* Wood Dep. 18:2-6.)

31.    On September 6, 2006, Mr. O'Hagan became Security Director for NYCHA. (*See* O'Hagan Dep. 10:17-11:5.) Prior to joining NYCHA, Mr. O'Hagan was a regional manager for Guardsmark, Incorporated, in charge of the greater New York and New Jersey areas. (*See* O'Hagan Dep. 11:13-12:21.) Guardsmark was then and is now a competitor of Copstat. (Wood Decl. ¶ 4.)

32.    A few weeks after joining NYCHA, Forhad Razzaque, chief sales executive and chief operating officer of Veritas Vox contacted Mr. O'Hagan about setting up a meeting. (*See* Email from Razzaque to O'Hagan (Sept. 25, 2006), attached as Exhibit 12; O'Hagan Dep.

7

112:13-113:11; 116:4-13.) Mr. O'Hagan was acquainted with Mr. Razzaque because they had worked together at Guardsmark. (*See* O'Hagan Dep. 113:15-20.) Mr. O'Hagan had informed Mr. Razzaque about his new position at NYCHA. (*See* O'Hagan Dep. 113:21-114:14.)

33. Although Mr. O'Hagan could not remember the exact date of his meeting with Mr. Razzaque, Mr. Razzaque wrote an email to Mr. O'Hagan confirming a meeting at 2:30 p.m. on October 20, 2006. (*See* Email from Razzaque to O'Hagan (Oct. 20, 2006), attached as Exhibit 13.)

34. On October 23, 2006, Mr. O'Hagan received a letter from Anthony Picciano at Veritas Vox setting forth a proposal for auditing Copstat. (*See* Letter from Picciano to O'Hagan (Oct. 23, 2006), attached as Exhibit 14; O'Hagan Dep. 117:11-21.) Mr. Picciano was another colleague of Mr. O'Hagan's from his tenure at Guardsmark. (*See* O'Hagan Dep. 15:18-16:4.)

35. Mr. O'Hagan claims he gave Veritas Vox a copy of the NYCHA Contract for purposes of conducting the audit. (O'Hagan Dep. 128:22-129:17.)

36. On November 15, 2006, Andrews notified Ray Rodriguez at NYCHA of the merger between Andrews and Copstat. (*See* Letter from James Wood (Nov. 15, 2006), attached as Exhibit 15.) Mr. Rodriguez is a security manager at NYCHA. (*See* O'Hagan Dep. 23:13-20.)

37. On or about February 1, 2007, Mr. O'Hagan received a written report from Veritas Vox. (*See* Veritas Vox Report, attached as Exhibit 16; O'Hagan Dep. 127:22-25.)

38. Although Mr. O'Hagan had been in the position of Security Director at NYCHA for five months by February 1, 2007, he still had not bothered to introduce himself to anyone at Andrews, send a letter or email to anyone at Andrews, or let Andrews know he was the new Security Director. (*See* O'Hagan Dep. 128:2-10; Ans. to Am. Compl. ¶ 12.)

39. Andrews has no record of ever receiving the Veritas Vox report until after this lawsuit was filed. (*See* Wood Decl. ¶ 10.)

40. The auditors at Veritas Vox noted their "analysis of Exhibit A, Section 11 (Shift/Supervisory Functions) of the HPD contract revealed ambiguity regarding the inspection standards required of the security vendor." (*See* Veritas Vox Report at NYCHA-62508-0099.) The auditors at Veritas Vox recommended that "the language be more clearly defined to provide the security vendor a singular, definitive performance standard." (*See id.* at NYCHA-62508-0108.)

41. Notably, the Veritas Vox report misstated the "minimum standard" contained in the NYCHA Contract as one inspection per shift. (*See id.* at NYCHA-62508-0099.) Pursuant to Addendum #2, the standard was one inspection per "day" shift, which was defined as an 8 a.m. to 4 p.m. shift. (*See* Addendum #2, attached as Exhibit 8.) Veritas Vox failed to mention in its report that none of the shifts required by the NYCHA Contract were "day" shifts and none of the shifts covered NYCHA "office sites."

42. The Veritas Vox report also misstated that subparagraph 11(b) of the NYCHA Contract remained a part of the contract. Pursuant to Addendum #2, subparagraph 11(b) was deleted. (*See* Addendum #2.)

43. The Veritas Vox report further misstated subparagraph 11(c) of the NYCHA Contract because that paragraph only applied to "NYCHA construction sites," which were never covered by the NYCHA Contract. (*See* HPD Contract, Exhibit A ¶ 11(c).)

44. The Veritas Vox report further failed to analyze whether the guards they audited were working shifts at the locations specified in subparagraphs 11(d) and 11(e).

9

45. On February 28, 2007, the NYCHA Contract ended. (*See* NYCHA Contract ¶ 2.1.)

46. Prior to expiration, NYCHA did not exercise its right to renew the NYCHA Contract. (*See* NYCHA Contract ¶ 3.1; O'Hagan Dep. 58:9-21.)

47. NYCHA did not advise Andrews to stop providing services to NYCHA. (Wood Decl. ¶ 11.) Given the lack of clear directions, Andrews continued providing security services to NYCHA's senior developments. (*See id.*)

48. On April 26, 2007, Mr. Wood and Mr. Topf went to a meeting at NYCHA with Mr. O'Hagan. (*See* Wood Dep. 13:20-14:21.) Mr. Wood thought the purpose of this meeting was to get acquainted with NYCHA's new Security Director, Mr. O'Hagan. (*Id.*) Mr. Wood had never met Mr. O'Hagan prior to April 26, 2007. (Wood Decl. ¶ 12.) Mr. O'Hagan had a very different purpose for meeting with Andrews, as he specifically planned to discuss NYCHA's delinquent payments and review the Veritas Vox report. (*See* O'Hagan Dep. 42:3-43:4.)

49. At this meeting, Mr. O'Hagan revealed the existence of the Veritas Vox report to Andrews. (*See* Wood Dep. 14:10-19; O'Hagan Dep. 38:2-9.) Mr. O'Hagan told Mr. Wood that the Veritas Vox report demonstrated there was "no supervision in the field" and that Andrews needed to "offer [him a] credit." (*See* O'Hagan Dep. 42:3-43:4; Email from O'Hagan to Topf (May 9, 2007), attached as Exhibit 17.)

50. Prior to April 26, 2007, no one from Andrews was aware that Veritas Vox had published a written report. (*See* O'Hagan Dep. 38:6-9, 41:16-42:2.) Moreover, between January 1, 2007, and April 26, 2007, NYCHA had not paid Andrews for any of the services rendered on behalf of NYCHA. (Topf Decl. ¶ 7.)

51.  As of May 7, 2007, Mr. O'Hagan planned to replace Andrews. (*See* O'Hagan Dep. 157:24-158:2.) On May 10, 2007, Mr. O'Hagan met with Mr. Kestecher from Andrews. (*See* Deposition of Leonard Kestecher (July 25, 2008) 22:10-15, attached as Exhibit 18.) At the meeting, Mr. Kestecher pointed out to Mr. O'Hagan that the services Andrews performed for NYCHA were for residential facilities, but the HPD Contract never spoke to residential developments or supervisory inspections at residential developments. (*See* Kestecher Dep. 37:5-38:6.) Mr. O'Hagan became upset and yelled out, "That's all legalese and if you're going to start with me now, I'll end this meeting." (*See id.*)

52.  On or about May 18, 2007, Mr. Kestecher, James Wood, and other management representatives from Andrews met again with Mr. O'Hagan. (*See* Kestecher Dep. 56:5-24; O'Hagan Dep. 43:12-16.) Mr. Kestecher recalls Mr. O'Hagan talking about wanting a credit from Andrews. (*See* Kestecher Dep. 56:5-57:23; Wood Dep. 22:23-23:25.) Mr. O'Hagan claims he informed Andrews at this meeting that NYCHA was "going to apply liquidated damages" due to the "lack of supervision" at NYCHA's "field locations, which are the senior developments." (*See* O'Hagan Dep. 43:5-16.) Mr. Wood asked Mr. O'Hagan what he was looking for, and Mr. O'Hagan said he was not sure. (*See* Wood Dep. 22:23-23:25; Kestecher Dep. 57:6-17.) No documentation or details about the missed supervisory inspections or amount of liquidated damages claimed by NYCHA was provided to Mr. Wood at this meeting. (Wood Decl. ¶ 14.)

53.  At the time of his May 2007 meeting with Mr. Wood, Mr. O'Hagan had not approved any of the 2007 invoices submitted by Andrews. (*See* O'Hagan Dep. 52:6-9.)

54.  On May 21, 2007, Mr. O'Hagan wrote to Mr. Wood informing him that NYCHA "elected not to renew the Agreement with your firm and is hereby terminating for convenience the Agreement for security services at various NYCHA field locations" effective June 22, 2007.

(*See* O'Hagan's Letter (May 21, 2007), attached as Exhibit 19.) Notably, the NYCHA Contract only permitted termination for convenience prior to February 28, 2007. (*See* NYCHA Contract ¶¶ 2.1-3.1.)

55.   On May 24, 2007, Mr. O'Hagan requested that Andrews execute an Amendment to Agreement No. 4020633 (the "Amendment") in order "to facilitate payment of the outstanding invoices." (*See* O'Hagan's Emails (May 24-30, 2007), attached as Exhibit 20; O'Hagan Dep. 137:10-138:6.)

56.   The Amendment was drafted by NYCHA. (*See* Am. Compl. ¶ 14; Ans. to Am. Compl. ¶ 14.) NYCHA's Amendment did not add any locations or shifts to those set forth in the NYCHA Contract.

57.   In response to a request by Mr. Kestecher, Mr. O'Hagan refused to clarify the issue of supervisory inspections, stating that "the sole purpose [of the Amendment] is to authorize payment for services rendered ... [and] the language in the City contract is clear on the requirements of the vendor and remained in the contract that NYCHA negotiated with [Andrews]." (*See* O'Hagan Emails (May 24-30, 2007) at NYCHA-0080.)

58.   Mr. Wood executed the Amendment on behalf of Andrews. (*See* Amendment, attached as Exhibit 21.)

59.   The Amendment modified the original term of the NYCHA Contract. Under the Amendment, the NYCHA Contract commenced March 1, 2005, and ended June 22, 2007. (*See* Amendment ¶ 2.)

60.   The Amendment provided that "capitalized terms used in this Amendment have the meanings set forth in the Agreement, unless otherwise specified in this Amendment." (*See* Amendment p. 3.)

61. The Amendment further modified the NYCHA Contract by defining "Services" to mean "security services at various senior developments." (*See* Amendment p. 2.) According to NYCHA, all the facilities listed on Exhibit 2 to the NYCHA Contract were "senior developments." (*See* O'Hagan Dep. 48:6-49:9.)

62. According to the Amendment, Andrews began performing the "Services" effective January 1, 2007. (*See* Amendment ¶ 1.)

63. On June 4, 2007, the Amendment, signed by Natalie Rivers, NYCHA's Deputy General Manager, was mailed to Andrews with a copy to Mr. O'Hagan. (*See* Amendment p. 1.)

64. As of June 4, 2007, Mr. O'Hagan had failed to provide any written or email notice to Andrews stating either that Andrews had failed to adhere to any NYCHA Contract standard or what specific standard Andrews allegedly violated. (*See* O'Hagan Dep. 78:2-79:20.)

65. As of June 4, 2007, Mr. O'Hagan had not approved payment of any 2007 invoices for Services. (*See* O'Hagan Dep. 72:4-11.)

66. On June 4 and 5, 2007, Mr. Kestecher of Andrews emailed Mr. O'Hagan inquiring about the outstanding payments due to Andrews. Mr. O'Hagan responded that January invoices left his office on June 4, the same day the Amendment was mailed back to Andrews, February and March invoices are expected to be in accounts payable by June 6, and April invoices are expected to be in accounts payable by June 7. (*See* Kestecher and O'Hagan Emails (June 4-5, 2007), attached as Exhibit 22.) Mr. O'Hagan made no mention of any liquidated damages in his email to Mr. Kestecher. (*See id.*)

67. On June 12, 2007, Mr. Kestecher again emailed Mr. O'Hagan regarding the outstanding invoices that remained unpaid. Mr. O'Hagan claimed the invoices had been

processed by his office and he would check on their progress. (*See* Kestecher and O'Hagan Emails (June 12-13, 2007), attached as Exhibit 23.)

68.  On June 15, 2007, Mr. O'Hagan admitted Andrews's invoices had not been processed. (*See* Kestecher and O'Hagan Emails (June 15, 2007), attached as Exhibit 24.)

69.  On June 20, 2007, two days before the NYCHA Contract per the Amendment ended, NYCHA remitted its first 2007 payment to Andrews in the amount of $121,819.33. Although NYCHA deducted $16,251.26 from the invoices, NYCHA provided no written explanation for the deduction. (Topf Decl. ¶ 10.)

70.  On June 22, 2007, the NYCHA Contract, as modified by the Amendment, expired. (*See* Amendment ¶ 2.)

71.  On that same day, NYCHA remitted another payment to Andrews in the amount of $355,464.91. Although NYCHA deducted $47,875.02 from the invoiced amount, NYCHA once again failed to provide any written explanation for the deduction. (Topf Decl. ¶ 11.)

72.  On June 29, 2007, Mr. Topf wrote to Mr. O'Hagan, informing NYCHA of a $64,126.68 balance due on invoices submitted to NYCHA over the past several months and requesting either immediate remittance or a detailed written explanation of the reason for the withholdings. (*See* Topf Letter (June 29, 2007), attached as Exhibit 25.)

73.  On June 29, 2007, NYCHA remitted another payment to Andrews in the amount of $9,229.28, deducting $1,000.00 from the invoices, but again providing no written or email explanation for the deduction. (Topf Decl. ¶ 13.)

74.  On July 13, 2007, NYCHA remitted another payment to Andrews in the amount of $2,914.72, deducting $450.00 from the invoices, but again providing no written or email explanation for the deduction. (Topf Decl. ¶ 14.)

75. On July 16, 2007, almost a month after Andrews was no longer performing the Services, Mr. O'Hagan finally wrote to Andrews and explained that NYCHA was seeking to impose liquidated damages to the invoices of "$25.00 per un-inspected shift penalty." (*See* O'Hagan Letter (July 16, 2007), attached as Exhibit 26.) The July 16, 2007 letter was the first written notice provided to Andrews informing it of its alleged failure to perform supervisory duties under the NYCHA Contract and NYCHA's decision to apply liquidated damages. (Wood Decl. ¶ 17.)

76. On July 20, 2007, Christopher Dunne, attorney for Andrews, wrote to Mr. O'Hagan, informing him of Andrews's disagreement with the assessment of liquidated damages and requesting an accounting of the alleged uninspected shifts by July 25, 2007. (*See* Dunne's Letter (July 20, 2007), attached as Exhibit 27.)

77. On July 30, 2007, Mr. Dunne wrote to Mr. Ryan, informing NYCHA that, under Article 10 of the NYCHA Contract, a dispute has arisen. Mr. Dunne noted that NYCHA provided no documentation for its allegations and requested the immediate remittance of the outstanding $64,126.68. (*See* Dunne's Letter (July 30, 2007), attached as Exhibit 28.)

78. On August 1, 2007, NYCHA remitted payment to Andrews in the amount of $110,575.30, deducting $6,410.81, but without providing any accompanying explanation for the deduction. (Topf Decl. ¶ 16.)

79. On August 2, 2007, Mr. Dunne again wrote to Mr. Ryan informing NYCHA that, under Article 10 of the NYCHA Contract, Andrews disputed the additional $6,410.81 in deductions. (*See* Dunne's Letter (Aug. 2, 2007), attached as Exhibit 29.)

80. On August 3, 2007, NYCHA remitted payment to Andrews in the amount of $48,851.46, deducting $4,275.02, but without providing any accompanying explanation for the deduction. (Topf Decl. ¶ 17.)

81. On August 6, 2007, Marguerite Ohmstedt, attorney for NYCHA, provided Andrews with a list of deductions taken from Andrews's 2007 invoices. (*See* Ohmstedt's Letter (Aug. 6, 2007), attached as Exhibit 30.) The list provided by Ms. Ohmstedt was prepared by Mr. O'Hagan's office. (*See* O'Hagan Dep. 83:13-85:6.) The list failed to identify any guards working day shifts (8 a.m. to 4 p.m.) and failed to identify any amendment to the NYCHA Contract altering the guard shifts specified in the NYCHA Contract. (*See* Ohmstedt Letter.)

82. On August 16, 2007, Mr. Dunne wrote to Mr. O'Hagan regarding $70,537.48 in wrongful deductions and $686,313.59 in unpaid invoices. Mr. Dunne explained that "HPD office sites" and "building construction sites" are not senior citizen housing sites. Mr. Dunne also noted the lack of any dispute concerning supervisory shift inspections during Sean Ryan's tenure at NYCHA. Mr. Dunne, on behalf of Andrews, informed NYCHA that if it does not receive the outstanding invoices and wrongful deductions it will file suit. (*See* Dunne's Letter (Aug. 16, 2007), attached as Exhibit 31.)

83. On September 25, 2007, NYCHA remitted payment to Andrews in the amount of $462,210.40, deducting $35,934.47, but without providing any accompanying explanation for the deduction. (Topf Decl. ¶ 18.)

84. NYCHA's designee, Mr. O'Hagan, testified that he relied on subparagraph 11(a) of the NYCHA Contract, Exhibit 1 (HPD Contract at Exhibit A), "Scope of Services." (*See* O'Hagan Dep. 83:8-12; *see also* HPD Contract, Exhibit A ¶ 11, attached as Exhibit 6.)

Mr. O'Hagan further testified NYCHA was not relying on any other contract provision for the "required security site inspections." (*See id.*)

85. The deductions taken by NYCHA as liquidated damages total $112,196.58. (Topf Decl. ¶ 19.)

86. NYCHA has refused to remit payment on this outstanding balance. (Topf Decl. ¶ 20.)

Respectfully submitted,

/s/
---
Christopher E. Dunne (CD9472)
325 Chestnut Street, Suite 403
Philadelphia, Pennsylvania 19106
Telephone: (215) 625-2995
cdunne@cedunne.us

Bryan D. Bolton, Admitted *Pro Hac Vice*
Funk & Bolton, P.A.
36 South Charles Street, 12th Floor
Baltimore, Maryland 21201
Telephone: (410) 659-7754
bbolton@fblaw.com

*Attorneys for Plaintiff,*
*Andrews International, Inc.*

Dated: August 8, 2008

31002.006:116236v3

# EXHIBITS TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY ANDREWS INTERNATIONAL, INC.

1. November 8, 2001 Agreement between NYCHA and Copstat
2. Declaration of James Wood (August 6, 2008)
3. November 7, 2003 Amendment to Agreement between NYCHA and Copstat
4. November 2004 Emails regarding Copstat Piggyback Agreement
5. Excerpts from Deposition of Sean Ryan (July 25, 2008)
6. Agreement # 4020633 between NYCHA and Copstat
7. Excerpts from Deposition of NYCHA (Designee Patrick O'Hagan) (June 10, 2008 and July 25, 2008)
8. Addendum #2 to HPD Contract
9. October 2005 Emails between Lenny Kestecher and Sean Ryan
10. Declaration of Michael Topf (Aug. 6, 2008)
11. Excerpts from Deposition of James Wood (July 25, 2008)
12. September 25, 2006 Email from Forhad Razzaque to Patrick O'Hagan
13. October 20, 2006 Email from Forhad Razzaque to Patrick O'Hagan
14. October 23, 2006 Letter from Anthony Picciano to Patrick O'Hagan
15. November 15, 2006 Letter from James Wood to Ray Rodriguez
16. Audit Report for NYCHA by Veritas Vox, Inc.
17. May 7-9, 2007 Emails between Mike Topf and Patrick O'Hagan
18. Excerpts from Deposition of Leonard Kestecher (July 25, 2008)
19. May 21, 2007 Letter from Patrick O'Hagan to James Wood
20. May 24-30, 2007 Emails between Patrick O'Hagan and Leonard Kestecher
21. Amendment to Agreement # 4020633 between NYCHA and Copstat
22. June 4-5, 2007 Emails between Leonard Kestecher and Patrick O'Hagan
23. June 12-13, 2007 Emails between Leonard Kestecher and Patrick O'Hagan
24. June 15, 2007 Emails between Patrick O'Hagan and Leonard Kestecher
25. June 29, 2007 Letter from Michael Topf to Patrick O'Hagan
26. July 16, 2007 Letter from Patrick O'Hagan to Michael Topf
27. July 20, 2007 Letter from Christopher Dunne to Patrick O'Hagan

28. July 30, 2007 Letter from Christopher Dunne to Sean Ryan
29. August 2, 2007 Letter from Christopher Dunne to Sean Ryan
30. August 6, 2007 Letter from Marguerite Ohmstedt to Christopher Dunne
31. August 16, 2007 Letter from Christopher Dunne to Patrick O'Hagan